

VOLUME I - 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10374WGY

NORTH AMERICAN SPECIALTY
INSURANCE COMPANY
        Plaintiff,

vs.

MARY & JOSEPHINE CORP. and
MATTEO RUSSO,
        Defendants.

DEPOSITION OF ROBERT McVEY, a witness
called on behalf of the Defendant, Mary &
Josephine Corp., pursuant to the Federal Rules
of Civil Procedure before Jo Anne M. Shields,
Professional Shorthand Reporter and Notary
Public in and for the Commonwealth of
Massachusetts, at the Law Offices of Joseph G.
Abromovitz, P.C., 858 Washington Street,
Dedham, Massachusetts, on Wednesday, January 5,
2005, commencing at 10:00 a.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street
Boston, Massachusetts  02109
Telephone (617) 742-6900

---

APPEARANCES:

LEONARD W. LANGER, ESQUIRE
TOMPKINS, CLOUGH, HIRSHON & LANGER, P.A.
Three Canal Plaza
P.O. Box 5060
Portland, Maine  04112-5060
(207) 874-6700
for the Plaintiff

RICHARD H. PETTINGELL, ESQUIRE
77 North Washington Street, Second Floor
Boston, Massachusetts  02114
(617) 778-0890
for the Defendant, Mary & Josephine Corp.

JOSEPH G. ABROMOVITZ, ESQUIRE
THE LAW OFFICES OF JOSEPH G.
ABROMOVITZ, P.C.
858 Washington Street
Dedham, Massachusetts  02026
(781) 329-1080
for the Defendant, Matteo Russo

ALSO PRESENT:

William J. Scola

---

North American Specialty Insurance Company
vs. Mary & Josephine Corp. and Matteo Russo

I N D E X

Deposition of:                    Direct        Cross
ROBERT McVey

By Mr. Pettingell                   10

E X H I B I T S

No.                                               Page

1   Renotice of Deposition                         5

---

S T I P U L A T I O N S

It is stipulated by and between
counsel for the respective parties that the
deposition transcript is to be read and signed
by the deponent under the pains and penalties
of perjury; and that the sealing and filing
thereof are waived; and that all objections,
except as to form, and motions to strike are
reserved to the time of trial.

* * *

P R O C E E D I N G S

MR. PETTINGELL:  All right.  Good morning,
everybody.  We're here this morning on a
Rule 30(b)(6) deposition of North American
Insurance Company.  And, I guess, since today
is January 5th, we'll use the renotice of the
deposition dated January 5th for purposes of
what we're going to talk about.

And I understand, Mr. Langer, that you've
brought three people with you today to respond
to the various areas of inquiry.  So I wonder
if we could first mark a copy of the January
5th deposition notice as an exhibit.  I guess
that would be Exhibit 1.

Robert McVey
January 5, 2005

North American Specialty Insurance Company vs. Mary & Josephine Corp. and Matteo Russ...

---

**Page 6**

1  (Renotice of Deposition marked as McVey
2  Exhibit No. 1.)
3  MR. PETTINGELL: Okay. So referring to
4  Exhibit 1, I wonder if you could identify who
5  you've brought and who's going to be responsive
6  to which allega-- which paragraphs.
7  MR. LANGER: Present on behalf of as
8  designees for North American Specialty
9  Insurance Company are William Scola, Robert
10  McVey, and Lynanne Houde.
11  With regard to Paragraph 1 of the notice,
12  which asks for information regarding the
13  recitation in Paragraph 14 of the Complaint for
14  Declaratory Judgment, that, "On October 3rd,
15  2003, Defendant Russo, on behalf of Defendant
16  M&J, called OMIA and advised that the Fishing
17  Vessel MARY & JOSEPHINE had not been fishing
18  since May 2003," both Ms. Houde and Mr. McVey
19  will testify regarding conversations with Mr.
20  Russo.
21  Paragraph 2 of the notice asked that we
22  produce -- that NAS produce a witness regarding
23  the allegations in Paragraph 15 of the
24  Complaint for Declaratory Judgment, that,

---

1  "Defendant Russo specifically requested that
2  the Vessel be deemed to have had 'port risk'
3  coverage starting May 1, 2003 rather than full
4  operational coverage and stated that Defendants
5  did not want any crew protection and indemnity
6  coverage during the period that the Vessel was
7  not fishing." Mr. McVey will respond to that.
8  Paragraph 3 asks for a witness regarding
9  Paragraph 16 of the Complaint for Declaratory
10  Judgment, to wit, "OMIA immediately notified
11  NAS of Defendant's request and procured a
12  credit of $1,425.00 for the initial level of
13  P&I coverage and an additional credit of
14  $519.00 for the excess P&I coverage. Such
15  credit was provided for the P&I coverage for 3
16  1/2 crewman originally covered by the policy
17  during the policy year August 13, 2002 through
18  August 13, 2003." Ms. Houde will respond to
19  that.
20  Paragraph 14 -- excuse me -- 4 asks that
21  NAS produce a witness to testify regarding the
22  allegations in Paragraph 17 of the Complaint
23  for Declaratory Judgment, to wit, "It was
24  understood and agreed by the parties that NAS

---

**Page 5**

1  would continue to provide port risk only
2  coverage with no coverage for any crewmen until
3  Defendants advised Vessel had returned to
4  active fishing, at which point Plaintiff would
5  reinstate full operational coverage.
6  "Additional credits would accrue to M&J
7  during this period of port risk coverage, which
8  credits would be applied either upon the
9  Vessel's return to full operational coverage or
10  the end of the policy year on August 13th,
11  2004, whichever occurred first." That would be
12  both Mr. McVey and Ms. Houde.
13  Paragraph 5 asked that NAS provide a
14  witness regarding allegations in Paragraph 18
15  of the Complaint for Declaratory Judgment, to
16  wit, "On October 3, 2003 and again on November
17  21, 2003, OMIA informed Defendants in writing
18  that the Vessel was covered by port risk
19  coverage only and that when the Vessel returned
20  to full fishing operations, notice should be
21  provided to OMIA so that policy could be
22  amended appropriately." Ms. Houde will respond
23  to those issues.
24  And, finally, Paragraph 6, "What is meant

---

1  by 'port risk coverage' as same was intended by
2  either NAS or OMIA during calendar year 2003,"
3  Mr. Scola will respond to that.
4  MR. PETTINGELL: All right. Fine. Thank
5  you. I would propose that we start with
6  Mr. McVey, followed by Ms. Houde, and then
7  Mr. Scola. So with that, I would ask that -- I
8  would -- I -- I think we're going to have three
9  separate depositions.
10  I understand that it's a 30(b)(6) notice of
11  the insurance carrier. But, obviously, the
12  people you're producing also have individual
13  knowledge that is going to be binding on them
14  individually, as well as areas that are binding
15  on the company. So I -- I think we need three
16  different. --
17  MR. LANGER: I understand you're going to
18  swear each witness.
19  MR. PETTINGELL: Right.
20  MR. LANGER: But it is NAS that's been
21  noticed --
22  MR. PETTINGELL: I understand.
23  MR. LANGER: -- for this deposition. And
24  that's why we're here. I don't represent Ocean

January 5, 2005

9

```
 1        Marine Insurance Agency.  So I can't represent
 2   that this is a deposition of Mr. McVey or Ocean
 3   Marine Insurance Agency because they may want
 4   to retain their own counsel and do whatever
 5   they want to do.
 6        MR. PETTINGELL:  I understand.
 7        MR. LANGER:  So --
 8        MR. PETTINGELL:  What we're saying is,
 9   there's going to be three separate --
10        MR. LANGER:  There'll be three -- I
11   understand there'll be three --
12        MR. PETTINGELL:  -- witnesses deposed.
13        MR. LANGER:  -- three separate witnesses
14   appearing on behalf of NAS in response to the
15   notice of deposition.
16        MR. PETTINGELL:  Fine.
17        MR. ABROMOVITZ:  Let's go off the record
18   for one second.
19        (A brief discussion was held off the
20   record.)
21             ROBERT McVEY, a witness called
22   for examination by counsel for the Defendant,
23   Mary & Josephine Corp., his identity having
24   been stipulated to by all attorneys and duly
```

10

```
 1   sworn by the Notary Public, was examined and
 2   testified as follows:
 3                      * * *
 4                 DIRECT EXAMINATION
 5   BY MR. PETTINGELL:
 6        MR. PETTINGELL:  Off the record for a
 7   second.
 8        (A brief discussion was held off the
 9   record.)
10        MR. PETTINGELL:  I understand that
11   Mr. McVey does not have, with him, a photo ID.
12   However, he is known to us.  And I think all
13   parties are prepared to stipulate that Mr.
14   McVey is who he claims to be.  Is that agreed?
15        MR. ABROMOVITZ:  Sure.
16        MR. LANGER:  I -- I will stipulate that he
17   is Robert McVey.
18        MR. PETTINGELL:  All right.
19   Q.   Sir, could you please state your name?
20   A.   My name is Robert McVey.
21   Q.   And your business address?  Well, your home
22        address, if you --
23   A.   My home address is 140 Kettle Pond Drive.
24        That's in South Kingstown, Rhode Island 02879.
```

```
 1   Q.   And you understand, Mr. McVey, that you are
 2        here to testify as a designate of North
 3        American Insurance Company concerning certain
 4        areas that have previously been identified in
 5        the deposition notice?
 6   A.   Yes.
 7   Q.   Fine.  And I'm going to -- well, let me ask
 8        you, sir, who are you employed by?
 9   A.   Ocean Marine Insurance Agency.
10   Q.   And, for ease of reference, can we just refer
11        to Ocean Marine Insurance Agency from this
12        point forward as OMI?
13   A.   Yes.
14   Q.   If I say that, you'll know what I mean and . . .
15   A.   Yes.
16   Q.   As a shorthand.  What is -- first of all,
17        what -- what does OMI do?
18   A.   OMI do is an insurance agency that procures
19        insurance mostly for commercial fishing boats.
20   Q.   And where are they located?
21   A.   We have our main offices in Warwick, Rhode
22        Island.  We have an office in Point Judith,
23        Rhode Island.  We have an office in Fairhaven,
24        Rhode Island.  And we have a -- a satellite
```

1

```
 1   office in Maine.
 2   Q.   And, if you know, are you aware of the
 3        relationship between OMI and North American
 4        Insurance Company?
 5   A.   Vaguely.
 6        MR. LANGER:  Let -- let me just interject
 7        at this point.  He can answer.  But there are
 8        six very specific categories that we were
 9        supposed to produce people --
10        MR. PETTINGELL:  And you have.
11        MR. LANGER:  -- for.  They -- one of those
12        categories was not the relationship between
13        OMIA and NAS or NAS at all.  It was very
14        specific, factual allegations that were set
15        forth in the Complaint.  So I'll let him
16        testify, but I -- I am going to hold everybody
17        fairly closely to the areas that we're
18        designating.
19        MR. PETTINGELL:  Well, off the record.
20        (A brief discussion was held off the
21        record.)
22        MR. PETTINGELL:  Mr. Langer and I have had
23        a -- a discussion concerning questions that go
24        beyond the scope of the six paragraphs listed
```

12

Robert McVey
September 13, 2005

North American Specialty Insurance Comp...
vs. Mary & Josephine Corp., et al.

