
Exhibit
E







UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10374WGY

NORTH AMERICAN SPECIALTY INSURANCE COMPANY,
Plaintiff,

vs.

MARY & JOSEPHINE CORP. and MATTEO RUSSO,
Defendants.

**DEPOSITION OF MATTEO A. RUSSO**, a witness called on behalf of the Plaintiff pursuant to the Federal Rules of Civil Procedure before Jo Anne M. Shields, Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of Joseph G. Abromovitz, P.C., 858 Washington Street, Dedham, Massachusetts, on Wednesday, September 14, 2005, commencing at 9:38 a.m.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**
One State Street
Boston, Massachusetts 02109
Telephone (617) 742-6900



APPEARANCES:

**LEONARD W. LANGER, ESQUIRE**
**TOMPKINS, CLOUGH, HIRSHON & LANGER, P.A.**
Three Canal Plaza
P.O. Box 5060
Portland, Maine 04112-5060
(207) 874-6700
for the Plaintiff

**RICHARD H. PETTINGELL, ESQUIRE**
77 North Washington Street, Second Floor
Boston, Massachusetts 02114
(617) 778-0890
for the Defendant, Mary & Josephine Corp.

**JOSEPH G. ABROMOVITZ, ESQUIRE**
**THE LAW OFFICES OF JOSEPH G. ABROMOVITZ, P.C.**
858 Washington Street
Dedham, Massachusetts 02026
(781) 329-1080
for the Defendant, Matteo Russo



I N D E X


| Deposition of: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| MATTEO A. RUSSO | | | | |
| By Mr. Langer | 4 | | | |


E X H I B I T S


| No. | | Page |
|---|---|---|
| 1 | Notice of Taking Deposition of Mary & Josephine Corp. | 4 |
| 2 | Notice of Taking Deposition of Matteo Russo | 4 |
| 3 | Answers to interrogatories | 104 |




P R O C E E D I N G S

(Notice of Taking Deposition of Mary & Josephine Corp. marked as Russo Exhibit No. 1.)

(Notice of Taking Deposition of Matteo Russo marked as Russo Exhibit No. 2.)

**MATTEO A. RUSSO**, a witness called for examination by counsel for the Plaintiff, having been satisfactorily identified by the production of his driver's license and having been duly sworn, testified as follows:

* * *

DIRECT EXAMINATION

BY MR. LANGER:

Q. Good morning, Mr. Russo. My name is Leonard Langer. I represent North American Specialty Insurance Company in an action currently pending in Federal Court in Boston. As I understand it, you are appearing here today both in your individual capacity and as the 30(b)(6) designee for Mary & Josephine Corporation; is that correct?

A. Yes.

Q. Okay. For the record, I have marked the two

notices of deposition, one for you individually, which is Exhibit 2, and the 30(b)(6) for Mary & Josephine, which is Exhibit No. 1. And there are 13 categories or areas I was going to ask questions in. And I understand you've been designated by Mary & Josephine to answer all of those questions?
A. Yes. I have.
Q. Okay. Could you please state your full name and address?
A. Matteo Angelo Russo. My address is 7 Derby Street, Gloucester, Mass. 01930.
Q. Have you ever been deposed before, Mr. Russo?
A. Yes.
Q. Okay. How many times have you been deposed?
A. Once.
Q. When was that?
A. I don't remember.
MR. PETTINGELL: Off the record for a second.
(A brief discussion was held off the record.)
Q. Was the deposition within the last year?
A. Yes.



Q. And what was the nature of the matter that you were being deposed in?
A. About this claim.
Q. So about the injury you sustained in December of 2003?
A. Yes.
Q. And was Mr. Abromovitz with you during that deposition?
A. Yes.
Q. Just as far as guidelines go, I'm going to ask you a series of questions this morning. If you don't understand my question, please let me know. I'll try and rephrase it so you do understand it. Please wait until I finish my question before you answer it, 'cause it's difficult for the court reporter to take down two or three or four of us all talking at the same time.
If either Mr. Pettingell or Mr. Abromovitz object to a question, please wait till they finish their objection and then answer the question. Please try and answer all the questions verbally rather than with a shake of your head. It's difficult for her to write



