

Exhibit F

William J. Scola
September 13, 2005

---

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 04-10374WGY

. . . . . . . . . . . . . . . . . . . .

NORTH AMERICAN SPECIALTY
INSURANCE COMPANY,
          Plaintiff,

vs.

MARY & JOSEPHINE CORP. and
MATTEO RUSSO,
          Defendants.

. . . . . . . . . . . . . . . . . . . .

DEPOSITION OF WILLIAM J. SCOLA, a witness called on behalf of the Defendant, Mary & Josephine Corp., pursuant to the Federal Rules of Civil Procedure before Jo Anne M. Shields, Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of Joseph G. Abromovitz, P.C., 858 Washington Street, Dedham, Massachusetts, on Tuesday, September 13, 2005, commencing at 2:01 p.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street
Boston, Massachusetts 02109
Telephone (617) 742-6900

---

**Page 2**

APPEARANCES:

LEONARD W. LANGER, ESQUIRE
TOMPKINS, CLOUGH, HIRSHON & LANGER, P.A.
Three Canal Plaza
P.O. Box 5060
Portland, Maine 04112-5060
(207) 874-6700
     for the Plaintiff

RICHARD H. PETTINGELL, ESQUIRE
77 North Washington Street, Second Floor
Boston, Massachusetts 02114
(617) 778-0890
     for the Defendant, Mary & Josephine Corp.

JOSEPH G. ABROMOVITZ, ESQUIRE
THE LAW OFFICES OF JOSEPH G.
ABROMOVITZ, P.C.
858 Washington Street
Dedham, Massachusetts 02026
(781) 329-1080
     for the Defendant, Matteo Russo

ALSO PRESENT:
     Robert McVey

---

**Page 3**

                    I N D E X

Deposition of:              Direct   Cross   Redirect
WILLIAM J. SCOLA

    By Mr. Pettingell          4                52
    By Mr. Abromovitz                  39

                  E X H I B I T S

No.                                              Page

8  Letter to Matt Russo from Lynanne
   Houde dated 10/3/03                            50

9  Letter to Matt Russo from Lynanne
   Houde dated 12/18/02                           51

---

**Page 4**

                S T I P U L A T I O N S

        It is stipulated by and between counsel for the respective parties that the deposition transcript is to be read and signed by the deponent under the pains and penalties of perjury; and that the sealing and filing thereof are waived; and that all objections, except as to form, and motions to strike are reserved to the time of trial.

                      * * *

                  P R O C E E D I N G S

                  WILLIAM J. SCOLA, a witness called for examination by counsel for the Defendant, Mary & Josephine Corp., having been satisfactorily identified by the production of his driver's license and duly sworn by the Notary Public, was examined and testified as follows:

                  DIRECT EXAMINATION

BY MR. PETTINGELL:

   Q.  Sir, could you please state your name?
   A.  William Scola.
   Q.  And your address?

Scola, 13, 2005

North American Specialty Insurance
vs. Mary & Josephine Corp., et al.

## Page 9

1  Was it a form of agency agreement, to your
2  knowledge?
3  A. I couldn't answer that question.
4  Q. Okay. I may not have asked you this. What's
5  your position at OMI?
6  A. Presently?
7  Q. Yes.
8  A. President.
9  Q. Okay. And how about going back to the year
10 2001?
11 A. Treasurer.
12 Q. You were an officer of OMI at that time?
13 A. Yes.
14 Q. And you're currently the CEO?
15 A. Yes.
16 Q. In that capacity, do you have an understanding
17 of the nature of the agreement that OMI has
18 with Sunderland?
19 A. I believe I just explained that.
20 Q. Well, I'm asking if you have an opinion as to
21 whether or not it's an agency agreement --
22      MR. LANGER: Object to the extent --
23 what your understanding is, sir.
24 A. I --

## Page 10

1  a legal conclusion.
2  A. Yeah. I just don't -- I -- I don't know the
3  legal definition of agency agreement. I really
4  can't answer that question.
5  Q. Okay. Other than being permitted by Sunderland
6  to approach them with business, does the
7  agreement authorize OMI to do anything else?
8  A. Not to my knowledge, no.
9  Q. Okay. Now, throughout the period from 2001 to
10 2003, policy -- policy endorsements were
11 issued to either Policy 1, Policy 2, or
12 Policy 3. You know what I mean when I refer to
13 those policies?
14 A. I do.
15 Q. Does the agreement that OM- -- or OMI
16 has, or had at that time, with Sunderland
17 authorize OMI to issue such endorsements on
18 behalf of Sunderland or its designated
19 companies?
20      MR. LANGER: You mean, without any kind of
21 prior authority?
22      MR. PETTINGELL: My question stands.
23 Q. Does it authorize them to issue?
24

## Page 11

1  A. May I answer this my own way? It may take a --
2  Q. Yes.
3  A. -- a minute. We are authorized to type up
4  endorsements on behalf of Sunderland Marine,
5  have them approved by Sunderland Marine, and
6  then mail them out from our office, if that
7  answers the question for you.
8  Q. It does.
9  A. Okay.
10 Q. Is OMI also authorized, under the terms of its
11 agreement with Sunderland, to have someone sign
12 the endorsements on behalf of Sunderland as a
13 rep -- as an authorized representative of
14 Sunderland?
15 A. I believe they are. Yeah.
16 Q. Okay. OMI wouldn't issue an endorsement, I
17 take it, without first running it by -- running
18 the question of whether an endorsement should
19 issue by Sunderland and getting their approval?
20 A. Yes.
21 Q. Yes, that's a correct statement?
22 A. Yes. We would get their approval prior to
23 sending it out. Yes.
24 Q. Okay. The ultimate decision on whether or not