---

**VOLUME II - 64**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO:  04-10374WGY

NORTH AMERICAN SPECIALTY
INSURANCE COMPANY,
        Plaintiff,

vs.

MARY & JOSEPHINE CORP. and
MATTEO RUSSO,
        Defendants.

CONTINUED DEPOSITION OF ROBERT McVEY, a witness called on behalf of the Defendant, Mary & Josephine Corp., pursuant to the Federal Rules of Civil Procedure before Jo Anne M. Shields, Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of Joseph G. Abromovitz, P.C., 858 Washington Street, Dedham, Massachusetts, on Tuesday, September 13, 2005, commencing at 10:08 a.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street
Boston, Massachusetts 02109
Telephone (617) 742-6900

---

**65**

APPEARANCES:

LEONARD W. LANGER, ESQUIRE
TOMPKINS, CLOUGH, HIRSHON & LANGER, P.A.
Three Canal Plaza
P.O. Box 5060
Portland, Maine  04112-5060
(207) 874-6700
for the Plaintiff

RICHARD H. PETTINGELL, ESQUIRE
27 North Washington Street, Second Floor
Boston, Massachusetts  02114
(617) 778-0850
for the Defendant, Mary & Josephine Corp.

JOSEPH G. ABROMOVITZ, ESQUIRE
THE LAW OFFICES OF JOSEPH G. ABROMOVITZ, P.C.
858 Washington Street
Dedham, Massachusetts  02026
(781) 320-9977
for the Defendant, Matteo Russo

ALSO PRESENT:

William J. Scola

---

**I N D E X**

| Deposition of: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| ROBERT McVey | | | | |
| By Mr. Pettingell | 68 | | 162, 180 | |
| By Mr. Abromovitz | | 128 | 173, 181 | |
| By Mr. Langer | | 174 | | |

**E X H I B I T S**

| No. | | Page |
|---|---|---|
| 2 | E-mail to Janet from Bob McVey dated 12/5/03 | 82 |
| 3 | E-mail to Bob McVey from Craig McBurnie dated 12/8/03 | 92 |
| 4 | Fax to Tracy Tate from Lynn Houde dated 10/3/03 consisting of one page | 96 |
| 5 | American Institute Port Risk Endorsement dated 1/16/70 | 98 |
| 6 | Endorsement dated 12/9/02 | 119 |
| 7 | Insurance policy effective 8/13/03 to 8/13/04 | 119 |
| | | 163 |

---

**6**

S T I P U L A T I O N S

It is stipulated by and between counsel for the respective parties that the deposition transcript is to be read and signed by the deponent under the pains and penalties of perjury; and that the sealing and filing thereof are waived; and that all objections, except as to form, and motions to strike are reserved to the time of trial.

* * *

P R O C E E D I N G S

MR. PETTINGELL: All right. Well, we're here this morning as a continuation of the 30(b)(6) deposition of American -- North American Specialty Insurance Company. Day 1 was on January 5th of this year. And we're continuing with the deposition of Robert McVey. And we -- we're all in agreement that he is Mr. McVey, who's known to us. And I understand he's still under oath. And I

MR. PETTINGELL: Let's go off the record for a second.

(A brief discussion was held off the record.)

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

**80**

```
1  made a phone call to Mr. Russo at the
2  hospital where he was undergoing treatment
3  following his injury and advised him there was
4  no coverage because he was an owner?
5  A.  That's not true.
6  Q.  That's not true?  Did you have a telephone
7      conversation with him at the hospital?
8  A.  Yes.  I did.
9  Q.  And did the topic of whether or not there was
10     coverage for his injuries ever come up during
11     that conversation?
12 A.  Yes.  It did.
13 Q.  Okay.  And what was the gist of the
14     conversation you had with Mr. Russo?
15 A.  I called Mr. Russo up to see how he was doing,
16     and he asked if there was coverage.  And I said
17     we were working on it.  At this time, we didn't
18     know.
19 Q.  Okay.  You had no discussion with him that you
20     recollect where the issue of whether or not he
21     was an owner of the vessel came up?
22 A.  While he was in the hospital, again?
23 Q.  Yes.
24 A.  No.
```

**81**

```
1  Q.  Okay.  I'd like to show you a -- I'd like to
2      show you a document --
3          MR. PETTINGELL:  And for the record -- for
4      your purposes, this is Bates stamped 000369.
5          MR. LANGER:  This highlighting is not part
6      of the original document, I'm assuming.
7          MR. PETTINGELL:  That's correct.  That's my
8      highlighting.  It's the only way I can read
9      them.
10         MR. LANGER:  The question is, do you
11     recognize the document?
12 Q.  -- and ask, sir, if you'd look at that and tell
13     me whether or not you recognize it.
14         (A brief discussion was held off the
15     record.)
16 A.  Yeah.  Yes.  I recognize it.
17 Q.  All right.  Can you tell me what that document
18     is?
19         MR. ABROMOVITZ:  Can we mark it first?
20         MR. PETTINGELL:  All right.  Let's mark it
21     as Exhibit 2.
22         MR. LANGER:  With the understanding that
23     the highlighting is --
24         MR. PETTINGELL:  The highlighting is not on
```

**82**

```
1  the original document.
2      MR. ABROMOVITZ:  Well, why don't we go off
3  the record.
4      (A brief discussion was held off the
5  record.)
6      (E-mail to Janet from Bob McVey dated
7  12/5/03 marked as McVey Exhibit No. 2.)
8      MR. PETTINGELL:  Off the record.
9      (A brief discussion was held off the
10 record.)
11     (Question read back.)
12 Q.  The document we've marked as Exhibit 2, can
13     you -- can you tell us what that document is,
14     please, sir?
15 A.  This is a correspondence that I sent to
16     Sunderland Marine regarding the accident Matt
17     Russo had.
18 Q.  And what's the date of the correspondence?
19 A.  December 5th.
20 Q.  This is --
21 A.  200- --
22 Q.  -- an e-mail, is it?
23 A.  Yes.  It is.
24 Q.  And it says "From: Deweydog@aol.com."
```

**83**

```
1  A.  Yes.
2  Q.  Is that your -- or was that your e-mail address
3      at the -- the time, December 5th, 19- -- 2003?
4  A.  Yes.
5  Q.  And I wonder, sir, if you could read the first
6      paragraph into the record.
7  A.  "I have just finished going over the claim
8      involving Matt Russo and realized that he is
9      covered as a crew member.  His father Sal is
10     listed as 100% -- 100% ownership with Matt
11     being the captain.  Matt is listed as
12     part-owner on their other 2 vessels, the F/V
13     Josephine and the F/V Damariscotta.  They are
14     covered for three to four men on the Mary &
15     Josephine."
16 Q.  So as of December 5th, 2003 when you sent this
17     e-mail -- and this e-mail went to who?
18 A.  Janet Cook.
19 Q.  And who's Janet Cook?
20 A.  She's the claims advisor of the claims, in
21     charge of claims at Sunderland Marine.
22 Q.  In England?
23 A.  Yes.
24 Q.  All right.  At the time that you sent Ms. Cook
```

1  his e-mail we've marked as Exhibit 2, you were
2  of the opinion that Mr. Russo was covered as a
3  crew member; he was entitled to coverage under
4  the policy?
5          MR. LANGER: Objection.
6  A.  Not necessarily.
7  Q.  Perhaps you can explain to me then what you
8      meant when you said you -- you "just finished
9      going over the claim involving Matt Russo and
10     realized that he is covered as a crew member?
11 A.  Well, we didn't realize at the time that he was
12     on port risk.
13 Q.  You didn't know --
14 A.  Because -- we -- we knew, but it kind of
15     slipped out.
16 Q.  So at the ti --
17 A.  Once --
18 Q.  I -- I beg your pardon. I -- I don't want to
19     cut you off. Go ahead.
20 A.  Once we went back over the claim, we realized
21     that the boat wasn't fishing; and it was on
22     port risk.
23 Q.  I see. So when you -- when you sent this
24     e-mail marked as Exhibit 2, you had forgotten

---

1  that the vessel Mr. Russo was working on was on
2  port risk?
3  A.  No. I hadn't forgotten. This is, pretty much,
4      a generic makeup of the course of the year. And
5      They were covered for three to four men. And
6      when the boat was actively fishing, when they
7      were covered, Matt was a covered crewman.
8  Q.  Uh-huh. Well, I'm referring to the first
9      sentence in the first paragraph where you
10     state, "I have just finished going over the
11     claim involving Matt Russo and realized that he
12     is covered as a crew member."
13 Q.  Yeah. When the boat was actively fishing, he
14     was listed as a crew member.
15 Q.  Well, coming up to the top, the subject of this
16     e-mail is "Matt Russo F/V Mary and Josephine."
17     And, in the first paragraph, you're talking
18     about the claim involving Matt Russo. So
19     when you say he's covered as a crew member,
20     that doesn't mean that you believed that he
21     was -- that his claim was a covered claim under
22     the policy?
23         MR. LANGER: Objection.
24 A.  Correct.