down shake of the head. If, at any time, you want to take a break, let me know; and we'll do the best to accommodate you. Do you understand those guidelines?
A. Yes. I do.
Q. Are they satisfactory to you?
A. Yes.
Q. Okay. Is there any reason why the deposition shouldn't go forward this morning?
A. No.
MR. PETTINGELL: Excuse me. Have we got the stipulations ironed out?
MR. ABROMOVITZ: Usual stipulations. Reserve the right to read and sign. All objections, except as to the form of the question, reserved until the time of trial.
MR. LANGER: That's fine.
MR. ABROMOVITZ: Sign within 30 days of receipt of the transcript. Do you need a notary, Len?
MR. LANGER: Yes.
MR. ABROMOVITZ: Okay. And the witness's deposition transcript to be notarized -- the signature --



MR. PETTINGELL: Are you --
MR. ABROMOVITZ: -- to be notarized.
MR. PETTINGELL: I'm sorry. Are you planning on bifurcating your deposition in some way so you get two transcripts? Or is just one transcript going to do it?
MR. LANGER: One transcript is fine with me.
MR. PETTINGELL: Fine.
MR. LANGER: I don't see --
MR. PETTINGELL: Okay.
MR. LANGER: -- any need to do it.
MR. PETTINGELL: I agree with you.
MR. LANGER: Okay. I mean, if there were going to be more than one witness for Mary & Josephine, I might. But --
MR. PETTINGELL: Okay.
MR. LANGER: -- it's all one witness.
MR. PETTINGELL: Reading and signing, obviously, is agreeable with me. I was going to ask for that.
MR. LANGER: Okay. So he'll read and sign both individually and on behalf of Mary & Josephine Corp.?

about the testimony you were going to give here today?
A. No.
Q. Briefly describe for me your educational background, Mr. Russo.
A. Twelve years of school.
Q. Did you graduate from high school?
A. Yes.
Q. Where was that?
A. Gloucester High School.
Q. And when was that?
A. 1990.
Q. Okay. And how -- what's your date of birth?
A. April 29th, 1972.
Q. And your Social Security number?
A. 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.
Q. Okay. Have you had any formal education of any sort since graduating from high school in 1990?
A. No.
Q. Describe for me your work history since you started working for a living or even before that, if you can recall.
A. When I was nine, I went fishing with my father during the summers. At thirteen, I fished



summers and weekends and school vacations.
Q. Also with your father?
A. Also with my father. Graduated high school, went full-time fishing with my father, went to Alaska for two summers. Years, I don't recall which years.
Q. Okay. Was it shortly after you got out of high school or sometime after that?
A. Went to Alaska?
Q. Right.
A. It was one or two years after I got out of high school.
Q. Okay.
A. I went to Alaska for the summer, for the summer, for two summers.
Q. Is it fair to say you've been a full-time commercial fisherman, at least, since you got out of high school?
A. Yes.
Q. Have you done any other type of work other than commercial fishing?
A. No.
Q. Have you always fished on -- well, strike that. Other than the two summers you were in Alaska,



what boats have you fished on since you got out of high school?
A. I fished on the Mary & Josephine, Damariscotta, and the Josephine.
Q. Now, as I understand it, the fishing vessel Mary & Josephine is owned by a corporation called Mary & Josephine Corporation?
A. Yes.
Q. Does Mary & Josephine Corporation also own the fishing vessel Josephine?
A. No.
Q. Who owns the fishing vessel Josephine?
A. F/V Josephine, Inc.
Q. Okay. And who owns the fishing vessel Damariscotta?
A. S & M Fisheries, Inc.
Q. Who owns the stock in Mary & Josephine Corporation?
A. My father.
Q. Okay. Has that always been the case from the time the corporation was formed?
A. I believe so.
Q. Okay. Now, your father is Salvatore Russo?
A. Yes.