## Page 12

1  an endorsement should issue lies with
2  Sunderland?
3  A. Correct.
4  Q. Okay. Now, who was involved at OMI back during
5  the years 2001 through 1003 with issuing
6  endorsements, the physical --
7  A. Can --
8  Q. -- process?
9  A. The physical --
10 Q. I understand --
11 A. -- process of it? That -- that would be --
12 certainly, Ms. Houde was involved at that time,
13 Mrs. Lemoges, I believe, was involved at that
14 time. I -- I don't -- memory fails me. I
15 mean, I don't know if anyone else was involved
16 physically with actually typing them up.
17 Q. Okay. And we have, at least, one example. I
18 think it's the last page of Exhibit 7 is a --
19 Endorsement No. 3 to Policy No. 3 that was
20 signed by Mr. Ostrow as authorized
21 representative.
22 A. I believe that's correct.
23 Q. All right. Did you ever, or did you ever,
24 during that period of time, sign endorsements

## Page 13

```
 1   as a -- an authorized representative?
 2   A.  I don't believe I did.
 3   Q.  Now, did -- did an endorsement issue
 4       every time there was a change in coverage under
 5       a policy?
 6   A.  Okay.  That would be the normal and accepted way.
 7   Q.  Were there exceptions to the rule?
 8   A.  Okay.  I really can't think of any.
 9   Q.  And what was the purpose of issuing an
10       endorsement, Mr. Scola?
11   A.  Just to reflect the change in the policy.
12   Q.  Well, why?
13   A.  For any reason.  I mean, a variety of reasons.
14   Q.  Well, if you could tell us what they are.
15   A.  When -- in this instance, when a client calls
16       and asks to be put on port risk, we would issue
17       the endorsement to reflect that that policy was
18       put on port risk at a certain date.
19   Q.  Well, was one of the reasons to memorialize in
20       writing a change in the contract of insurance
21       between Sunderland and the insured?
22   A.  Yes.  That would be a reason.
23   Q.  And was one of the reasons to send it to the
24       client so that the client would have
```

## Page 14

```
 1       confirmation in writing that the policy
 2       change -- the requested policy change had taken
 3       place?
 4   A.  That would be a reason.
 5   Q.  And was one of the reasons because, if there
 6       was some mistake made, it would afford the
 7       insured with an opportunity to correct the
 8       mistake or, at least, raise the fact that, hey,
 9       this isn't what I -- what I wanted?
10   A.  That was usually done ahead of the endorsement.
11       We would -- we would send out letters verifying
12       conversations to show what had taken place in
13       that conversation.  And, at that point, that
14       gives the client an opportunity then to call
15       and say that is not what I wanted to have done.
16   Q.  So is it fair to say that the normal practice
17       of OMI was that, if there was to be a change in
18       coverage under a given policy, there was some
19       sort of writing that went from O- -- OMI to the
20       insured, either in the form of a confirmatory
21       letter or in the form of an endorsement?
22   A.  That's the way it should work.
23   Q.  So that the -- the insured would --
24   A.  Be aware.
```

## Page 15

```
 1   Q.  -- be aware.  And that he would -- to fully answer
 2       the question, that the insured would know that
 3       we were aware of what was happening.
 4   A.  Exactly.
 5   Q.  Right.  Just good business?
 6   A.  Yes.
 7   Q.  Okay.  Now, I wonder if you could tell us what
 8       your duties are at OMI as president?
 9   A.  I have a feeling that may be beyond the scope
10       of why I'm here today.
11   Q.  Well, maybe.  But I've got to know who you are
12       and -- and have some understanding of where
13       you're coming from.  Otherwise, your testimony
14       is sort of out there in a -- in a vacuum.
15   A.  Well --
16   Q.  You can be general.
17   A.  Yeah.  I mean, I -- I'd have to be general.  I
18       mean, I certainly have responsibility for
19       seeing to it that the company is run properly,
20       that we're using proper procedures, that we're
21       doing what our clients wish us to do, that
22       we're doing what the insurance companies wish
23       us to do.  And, I guess, as president, the buck
24       stops there.
```

## Page 16

```
 1   Q.  --
 2   A.  --
 3           MR. PETTINGELL:  Off the record.
 4              (A brief discussion was held off the
 5       record.)
 6           MR. PETTINGELL:  Back on the record.
 7   Q.  Now, going back to the period of time when
 8       Mr. Ostrow was the president --
 9   A.  Uh-huh.
10   Q.  -- were your duties different to any degree?
11   A.  To a lesser degree.  Obviously, Frank --
12       Mr. Ostrow took on many of those same
13       responsibilities at that time as president.
14   Q.  Could you give us a rundown of your educational
15       history?
16   A.  I have a master's in business, a college degree
17       and a master's degree.
18   Q.  Oh, a long time ago.
19   A.  That's a long time ago.
20   Q.  Okay.  When did you obtain the master's in
21       business?
22   A.  Yeah.  1972.
23   Q.  Okay.  And could you give us a rundown of
24       your -- your work experience?
```