85

---

1          MR. LANGER: Form of the question. Wait
2      till he finishes his question --
3          THE WITNESS: Sorry.
4          MR. LANGER: -- before you answer it.
5  Q.  You say that wha-- -- my statement was correct?
6  A.  Repeat it again.
7          MR. PETTINGELL: Can I have it read back,
8      please.
9          (Question read back.)
10         MR. LANGER: Objection to the form.
11         MR. PETTINGELL: Calls for a legal conclusion.
12     Foundation. Well, you stated your
13     objection and the basis for it. And I think
14     you. But this is Mr. McVey's language, and I'm
15     trying to understand what he means when he says
16     "covered."
17         MR. LANGER: Well, then, ask him what he
18     means, rather than telling him what you think
19     he means.
20         MR. PETTINGELL: Well, I'll ask my question
21     the way I want.
22         MR. LANGER: Fine. I'll object to it.
23         MR. PETTINGELL: And you can object to it.
24 Q.  At the time that you wrote this e-mail,

87

---

1  Mr. McVey, you were aware that Sunderland was
2  denying coverage. At least, one of the bases
3  for denying coverage was that Mr. Russo was an
4  owner of the vessel.
5          MR. LANGER: Object to the form and the
6      foundation of the question.
7  A.  I think they were looking into the fact that he
8      might have been an owner, but I don't think the
9      claim was directly denied because he was an
10     owner.
11 Q.  All right. Do you know whether or not the
12     claim was ever denied on the basis that
13     Mr. Russo was an owner of the vessel?
14 A.  No. I don't.
15 Q.  Okay. In any event, the first paragraph of
16     Exhibit 2, referring to that first paragraph of
17     Exhibit 2, is it fair to say you were telling
18     Ms. Cook that he was not an owner?
19 A.  Yes.
20 Q.  And your statement that you -- and I quote --
21     "I have finished going over the claim involving
22     Matt Russo and realized that he is covered as a
23     crew member."
24 A.  When he was being a crew when the boat was

**88**

1  A.  active.
2  Q.  Well, was the boat active at the time of his
3      injury?
4  A.  No.
5  Q.  Why did you pick this particular time,
6      December 5th, 2003, to pass that bit of
7      information on to Ms. Cook at Sunderland?
8  A.  I don't remember the context. But she might
9      have been asking me how many crew was on the
10     boat when it was insured for active fishing.
11 Q.  Now, were you involved at all in placing the
12     vessel on port risk only coverage?
13 A.  Yes.
14 Q.  And what was your involvement?
15 A.  I received a phone call from Matt Russo,
16     telling me to put the boat -- that the boat
17     hadn't been fishing and will not be fishing. I
18     reiterated that information to Lynn.
19 Q.  Do you remember when that phone call was?
20 A.  The beginning of October, I believe, 2003.
21 Q.  Was there any discussion during that telephone
22     call about a reduction in the size of the crew
23     on the vessel?
24 A.  Yes.

**89**

1  Q.  Would you tell us about that, please?
2  A.  Mr. Russo indicated to me -- told me that there
3      was no crew on the vessel; there hadn't been, I
4      believe, since May; and there will not be till
5      further notice.
6  Q.  Did he instruct you that he wished to have the
7      size of the crew reduced under the policy?
8  A.  Yes.
9  Q.  And when was this call?
10 A.  The beginning of October.
11 Q.  And what is your memory of -- of what Mr. Russo
12     asked you to do?
13 A.  He said that the boat hadn't been fishing -- I
14     believe, again -- since May and presently
15     wasn't fishing; wasn't going to be fishing; and
16     he did not want any crew covered on the boat.
17 Q.  Okay. And, in response to that, what did you
18     do?
19 A.  I talked to Lynn and gave her the information.
20 Q.  For what purpose?
21 A.  So we could see if we could get him some money
22     back on his policy.
23 Q.  Now, was it your understanding that Lynn -- and
24     by Lynn, you mean Ms. Houde?

**90**

1  A.  Ms. Houde.
2  Q.  What was your understanding as to what she was
3      going to do with the information you had passed
4      on to her?
5  A.  I really don't know what Lynn's procedures are
6      when she's in the office.
7  Q.  Speaking generally, is it your understanding
8      that that information was to be communicated to
9      Sunderland?
10 A.  I really don't know.
11 Q.  Okay. This is something that would be better
12     left for --
13 A.  Yeah.
14 Q.  -- Ms. Houde to discuss?
15 A.  Exactly.
16 Q.  All right. Fair enough. Okay. I may have
17     just asked you this, but your answer is not
18     clear to me so I understand it. What was your
19     purpose in telling Ms. Houde that Mr. Russo
20     didn't want to have any crew coverage while the
21     vessel was on port risk?
22 A.  The purpose was 'cause she keeps the records,
23     and she does the paperwork involvement.
24 Q.  Was it necessary that something formally happen

**91**

1      with respect to the policy in order to effect a
2      change in coverage or the change in coverage
3      that Mr. Russo was asking you for?
4  A.  Again, that would probably be more Ms. Houde's
5      department than mine.
6  Q.  I understand that. But you passed it on to her
7      for purposes of recordkeeping.
8  A.  Right.
9  Q.  And what -- what was your understanding of why
10     that was necessary, your understanding of why
11     that was necessary?
12 A.  So Matt Russo wouldn't have to pay a premium on
13     his crew when he wasn't using it.
14 Q.  So you were passing this information on to
15     Ms. Houde so that she could get a return
16     premium, if possible, for --
17 A.  Yes.
18 Q.  -- the client? Okay. Now, do you recall -- is
19     that what I gave you there? Do you recall
20     getting a response back from Sunderland to your
21     e-mail of December 5th that we've marked as
22     Exhibit 2?
23 A.  No. I don't.
24     MR. ABRAMOWITZ: What are you looking for?

1    MR. PETTINGELL: An unmarked copy of this.
2    Let me show you a document -- this is Bates
3    stamped 382 -- and ask if you'd take a moment
4    and look at it.
5    MR. PETTINGELL: I'm going to have this
6    marked as Exhibit 3.
7    (E-mail to Bob McVey from Craig McBurnie
8    dated 12/8/03 marked as McVey Exhibit
9    No. 3.)
10  Q. Have you had a chance to review it?
11  A. Yes.
12    MR. PETTINGELL: Okay. Why don't we mark
13    that as the next exhibit, as Exhibit 3.
14    THE WITNESS: We marked it already.
15    MR. LANGER: We marked it.
16    MR. ABRAMOWITZ: It's marked.
17  Q. Can you tell us what that document, Exhibit 3,
18  is?
19  A. It's correspondence to me from Craig McBurnie
20  from Sunderland Marine.
21  Q. Okay. Now, calling your attention to the third
22  paragraph of that correspondence, was this the
23  first indication you received from Sunderland
24  that one of the bases for their denial of

---

**93**

1  coverage for Mr. Russo's claim was that
2  Sunderland had deleted crew P&I coverage
3  entirely until fishing recommenced?
4    MR. LANGER: Objection to the form and
5  foundation of the question. Assumes facts not
6  in evidence.
7  A. Could you read that back, please?
8    (Question read back.)
9  A. I'm not sure.
10  Q. Do you remember having any discussions with
11  anybody at Sunderland, telephone conversations,
12  where the fact that crew P&I coverage had been
13  deleted entirely while the vessel was on port
14  risk at any time prior to this December 8th,
15  2003 correspondence?
16    MR. LANGER: You mean, between the date of
17  the accident and December 8th?
18    MR. PETTINGELL: Yes. Thank you.
19  A. I can't recollect any.
20  Q. Now, there's a handwritten notation that
21  appears, "Per Bill." Do you see that?
22  A. Yes.
23  Q. Whose handwriting is that, if you know?
24  A. I really don't know.

---

1  Q. Okay. Can you read the handwriting to
2  yourself?
3  A. Yes.
4  Q. And do you have any knowledge as to what that
5  refers to?
6    MR. LANGER: Don't guess. If you know,
7  fine.
8  A. I don't.
9  Q. Okay. Fair enough. That's not your
10  handwriting?
11  A. No.
12  Q. Well, I suspect that the "Bill" is Mr. Scola.
13  So we'll -- we can always go on to him when we
14  take his deposition. Now, Mr. Russo's
15  corporation had obtained insurance for the Mary
16  & Josephine through OMI for two years prior to
17  the incident in which he was injured on his
18  boat in December of 2003; is that correct?
19  A. That's correct.
20  Q. And were you involved in -- strike that. And
21  I -- I think you testified back in January that
22  you were involved in the initial placement of
23  coverage?
24  A. Yes.

---

1  Q. You provided quotes for coverage?
2  A. Yes.
3  Q. Is that also correct -- with respect to Policy
4  Year 2?
5  A. Correct.
6  Q. So in the second -- excuse me -- third
7  paragraph where Mr. McBurnie, an underwriter at
8  Sunderland, writes to you that "Last year,
9  we' -- well, strike that. "In addition, cover
10  at present is restricted to Port Risks only
11  following your fax of October 3rd. Last year,
12  we did the same (as per Lynn's of 17th
13  September '02) and deleted crew P&I coverage
14  entirely until fishing recommenced."
15  Were you involved at all in a request that
16  crew P&I coverage be deleted entirely for
17  Policy Year 2 while the vessel was on port
18  risk?
19  A. I don't remember.
20  Q. Okay. This reference to a -- your fax of
21  October 3rd, do you have that fax with you here
22  today?
23  A. I think we might.
24    MR. LANGER: Do you have it?

**95**

2005

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

---

**Page 96**

```
 1        have it.  No.  I do not have it.
 2   MR. PETTINGELL:  Let's go off the record.
 3        I save a lot of time if we can find it.
 4        (A brief discussion was held off the
 5   record.)
 6        MR. PETTINGELL:  With Mr. Langer's
 7   assistance, we found the fax.
 8        MR. SCOLA:  Then it must be the fax
 9   that's missing.
10        MR. PETTINGELL:  And it appears that it was
11   a fax sent by Ms. Houde.  So --
12        MR. ABROMOVITZ:  Do you want to mark it
13   now, Dick, or no?
14        MR. LANGER:  He referred to it.  We might
15   as well mark it.
16        MR. ABROMOVITZ:  Yeah.
17        MR. PETTINGELL:  Yeah.  Why don't we mark
18   it.
19        (Fax to Tracy Tate from Lynn Houde dated
20   10/3/03 consisting of one page marked as
21   McVey Exhibit No. 4.)
22        MR. PETTINGELL:  And this is Exhibit 4?
23        COURT REPORTER:  Yes.
24   Q.   Mr. McVey, I'd like you to look at what we've
```

---

**Page 97**

```
 1        marked as Exhibit 4 and ask you if, to your
 2        knowledge, that is the fax that you were
 3        referring to and which, apparently, is referred
 4        to in the correspondence to you that we've
 5        marked as Exhibit 3?
 6        MR. LANGER:  Just to make it clear, you
 7        just asked him whether it was a -- a fax he
 8        referred to, and then you said in the
 9        correspondence to him.  So can you just clarify
10        the question?
11   Q.   Well, have you seen the document we've marked
12        as Exhibit 4 before?
13   A.   No.
14   Q.   Okay.  Following your receipt of the
15        correspondence marked as Exhibit 3 from Craig
16        McBurnie, which made reference to your fax of
17        October 3rd last year -- excuse me --
18        October 3rd, did you make any effort to see
19        what he was referring to?
20   A.   I wouldn't have any reason to.
21   Q.   Well, so the answer to my question is, you did
22        not?
23   A.   No.
24   Q.   Okay.  And I take it -- I think I take it that
```