Q. For F/V Josephine Corp., who owns the stock in that company?
A. My father and I.
Q. Okay. What percentage does your father own, and what percent do you own?
A. My father owns 60, and I own 40.
Q. And for S & M Fisheries, Inc., who owns that corporation?
A. S & M Fisheries, Inc., who owns the stock?
Q. Yes.
A. It's my father and I. And it's 50/50.
Q. Has that always been the case since the corporations were formed?
A. Yes.
Q. Do you know when Mary & Josephine Corporation was first formed?
A. No.
Q. Okay. As long as you know, it's been around?
A. Yes.
Q. Okay. What about the fishing vessel Josephine Corp., do you know when that was formed?
A. 1996.
Q. Is that when the fishing vessel Josephine was acquired by the company?

Josephine on port risk for that period of time?
A. We were fishing -- my father and I were fishing the Josephine during the summer.
Q. And you didn't want to pay the premium for coverage you didn't need; is that fair?
A. Correct.
Q. And so while it was on port risk, you weren't buying any P&I coverage to protect the crew 'cause there was no crew; is that correct?
MR. ABROMOVITZ: Objection.
MR. PETTINGELL: Objection.
Q. Is that correct?
A. Repeat that again.
Q. Sure. During the time that the Josephine was tied up on port risk, she didn't have any crew?
A. She did not have any crew.
Q. Okay. And would it be fair to say that you didn't want to pay the cost of buying insurance for the crew when there wasn't any crew?
MR. PETTINGELL: Objection. You -- you're coming in with a different issue. I mean, I want to be fair, Len. You can explore this all you want. But it seems to me you're co- -- you were talking about port risk. You're coming in



with a different issue, I think, without laying a sufficient foundation. Now you're talking about P&I coverage. I understand what your position is, and ours is a little different.
MR. LANGER: Okay. I'd like him to answer the question.
MR. PETTINGELL: Well, I'm going to --
MR. LANGER: And I --
MR. PETTINGELL: -- object --
MR. LANGER: -- unders- -- I understand your objection.
MR. PETTINGELL: I'm going to object to the form of the question. I think it's misleading. I think you can put it in -- you're the guy asking the questions. But I think it can be put a little more clearly and get what you want. I'm not instructing him not to answer.
MR. LANGER: That's good. 'Cause I understand, in this district, you can't do that.
Q. Mr. Russo, I'll -- I'll ask it a little differently, see if I can satisfy Mr. Pettingell. When you put a boat on port risk coverage, requested that Blackadar put the



Mary & Josephine on the port risk coverage from early summer until late fall, what was your understanding of the types of coverage that you would get during that time period?
A. Through Blackadar?
Q. Yes.
A. That the boat was on port risk. We never talked about deleting crew coverage through Blackadar. They had a -- a seasonal type credit through Blackadar.
Q. They had a seasonal credit?
A. Correct.
Q. Did you understand that you were getting money back for both the P&I premium that you paid and the hull premium that you paid during the period it was on port risk?
A. Yes.
Q. Did you ever find out what you got back for hull and what you got back for P&I?
A. No.
Q. Did you ever ask?
A. Don't remember.
Q. Were you curious as to why you were getting back whatever it was? Or did you just rely on



Blackadar for properly calculating the return premium?
A. I don't remember.
Q. Now -- but you thought you were getting back some money relating to the P&I coverage?
A. Yes.
Q. Now, did you believe that while the vessel was on port risk from early summer till late fall that there was coverage for the crew on the Mary & Josephine?
A. Yes.
Q. What sort of coverage did you think there was?
A. If someone got hurt, they would be covered.
Q. Did you ever ask anybody at Blackadar what was covered or what wasn't covered while you were getting money back on the P&I premium?
A. I don't remember.
Q. Did you think that there were -- well, let me strike that. I think you told me earlier you couldn't recall the number of crewmen that were covered on the Mary & Josephine while it was insured with Blackadar; is that correct?
A. That's correct. Yes.
Q. Did you believe that the entire crew