Scola
13, 2005

17

```
 3  approximately five years. I worked in a
 4  manufacturing business for approximately five
 5  years. And then I got into the insurance
 6  business.
 7  Q. When was that?
 8  A. 1985.
 9  Q. And in what capacity did you get into the
10     insurance business?
11  A. A complete novice.
12  Q. Well, we all have to start somewhere. But, I
13     mean, who were you working for?
14  A. I worked with Frank Ostrow --
15  Q. Was this --
16  A. -- in -- in a predecessor company to Ocean
17     Marine Insurance Agency.
18  Q. Okay. And in what capacity were you working
19     with Mr. Ostrow in OMI's predecessor?
20  A. Principally, learning. I knew nothing about
21     marine insurance at the time.
22  Q. Okay. And that was beginning in 198- --
23  A. '85.
24  Q. '85?
```

18

```
 1     present time for OMI or its predecessor
 2     company?
 3  A. Yes.
 4  Q. All right. Did you have any formal training in
 5     insurance?
 6  A. No.
 7  Q. So it was --
 8  A. Other than a -- a few classroom situations, as
 9     Mr. McVey went through, to maintain licensing
10     and things like that. However, those were so
11     minimal in marine insurance as to be worthless
12     towards marine.
13  Q. Okay. And do you hold any licenses in Rhode
14     Island?
15  A. Yes.
16  Q. What licenses?
17  A. Producer's license.
18  Q. Producer's license.
19  A. Is that the --
20  Q. I -- I'm just curious. Is that the term in
21     Rhode Island?
22  A. Producer's license. Yes.
23  Q. Massachusetts, it would be a -- a broker's
24     license?
```

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

19

```
 1  A. I'm not really sure.
 2  Q. Okay.
 3  A. It may be. I -- I -- I am licensed in
 4     Massachusetts, but I don't even know the term.
 5  Q. Okay. I don't think it's germane. Well, maybe
 6     it is. But . . .
 7         Now, you heard Mr. McVey's testimony
 8     concerning the -- his opinion as to the scope
 9     of P&I coverage available under a -- a port
10     risk cover?
11  A. I did.
12  Q. What is -- what is your understanding,
13     Mr. Scola, of the scope of P&I cover that is
14     available under a port risk policy?
15  A. Under a -- in my experience, under a normal
16     port risk policy, there is no need for crew
17     coverage. And, hence, there is no crew P&I
18     coverage under a port risk policy under normal
19     situations.
20  Q. Now, you said "a normal port risk policy." How
21     about a situation where you have a hull and P&I
22     policy in the form of the policy which has been
23     marked as Exhibit 7?
24  A. Correct. Yeah.
```

20

```
 1  Q. Now, the last page of Exhibit 7 has an
 2     endorsement, Endorsement No. 3, which covers
 3     for port risk only from August 13, 2003 to
 4     December 21st, 2003.
 5  A. Yes.
 6  Q. If Endorsement 3 had never been issued and the
 7     policy terms and provisions were as set out in
 8     Exhibit 7 with the exception of Endorsement 3,
 9     would there have been what has been referred to
10     in Mr. McVey's deposition as crew P&I cover
11     available under the policy?
12         MR. LANGER: Objection to the extent it
13     calls for a legal conclusion.
14  A. Can you repeat that question again now?
15  Q. Sure. Exhibit 7 is -- has been testified to, a
16     copy of Policy No. 3 --
17  A. Uh-huh.
18  Q. -- and my question is, had Endorsement 3 never
19     been issued -- I understand it did; I'm
20     changing it --
21  A. Okay.
22  Q. -- that wasn't part of the policy terms and
23     provisions -- would there have been what has
24     been referred to as crew P&I coverage available
```

Scola
13, 2005

21

```
 1      under the policy?
 2           MR. LANGER:  The same objection.
 3      A.   All right.  Let me -- let me answer that
 4      question.  Had circumstances been totally
 5      different --
 6      Q.   Yes.
 7      A.   -- there were no phone calls made --
 8      Q.   Yes.
 9      A.   -- there were no endorsement -- there was no
10      endorsement issued, the policy was renewed in
11      August as an operational policy, it would have
12      been an operational policy.
13      Q.   And by "operational policy," you mean a policy
14      that the vessel could have gone out fishing?
15      A.   Could have gone out fishing.
16      Q.   Under that circumstance, under the language as
17      set forth in Exhibit 7, there would have been
18      coverage for the crew?
19           MR. LANGER:  The same objection.
20      A.   Under an operational policy, there would have
21      been coverage for the crew.
22      Q.   Well, if one -- if -- if Exhibit 7 did not have
23      Exhibit -- Endorsement No. 3 --
24      A.   And it was an operational policy.
```

22

```
 1      Q.   -- would it be regarded as an operational
 2      policy by you?
 3      A.   Yes.
 4      Q.   All right.  And Endorsement 3 was issued.  And
 5      I'm -- I'd like to give you Exhibit 7 --
 6           MR. LANGER:  He has it --
 7      A.   I have it.
 8           MR. LANGER:  -- in front of him.
 9      Q.   -- and ask you if you could show me where in
10      the policy language and endorsements it states
11      that there is no coverage for crew?
12      A.   For the time period August 13th, 2003 to
13      December 21st, 2003, the fishing vessel is
14      covered for port risk only, no fishing.
15           MR. ABROMOVITZ:  Are you looking at --
16           THE WITNESS:  At this endorsement.
17           MR. ABROMOVITZ:  -- Exhibit No. 7?
18           THE WITNESS:  Yes.
19           MR. ABROMOVITZ:  Endorsement No. 3 to
20      Exhibit 7?
21           THE WITNESS:  Yes.
22           MR. ABROMOVITZ:  Okay.
23           THE WITNESS:  Yeah.
24      Q.   I understand that's what Endorsement No. 3
```