---

**Page 98**

```
 1        the document marked Exhibit 4 you've never seen
 2        before today?
 3   A.   I don't recollect seeing it before.  No.
 4   Q.   Then we can move on.  Now, at the time that you
 5        and Mr. Russo had a conversation about the
 6        vessel going on port risk, what was your
 7        understanding of the purpose for the vessel
 8        going on port risk?
 9   A.   It was to save Mr. Russo some premium.
10   Q.   And that's because the vessel hadn't been
11        fishing.  So he was trying to retroactively
12        save some premium?
13   A.   Correct.
14   Q.   Was there any other reason that the boat was to
15        go on port risk that you were aware of?
16   A.   Not that I'm aware of.
17   Q.   Okay.  Do you recall whether or not -- strike
18        that.  We had some discussion last January
19        about an annual survey of vessels that were
20        being insured with the Sunderland being
21        undertaken.  Do you recall that?
22   A.   Vaguely, I recall.
23   Q.   All right.  And it's a requirement of
24        Sunderland that the vessels that it is
```

---

**Page 99**

```
 1        providing insurance for have to be surveyed
 2        every year, don't they, prior to renewal?
 3   A.   Approximately, every year.
 4   Q.   All right.  And was this done with regard to
 5        Mr. Russo's vessel or the Mary & Josephine?
 6   A.   I believe so.
 7   Q.   The first year covered from August of 2001 to
 8        August of 2002?
 9   A.   Yes.
10   Q.   The second year covered from August of 2002 to
11        August of 2003?
12   A.   Yes.
13        MR. LANGER:  At which point?
14        MR. PETTINGELL:  Prior to the renewal.
15        MR. LANGER:  Which renewal?
16        MR. PETTINGELL:  2003, Policy Year 3.
17   A.   I don't remember.
18   Q.   Do you recall any year -- now, there were three
19        policies issued for this vessel; is that
20        correct?
21   A.   Yes.
22   Q.   And the vessel was up for renewal, which would
23        have covered from August of 2003 to August of
24        2004?
```

**Page 104**

```
 1   care of recommendations on the Mary & Josephine
 2   during the period that the vessel was on port
 3   risk prior to taking the boat out fishing for
 4   Policy Year 3?
 5 A.  I don't.
 6 Q.  I asked if you recall. Are you saying you --
 7      you just don't have a memory one way or the
 8      other? Or that definitely didn't happen?
 9 A.  I don't think it happened.
10 Q.  You don't think it happened.
11 A.  It -- it -- not to my recollection, it didn't
12      happen.
13 Q.  Okay. I think we're at the same point. Did
14      you ever tell Mr. Russo that there was no crew
15      P&I cover while on his vessel -- or the vessel he
16      was captain of was on port risk?
17 A.  I discussed it with him when he called me in
18      the beginning of October. So I probably would
19      have said, we'll try to take care of it.
20 Q.  I'm not certain that was responsive to my
21      question. Did you ever tell Mr. Russo that
22      while his boat -- the boat that he was captain
23      of was on port risk, there was no crew P&I
24      coverage --
```

**Page 105**

```
 1 A.  Yes. I did.
 2 Q.  -- for the policy? You have a memory of doing
 3      that?
 4 A.  Yeah.
 5 Q.  Okay. When did you tell him that, sir?
 6 A.  Probably when he called me in October.
 7 Q.  You say "probably."
 8 A.  Yeah.
 9 Q.  Do you have a memory of telling him in October?
10 A.  Vaguely.
11 Q.  Of what year?
12 A.  2003.
13 Q.  2003.
14      Did you ever tell him at any time that there
15      was no crew coverage available if the vessel
16      was on port risk at any time before October of
17      2003?
18 A.  I don't recall.
19 Q.  But you do have a memory of telling him that in
20      October of 2003?
21 A.  We discussed it, I believe, when he called me
22      in October. Yes.
23 Q.  Could you tell us about that conversation,
24      please, sir?
    A.  I had a call from Matt Russo, telling me that
```

**Page 106**

```
 1   the boat hadn't fished. Again, I think it's
 2   since May of 2003. It was not fishing
 3   presently, and it probably wasn't going to fish
 4   till several months into the year. And he did
 5   not want any P&I, no crew at all.
 6 Q.  Okay. And what did you respond?
 7 A.  I responded, we'll take care of it.
 8 Q.  Did you tell him, well, don't worry; there's no
 9      P&I just as soon as you put it on port risk
10      MR. LANGER: Objection to the form of the
11      question.
12 Q.  By virtue of putting it on port risk, there's
13      no crew P&I coverage?
14 A.  He asked me for zero P&I coverage.
15 Q.  Right. And my question was, did you tell him,
16      well, don't worry, it's automatic; if you put
17      crew P&I coverage, there is no
18 A.  I never use the word "automatic" in dealing
19      with insurance issues.
20 Q.  Well, isn't it your testimony that you
21      understand that if the vessel is on -- if a
22      vessel is on port risk coverage, there is no
23      crew P&I cover?
24
```

**Page 107**

```
 1 A.  That's correct.
 2 Q.  And that's automatic. Right?
 3 A.  Yeah.
 4 Q.  That's just by virtue of having a boat go on
 5      port risk. There's vessel P&I coverage, but
 6      the crew P&I coverage is cancelled?
 7 A.  Is nonexistent.
 8 Q.  Is nonexistent. That's your understanding?
 9 A.  Yes.
10 Q.  And that's your understanding based upon your
11      16 years of experience in the industry?
12 A.  Yes.
13 Q.  And someone at OMI told you that. You don't
14      remember who?
15      MR. LANGER: Objection. It's been asked
16      and answered. He's been through this twice
17      now. Do we need to go through it again?
18      MR. PETTINGELL:
19      MR. LANGER: Yeah.
20      MR. PETTINGELL: Well, I'm going to instruct
21      him --
22      MR. PETTINGELL: Well, we're not --
23      MR. LANGER: -- not to answer that for --
24      you're -- you're just asking him the same
        questions again and again.
```

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

---

2005

108

```
1   PETTINGELL: You know, you're -- you're
2   ...ing my train of thought.
3   ...if you've --
    MR. LANGER: Well, I don't mean to do that.
4   MR. PETTINGELL: But --
5   MR. LANGER: -- been through this --
6   MR. PETTINGELL: But --
7   MR. LANGER: -- twice.
8   MR. PETTINGELL: Let me finish it, and
9   we'll move on.
10  MR. LANGER: Good.
11  MR. PETTINGELL: Can we have my question
12  read back, please.
13  MR. ABROMOVITZ: I'll also state -- let me
14  just state on the record that, in this
15  jurisdiction, you cannot instruct the witness
16  not to answer a question. You can suspend the
17  deposition. You can get a court order and a
18  protective order. You cannot tell him not to
19  answer a question.
20  MR. LANGER: Okay. Then we'll do that.
21  MR. PETTINGELL: It's not necessary.
22  Just --
23  MR. LANGER: Keep going.
24
```

109

```
1   MR. PETTINGELL: -- let's get this -- let's
2   get by this and move on.
3         (Question read back.)
4   Q.  Is that correct?
5   A.  That's correct.
6   Q.  All right. And my question is, did you, sir,
7       ever tell Mr. Russo that that's what happened
8       if the vessel went on port risk coverage, that
9       the --
10  A.  Yes.
11  Q.  -- would be -- you did tell him that?
12  A.  (Witness indicates).
13  Q.  When did you tell him that?
14  A.  I don't remember exactly when I told him.
15  Q.  Well, do you remember what year?
16  A.  He was on and off port risk so much that it's
17      hard to recollect exactly when I told him, but
18      we discussed it.
19  Q.  Now, the Mary & Josephine was covered three
20      policy years. Right?
21  A.  Not quite three. I don't think it made it
22      through the third one.
23  Q.  Well, there was three policy years
24      contemplated?
```

110

```
1   A.  Yes.
2   Q.  And the vessel was on port risk in the first
3       policy year?
4   A.  Yes.
5   Q.  And coverage was placed through Sunderland?
6   A.  Yes.
7   Q.  Coverage was not placed by Sunderland with
8       North American Specialty Insurance Company in
9       that first policy year. It was placed with a
10      different company, wasn't it?
11  A.  I believe so.
12  Q.  Fairfield?
13  A.  I believe. Fairfield.
14  Q.  All right. And then, in the second policy
15      year, coverage was placed by Sunderland with
16      North American Specialty?
17  A.  Correct.
18  Q.  And the vessel went on port risk?
19  A.  Correct.
20  Q.  And there was a third policy issued, wasn't
21      there?
22  A.  Yes.
23  Q.  And coverage was placed by Sunderland with
24      North American Specialty?
```

111

```
1   A.  Yes.
2   Q.  And that's the policy where the vessel went on
3       port risk and was on port risk at the time of
4       Mr. Russo's injury?
5   A.  Yes.
6   Q.  In each of those years -- now, you've told us
7       that, in October, I think you said, or sometime
8       prior to the renewal of coverage -- perhaps, it
9       would have been earlier than October because
10      coverage was renewed for Policy Year 3
11      beginning in August of 2003, wasn't it?
12  A.  Correct.
13  Q.  And I apologize if I asked you this. Do you
14      remember when Mr. Russo and you had a
15      conversation where he indicated he wanted the
16      vessel to go on port risk?
17      MR. PETTINGELL: Objection. It's been asked
18      MR. LANGER: and answered.
19      MR. PETTINGELL: I'm just trying to --
20  A.  I'm not positive. It could have been in Oc-
21      tober when he called me.
22  Q.  Okay. Now, you've testified that you -- you
23      have a memory of a conversation with Mr. Russo
24      where you told him that if the vessel was on
```

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

---

**116**

```
 1  for Policy Year 2?
 2  A.   Yes.
 3  Q.   And you have an express memory not for Policy
 4       Year 3?
 5  A.   Correct.
 6            MR. PETTINGELL:  I'm getting close to the
 7       end, I think.  Off the record for a second.
 8                 (A brief discussion was held off the
 9            record.)
10                 (Brief recess taken.)
11            MR. PETTINGELL:  All right.  I only have, I
12       think, one more area I want to go into.  And
13       there's a document that I seem to have, in my
14       initialable style, mislaid.  So why don't I pass
15       the witness to Mr. Abromovitz, and I'll come --
16       with the understanding I can come back and --
17       oh, I found it.  Too -- too late.
18  BY MR. PETTINGELL:
19  Q.   Now, coming back to the fact that there were
20       three different policies issued in three
21       different policy years, the first one, I think
22       we have already established, was issued by
23
24
```