complement, whatever it was, was covered while the vessel was on port risk --
A. Yes.
Q. -- or only some of them?
A. Entire crew.
Q. Would that -- if, in fact, the vessel was not fishing during that time period, why did Mary & Josephine Corporation want to continue covering or providing P&I coverage for the crew?
A. Why would it require?
Q. No. Why did Mary & Josephine Corp. want to provide P&I coverage for the crew, the whole crew, during the time when the vessel wasn't fishing and, therefore, had no crew?
A. I said it would require -- well, one reason would be that, where we tie up at the state pier, they require coverage. And, two, if you need to do work on the boat, you would like to be covered.
Q. Is it your testimony that the state pier in Gloucester requires that the vessel carry crew P&I coverage?
A. Yes.
Q. Would the entire crew be doing work on the



vessel while it was on port risk?
A. If it had a crew, yes.
Q. It didn't have a crew, did it? The crew was fishing somewhere else; is that correct?
A. Yes.
Q. Now, you said that the Mary & Josephine was on port risk from early summer to late fall while you and your father were fishing on the Josephine; is that correct?
A. Repeat that again.
Q. Sure. While the Mary & Josephine was on port risk from early summer to late fall, you and your father were fishing on the Josephine?
A. Correct.
Q. Okay. And there may have been another crewman from time to time on the Josephine as well?
A. Correct.
Q. At some point, did the Josephine get tied up so that you and your father could return to fishing on the Mary & Josephine?
A. Yes.
Q. And was that sort of from November or December through the winter, back to the beginning of the summer again?



A. Which year?
Q. Well, while you were being insured through Blackadar.
A. Every year was different.
Q. Okay. So was there a period of time when both the Mary & Josephine and the Josephine were placed on port risk?
A. No.
Q. While the -- while you were insured with Blackadar, would the Josephine be put on port risk when the Mary & Josephine came off port risk?
A. Correct.
Q. Okay. Is it the practice on -- on the Mary & Josephine that deck hands or crew members are expected to do gear work on the vessel from time to time?
A. Yes.
Q. And did they do gear work on the vessel both at sea and while it's tied up in between trips?
A. Yes.
Q. If the Mary & Josephine were on port risk when it didn't have a fishing crew, how would you compensate people that were working on the



boat, if they were?
A. I would hire outside help.
Q. Okay. Was your understanding of port risk coverage for the Josephine the -- the same as you've described to me for the Mary & Josephine?
A. Yes.
Q. So while it was on port risk, you would get credit for a reduction in premium on both the P&I and the hull?
A. Yes.
Q. What's your -- we talked about putting it on port risk coverage. What's your understanding of the term "port risk"?
A. I was told that port risk is something that I could do when the boat was tied to the dock and not fishing.
Q. Who told you that?
A. Blackadar told me, and Bob McVey had told me the same.
Q. Okay. Did they tell you any more other than it was just some type of coverage you could get when the boat was tied to the dock and not fishing?

A. No. They didn't.
Q. They didn't tell you anything about -- yeah, you got to speak up. They didn't tell you anything about what port risk covered or what it didn't cover?
A. No.
MR. PETTINGELL: Matt, you're swallowing your words. Speak up a little bit.
A. No.
THE WITNESS: Sorry.
Q. Did anybody ever tell you how the premium was being calculated to return to the vessel's owner --
MR. PETTINGELL: While?
Q. -- while it was on port risk?
MR. PETTINGELL: O- -- okay. I'm -- we are talking Blackadar, and then I heard Bob McVey come in. We've had testimony that, at different times, the boat was insured with OMI. So I'm going to ask that you specify at what point in time.
MR. LANGER: I'm asking if anybody ever told him how the premiums were calculated.
A. No.



Q. In the summer -- let me back up a minute. Strike that. Did you ever file a claim -- let me strike that again. Did Mary & Josephine Corp. ever file a claim against the insurance, while it was insured with Blackadar, through Blackadar and while the vessel was on port risk?
A. No.
Q. Did F/V Josephine, Inc., ever file a claim for an incident or incidents involving the fishing vessel Josephine while it was on port risk through Blackadar?
A. Could you repeat the question before? Could you repeat that again?
Q. Sure.
A. I'm sorry.
Q. While the Mary & Josephine was insured through Blackadar --
A. Through Blackadar. Okay.
Q. -- was there ever a claim filed arising out of some incident that occurred while the vessel was on port risk?
A. No.
Q. Okay. Were there any claims filed when it was