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

23

```
 1      says.  But I asked you something different.
 2      Where in the policy does it say there is no
 3      coverage for crew?
 4      A.   You mean, where is it written there is no
 5      crew -- quote, there is no crew coverage or
 6      words to that effect?
 7      Q.   Yes.
 8      A.   The -- there -- there are no words written to
 9      that effect in this policy.  There is only this
10      endorsement that reflects it was on port risk.
11      Q.   I see.  So you're saying, by virtue -- and
12      we're just restricting ourselves to the
13      policy now -- by virtue of the fact that
14      there's an endorsement that places the vessel
15      on port risk for a period of time, that is
16      where one would look for the conclusion that
17      there is no crew cover?
18      A.   That, and the fact, from what I heard from
19      Mr. McVey's testimony, that the client
20      requested that there be no crew coverage and
21      the boat be put on port risk.
22      Q.   Well, I understand that that's what Mr. McVey
23      says.  But I'm asking in terms of the policy
24      itself, the language of the policy that was in
```

24

```
 1      effect at the time of --
 2      A.   The -- the only --
 3      Q.   -- Mr. Russo's injury.
 4      A.   The only reference I can make to no crew
 5      coverage is the fact that it's on port risk.  I
 6      can -- I can make no reference to other facts,
 7      such as the boat cannot go offshore.  It
 8      doesn't say that in this endorsement, but it
 9      certainly is implied in this endorsement.  It
10      simply says "NO FISHING."
11      Q.   Well, I'm not talking about -- now -- now,
12      that's a navigational warranty, isn't it, what
13      would be referred to as a navigational
14      warranty?
15      A.   It's another warranty, yes, a navigational --
16      Q.   All right.
17      A.   -- warranty.  Yeah.
18      Q.   And by navigational warranty and -- you
19      understand that to mean the geographical area
20      that the vessel was permitted to travel in?
21      A.   Yes.
22      Q.   And if one were to go through the various pages
23      of this policy, you would find a navigational
24      warranty limiting the geographical area,
```

J. Scola
September 13, 2005

Page 33

```
 1  Q.  -- and all the other language remained the
 2      same -- are you with me?
 3  A.  I'm with you.
 4  Q.  All right. Now, you have the language that
 5      says "This policy is hereby amended from
 6      Operational to Port Risk. Adding: American
 7      Institute Port Risk Endorsement (01/18/70),"
 8      which is Exhibit 5.
 9  A.  Uh-huh.
10  Q.  All right. You also have the language that
11      says "Endorsement Section I and II, ALL OTHER
12      TERMS AND CONDITIONS REMAIN UNCHANGED."
13      Doesn't that mean that the crew warranty would
14      remain unchanged?
15          MR. LANGER: Objection.
16  A.  Not in my opinion.
17  Q.  And why is that, sir?
18  A.  Because the -- this endorsement puts the vessel
19      on port risk.
20  Q.  And where is the language that says, by virtue
21      of going on port risk, there is no -- I'll use
22      the phrase --
23  A.  I -- I --
24  Q.  -- "P" -- let -- let me finish.
```

Page 34

```
 1  A.  I'm sorry. Go ahead.
 2  Q.  -- "crew P&I cover"?
 3  A.  I don't see language to that effect on here.
 4      However, in -- in -- just in common knowledge
 5      of the reason for port risk and what people use
 6      it for and what know it to be, there is no need
 7      for crew coverage on a port risk vessel unless
 8      there are unusual circumstances. I go back to
 9      that again. That is why the -- it says there's
10      a crew of one covered on here to add that
11      coverage in what otherwise would be considered
12      by the underwriter to be no crew.
13  Q.  Well, you say that's common knowledge in the
14      industry?
15  A.  It is, to me and people I know.
16  Q.  Meaning?
17  A.  I -- I can't speak for everyone in the
18      industry, obviously. But, I -- I mean, when a
19      client calls to put his boat on port risk, he,
20      typically, will take off all the crew to save
21      money because he has no need for crew. He's
22      not doing anything --
23  Q.  I see.
24  A.  -- to that vessel.
```

Page 35

```
 1  Q.  Well, let's explore that a little bit. You've
 2      been working in the insurance industry as a
 3      broker with OMI or a predecessor since 1985?
 4  A.  Yes.
 5  Q.  And is it fair to say your knowledge and
 6      understanding of coverage under marine policies
 7      stems from things you've learned over the
 8      period of time from 1985 to the present, the
 9      last 20 years, I guess?
10  A.  Yes.
11  Q.  All right. Are you suggesting that all vessel
12      owners know as much about insurance, marine
13      insurance, as you do?
14          MR. LANGER: Objection to the form of the
15      question.
16  A.  That's not at all what I'm suggesting.
17  Q.  All right.
18  A.  Not at all.
19  Q.  So --
20  A.  But -- but, however --
21  Q.  Well --
22          MR. LANGER: Let him fin- -- let him finish
23      his answer. Let him finish the answer.
24  Q.  Not at all what you're suggesting. Is there
```