---

**117**

```
 1       Fairfield.
 2  A.   Correct.
 3  Q.   And the next two were North American Specialty.
 4       Each of those policies had different policy
 5       numbers, didn't they, renewal policies?
 6  A.   I'm not sure of that.  I'm not aware of that.
 7  Q.   Well, I show you a letter dated September 17th,
 8       2002 from Lynanne Houde -- and -- and we don't
 9       need to mark that -- and ask you whether that
10       makes reference to a renewal policy by policy
11       number.
12            MR. LANGER:  Well, the document speaks for
13       itself.
14            MR. PETTINGELL:  Well, I understand.  But
15       I'm focusing the witness in on something that
16       he said he didn't recall.
17            MR. LANGER:  Read the first paragraph to
18       yourself.  For the record, Mr. Pettingell's
19       referring to a letter dated September 17th,
20       2002 from Lynanne Houde to Matteo Russo.
21  A.   Okay.
22  Q.   And does that refer to a policy number?
23  A.   Yes.
24  Q.   And that policy number would be what?
```

---

**118**

```
 1  A.   I have no idea.
 2  Q.   Well, it's because you don't have the document
 3       in front of you.
 4  A.   You want me to read the policy number?
 5  Q.   Yes.
 6  A.   Okay.  It would read DNM0000003-00.
 7  Q.   And would that refer to the Policy No. 2 that
 8       we've been referring as Policy Year 2, which
 9       would be from August 13th of 2002 to
10       August 13th, 2004 --
11            MR. LANGER:  Well, the document speaks --
12  Q.   -- '3?
13            MR. LANGER:  -- for itself.
14            MR. PETTINGELL:  I understand.
15  A.   I believe so.
16  Q.   Okay.  And I think you've already indicated
17       that, during that Policy Year No. 2, Mr.
18       Russo's vessel went on port risk?
19  A.   Correct.
20            MR. PETTINGELL:  Time out.
21                 (A brief discussion was held off the
22            record.)
23  Q.   Okay.  Let me show you a document and ask if
24       you can look at it.
```

---

**119**

```
 1            MR. PETTINGELL:  Would you make some copies
 2       of that?  Then we'll make copies of this after.
 3       Off the record.
 4                 (A brief discussion was held off the
 5            record.)
 6                 (American Institute Port Risk Endorsement
 7            dated 1/18/70 marked as McVey Exhibit
 8            No. 5.)
 9                 (Endorsement dated 12/9/02 marked as McVey
10            Exhibit No. 6.)
11  Q.   Now, looking at what we've just marked as
12       Exhibit 6, do you have that document before
13       you?
14  A.   Yes.
15  Q.   Have you had a chance to read it?
16  A.   No.  I'm reading it now.
17                 (Pause.)
18  Q.   Let me know, please, when you're finished
19       looking at it.
20  A.   Finished.
21  Q.   All right.  Can you tell us what that document
22       is marked as Exhibit 6?
23  A.   It looks like an endorsement.
24  Q.   What's an endorsement?
```

**120**

1 An endorsement is something added to an
2 existing policy.
3 Q. Would it be fair to say it's a document that's
4 issued reflecting a policy change of some
5 sort --
6 A. -- Yes.
7 Q. -- change in coverage?
8 A. Yes.
9 Q. To your knowledge, do they always issue when
10 there's a --
11 MR. LANGER: Objection.
12 Q. -- change in coverage?
13 MR. LANGER: It's been asked and answered.
14 This was covered in some detail in January.
15 A. I don't know that they're always issued.
16 Q. Okay. And looking at the lower right-hand
17 corner, there's reference to a policy number.
18 Do you see that?
19 A. I do.
20 Q. And would you agree with me, sir, that that
21 policy number that is referenced there is the
22 policy number that is for Policy Year No. 2?
23 A. Yeah. The same.
24 Q. Okay. What changes does this endorsement

**121**

1 reflect?
2 MR. LANGER: Objection. The document
3 speaks for itself.
4 A. It says "amended from Operational to Port
5 Risk."
6 Q. Okay. And does it reference a particular port
7 risk endorsement?
8 A. Yes.
9 Q. American Institute Port Risk Endorsement dated
10 January 18, 1970?
11 A. Yes.
12 Q. Is that a policy form that you're familiar
13 with?
14 A. Somewhat familiar with it.
15 Q. Well, you've seen it before?
16 A. Yes.
17 Q. Looking at the document we've marked as
18 Exhibit 5, take a moment to look at that.
19 (Pause.)
20 A. I've read it.
21 Q. Okay. Is Exhibit 5 the American Institute Port
22 Risk Endorsement dated January 18, 1970 that
23 you're somewhat familiar with?
24 A. Somewhat.

**122**

1 Q. And would you agree, sir, that Exhibit 5 is the
2 American Institute Port Risk Endorsement
3 referred to in Exhibit 6?
4 MR. LANGER: If you know.
5 A. It's referred to. Yes.
6 Q. All right. So what's stated on Exhibit 6,
7 "Adding: American Institute Port Risk
8 Endorsement January 18, 1970, what that's
9 referring to is what has been marked as
10 Exhibit 5?
11 A. Correct.
12 Q. All right. Thank you. Now, coming back to
13 Exhibit 6, there's also a change with respect
14 to the crew complement, isn't there?
15 A. Yes.
16 Q. It says, "The Crew Complement is amended to
17 'Crew of 1 excluding Owners.'"
18 A. Correct.
19 Q. Now, that language doesn't appear every time a
20 vessel is put on port risk, does it?
21 A. No.
22 Q. That's something that was done just with regard
23 to Policy No. 2?
24 A. That's correct.

**123**

1 Q. It says, "The Navigation Limit is amended to:
2 'Port Risk Only. Warranted No Fishing.'" Do
3 you --
4 A. Yes.
5 Q. -- see that? Is that something that does
6 appear routinely on -- on endorsements when a
7 vessel goes on port risk?
8 A. Yes.
9 Q. All right. And reading down a little further,
10 "Endorsement Section I & II, ALL OTHER TERMS
11 AND CONDITIONS REMAIN UNCHANGED." Do you see
12 that language?
13 A. Yes.
14 Q. Do you know what that means?
15 A. Yes.
16 Q. What does it mean?
17 A. Just what it says it means.
18 Q. Well, can you explain to us?
19 MR. LANGER: What is his understanding?
20 I'm -- I'm --
21 MR. PETTINGELL: Well, he said he's
22 somewhat familiar with port risk. He said
23 he's -- he said port risk doesn't provide a
24 crew P&I cover. I think I'm entitled to

**132**

```
 1   Q.   Correct.
 2        But let's say I went and visited Matt Russo,
 3   who was working on the boat during the period
 4   of time that that vessel P&I was in effect, and
 5   I got hurt due to some defective condition on
 6   the vessel and I'm not a member of the crew,
 7   would I be covered?
 8            MR. LANGER:  Objection.  Calls for a legal
 9   conclusion.
10            MR. ABROMOVITZ:  Well, I'm asking his
11   understanding.
12   A.   I would say, probably.
13   Q.   Okay.  And let's assume that the -- during the
14   same period of time -- this is when the vessel
15   is covered under vessel P&I and not crew P&I
16   when the vessel's tied up at the dock -- let's
17   assume that, through something done by
18   Mr. Russo as captain of the boat, the dock is
19   actually damaged.  Would the vessel be covered
20   for damage to the dock, your understanding?
21            MR. LANGER:  The same objection.  It calls
22   for a legal conclusion.
23   A.   I believe it would.
24   Q.   Okay.  Have you seen anything in any of the
```

**133**

```
 1   policies that were issued through your company
 2   that were in effect -- this is a policy or
 3   endorsement -- that were in effect for the
 4   period of August '03 to August '04 that defines
 5   vessel P&I coverage in the manner in which
 6   you've defined it?
 7   A.   I haven't seen anything that I recollect.  No.
 8   Q.   Have you seen anything in the policies -- and,
 9   again, I'm referring to Policy -- for policy
10   year '03, August '03 to August '04 -- have you
11   seen anything in the policy that says there was
12   no crew coverage for P&I during that policy
13   year?
14   A.   We have a document here from Sunderland that
15   says that there was no crew P&I.
16   Q.   What document are you referring to, sir?
17   A.   I think it's a letter that he sent to me.
18   Q.   Are you referring to Exhibit No. 3?
19   A.   Yes.
20   Q.   Okay.  How about in the insurance policy
21   itself, have you seen anything in the insurance
22   policy or any endorsement issued by or on
23   behalf of MAS that says there was no crew
24   coverage for P&I while this vessel was at the
```

**134**

```
 1   dock in December of '03 when Matt Russo was
 2   injured?
 3   A.   I haven't seen it.
 4   Q.   Let's go to Exhibit No. 6, which is the
 5   preceding policy year, the policy year of
 6   August '02 to August of '03.  What is your
 7   understanding as what is meant by -- with
 8   reference to a port risk endorsement of "Crew"
 9   of 1 excluding Owner?
10   A.   Sometimes, in a situation where we know there's
11   going to be somebody on the vessel,
12   particularly if a crewman's on there as a
13   watchman or he's doing work, we suggest that
14   they keep one guy covered.
15   Q.   Were you aware that at the time of Matt Russo's
16   accident in December 2003 that what Mr. Russo
17   was doing was carrying out one of the repairs
18   that was recommended by the surveyor of the
19   vessel?
20   A.   I was not aware of that.
21   Q.   Did your office arrange for the survey on the
22   vessel for that particular policy year?
23   A.   Possibly.
24   Q.   Would that be something that, given your
```