operational?
A. Through Blackadar?
Q. Yes.
A. Yes. One.
Q. Okay. What type of claim was that?
A. A broken finger.
Q. And who had the broken finger?
A. Danny Balvo.
Q. B-a-l-v-o?
A. Yeah.
Q. Close enough. Huh?
A. Yeah. Your guess is as good as mine.
MR. PETTINGELL: Plus enough for government work.
Q. Any other claims while the vessel was insured with Blackadar?
A. No.
Q. What about the Josephine, were there ever any claims filed while the vessel was insured with Blackadar?
A. No.
Q. Okay. Sometime in the summer of 2001, you called Bob McVey; is that correct?
A. Is that the first year that we signed on? Yes.



Q. Okay. Why did you call Mr. McVey?
A. To get a quote on insurance for the vessels.
Q. Why were you looking for a different quote?
A. Ocean -- Bla- -- I believe Blackadar was going to eliminate offshore vessels insurance. Yeah. No insurance on offshore vessels.
Q. So, at some point, did they tell you that they weren't going to renew your coverage?
A. Just one boat, the Mary & Josephine. Yes.
Q. But they were going to renew the Josephine?
A. Yes.
Q. And so did you call people other than Mr. McVey, or did you just call Mr. McVey?
A. I just called McVey.
Q. And why did you call Mr. McVey?
A. I was told that they were a good company --
Q. Who told you --
A. -- from a friend of mine.
Q. Who told you that?
A. Tommy Williams.
Q. Does he own a vessel?
A. Yes.
Q. What's the name of his vessel?
A. It's in Point Judith. I can't think of it off

show up or had time off?
A. Yes.
Q. During the period from the summer of 2001 to the present, did either Salvatore, Jr. or Gerald own their own boats?
A. Yes.
Q. Okay. And can you tell me which one or both and the names of their boats?
A. Salvatore owned the -- Salvatore owned a boat. I'm not even sure of its name. He did own a boat. I can't remember the name of the boat. I'm sorry.
Q. Okay. Did -- did he own it for the whole time, from the summer of 2001 up till now, or just part of that time?
A. The question before this one, okay, could you repeat that again? I'm sorry to do that.
Q. I think it was a question of what the name of the boat was and what period of time he owned it.
MR. PETTINGELL: Well, why don't we double-check?
MR. LANGER: You can -- why don't you read it back.



(Questions and Answers read back.)
A. Okay. Salvatore, 2001 to the present, owns a vessel called "Atlantic Mistress."
Q. Okay.
A. And Gerry does not.
Q. No vessel?
A. No vessel.
Q. Okay. Is he a full-time fisherman on another vessel other -- you said he was a transient crewman on the Mary & Josephine. Does he fish full time on another vessel and then fill in? Or does he do something else?
A. He fishes his vessel and then comes with me.
Q. I'm talking about Gerald.
A. Oh, Gerald. Gerald when?
Q. From the summer of 2001 until now.
A. Mary & Josephine?
Q. Okay.
A. No. Did he fish on the Mary & Josephine?
Q. Well, he -- you said earlier he was a transient crewman on the Mary & Josephine.
A. Yeah.
Q. What I'm just trying to figure out, is there some vessel that he fishes on full time and



then fills in when needed on the Mary & Josephine?
A. Yes. He fishes full time on the Josephine.
Q. Okay. And when the Josephine is on -- is tied up on port risk and not fishing, where does he fish, if he does? Maybe he doesn't fish. I don't know.
A. When he wants to, he comes fishing with us on the Mary & Josephine.
Q. Okay. I think I understand.
MR. PETTINGELL: Off the record.
(A brief discussion was held off the record.)
Q. And Sal, Jr. fishes his own boat and then fills in from time to time on the Mary & Josephine?
A. Correct.
Q. And on the Josephine from time to time?
A. Correct.
Q. Do you know whether the Atlantic Mistress, during the period -- summer of 2001 until now, was insured through Ocean Marine?
A. Yes. It was.
Q. Is it still insured with Ocean Marine?
A. No.