Page 36

```
 1      something else you were suggesting?
 2  A.  I was suggesting that it's common knowledge
 3      that most people would understand how and why
 4      to put a vessel on port risk, what the reason
 5      for it is, and why they know why they would
 6      want to do it.
 7  Q.  Isn't one of the reasons that vessel owners put
 8      their vessels on port risk because they're not
 9      going to be going out fishing?
10  A.  Yes.
11  Q.  Isn't it true, Mr. Scola, that the exposure to
12      someone being hurt on a vessel while out
13      conducting fishing ex- -- exercises or on an
14      operational vessel is greater than on a vessel
15      tied up to the pier?
16  A.  I would say that the exposure is greater while
17      out fishing. There are more chances of things
18      going wrong. However, you can certainly get
19      hurt, when you're on a vessel doing repairs,
20      very badly.
21  Q.  Isn't one of the reasons that a vessel owner
22      might tie a -- might request a vessel go on
23      port risk because they have repairs that they
24      want to conduct, and they're looking to save
```

J. Scola
ber 13, 2005

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

Page 37

```
 1   money because there's a reduced premium because
 2   the ex- -- the risk is not as great?
 3 A. That may be a reason that a vessel owner would
 4   want to go on port risk. That's not,
 5   necessarily, a reason why an underwriter would
 6   want to place that vessel on --
 7 Q. Okay.
 8 A. -- port risk.
 9 Q. Well, I'm talking about --
10 A. Oh, I -- I'm telling you what the real world is
11   like though.
12 Q. Please. I'm speaking about what a vessel owner
13   might want to do. And you understand -- I
14   think you've answered that you understand that
15   that, certainly, is something that vessel
16   owners might want?
17 A. Yes.
18 Q. If a vessel owner is working on a vessel tied
19   up at port risk, sometimes, vessel owners have
20   repairmen come aboard; welders, things of that
21   nature.
22 A. They do.
23 Q. And, frequently, to save money, vessel owners
24   have the crew come aboard and do repairs
```

Page 38

```
 1   themselves?
 2 A. They will. Yeah.
 3 Q. I mean, that's not --
 4 A. Not unusual.
 5 Q. -- unheard of?
 6 A. No.
 7 Q. Okay.
 8       MR. PETTINGELL: Just a second, please.
 9       (Brief recess taken.)
10   BY MR. PETTINGELL:
11 Q. You're here in response to the notice of
12   deposition duces tecum, and you're being
13   offered as NAS's designate with respect to
14   Paragraph 6. One of the things it asks you to
15   bring with you to the deposition is "Any and
16   all writings of whatever kind or nature that
17   define the term 'port risk coverage' as same as
18   being relied upon by Plaintiff" -- that's
19   NAS -- "in its Complaint." Have you brought
20   any documents with you?
21 A. I haven't.
22       MR. PETTINGELL: Mr. Langer, have you got
23   any documents?
24       MR. LANGER: I'm not aware of any written
```

Page 39

```
 1   definitions of port risk that explain as -- as
 2   defined by Mr. Scola --
 3       MR. PETTINGELL: Okay.
 4       MR. LANGER: -- in his answers to your
 5   questions.
 6 Q. Are you aware of any such documents, sir?
 7 A. I'm not.
 8 Q. Okay.
 9       MR. PETTINGELL: I think, with that, I'm
10   going to pass the witness. I told you we'd be
11   short.
12       MR. ABROMOVITZ: Just one moment.
13
14                    CROSS-EXAMINATION
15   BY MR. ABROMOVITZ:
16 Q. Mr. Scola, I think you testified earlier in the
17   deposition that, once a request for an
18   endorsement or change to the insurance pol[icy]
19   came from the -- the insured -- in this ca[se]
20   vessel owner -- typically, what would hap[pen]
21   is, a letter would go out to the insured
22   confirming any communications regarding a
23   proposed change to coverage; is that corr[ect?]
24 Q. Yes.
25 Q. Did one go out in this case to the Mary &[...]
```

(continued)
```
 9 Q. Josephine Corporation?
10 A. I believe I saw one to that effect. Yes.
11 Q. And this would be an endorsement -- now,
12   referring specifically to the policy year
13   August '03 to August '04. Are you saying
14   there was a letter that was -- went from
15   office to the owners of the Mary & -- Mary
16   & Josephine Corporation sometime in that policy
17   period in connection with a requested change?
18 A. I seem to recall -- and I'm su-- we -- we
19   probably have one here in the room somewhere --
20   a letter that was sent by Lynn Houde in
21   October, on the day or the day after she spoke
22   with Matt Russo, regarding placing this vessel
23   on port risk from -- for a couple of different
24   time periods.
```

(continued)
```
17   But I'm not -- I -- I can't be specific.
18   But I -- I think one went from May to August,
19   and the other went from August forward. But
20   it's -- it's here somewhere, if you want to see
21   it.
22 Q. Okay. Have you seen anything in any of these
23   letters that indicate to the vessel owner, Mary
24   & Josephine Corporation, that when the vessel
```