**135**

```
 1   relationship with Sunderland or MAS, if a
 2   survey was requested by the underwriter that
 3   your office would arrange?
 4   A.   It -- it could be done automatically.
 5   Q.   Okay.  Would -- you're familiar with Marine
 6   Safety Consultants, are you not?
 7   A.   Yes.
 8   Q.   Are you aware that they had done a survey on
 9   Matt Russo's accident.
10   A.   Was I aware at what point?
11   Q.   Sure.  Let me ask the question this way.
12   A.   Please.
13   Q.   Matt Russo was injured during the course of
14   performing some work in connection with
15   installing new outriggers while the vessel was
16   at the dock in Gloucester.  Correct?
17   A.   I believe so.
18   Q.   I'm not exactly sure what he was
19   doing.  But --
20   A.   Well, take a look at your Exhibit No. 2, which
21   is your e-mail to Janet at Sunderland dated 05
```

y,
3, 2005

---

**136**

1 December of 2003. And take a look at the last
2 paragraph of that -- of that letter. And I'll
3 quote into the record. "A brief synopsis of
4 the accident: They were installing new
5 outriggers at the dock and Matt was atop
6 outrigger measuring the stays when the cleat
7 holding the outrigger let go and crashed down
8 with Matt on top of it."
9     Did I read that correctly?
10 A. Yes.
11 Q. Do you know why it was that Matt Russo was
12 installing new outriggers at the time of his
13 accident?
14 A. No.
15 Q. Where did you get the information that that's
16 the work that Matt was performing at the time
17 he was hurt?
18 A. From Matt himself.
19 Q. And this is during your telephone conversation
20 with him when he was in the hospital?
21 A. Yes.
22 Q. Was there anything of which you're aware in the
23 Sunderland policy that prevented the captain of
24 the boat from carrying out some of the repairs

---

**137**

1 recommended by the surveyor when performing the
2 survey at a request of an underwriter such as
3 NAS?
4 A. Repeat that again, please, Joe.
5 Q. Sure. I'm going to ask you to assume that at
6 the time Matt Russo got hurt that the out- --
7 new outriggers were being installed on the
8 recommendation of the surveyor, Marine Safety
9 Consultants.
10     Assuming that to be so, was there anything
11 under the Sunderland pol- -- strike that --
12 anything under the NAS policy that was in
13 existence at the time of Matt Russo's accident
14 from August '03 to August '04 that said, if
15 Matt Russo gets hurt while performing this
16 work, there is no coverage?
17     MR. LANGER: Objection. Calls for a legal
18 conclusion.
19 Q. Your understanding of the policy.
20 A. My understanding of the pol- -- he would not be
21 covered if he --
22 Q. Why not?
23 A. -- got hurt. Because he specifically asked me
24 to drop all crew -- crew P&I from his policy on

---

**138**

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

1 the Mary & Josephine to save money.
2 Q. Can you show me anything in the policy itself
3 or any endorsements issued in connection with
4 the policy that support your position?
5     MR. LANGER: You mean, regardless of
6 whether there was coverage or not?
7 Q. Let's start with regardless of whether there
8 was coverage or not.
9 A. It -- it's his vessel. He could do whatever he
10 wants.
11 Q. Okay. And assuming there was nothing in the
12 policy that says Matt Russo was not covered at
13 the time he was hurt, is there anything else in
14 the policy that says, if Matt Russo was injured
15 during the work -- doing the work recommended
16 by the surveyor, he would not be covered?

---

**139**

1 A. Not that I'm aware of.
2 Q. Is it fair to say that, in your dealings with
3 the Mary & Josephine Corporation insofar as
4 insurance coverage being placed for the vessel
5 Mary & Josephine, you dealt primarily with Matt
6 Russo?
7 A. Correct.
8 Q. Did you deal with Sal Russo at all?
9 A. No.
10 Q. Have you ever had a conversation with Sal
11 Russo?
12 A. No.
13 Q. How about Matt Russo's brother Gerry, have you
14 ever -- ever had any conversations with Gerry
15 concerning placement of insurance coverage
16 aboard the -- or for the fishing vessel Mary &
17 Josephine?
18 A. No.
19 Q. Is it fair to say that if Matt Russo needed to
20 contact somebody on behalf of the underwriter,
21 he would contact someone in your office, OMI?
22 A. Yes.
23 Q. And you would be the principal contact for Matt
24 Russo?

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

**140**

```
1   A.  Yes.
2   Q.  And that's the nature of the relationship that
3       you fellows had during the couple of years that
4       you did business together?
5   A.  Correct.
6   Q.  It's your testimony that Matt Russo requested
7       an endorsement, in your conversation in early
8       August '03, excluding all crew P&I for the
9       fishing vessel Mary & Josephine. Correct?
10  A.  He didn't use the word "endorsement."
11  Q.  Well, let me ask the question this way. It's
12      your testimony that during your conversation in
13      early October 2003 that Matt Russo requested
14      that because the vessel was on port risk that
15      there be no P&I coverage?
16  A.  That's correct.
17  Q.  Yet, two months later, as of the time of his
18      accident, no endorsement had issued from the
19      company to that effect; is that correct?
20  A.  I believe so.
21  Q.  Do you know why that is?
22  A.  Well, I -- I do. I can -- part of the reason
23      is, when -- it's called a lay-up credit, and we
24      usually wait till he tells us the boat's going
```

**141**

```
1       back fishing so we can prevent a lot of
2       paperwork from -- if he says, I'm not going to
3       I'm going. So we usually wait till he says the
4       boat is off port risk. Then we calculate the
5       time and the monies involved and return him
6       lay-up credits.
7   Q.  How -- how much work is involved in issuing an
8       endorsement saying there is no crew coverage?
9   A.  I don't issue them. So I really don't know.
10  Q.  Is that Lynn Houde's job?
11  A.  Yes.
12  Q.  And when a customer such as Matt Russo requests
13      the elimination of crew coverage, is it your
14      job then to communicate that information to
15      Lynn Houde, who then deals with the underwriter
16      in generating the paperwork?
17  A.  That's correct.
18  Q.  Now, in this particular case, is it your
19      testimony that you -- you communicated to Lynn
20      Houde the request of Matt Russo that crew
21      coverage be eliminated during the period the
22      vessel was on port risk in this third policy
23      year?
24  A.  Yes.
```

**142**

```
1   Q.  Was there anything in writing that you gave
2       her, either written or e-mail or anything to
3       that effect?
4   A.  I believe it was done by phone call or in
5       person.
6   Q.  Okay. And so the answer to my question is,
7       there is no written memo or e-mail from Bob
8       McVey to Lynn Houde to the effect of, Matt
9       Russo wants you to take P&I coverage off the
10      vessel while it's on port risk. Is that
11      statement correct?
12  A.  That's correct.
13  Q.  And it was Lynn's job then to communicate the
14      desire of the vessel owner to the underwriter
15      to effect the issuance of an endorsement.
16      Correct?
17  A.  That's correct.
18  Q.  And it wasn't done in this case either because
19      she hadn't gotten around to it, or she didn't
20      do her job properly. Correct?
21          MR. LANGER: Objection.
22  A.  No. I wouldn't --
23          MR. LANGER: Mischaracterize it.
24  A.  -- say that.
```

**143**

```
1           MR. LANGER: It mischaracterizes the
2       testimony and assumes facts not in evidence.
3       And it's argumentative.
4   Q.  Let me ask the question this way. Have you
5       seen anything in writing, by way of a memo,
6       e-mail, anything, going from Ms. Houde to
7       either Sunderland or NAS wherein it was
8       communicated to the underwriter that the vessel
9       owner wanted to eliminate crew P&I during the
10      period of time that the vessel was on port
11      risk?
12  A.  Yes.
13  Q.  Where did you see it?
14  A.  I thought we had one of these documents here
15      that was sent, this one dated October 3rd,
16      "Dear Tracy."
17          MR. LANGER: It's Exhibit 4.
18  A.  Exhibit 4.
19  Q.  Okay. Where in this document do you read a
20      communication from Lynn Houde to Tracy that
21      says the vessel owner wants no P&I crew coverage
22      while the vessel is on -- P&I crew coverage
23      while the vessel is on port risk?
24  A.  It says, "Insured just called to let us know
```

ey
13, 2005

13, 2005

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

**144**

```
 1        the vessel has not been fishing since May 1st,
 2        2003. He forgot to call us earlier. The
 3        account did renew on 8/13/03."
 4   Q.   So where does it say that Matt Russo is asking
 5        that the company issue an endorsement for port
 6        risk coverage different than was issued the
 7        previous year, as reflected in Oc-- in -- in
 8        Exhibit No. 6?
 9   A.   It -- it doesn't. I think he followed up with
10        a phone call to Lynn.
11   Q.   You're saying that Matt Russo called Lynn
12        sometime after October 3rd, 2003?
13   A.   No. I think it was on October 3rd.
14   Q.   So the same day that you spoke to Matt Russo
15        about what his desires were with coverage, you
16        believe that Matt Russo also spoke to Lynn
17        Houde?
18   A.   Yes.
19   Q.   Why do you say that?
20   A.   Because I think I instructed Matt to call Lynn
21        to tell her direct. I might have been on the
22        road, driving in my vehicle. And I probably
23        told him, why don't you call Lynn and -- which
24        we do often because Lynn is the one that would
```

**145**

```
 1        be taking care of that end of the policy.
 2   Q.   And did Lynn tell you that she, in fact, spoke
 3        with Matt Russo on October 3rd?
 4   A.   Yes.
 5   Q.   And what did she tell you that he said to her?
 6   A.   He reiterated what he said to me, that he
 7        didn't want any crew coverage.
 8   Q.   Have you seen any communications between Lynn
 9        Houde and -- strike that. First of all, who is
10        Tracy, Tracy Tate at SM?
11   A.   That's Sunderland.
12   Q.   Okay. Other than this fax, Exhibit 4, dated
13        October 3rd, 2003, have you seen any
14        communications between Lynn Houde and
15        Sunderland Marine referencing the desire of
16        Matt Russo, on behalf of M & J Corporation, to
17        eliminate crew coverage for PEI while the
18        vessel was on port risk?
19   A.   I haven't. But I very rarely do see -- see
20        correspondence between Lynn and Sunderland.
21   Q.   So are you saying there may be additional
22        correspondence that's not been produced in
23        connection with this case?
24           MR. LANGER: Objection.
```

**146**

```
 1   A.   There could be.
 2   Q.   Do you know why any --
 3   A.   I don't see how -- why --
 4   Q.   -- additional --
 5   A.   No.
 6   Q.   -- correspondence has not been produced
 7        that's --
 8   A.   I don't think --
 9   Q.   -- been requested?
10   A.   I don't know --
11           MR. LANGER: Objection.
12   A.   -- if there is correspondence. As I said, I
13        don't see it. So I don't know what's there.
14   Q.   Okay. Let's go to your e-mail to Janet of
15        December 5th, 2003. Do you have that in front
16        of you, Mr. McVey?
17   A.   Yes. I do.
18   Q.   Okay. Prior to sending this e-mail, what, if
19        anything, did you review in connection with the
20        policy of insurance issued through your office
21        for the Mary & Josephine Corporation regarding
22        the fishing ves-- fishing vessel Mary &
23        Josephine for the policy year Aug-- August
24        '03 to August '04?
```