Q. Who -- who insures it now, if you know?
A. I don't know.
Q. Okay. Do you know when it was insured with Ocean Marine?
A. I don't know.
MR. PETTINGELL: Are you okay?
THE WITNESS: Yeah. Thanks for asking.
Q. Were you always the contact with Ocean --
MR. ABROMOVITZ: Okay. Can we take a quick break?
MR. LANGER: We'll take a five-minute break.
(Brief recess taken.)
BY MR. LANGER:
Q. Were you always the contact on behalf of Mary & Josephine Corp. and the fishing vessel Josephine, Inc., with Ocean Marine Insurance Agency?
A. Yes.
Q. To your knowledge, did your father or mother ever speak to anybody at Ocean Marine at any time?
A. At any time? Yes. After I got hurt.
Q. Okay. Let me back up then. And we'll -- we'll

Q. Now, during the time from Augu- -- excuse me -- May 15th when the boat stopped fishing up until the day you called on August 3rd -- excuse me -- October 3rd, did the -- was there a crew on board the vessel, the Mary & Josephine?
A. From May?
Q. From May 15th to October 3rd when you called.
A. Was the boat fishing?
Q. Well, you already said it wasn't fishing; and that's why you wanted a return premium based on a port risk coverage.
A. Correct.
Q. And what I'm asking you is, were there any crew members of the vessel during that time period May 15th to October 3rd?
MR. ABROMOVITZ: Any of the days during that time period?
Q. Any days during that time period.
MR. PETTINGELL: Of '03?
MR. LANGER: Correct.
A. There was -- there was a crew that I had. There were people that I had that were on my other two boats, fishing. They were waiting to go back onto the Mary & Josephine.



Q. My question was, during the period from May 15th of '03 to October 3rd of '03, was there a crew on the Mary & Josephine?
A. Not physically on the Mary & Josephine. They were ready to go when the Mary & Josephine was ready to go.
Q. Okay. But you told Ocean Marine that it wasn't fishing, and it wouldn't be fishing for some time?
A. That's correct.
Q. Okay. So was there a crew that was being paid to either stand by on the Mary & Josephine or -- or do work on the Josephine during that period from May 15th to October 3rd?
A. There was a crew that was working.
Q. Okay. Who was the crew, and what work were they doing during the period May 15th --
A. Myself.
Q. Okay.
A. Charles Reed, my father. I think, Ricky Marshall. That's all I can remember.
Q. Okay. And what were they doing, you and they doing, on the Mary & Josephine from May 15th to October 3rd of 2003?



MR. PETTINGELL: Objection.
Q. You can answer the question.
A. Nothing.
Q. Do you recall, in your conversation with Mr. McVey on October 3rd, telling him that you wanted the boat on port risk, and you didn't want to pay any crew P&I?
A. No. I did not say that.
Q. Did you tell him that you didn't even want one crew P&I the way you had it when it was on port risk before?
A. No. I did not.
Q. Did you have any conversation with Mr. McVey on October 3rd about the number of crew that would be covered during the time the vessel was on port risk?
A. No. I did not.
Q. Now, from October 3rd of 2003, when you talked to Mr. McVey, up until the time of your accident, did you have any other conversations with Mr. McVey about either the Josephine or the Mary & Josephine?
A. I don't remember.
Q. Do you remember having any conversations with



anybody else at Ocean Marine during that time period about either the Josephine or the Mary & Josephine?
A. No.
Q. Do you remember having any conversations with anybody at Sunderland during that time period regarding either vessel?
A. Hold on. Could you go back two questions and give me the dates again? I'm sorry.
Q. From October 3rd --
A. Yes.
Q. -- we're deal- -- we're dealing with the period from the day you talked to Bob McVey and --
A. The day --
Q. -- Ms. Houde --
A. -- I got hurt?
Q. -- to the day you got hurt, did you have any conversations with anybody at Ocean Marine?
A. No.
Q. Did you have any conversations with anybody at Sunderland?
A. No.
Q. Did you have any conversations during that time period with anybody at North American