Scola
13, 2005

Page 41

```
 1   was put on port risk, there was no crew P&I
 2   coverage, any words to that effect in the body
 3   of any of these letters?
 4   A.  No.  I don't recall seeing that there -- there
 5       was no crew P&I coverage.  The only wording I
 6       remember is that it was -- it was requested to
 7       be put on port risk.
 8   Q.  Prior to December 3rd, 2003, the date of Matt
 9       Russo's accident, had you ever had any
10       conversations with him whatsoever?
11   A.  Not that I can recall, no.
12   Q.  Prior to December 3rd, 2003, had you ever had
13       any conversations with Sal Russo, Matt's
14       father?
15   A.  Not that I can recall.
16   Q.  Prior to December 3rd, 2003, had you had any
17       conversations with anybody on behalf of the
18       Mary & Josephine Corporation?
19   A.  No, not -- I don't recall speaking with anyone
20       from that corporation.
21   Q.  Would it be fair to say that prior to
22       December 3rd, 2003, you had no written
23       communication with anybody on behalf of the
24       Mary & Josephine Corporation, you, yourself?
```

Page 42

```
 1   A.  Not to my knowledge, Mr. Abromovitz.  I mean,
 2       it -- it's possible.  I don't recall everything
 3       that took place.  But I don't remember this, if
 4       there was anything.
 5   Q.  Do you remember any exchange of e-mails between
 6       you and anybody on behalf of the Mary &
 7       Josephine Corporation prior to December 3rd --
 8       December -- December 3rd, 2003?
 9   A.  No.  I -- I don't remember communicating with
10       anyone from Mary & Josephine Corporation.
11   Q.  Prior to December 3rd, 2003, did you have any
12       communication with anybody from the Russo
13       family concerning vessels other than the
14       fishing vessel Mary & Josephine?
15   A.  I believe I -- I had conversations with either
16       Matt's brother or cousin -- I'm not sure who it
17       was -- about a different vessel altogether that
18       wasn't part of that corporation.
19   Q.  Okay.
20   A.  Yeah.
21   Q.  That was owned by somebody in the Russo family?
22   A.  Someone else.  Yes.
23   Q.  Do you remember the essence of any of these
24       conversations?
```

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

Page 43

```
 1   A.  We had insurance on another vessel.
 2   Q.  At any point in time, in connection with
 3       conversations with anyone else from the Russo
 4       family relative to vessels other than the Mary
 5       & Josephine, did you ever communicate to any of
 6       these other persons your understanding of what
 7       a vessel being on port risk did to the
 8       existence of crew P&I coverage?
 9   A.  If anyone put a vessel on port risk, anyone --
10       either in this family or outside of this
11       family -- and they asked me to put a vessel on
12       port risk, I would have explained the situation
13       to them at the time as to what it was.
14   Q.  Were any of the other Russo vessels -- strike
15       that.  Were any of the other vessels owned or
16       operated by the Russo family ever put on port
17       risk other than the fishing vessel Mary &
18       Josephine?
19   A.  I'm sorry.  I don't -- I don't know.  Maybe.
20       Maybe not.  I just don't know.
21   Q.  Do you have any recollection prior to
22       December 3rd, 2003, in connection with any
23       vessel owned or operated by a member of the
24       Russo family, of advising somebody in writing
```

Page 44

```
 1       that if the vessel went on port risk, there was
 2       no crew P&I coverage?
 3   A.  I have no recollection of that.
 4   Q.  Does your office maintain separate files from
 5       the -- for the vessels insured by -- through
 6       OMI other than the fishing vessel Mary &
 7       Josephine?
 8   A.  I -- I'm not sure I understand the question.
 9       But I think I -- I know where you're getting
10       at.  We maintain a separate file for each
11       vessel that is insured by us.
12   Q.  Have you had occasion prior to today of looking
13       in the other files -- this is for vessels owned
14       or operated by the Russo family other than the
15       Mary & Josephine -- to determine if there's any
16       correspondence in there to anybody from the
17       Mary & Joseph- -- anybody from the Russo
18       family, informing them that if a vessel's on
19       port risk coverage, there is no P&I crew
20       coverage?
21   A.  I did not have occasion to look.
22   Q.  And if either of those vessels -- I'm going to
23       ask you to assume there were two other vessels
24       that were operated by a member of the Russo
```

Scola
er 13, 2005

Page 45

```
 1   family prior to December 2nd, 2003 -- if those
 2   vessels were ever on port risk -- placed on
 3   port risk, the documentation in connection with
 4   placing the vessel on port risk would be in
 5   those respective files?
 6  A. It should be.
 7  Q. Thank you. In connection with the last page of
 8     Exhibit 7, the port risk endorsement signed by
 9     Mr. Ostrow --
10  A. Uh-huh. Yes.
11  Q. -- do you know if, at that time -- this is as
12     of February '04 -- there was anything in
13     writing concerning OMI's arrangement with
14     Sunderland or NAS that granted Mr. Ostrow
15     authority to sign as their authorized
16     representative?
17  A. I believe your question asks me if there was
18     anything in writing?
19  Q. Yeah.
20  A. I don't think so.
21  Q. Okay. What is your understanding presently as
22     to the relationship between Sunderland and
23     North American Specialties, Sunderland Marine
24     and North American Specialties?
```