**147**

```
 1   A.   I believe I reviewed his application.
 2   Q.   Did you look at the policy itself?
 3   A.   I don't recollect if I did or not.
 4   Q.   Insofar as the filing system is maintained in
 5        the offices of OMI in the time frame of
 6        December '05, would there be a -- do you have a
 7        separate folder per policy year per vessel? Or
 8        how do you guys file?
 9   A.   We have a -- a file that contains all the
10        policy years, a single file.
11   Q.   Okay. And when a vessel owner such as --
12        strike that. Are you saying there was a single
13        file for the M & J -- Mary & Josephine
14        Corporation for the very beginning of the
15        placement of the coverage through the last
16        policy issued?
17   A.   Yes.
18   Q.   Okay. Did you look through that file prior to
19        sending the e-mail on December 5th, 2003,
20        Exhibit No. 2?
21   A.   I -- I probably did.
22   Q.   Okay. And is it fair to say you saw no written
23        endorsement in connection with that policy that
```

3, 2005

**148**

```
 1   ...inated crew coverage for that policy year,
 2       PEI crew coverage?
 3   A   That's correct.
 4   Q   Now, let's go to the third paragraph of your
 5       letter. You testified that it was your opinion
 6       when you wrote this e-mail that there was no
 7       insurance to cover Matt Russo's accident?
 8   A   Yeah.
 9   Q   Then why did you go on to say, quote, "If all
10       goes well, hopefully, we can keep this claim
11       within reason given the nature of the
12       injuries," end quote?
13   A   Because what we were prepared to do, as an
14       agency and with Sunderland, was to help Matt
15       out financially regardless of whether he was
16       covered or not, which we do --
17   Q   Did you do that?
18   A   -- which we do often.
19   Q   Did you do that in this case?
20   A   Matt rebuffed our efforts.
21   Q   Did you ever pay any of Matt Russo's medical
22       bills?
23   A   Not that I'm aware of.
24   Q   In what way did Matt rebuff your efforts to
```

**149**

```
 1       help him out, as you do in cases like this?
 2   A   He went and hired an attorney.
 3   Q   Oh. You've never done that, Mr. McVey? That's
 4       withdrawn.
 5   A   I didn't say it was a bad thing. I just said
 6       he went and hired an attorney.
 7       MR. PETTINGELL: Lawyers have to eat too,
 8       you know. Off the record.
 9   Q   Isn't it true, Mr. McVey, that you -- when you
10       wrote this e-mail to Sunderland on December 5th,
11       2003, it was your opinion that there was
12       coverage under the PEI policy for Matt Russo's
13       injuries? Isn't that a fact?
14   A   No. I'd say it was ambiguous.
15       MR. LANGER: Objection.
16   Q   Did you indicate any of that ambiguity in the
17       body of your e-mail? And Exhib--
18       MR. LANGER: The document speaks for
19       itself.
20       MR. LANGER:
21   Q   -- we're referring to Exhibit No. 2.
22   A   This is taken -- if it was taken in the context
23       of which this was sent to Janet, then it takes
24   Q   So tell me the context in which you sent this
```

**150**

```
 1       e-mail to Janet.
 2   A   Well, there was some ambiguity as to far as --
 3       as far as if Matt was an owner. As she
 4       mentions in here from correspondence with
 5       Marine Safety, they was under the impression
 6       that Matt was an owner. I went and looked up
 7       his policy and -- and straightened out that
 8       situation, said he was not a owner, that Sal
 9       was a hundred-percent owner.
10   Q   Why was that significant?
11   A   Excuse me?
12   Q   Why was that significant, whether Matt was an
13       owner or not?
14   A   Because, if he was an owner, he probably
15       wouldn't have been covered under the policy.
16   Q   Was that typical in connection with insuring
17       fishing vessels out of the port of Gloucester
18       in that time frame?
19   A   I wouldn't specify Gloucester. It was
20       significant to most fishing vessels.
21   Q   Okay. Most fishing vessels that were insured
22       through your agency in the time frame of 2003
23       excluded PEI coverage for owners who were also
24       crew members?
```

**151**

```
 1   A   Yes.
 2   Q   Okay. And you learned that Matt Russo was not
 3       an owner?
 4   A   Correct.
 5   Q   In what other way was -- give me the other
 6       contexts in which -- strike the question.
 7       Other than addressing the issue of whether Matt
 8       Russo was or was not a part-owner of the
 9       corporation called the Mary & Josephine
10       Corporation, what else were you attempting to
11       convey to Janet at Sunderland Marine by your
12       e-mail of December 5th, 2003?
13   A   I was just trying to clarify. When the boat
14       was operational, they were insured for three to
15       four men, including Matt, for the policy when
16       it was operational, and to also let them know
17       that he wasn't a -- he wasn't an owner. Excuse
18       me. I was just making clarifications on the
19       policy which she might have asked for earlier.
20   Q   Okay. Can we agree that during the period of
21       time that the policy did cover Matt Russo as
22       captain of the vessel that he was one of the
23       three or four men that was contemplated to
24       be -- to be within the scope of the PEI
```

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

---

**160**

```
 1        there is no crew P&I coverage?
 2   A.   Yes.
 3   Q.   Okay.  Who did you direct to issue such a
 4        communication?
 5   A.   Probably, Ms. Houde.
 6   Q.   And do you remember when that was?
 7   A.   We've had so many changes with this particular
 8        vessel that I'm really -- couldn't pinpoint it.
 9   Q.   Have you ever seen any such document issued by
10        Corporation dated before December 2 --
11        December 3, 2003 to the effect that when your
12        vessel is on port risk, there is no crew P&I
13        coverage?
14   A.   I don't recall that specifically.
15   Q.   All right.  If there was such a document, you'd
16        expected it to be in the -- you'd expect it to
17        be in the file for the Mary & Josephine
18        Corporation as regards the fishing vessel Mary
19        & Josephine.  Correct?
20   A.   I would expect that.
21   Q.   I believe, in response to one of
22        Mr. Pettingell's questions, you've indicated
23        that, in your conversation with Matt Russo in
24
```

---

**161**

```
 1        early October 2003 when he told you that he did
 2        not want any P&I coverage at all for his crew
 3        while the vessel was at port risk that you told
 4        him you would -- you would take care of it.
 5        Was that -- was that your testimony?
 6   A.   I believe so.  Yes.
 7   Q.   Okay.  And how would you go about taking care
 8        of it?
 9   A.   I would reiterate his information to Lynn.
10   Q.   I thought you told me before that you told Matt
11        Russo to call Lynn himself?
12   A.   I did.  We both did.
13   Q.   Okay.  So you're saying you said to Lynn that
14        Matt Russo doesn't want any coverage for -- P&I
15        coverage for crew while the vessel's in port
16        and that Matt Russo, you understood, also
17        called Lynn and told her that himself?
18   A.   That's correct.
19   Q.   Other than your conversation with Matt Russo on
20        October 3rd, 2003 or thereabouts wherein you
21        claim that he communicated to you his desire to
22        remove all P&I crew coverage for the Mary &
23        Josephine while the vessel was on port risk,
24        did you have any other conversations with him
```

---

**162**

```
 1        regarding the insurance for the vessel prior to
 2        December 3rd, 2003?
 3   A.   I don't believe so.
 4   Q.   Do you know if Lynn Houde did?
 5   A.   I'm not sure.
 6   Q.   Has she ever told you that she did?
 7   A.   No.
 8   Q.   Did Bill Scola indicate to you whether he ever
 9        discussed underwriting issues with Matt Russo
10        between October 3rd, 2003 and December 3rd,
11        2003?
12   A.   No.
13   Q.   Have you ever seen anything issued from
14        Mr. Scola to the M & J Corporation, Mary &
15        Josephine Corporation, prior to December 5th,
16        2003 to the effect that while the vessel is on
17        port risk coverage, there is no crew P&I
18        coverage for any of the crew members?
19   A.   Not that I can recollect.
20             MR. ABRAMOVITZ:  Thank you.  That's all I
21        have.
22             MR. PETTINGELL:  I have a couple of
23        follow-up on things that you touched on.
24                    REDIRECT EXAMINATION
```

---

**163**

```
 1   BY MR. PETTINGELL:
 2   Q.   I'm showing you a document, sir.  And I
 3        would --
 4             MR. LANGER:  Shall we mark it?
 5   Q.   I would suggest to you that this is a copy of
 6        the policy that was issued for Policy Year 3.
 7             MR. LANGER:  Before you ask any more
 8        questions, let's just mark it so that we'll
 9        have a record of what it is he's talking about.
10             (Insurance policy effective 8/13/03 to
11             8/13/04 marked as McVey Exhibit No. 7.)
12   Q.   While you're looking at it, Policy Year 3 --
13        we -- you've already testified, would run from
14        August 13th of 2003 to August 13th of 2004.
15   A.   Yes.  Sorry.
16   Q.   So the document which has been marked as
17        Exhibit 7, would you agree that is a copy of
18        the policy that was issued for Policy Year 3?
19             MR. LANGER:  Look it over and make sure
20        it's a complete copy as you understand it, if
21        you know.
22   A.   Some of it's not very legible.  But . . .
23             MR. PETTINGELL:  While he's look --
24        looking, for the record, the policy contains,
```

**Page 164**

```
                    t the top, Policy No. OMN000003-01.
3, 2005

        (Pause.)
    MR. PETTINGELL: I think you're correct.
DUH.
        zero.
    MR. LANGER: I think that's a D, not a
 6  A. It appears to be a -- a complete policy.
 7  Q. All right. Now, looking -- looking at the last
 8     page on Exhibit 7, where the language appears,
 9     "This endorsement changes the policy," do you
10     see that?
11  A. Under 'Changes'?
12  Q. The last page of this.
13  A. Yeah.
14  Q. Now, the last page, would you agree, has got
15     "Policy Endorsement Number 3"?
16  A. Yes.
17  Q. All right. And that has a policy change
18     effective August 13th, 2003?
19  A. Yes.
20  Q. What does that mean?
21  A. It means that it's covered for port risk only.
22  Q. No, no, no. The fact that the change is
23     effective on August 13, 2003, what does that
24
```
164