Page 46

```
 1  A. North American Specialty has some type of an
 2     arrangement, to -- to my knowledge, within the
 3     state of Massachusetts. That's the only state
 4     that I know of. There may be others -- because
 5     I don't do business all over the United States
 6     with Sunderland -- where policies are issued
 7     using the name of North American Specialty.
 8        To the extent of how that o-- how that
 9     operates, I really don't understand it or have
10     any knowledge of -- of the business arrangement
11     or the intricacies or even, actually, why that
12     is. I assume it's for some legal reason that
13     Sunderland does this.
14  Q. Does OMI have a direct relationship with North
15     American Specialties?
16  A. We do have to communicate with North American
17     Specialties as far as having things approved,
18     certain things that they need to see ahead of
19     time. I believe they get copied on things that
20     we send Sunderland.
21  Q. And I think you said very early in your
22     testimony today that the arrangement that OMI
23     has is -- pursuant to this written arrangement
24     with Sunderland is, you have the right or
```

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

Page 47

```
 1     the -- how did you express it -- the
 2     opportunity to present business to Sunderland?
 3  A. That's right.
 4  Q. Okay. When you present business to Sunderland
 5     with reference to a vessel operating under
 6     Massachusetts, is it your understanding that
 7     you're also presenting a business opportunity
 8     to North American Specialties?
 9  A. I -- I don't know what their arrangement is.
10  Q. When you present a business opportunity to
11     insure a commercial fishing vessel to
12     Sunderland at present, if Sunderland accepts
13     the opportunity, do they always write the risk
14     through North American Specialties?
15  A. Within the state of Massachusetts.
16  Q. And who does Sunderland use through vessels
17     operating out of Rhode Island?
18  A. They -- they use themselves.
19  Q. They have their own company, Sunderland Marine?
20  A. Sunderland Marine.
21  Q. Okay.
22  A. Yes.
23  Q. I don't mean to beat this to death. But I
24     understand from your testimony that you cannot
```

Page 48

```
 1     refer to any written materials from any source
 2     that supports your understanding that when a
 3     vessel is placed on port risk, there is no crew
 4     P&I coverage. Correct?
 5  A. You know, I probably didn't exhaust every
 6     avenue to see -- to -- to read everything
 7     that's out there on that. Nothing comes to
 8     mind in writing. As I said in my testimony,
 9     it's, pretty much, common knowledge that a --
10     an underwriter who accepts port risk just
11     naturally knows that he's not accepting crew
12     coverage with that.
13  Q. Common knowledge among whom?
14  A. Common knowledge among underwriters, common
15     knowledge among claim people, common knowledge
16     among agents and brokers, common knowledge
17     among fishermen who own vessels who place them
18     on port risk.
19  Q. But you, yourself, prior to December 2nd or
20     December 3rd, 19-- strike that.    You
21     yourself, prior to December 3rd, 2003, have no
22     personal knowledge of what Matt Russo
23     understood the insurance situation would be as
24     of that date, do you, sir? You never spoke to
```

Scola
[illegible] 3, 2005

## Page 49

1  I never spoke with him. So I guess I don't
2  have knowledge. But I -- certainly, be -- in
3  preparation for this, I looked through the file
4  to see what his -- as a client, you know, what
5  he did with his account. And it was on-and-off
6  port risk without crew many occasions and --
7  and on with -- with one crew on another
8  occasion. So I assume that someone with that
9  much experience knows what's going on. I could
10 be wrong, but I just have to assume that.
11 Q. Is it fair to say that, prior to the port risk
12    endorsement of February 16th, 2004 to Exhibit
13    No. 7, the policy at issue in this case --
14 A. I'm with you. Yeah.
15 Q. -- there was no written endorsement in the file
16    as of December 3rd, 2003?
17 A. There was no written endorsement with respect
18    to port risk --
19 Q. Yes.
20 A. -- for that policy -- Policy Year 3.
21 Q. Yes.
22 A. That's correct.
23 Q. Okay. So let me just make sure this -- we got

## Page 50

1  this clear on the record.
2  A. Yeah.
3  Q. You agree with me, do you not, sir, that prior
4     to Matt Russo's accident December 3rd, 2003,
5     there was no written endorsement put -- placing
6     this vessel on port risk that was part and
7     parcel to the insurance policy at issue in this
8     case? Do you agree with that, sir?
9  A. I agree. And I -- I also extend that there was
10    a letter that was sent to him, showing that he
11    asked to have it placed on port risk.
12 Q. There was --
13 A. And that is --
14 Q. -- a letter that --
15 A. That was in the file.
16 Q. -- that went out from Ms. Houde?
17 A. That's correct.
18 Q. Well, we'll chat with her about that.
19    MR. PETINGELL: Well, off the record for a
20    second.
21    (A brief discussion was held off the
22    record.)
23    (Letter to Matt Russo from Lynanne Houde
24    dated 10/3/03 marked as Scola Exhibit

## Page 51

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

1  No. 8.)
2  (Letter to Matt Russo from Lynanne Houde
3  dated 12/18/02 marked as Scola Exhibit
4  No. 9.)
5  Q. Mr. Scola, with reference to Exhibit No. 8,
6     which is Ms. Houde's letter of October 3rd,
7     2003, is that the letter that you referred
8     to --
9  A. Yes.
10 Q. Let me get it out, please.
11 A. Oh, I'm sorry.
12 Q. Is that the letter that you were making
13    reference to when you indicated that you
14    believe you saw, in the file, a letter going to
15    Mr. Russo confirming his request that the
16    policy -- that the vessel be placed back on
17    port risk coverage and the policy amended?
18 A. Yes.
19 Q. Okay. And then, I understand from Mr. Langer's
20    testimony that, sometime after December 2 --
21    or as Mr. Langer's off-the-record statement
22    that, sometime after December 12th, 2003, the
23    date the vessel -- the vessel again became
24    operational was handwritten in on Exhibit