**Page 165**

```
 1     mean?
 2  A. I don't understand what you mean, what does it
 3     mean?
 4  Q. Well, let me try this. Policy changes
 5     effective August 13, '03, do you see that
 6     language?
 7  A. Yeah. Correct.
 8  Q. Does that mean to you that whatever changes are
 9     contained in the endorsement are effective as
10     of August 13, 2003?
11  A. Yeah. Correct.
12  Q. Okay. Now, coming down to the bottom, can you
13     see the date that the policy was issued --
14     the -- excuse me -- Endorsement 3 was issued?
15  A. Yes.
16  Q. When was it issued?
17  A. It says here is February 16th, '04.
18  Q. All right. So we have -- and is this signed by
19     someone?
20  A. It's signed by Frank Ostrom.
21  Q. Who's Mr. Ostrom?
22  A. He is the former president of OMI.
23  Q. Okay. Did he hold that position or a position
24     in OMI on February 16, 2004?
```
165

**Page 166**

```
                              vs. Mary & Josephine Corp., et al.

 1  A. Yes.
 2  Q. And, to your knowledge, did he have signing
 3     authority for purposes of signing endorsements,
 4     policy endorsements?
 5  A. Yes.
 6  Q. And by virtue of his signature, he was an
 7     authorized representative of whatever company
 8     he was issuing the endorsement for?
 9     MR. LANGER: Objection.
10  A. Yes.
11     MR. LANGER: It asks for a legal
12     conclusion. That's your understanding though?
13  A. All right. That's your understanding. Yes.
14  Q. It's my understanding.
15  A. All right. Now, prior to the issuance and
16     effective date -- prior to the effective date
17     of Endorsement No. 3, would you agree with me
18     that, as far as the policy language itself is
19     concerned, the vessel was not covered for port
20     risk?
21     MR. LANGER: Objection.
22     Now, there's a distinction I'm making here.
23     I'm talking about the policy language as
24     opposed to the effect of the endorsement. I'm
       saying, before the endorsement was issued, the
```
166

**Page 167**

```
 1     coverage would have been available -- that
 2     would have been available to the vessel would
 3     be what is contained in the policy, not
 4     counting Endorsement 3.
 5  A. Yes.
 6  Q. Do you agree with that?
 7     MR. LANGER: Objection. It asks for a
 8     legal conclusion.
 9  Q. All right. And under the language of Policy
10     No. -- we'll call it Policy No. 3, Exhibit 7,
11     prior to the issuance of Endorsement No. 3 and
12     the effective date of Endorsement No. 3, was
13     there available, under the terms of the policy,
14     what we have been referring to as crew P&I
15     coverage?
16     MR. LANGER: Objection. Calls for a legal
17     conclusion.
18  A. I would say no.
19  Q. You would say no?
20  A. Yeah.
21  Q. And what's the basis of your statement that
22     there would not be?
23  A. Because that's what our client asked that there
24     not be.
```
167

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

...ey
13, 2005

**Page 168**

```
 1          I don't think you understood my question, and
 2   that's my fault. The policy, if you look at
 3   Exhibit 7, was issued from -- had --
 4   effective dates from August 13th of 2003 to
 5   August 13th, 2004; is that correct?
 6   A.   Yeah. Correct.
 7   Q.   And would you agree that the policy provisions
 8        contain the -- the scope of the coverage that
 9        would be available under the policy before any
10        changes in -- in -- in coverage are made?
11   A.   Yes.
12   Q.   All right. So -- and -- and I understand it's
13        your testimony that Mr. Russo requested that
14        there be no P&I coverage while the vessel was
15        on port risk. I understand that's your
16        testimony.
17             And, in fact, Endorsement No. 3 to
18        Exhibit 7, the last page, states that "It is
19        hereby understood and agreed in consideration
20        of a return premium of $3,117 that the F/V Mary
21        & Josephine is covered for Port Risk only-no
22        fishing effective August 13, 2003 to
23        December 21, 2003." Right?
24   A.   Correct.
```

**Page 169**

```
 1   Q.   And Endorsement No. 3, I take it, puts into
 2        effect what you understood Mr. Russo told you
 3        he wanted in the October telephone conversation
 4        that you had?
 5   A.   That's correct.
 6   Q.   All right. Before that conversation took
 7        place, before Endorsement No. 3 went into
 8        effect -- and it went into effect, by its
 9        terms, on August 13th at the beginning of the
10        policy period -- the balance of the policy
11        contained the original policy terms and
12        provisions of the -- of the policy. Right?
13   A.   Yes.
14   Q.   And under the policy terms as written before
15        the effective date of Endorsement No. 3, was
16        there coverage under the policy for what we
17        have been terming crew P&I coverage?
18             MR. LANGER: Objection. Seeks a legal
19        conclusion. Go ahead. The do -- I mean, the
20        document speaks for itself.
21             MR. PETTINGELL: Well, I'm asking for
22        his opinion, his understanding.
23             MR. LANGER: He's -- he's told you it
24        him for --
```

**Page 170**

```
 1        didn't.
 2             MR. PETTINGELL: Well, I asked the --
 3             MR. LANGER: What more do --
 4             MR. PETTINGELL: -- the bas--
 5             MR. LANGER: -- you want?
 6             MR. PETTINGELL: Please. I -- I don't want
 7        to argue with you. I asked the basis for that.
 8        And it was apparent to me he didn't understand
 9        my question. So I'm trying it again.
10             MR. PETTINGELL: Repeat your answer.
11   Q.   Well, don't repeat your answer. Please answer
12        the question. If it's a different answer, then
13        give a different answer. If it's the same,
14        give the same.
15   A.   The same answer I gave before.
16   Q.   And that is?
17   A.   Can you read it back to me?
18   Q.   I would say no.
19   A.   I would say no.
20   Q.   Okay. If Endorsement 3 had never been issued and
21        was not a part of the policy -- I'm changing
22        things; okay -- would there have been coverage
23        under Policy No. 3, marked as Exhibit 7, for
24        what has been termed as crew P&I cover?
```

**Page 171**

```
 1             (Question read back.)
 2             MR. LANGER: Objection. Calls for a legal
 3        conclusion. The document speaks for itself.
 4   A.   I would say no.
 5   Q.   And why is that?
 6   A.   Because we gave Matt Russo a return premium
 7        from May until policy issue at August on his
 8        asking for it. So, therefore, this policy
 9        wouldn't be the same.
10   Q.   Okay. You're saying, by virtue of your
11        returning the premium, that was reflective of a
12        change in coverage as stated in Endorsement No. 3
13        to Exhibit 7?
14             MR. LANGER: Objection to the form of the
15        question.
16   A.   It would be prior to Endorsement 3, I believe,
17        the way you're talking about --
18   Q.   Okay.
19   A.   -- and by virtue of his asking us.
20   Q.   All right. That's fair. How about if he
21        hadn't asked you and you didn't return a
22        premium, would there have been crew P&I cover
23        under the policy?
24   A.   Yes.
     Q.   And there would have been coverage -- rather
```

**172**

1  than have you flip through the pages because
2  they're not numbered -- there would have been
3  crew cover for how many crew?
4  A. Three to four men.
5  Q. And it would have included -- well, doesn't it
6  say a little more?
7  A. It says "excluding Owners."
8  Q. And since we've established that Mr. Russo was
9  not an owner, if Mr. Russo was part of that
10 crew, assuming Endorsement 3 had not issued,
11 there would have been coverage for him under
12 this policy as well?
13      MR. LANGER: Objection. Seeks a legal
14 conclusion.
15 A. That's -- that's correct.
16 Q. Now, in Exhibit 7, Endorsement No. 3 was
17 issued. And Endorsement No. 3 states, "In
18 consideration of a return premium of -- a
19 stated amount -- "the Mary & Josephine is
20 covered for Port Risk only-no fishing effective
21 August 13 to December 21, 2003." Do you agree?
22 A. Yes.
23 Q. Would you find the place in Exhibit 7 in Policy
24 No. 3 where it states that there is no crew

**173**

1  coverage?
2      MR. LANGER: While it's on port risk, you
3  mean?
4      MR. PETTINGELL: Yes.
5      MR. LANGER: Is there anything in the
6  policy that says that if it's on port risk,
7  there's no crew coverage?
8  A. I don't believe so. But I -- I don't think it
9  says anything in here regarding that.
10     MR. PETTINGELL: Thank you. All right. I
11 have nothing further.
12     MR. ABRAMOVITZ: Just a couple of other
13 questions.
14
15          RECROSS-EXAMINATION
16 BY MR. ABRAMOVITZ:
17 Q. You indicated that Mr. Ostrow was the former
18 president of your company?
19 A. Yes.
20 Q. Where is he now?
21 A. Mr. Ostrow passed away.
22 Q. When did he pass away?
23 A. April.
24 Q. Did you -- I'm sorry. I wasn't aware of that.
   Have you ever seen anything from Mr. Ostrow to

**174**

1  anybody on behalf of Mary & Josephine
2  Corporation to the effect of a position on
3  behalf of OMI or Sunderland or NAS that when a
4  vessel is on port risk coverage, there is no
5  crew P&I coverage?
6  A. No.
7      MR. ABRAMOVITZ: Thank you. That's all I
8  have.
9      MR. LANGER: I have a couple of questions.
10         CROSS-EXAMINATION
11 BY MR. LANGER:
12 Q. Mr. McVey, was your conversation with Mr. Russo
13 on October 3rd of 2003 the first time he talked
14 to you about putting the boat on port risk for
15 what Mr. Pettingell has called Policy Year
16 No. 3?
17 A. I believe so.
18 Q. And, in fact, he asked you to put it on port
19 risk retroactive, in fact, back into part of
20 Policy Year No. 2?
21 A. That's correct.
22 Q. And you carried out his wishes by passing that
23 information along to Ms. Houde?
24 A. That's correct.

**175**

1  Q. And you believe that, at some point either on
2  or shortly after October 3rd of 2003, Mr. Russo
3  called Ms. Houde?
4  A. I'm pretty sure he called her.
5  Q. When you talked to Mr. Russo on October 3rd,
6  around October 3rd, did he tell you that he
7  would -- would be working on his boat or the
8  Mary & Josephine, doing recommendations
9  provided by a surveyor?
10 A. No.
11 Q. Were you aware at any time prior to hearing of
12 Mr. Russo's accident that there were any
13 surveyor recommendations that had to be
14 completed on the Mary & Josephine?
15 A. I wasn't aware of any.
16 Q. Who -- who makes decisions regarding whether a
17 particular claim is covered by the policy?
18 A. I would say, the insurance companies, the
19 underwriters.
20 Q. You -- you don't make that decision?
21 A. No.
22 Q. Just so we're clear, I think you testified -- I
23 just want to be clear; I'm referring to Exhibit
24 No. 6 -- the reference to the crew complement