## Page 52

1  No. 8, 12/21/03?
2  A. Yes. It must have been handwritten in 12/21 or
3     after.
4     MR. ABROMOVITZ: Okay. Thank you. That's
5     all I have.
6     BY MR. PETTINGELL:
7  Q. Just a few more, Mr. Scola.
8     MR. PETTINGELL: Oh, I'm sorry, Len, unless
9     you want to go first, whatever your pleasure
10    is.
11    MR. LANGER: I have -- I have no questions.
12    I'm beginning to feel a little like a ping-pong
13    ball between the -- the two defendants. But
14    I'll reserve my comments until --
15    MR. PETTINGELL: Okay. Well, it might make
16    sense to go at the end, if you wish.
17 Q. But, anyway, coming back to Exhibit 9 -- I'm
18    sorry -- Exhibit 8 --
19    MR. PETTINGELL: Oh. Something's wrong
20    here. Oh, I see what I did.
21 Q. -- this is the only writing that you are aware
22    of running from OMI to Mary & Josephine Corp.
23    that references, I guess, by extension, that

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

cola 2005

Page 53

```
 1  Q.  here's no crew warranty because it says the
 2      vessel's going on port risk?
 3  A.  Yes.
 4  Q.  And another letter that went out after
 5      that, and as a reminder that was --
 6  A.  All right.
 7  Q.  -- the same letter again.  Yeah.
 8  A.  Okay.  And other than the fact that it states
 9      that the vessel's on port risk, it, certainly,
10      doesn't contain any language, express language,
11      saying, and there's no crew P&I coverage?
12         MR. LANGER:  Objection.  The document
13      speaks for itself.
14  A.  It doesn't say that -- the words you used.
15  Q.  And you're unaware of any writing to Mary &
16      Josephine Corp. that does state in clear and
17      concise language that, during the period the
18      vessel is on port risk, there will be no crew
19      P&I coverage?
20  A.  I'm unaware of anything in writing.  Correct.
21  Q.  All right.  And I think you said it's your
22      understanding that that's common knowledge?
23  A.  I did say that.
24  Q.  But you'll also agree you have no knowledge of
        what Mr. Russo's understanding of insurance is?
```

Page 54

```
 1  A.  I don't believe that's what I said.
 2  Q.  Well, I'm asking you.
 3  A.  We --
 4  Q.  Do you, sir, know what Mr. Russo's knowledge of
 5      the coverage available under port risk
 6      insurance policies was at the time that
 7      Exhibit 8 was sent out?
 8  A.  I never spoke with him about it.  So I really
 9      shouldn't say anything.  I'm only reflecting
10      upon what I see he has done with his insurance
11      coverage by going on port risk without crew,
12      with crew over quite a few -- probably more
13      than any client I know in that short a period
14      of time.
15  Q.  Mr. Russo would tie his boat up and reduce the
16      size of the crew on the --
17  A.  Eliminate the crew.
18  Q.  -- on the vessel during --
19  A.  Eliminate the crew.
20  Q.  -- the period -- we have to talk one at a time.
21  A.  I'm sorry.
22  Q.  -- would reduce the size of the crew during the
23      period that the vessel was tied up?
24  A.  Yes.
```

Page 55

```
 1  Q.  And it's your recollection that, at times, he
 2      reduced it to zero?
 3  A.  Yes.
 4  Q.  Do you know what policy year he did that in,
 5      sir, reduced it to zero?
 6  A.  I -- I cannot remember.  I mean, I could look
 7      it up with some research.  I could tell you.
 8  Q.  Are you certain that he ever re- -- that --
 9      that he reduced it to zero for any of the
10      policies?
11  A.  To answer accurately, he was given port risk
12      credits with zero crew coverage at times and,
13      at other times, with crew coverage.
14  Q.  Other times, he reduced it to less than full
15      crew coverage?
16  A.  I don't know if he did, or it was suggested by
17      Mr. McVey.  I'm not sure how that worked.
18  Q.  Well, ultimately, the scope of the coverage
19      that Mr. Russo or Mary & Josephine Corporation
20      was requesting was for them to decide, wasn't
21      it?
22         MR. LANGER:  Can you repeat that question?
23         THE WITNESS:  Could you read that one to me
24      again?
```

Page 56

```
 1  Q.  Ultimately --
 2  A.  Yeah.
 3  Q.  -- the scope of coverage that Mary and
 4      Josephine Corporation was requesting was for
 5      them to decide, wasn't it?
 6  A.  Was for Mary & Josephine to decide.
 7  Q.  Yes.
 8  A.  It was their decision.
 9  Q.  Right.
10  A.  Yes.
11  Q.  The fact that somebody suggested that you might
12      want to keep one man on didn't mean they had to
13      follow that advice?
14  A.  They did not.
15  Q.  Okay.  And other than the fact that Mary &
16      Josephine Corporation appeared to have a habit
17      of putting their vessel on port risk and making
18      changes in the size of the crew, you don't have
19      any knowledge of what Mr. Russo's awareness of
20      the scope of coverage available under port risk
21      was, do you?
22  A.  You know, I -- I don't know how you can say
23      that af- -- after seeing what was done with his
24      policy by him.
```

DUNN & GOUDREAU
(617) 742-6900