
Exhibit
9

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 04-10374WGY

* * * * * * * * * * * * * * * * * * *

NORTH AMERICAN SPECIALTY INSURANCE COMPANY,
Plaintiff,

vs.

MARY & JOSEPHINE CORP. and MATTEO RUSSO,
Defendants.

* * * * * * * * * * * * * * * * * * *

**DEPOSITION OF LYNANNE HOUDE**, a witness called on behalf of the Defendant, Mary & Josephine Corp., pursuant to the Federal Rules of Civil Procedure before Jo Anne M. Shields, Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of Joseph G. Abromovitz, P.C., 858 Washington Street, Dedham, Massachusetts, on Tuesday, September 13, 2005, commencing at 3:34 p.m.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**
One State Street
Boston, Massachusetts 02109
Telephone (617) 742-6900



**APPEARANCES:**

**LEONARD W. LANGER, ESQUIRE**
**TOMPKINS, CLOUGH, HIRSHON & LANGER, P.A.**
Three Canal Plaza
P.O. Box 5060
Portland, Maine 04112-5060
(207) 874-6700
for the Plaintiff

**RICHARD H. PETTINGELL, ESQUIRE**
77 North Washington Street, Second Floor
Boston, Massachusetts 02114
(617) 778-0890
for the Defendant, Mary & Josephine Corp.

**JOSEPH G. ABROMOVITZ, ESQUIRE**
**THE LAW OFFICES OF JOSEPH G. ABROMOVITZ, P.C.**
858 Washington Street
Dedham, Massachusetts 02026
(781) 329-1080
for the Defendant, Matteo Russo

ALSO PRESENT:

William J. Scola

Robert McVey



**I N D E X**


| Deposition of: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **LYNANNE HOUDE** | | | | |
| By Mr. Pettingell | 4 | | 86 | |
| By Mr. Abromovitz | | 80 | | 105 |
| By Mr. Langer | | 89 | | |


**E X H I B I T S**


| No. | Page |
|---|---|
| 10 Letter to Matt Russo from Lynanne Houde dated 10/3/03 | 27 |
| 11 Letter to Matt Russo from Lynanne Houde dated 12/18/02 | 31 |
| 12 E-mail to Craig from Marie dated 12/24/03 | 86 |




S T I P U L A T I O N S

It is stipulated by and between counsel for the respective parties that the deposition transcript is to be read and signed by the deponent under the pains and penalties of perjury; and that the sealing and filing thereof are waived; and that all objections, except as to form, and motions to strike are reserved to the time of trial.

* * *

P R O C E E D I N G S

**LYNANNE HOUDE**, a witness called for examination by counsel for the Defendant, Mary & Josephine Corp., having been satisfactorily identified by the production of her driver's license and duly sworn by the Notary Public, was examined and testified as follows:

* * *

DIRECT EXAMINATION

BY MR. PETTINGELL:

Q. All right. Could you please state your name and address?

A. Lynanne Houde, 5 Kingston Street, Johnston,

Rhode Island 02919.
Q. And what's your occupation, ma'am?
A. Representative of Ocean Marine, service rep.
Q. And what are your duties as a service rep?
A. My duties is, I take -- when we obtain business, I obtain the quotes from the companies. I do the paperwork, the policies, the financing, the invoicing, endorsements to the policies, everything, cancellations, reinstatements, all kinds of things --
Q. And how long --
A. -- start to finish.
Q. I'm sorry.
A. I'm sorry.
Q. How lo- -- how long -- well, if I say OMI, can we have an agreement that that's a shorthand for Ocean Marine Insurance Agency, Incorporated?
A. Yes.
Q. How long have you worked for OMI?
A. Fifteen years.
Q. And do you have any experience or training in insurance?
A. I started in insurance in 1979.
Q. In what capacity?



A. Travelers Insurance, as a typist and then became a senior rater. And then I got into the agency business.
Q. All right. You say, as a senior rater?
A. Yes.
Q. What did you have to do as a senior rater?
A. You rate all the calculations, the hull -- I'm thinking marine. I was in commercial property, do the building, the contents, general liability, auto, everything like that. I started in the marine business in 2000 -- 2- -- 19- -- wait a minute. 2000. Fifteen years ago. I can't think. 1990.
Q. That's at OMI?
A. Yes.
Q. Okay. Now, with respect to your duties at OMI, have they changed from when you first went to work for them up to the present?
A. No.
Q. And during the period from 2001 through the present --
A. Uh-huh.
Q. -- do you have occasion to be in communication with people at Sunderland Marine Insurance



Company in Sunderland, England?
A. Yes.
Q. What sorts of things do you formally do in the course of these communications?
A. We ask them to quote new business. And we give them -- whatever situation we have, we go to them as far as issuing an endorsement. Or the renewal policies, we communicate back and forth. And they have to approve everything that we send out of the office. All the paperwork is approved by them.
Q. Things such as endorsements?
A. Everything. Yes.
Q. Or return premiums?
A. Yes.
Q. And you're -- you say "we." You mean OMI?
A. Yes.
Q. And would it be fair to say your role in this is -- you're the one that actually gets to send the e-mails and the faxes and things of this nature?
A. Yes.
Q. Sometimes, you make telephone calls?
A. Yes.



Q. Is there a policy at OMI about communications between OMI and Sunderland on things such as coverages or return premiums being in writing?
A. Yes.
Q. So if there's going to -- if -- if an insured --
A. Uh-huh.
Q. -- wants to make a change in their coverage of some sort, would they come to you? Or would they go to somebody else at OMI?
A. Are you sa- -- are you asking, will the insured come to me?
Q. Yes.
A. It could come to me directly. Or it could go through one of the producers first, and they can call me. Or, sometimes, the insured will call me after they speak to the producer.
Q. All right. So if, hypothetically, a boat owner wanted to make a change in his coverage -- say he wanted to increase the amount of hull coverage --
A. Uh-huh.
Q. -- and he called Mr. McVey and told him this, and Mr. McVey came and told you --

Q. ... and then, when he went into the next policy year, he came to you and said, look, the boat wasn't fishing during that period; can I get the thing placed retroactively on port risk and get a return premium? Did Mr. Russo ever come to you with such a request?
A. Yes.
Q. And did you pass that request on to Sunderland?
A. Yes. I did.
Q. And did Sunderland ever honor that request?
A. Yes. They did.
Q. More than one occasion?
A. Yes.
Q. All right. So with respect --
MR. PETTINGELL: Off the record for a second.
(A brief discussion was held off the record.)
MR. PETTINGELL: Withdraw the start of that next question.
Q. Now, Exhibit 4, is that the fax of October 3rd?
A. Yes. Yes. It is.
Q. Can you tell me, please, what Exhibit 4 is and what it is an attempt to do?



A. To tell the insur- -- tell Sunderland that the insured just contacted us that the vessel was not fishing way back to May and that he wanted credit for that period and did not know -- well, he did. He said he would be returning sometime in November '03.
Q. So this is, in fact, an example of the question I just put to you?
A. Yes.
Q. And did Sunderland go along with the request for a -- a return premium?
A. Yes. They did.
Q. Retroactively?
A. Yes.
Q. And Exhibit 3 is a response to your fax --
MR. LANGER: Objection.
Q. -- is that correct?
A. No. It's not.
Q. Well, one, two, third paragraph, "In addition, cover at present " --
A. Oh.
Q. -- "is reduced to Port Risks only following your fax of October 3rd."
A. Okay. Again, that fax, that was sent to Bobby.





I did not see that until just today. So . . .
Q. All right. And it says, "Last year, we did the same" -- as per your September 17th, '02 e-mail -- "and deleted crew P&I coverage entirely until fishing recommenced." Now, in your fax of October 3rd, Exhibit 4, do you request that P&I coverage entirely be deleted?
A. No. I just -- we put it on port risk. It does not mention P&I.
Q. Okay. Now, what is your understanding of the meaning of port risk with respect to coverage that is available for P&I?
A. The vessel is just sitting at the dock. It's not fishing. There's no work being performed. It's just sitting there. No one's, you know, working on it, fishing, or moving it.
Q. Is P&I coverage with a crew still available?
A. I'm not that familiar with port risk crew.
Q. That's -- that's fine.
A. I'm sorry.
Q. If you don't know, that's a perfect answer. Did you ever have any discussions with Mr. Russo as to whether or not P&I coverage would be available while a vessel was on port



risk?
A. No. I did not.
Q. Beyond -- well, strike that. In terms of the various requests for coverage changes that you prepared and sent to Sunderland --
A. Uh-huh.
Q. -- is it fair to say that if it was a request that was passed on to you by Mr. McVey that you would simply then prepare and pass on the request that Mr. McVey had presented to you?
A. Yes.
Q. And, in some instances, you talked directly to the vessel owner; and then you passed their requests along?
A. Yes. I would discuss it with Bobby first. And then I --
Q. Right.
A. -- would go to Sunderland.
COURT REPORTER: I'm sorry. I can't hear you.
A. I would talk -- I'm sorry. I would go to Bob McVey first. And then we would submit it to the company.
Q. Now, apparently, at the -- in September or

A. Yeah. Mr. McVey -- Mr. Russo had called Bobby. And he called me after that, telling me that he wanted the boat on port risk. It's in my notes right here.
Q. Okay. When was that?
A. October 3rd.
Q. Fine. He told you he wanted the boat on port risk?
A. Yes.
Q. Did he say to you during that conversation that he did not want any P&I crew coverage?
A. He did not tell me that. No.
Q. All right. And as a result of your conversation with Mr. Russo on October 3rd, is that what led you to send the fax dated October 3rd, which has been marked as Exhibit 4?
A. Yes.
Q. And, in that fax, you request that the vessel be placed on port risk from May 1st of '03 to August 13th of '03?
A. Yes.
Q. And, again, this is one of those instances where you're trying to get retroactive --



A. Yes.
Q. -- premium? And Sunderland came back to you and agreed to that?
A. Yes. They did.
Q. And do we have the letter that they -- the fax or whatever that they sent back to you? Is that the --
MR. ABROMOVITZ: Let me see what you have.
Q. Is that Exhibit --
MR. PETTINGELL: That's the one -- off the record.
(A brief discussion was held off the record.)
Q. Is that Exhibit 3?
MR. LANGER: Objection. It's been asked and answered. The question is, is Exhibit 3 the response you got from Sunderland to the Exhibit 4?
A. Yes.
MR. LANGER: It is?
Q. I realize it went to Mr. McVey.
A. No.
MR. LANGER: Listen to the question --
THE WITNESS: Okay. I'm sorry.



MR. LANGER: -- and pay attention --
THE WITNESS: Yeah. Okay.
MR. LANGER: -- to what's going on. The question was, is Exhibit 3 the response you got from Sunderland to the e-mail that's been marked as Exhibit 4?
A. I did not get the response personally.
Q. It went to Mr. McVey?
A. It went to Mr. McVey.
Q. But is it your understanding that's the res- -- that Exhibit 3 is the response from Sunderland back to OMI --
MR. LANGER: In response to your request --
Q. -- to your October 3rd fax?
MR. LANGER: Do you understand the question?
THE WITNESS: Yeah. I'm try- -- I'm getting mixed up here.
MR. LANGER: Well, wait a minute. The question is, did you get an e-mail back --
THE WITNESS: Yes.
MR. LANGER: -- when you sent your letter to Tracy Tate on October 3rd?
A. Yes. I would --



MR. LANGER: Did --
A. -- have. Yes.
MR. LANGER: Okay. Was it the e-mail from Craig McBurnie to Bob McVey dated December 8th, 2003?
THE WITNESS: Yes.
Q. Well, are you aware of any other --
A. See, I would have gotten one personally, approving it.
MR. LANGER: Well, that's the question.
THE WITNESS: Okay.
MR. LANGER: That's the question.
THE WITNESS: All right. What --
A. I would have something personally from Tracy, saying it's approved.
MR. LANGER: Okay.
Q. You would expect that you would have?
A. Yes. I would have. Otherwise, I wouldn't have issued the paperwork.
Q. By paperwork, what do you mean?
A. The endorsement which we just discussed.
Q. Do we have a copy of the response that you personally got sometime after October 3rd of '03?

MR. LANGER: If it was in the --
A. I don't have it.
MR. LANGER: -- file, you would have gotten it.
MR. PETTINGELL: I don't doubt that a bit. Off the record.
(A brief discussion was held off the record.)
MR. PETTINGELL: Do you remember seeing one, Len? Honestly.
MR. LANGER: Yes.
MR. ABROMOVITZ: Let's go off the record. You're looking -- you're looking for a response to Lynn from Tracy at Sunderland to the fax of August 3rd, 2003 --
MR. LANGER: Correct.
MR. ABROMOVITZ: -- that precipitated the issuance of an endorsement?
MR. LANGER: Right. It would have approved the port risk calculations that she's made --
THE WITNESS: A copy.
MR. LANGER: -- and authorized issuing the endorsements.
MR. ABROMOVITZ: And do we have the



endorsement that was issued marked as an exhibit yet?
THE WITNESS: That would be --
MR. ABROMOVITZ: Because the one I'm looking at is --
MR. LANGER: No. You only have the one -- that went from August 13th --
MR. ABROMOVITZ: February 5th to August 13th.
MR. LANGER: And there's another one -- no. There's one from May 5th -- May 1st to August 13th --
THE WITNESS: It's this one, right here.
MR. LANGER: -- '03.
MR. ABROMOVITZ: Right.
THE WITNESS: Right here.
MR. LANGER: And there's another one from August 14th to December 21.
MR. ABROMOVITZ: That's the one we're looking for.
THE WITNESS: Oh, August to the -- the last one?
MR. LANGER: That's the -- that one's already been marked as the last page --



MR. ABROMOVITZ: Okay.
MR. LANGER: -- of Exhibit 7.
MR. ABROMOVITZ: That was issued in February '04?
MR. LANGER: Right.
MR. ABROMOVITZ: Okay.
MR. LANGER: And where's the one that covers the period -- yeah. Where's the one that covers the --
THE WITNESS: Right here.
MR. LANGER: -- period -- okay.
MR. PETTINGELL: Which period are we looking for?
MR. LANGER: I thought you were looking at the -- at the endorsement that covered the period May 1, '03 to August 13th, '03. It's Endorsement No. 4.
MR. PETTINGELL: I actually have an endorsement that goes from December 9th, '02 to August 13th, '03. That's --
MR. LANGER: That's -- yeah. But then, that goes back to Exhibit 6.
MR. PETTINGELL: All right.
MR. ABROMOVITZ: Well, you've got an



exhibit -- Endorsement No. 4 that we don't have as part of Exhibit No. 7.
MR. LANGER: 'Cause it's a different policy. It's Policy Year 2.
MR. PETTINGELL: Policy 3.
MR. ABROMOVITZ: Oh, okay.
MR. PETTINGELL: So this 7 goes to --
MR. ABROMOVITZ: Policy 3.
MR. LANGER: Exhibit 7 is Policy Year 3.
MR. ABROMOVITZ: Right.
MR. LANGER: The Endorsement No. 4 that we're talking about is Policy Year 2 and covers the period May 1, '03 to August 13, '03.
MR. ABROMOVITZ: Okay. I'll try to sort this out --
MR. PETTINGELL: No. I don't think --
MR. ABROMOVITZ: -- when I ask some questions.
MR. PETTINGELL: -- that's right.
MR. ABROMOVITZ: Well, let me -- let me -- let me see if I can --
MR. PETTINGELL: Let's stay off the record for a second.
(A brief discussion was held off the

record.)
MR. ABROMOVITZ: Yeah. Let -- let's stay on -- let's keep her eye on the ball. The question is, did she get a return fax or e-mail to her letter of October 3rd, 2003 that was sent to Tracy. If she did, let's see it.
MR. LANGER: Well, the answer is, you would have gotten it or you wouldn't have issued the --
THE WITNESS: That's exactly -- I would --
MR. ABROMOVITZ: But what -- what endorsement then issued? That's what I'm trying to figure out.
THE WITNESS: This one, right there.
MR. PETTINGELL: But off the record for a second.
(A brief discussion was held off the record.)
(Questions and Answers were read back.)
Q. All right. Let me see if I can get us back here. Exhibit 11 is an e-mail that you sent to Mr. Burke pertaining to which policy year?
A. 2.
Q. All right. And this was something that was



also sent retroactively, to get a retroactive --
A. This was --
Q. -- premium return?
MR. LANGER: No.
A. No.
Q. This was a request for something new?
A. This was September 10th. This second part was -- okay.
Q. The letter's dated --
A. Yes.
Q. -- September 17th --
A. Okay.
Q. -- your e-mail?
A. Uh-huh.
Q. And what was the purpose of this e-mail?
A. To obtain a credit for him from September to No- -- well, we had -- I told him that he's not fishing as of September 10th.
Q. And he wanted to go on port risk --
A. Yes.
Q. -- through November 14th?
A. At that point, I didn't have a date.
Q. Or -- that's right. He wanted to go on port



risk?
A. Yes.
Q. And did you get a response from Mr. Burke?
A. Yes.
Q. And he authorized the vessel going on port risk?
A. Yes.
Q. And did he also agree to delete crew P&I coverage for the period that the vessel was on port risk?
A. Yes.
Q. So looking at this second paragraph of Exhibit 11, that's a specific request to delete P&I cover --
A. Yes.
Q. -- both retroactively and until such time as the vessel goes back fishing?
A. From September 10th until it goes back fishing.
Q. Right. Well, the e-mail is dated September 17th.
A. Yes.
Q. Okay. And then we have Exhibit 10, which is a fax from you to, again, Mr. Burke, or an e-mail?
A. Yes. E-mail.



Q. And, in this, you reference that you had faxed a port risk endorsement to him for his approval?
A. Uh-huh.
Q. And then, after speaking to Bob -- that's Mr. McVey -- you changed what you were requesting and requested, instead of a complete deletion of P&I cover, an amendment of the crew complement to one man?
A. Yes.
Q. And you got back this, saying "Seems okay," giving you approval?
MR. LANGER: The document speaks for itself.
Q. Well, I mean, is that your understanding? Was this faxed back to you or --
A. I don't remember -- I don't know who wrote that. But I have written approval of it to me.
Q. Okay. And then you have the October 3rd fax which now pertains to the next policy, Policy Period 3?
A. Yes.
Q. And what are you requesting in that?
A. That we go back to May -- May 1st when he

stopped fishing, give him a credit until the expiration date. And then, when we find out what day he returns fishing in November, we would, at that time, issue him a second credit for that policy period.
Q. Did you make any request in your October 3rd fax to Sunderland that they delete or change the size of the crew?
A. No.
Q. And you say you got a response. But we don't have a copy of that.
A. Right.
Q. And we'll straighten that out later.
A. Yes.
Q. But we do have the letter to Mr. McVey which makes reference -- and you have now seen this letter --
A. Yes.
Q. -- this is Exhibit 3 -- which makes reference to, as of December 8th of 2003, "coverage is restricted to Port Risks only" following your fax of October 3rd. And that's what you had requested?
A. Yes.



Q. And then, "Last year, we did the same (as per Lynn's of 17 September '02) and deleted crew P&I coverage entirely until fishing recommenced." Now, that's what you had requested for the prior year in your --
A. That's --
Q. -- September 17th, '02 e-mail to Tracy?
A. That's a different policy period.
MR. LANGER: Just listen to the question that he's asking.
Q. That's what you had requested. Right?
MR. LANGER: In September of '02, did you request deletion of crew P&I?
Q. What -- what exhibit is that?
A. 11.
MR. LANGER: 11.
A. Yes.
Q. That's what you were asking in Exhibit 11?
A. Yes.
Q. Then, after that Exhibit 11, again, talking Policy Year 2 --
A. Uh-huh.
Q. -- you changed your request to maintaining one crewman --



A. Yes.
Q. -- for that policy?
A. Yes.
Q. All right. So for Policy Year 2, you have written evidence in your file indicating that you made a specific request of Sunderland that they place the vessel on port risk and that they delete the P&I cover?
A. Yes.
Q. And then, after that, as a follow-up, in effect, you said, wait a minute. The insured's changed his mind. We want to keep one crewman on --
MR. LANGER: Objection.
Q. -- while it's on port risk?
MR. LANGER: Objection to the form of the question.
Q. And that's -- would you agree with that?
MR. LANGER: Objection.
THE WITNESS: Do I have to answer?
MR. LANGER: Yeah. If -- if you understand it, you can answer it.
A. I'm -- I'm really getting confused with all these dates. Which?



Q. Policy 2.
A. Yes.
Q. December 11th of 2002. I don't know what exhibit this is.
MR. ABROMOVITZ: It's got a number at the top.
Q. Exhibit 10.
MR. ABROMOVITZ: Can I have that one back?
A. Okay.
Q. I'll give you the question again after you've read the exhibit.
A. Yeah.
Q. All set?
A. Yes.
Q. All right. Policy 2 --
A. Uh-huh.
Q. -- you -- you, on behalf of OMI and Matt Russo, made a request to Sunderland that the vessel go on port risk --
A. Uh-huh.
Q. -- this was on September 17th of '02 -- and that the P&I cover be deleted. This was for Policy Year 2, during the period that it was on port risk.

MR. ABROMOVITZ: Exhibit 11.
Q. Does that fairly state what you did on --
A. September --
Q. -- September 17th?
A. -- and then December. Yeah. We dele- -- we were deleting all the men.
Q. Right. You wanted -- you made a request --
A. Yeah.
Q. -- that the vessel go on port risk --
A. Uh-huh.
Q. -- and that all of the P&I be deleted --
A. Yes.
Q. -- until the vessel went back --
A. Uh-huh.
Q. -- fishing; is that correct?
A. Yes.
Q. And then, after September 17th, as contained in Exhibit 10 --
A. Uh-huh.
Q. -- you indicate that you had faxed a port risk endorsement for his approval; but, now, there had been a change. And instead of deleting all of the men during the time on port risk, they wanted to keep one man on P&I covered?



MR. LANGER: Objection. Can we go off the record?
MR. PETTINGELL: I'd like an answer to this question. Then we can.
A. Okay.
MR. LANGER: Are you -- object. I think it mischaracterizes the testimony.
MR. PETTINGELL: Well --
MR. LANGER: Go ahead and answer.
A. It's just that there's three months' difference, and I -- it wouldn't take David three months to get back to me. I don't think this pertains to this one.
Q. You think -- oh, okay. You thi- -- that's fair. You think that Exhibit 10 pertains to a different period?
A. Yes.
Q. Okay. Other than your September 17th of '02 e-mail, Exhibit 3 --
A. Uh-huh.
Q. -- did you ever make any other request of Sunderland on behalf of Mary & Josephine Corporation to delete a hundred percent of the P&I cover while the vessel was on port risk?



A. Okay. You said Exhibit 3. I -- that didn't come to me. So are --
Q. I'm sorry. Not Exhibit 3.
MR. LANGER: Exhibit 4?
Q. Exhibit 11, I think it is, your September 17th fax.
A. Could you re- -- repeat the question?
Q. I'll try to rephrase it. On September 17th --
A. Uh-huh.
Q. -- of '02, you sent an e-mail to Sunderland and requested two things. You requested that the vessel go on port risk, and you requested that a hundred percent of the crew complement be deleted from P&I.
A. Yes.
Q. All right. And that pertained to Policy 2?
A. Yes.
Q. Did you ever make any other request of Sunderland for Policy 3, for example, where you asked that they delete a hundred percent of the crew complement from P&I cover while the vessel was on port risk?
A. No.
Q. To your knowledge, did anybody else at OMI make



such a request of Sunderland?
A. No.
Q. And that would be for Policy Year 3?
A. Yes.
MR. PETTINGELL: All right. Now, if I could just find the notice duces tecum -- it's probably here somewhere. I've probably got it in my lap. I just have this last thing to check. Then I believe I'm done.
MR. ABROMOVITZ: Dick, while you're doing that, why don't I ask a couple of questions.
MR. PETTINGELL: Yeah. Go ahead.

CROSS-EXAMINATION

BY MR. ABROMOVITZ:
Q. Ms. Houde, as of October 2003, had you ever seen any written company policy as to what happened to P&I crew coverage when a commercial fishing vessel was on port risk?
A. No.
Q. What was your understanding as of October 2003, if you had one, as to what effect a vessel -- a commercial fishing vessel being on port risk would have upon the continuation of crew P&I coverage, if you had it?

A. I don't unders- -- I don't know anything about that.
Q. Okay. Go to your notes from your conversation in October 2003 with Matt Russo.
A. Uh-huh.
Q. Do you have those available?
A. Uh-huh.
Q. Tell me what your practice was in that time frame of making notes to your underwriting file. What did you do, and why did you do it?
A. I just wrote down his request, exactly what he told me, that the boat had not been fishing since May; and it would not fish till sometime in November '03. At that point, I went to underwriters and explained to them that was happening, that we would -- requested a port risk be done from May to August since the poli- -- policy already expired. And then, once he returns in November, at that point, we would issue the port risk credit.
Q. Can you read into the record everything you wrote down in connection with your October 3rd, 2003 conversation with Matt Russo?
A. Just read this?



MR. LANGER: Just read that.
A. Okay. "Back on October 3rd, '03, per the insured, we told Sunderland vessel was not fishing as of May 1st, '03 and would not fish until November '03. The account renewed as operational and the port risk credit" --
COURT REPORTER: Excuse me.
Q. Slow down just a little bit.
A. I -- I'm sorry. "The account renewed as operational, and the port risk credit from 8/13 to November ?, '03."
MR. LANGER: 8/13/03. Read the entire date.
A. "8/13/03 to November" -- I put a question mark, '03 'cause we didn't know the date -- "would be issued when he returned the -- the letter showing the vessel began fishing again. The original letter dated 10/3/03 never returned. I sent Matt a reminder letter on 11/21/03, asking for the date the vessel will begin fishing. Letter never returned. So vessel was still not fishing because insured never notified us."
Q. Now, the notes that you just read in, when were



those prepared?
A. When was this actually being prepared?
Q. Yes.
A. I did it on November 18th, '04.
Q. And was that done in connection with this lawsuit?
A. Yes.
Q. Okay. These were not notes that you prepared contemporaneous with the events as they took place back in October '03. Correct?
A. I don't understand. Can you --
Q. Sure. The notes you just read --
A. Yeah.
Q. -- are sort of your summary of what happened, and you -- and they were prepared because of this lawsuit?
A. Yes.
Q. Okay. When -- back in the time frame of October '03, did you have any conversations with Bob McVey relative to the port risk status of the fishing vessel Mary & Josephine concerning P&I coverage?
A. No.
Q. Did you have any understanding, based upon your



conversation with either Mr. McVey, Mr. Scola, Mr. Ostrow, or anyone else at OMI, as to what happened to P&I coverage that was in existence on a commercial fishing vessel once that vessel went into port risk?
A. No.
MR. PETTINGELL: Are you waiting, or are you actually --
MR. ABROMOVITZ: No. I'm just checking my notes.
(A brief discussion was held off the record.)
Q. Prior to December 3rd, 2003, the date of Matt Russo's accident, what endorsements were physically issued in connection with the policy that went into effect on August 13th, 2003?
A. Let me just check one thing. After December 3rd, there was one --
Q. No, no. This -- this polic- -- policy --
A. 3.
Q. -- for Year No. 3 --
A. Yeah.
Q. -- went into effect on August --
A. Yes.

Q. -- 13th, 2003.
A. Uh-huh.
Q. Matt Russo's accident happened on December 3rd, 2003.
A. Uh-huh.
Q. Insofar as an endorsement that was actually prepared prior to December 3rd, 2003, was there one?
A. No.
Q. Okay. The policy endorsement that actually was executed -- the first one that was executed after Matt Russo's accident was sometime in February 2004?
A. It was -- it was for the period August 13th, '03 to December 21st, '03.
Q. And the date of that endorsement?
A. There's no date on the endorsement. But it was -- again, I calculated it on January 6th, '04.
Q. January 6th, '04. Okay. So is it fair to say that your job in the office at OMI was to prepare the paperwork in connection with policies of insurance that were issued for commercial fishing vessels?



A. Yes.
Q. And is it also fair to say that prior to December 3rd, 2003, with reference to the policy year that started on August 13th, 2003, there were no written endorsements that were made part and parcel to that insurance policy before December 3rd, 2003?
A. Correct.
MR. ABROMOVITZ: Thank you. That's all I have.

REDIRECT EXAMINATION

BY MR. PETTINGELL:
Q. I'd like to show you a document marked --
MR. PETTINGELL: Well, I'm sorry. Mark it as Exhibit 12, and then I'll --
(E-mail to Craig from Marie dated 12/24/03 marked as Houde Exhibit No. 12.)
Q. I'd like to show you a document which we've previously marked as Exhibit 12 and ask you to take a look at it. Have you done that?
A. Yes.
Q. All right. Now, first off, this is a -- appears to be an e-mail from someone at -- at Sunderland?



A. No. From Marie from our office to Sunderland.
Q. From Marie. All right. Who's Marie?
A. She's one of the girls that I work with.
Q. All right.
A. I was not supposedly in that day. I was out sick, either vacation or -- or I don't remember.
Q. They give you vacations?
A. Yes.
Q. Wow. You deserve one after today. All right. This is a letter from Marie. Does she, essentially, do the same thing you do?
A. Yes.
Q. To Craig McBurnie?
A. Yes.
Q. And Craig McBurnie is at Sunderland --
A. Yes.
Q. -- is that right?
A. Yes.
Q. All right. Now, had you had any discussions with Marie at all concerning the subject matter of this letter?
A. No.
Q. All right. How about after the letter went



out?
A. I have to say I don't know if she issued that or if I did. Wait a minute. The coverage the next ten days. That was the last credit. So I ended up issuing the actual paperwork. But the correspondence was between Marie and the company.
Q. All right. In the second line, it says, "The crew P&I is already in place." Now, I realize you didn't send -- you're not --
A. Uh-huh.
Q. -- the one that authored this. But do you have any knowledge as to what Marie was referring to in making the statement, "The crew P&I is already in place"?
A. No. I don't.
MR. PETTINGELL: Off the record for a second.
(A brief discussion was held off the record.)
Q. During the period of December 2003 while you -- you were at OMI, would OMI ever issue an endorsement changing crew P&I without authority from Sunderland?

A. No.
MR. PETTINGELL: Okay. Thank you.
MR. LANGER: Are you done?
MR. PETTINGELL: Yeah.
MR. ABROMOVITZ: I -- I have nothing further, Len, unless you have some questions.
MR. LANGER: I have a couple of questions.
(A brief discussion was held off the record.)

CROSS-EXAMINATION

BY MR. LANGER:
Q. Ms. Houde, I want to try and clarify a couple of questions. I think Mr. Abromovitz asked you a question and Mr. Pettingell asked you a question about crew P&I and port risk. When a vessel is on port risk and you're calculating a return premium, do you provide credit for all the crew members that had been covered while it was operational or only some of them?
A. All of them.
Q. So you give a return premium for all the P&I -- the crew P&I coverage that would have been effective had the boat been operational?



A. Yes.
Q. So while a vessel is on port risk coverage, there is no crew and I -- no crew P&I coverage available?
A. Right.
MR. PETTINGELL: Objection.
MR. ABROMOVITZ: Objection.
MR. PETTINGELL: Do we need to state the grounds, Len? Let's see. Calls for a legal conclusion. Foundation. Just whatever he said.
Q. Has that been the practice at Ocean Marine for as long as you've been there?
MR. ABROMOVITZ: Object to the form.
MR. PETTINGELL: Objection. Has what been the practice?
Q. Has deleting all crew P&I coverage while a vessel has been on port risk always been the policy while you've been at Ocean Marine?
A. Yes.
MR. ABROMOVITZ: Object. I'm -- let me get in an objection to the form.
Q. And referring to Exhibit No. 6, when a vessel -- the vessel was placed on port risk --



A. Uh-huh.
Q. -- but one crew was covered --
A. Uh-huh.
Q. -- would that be unusual, in your experience while you were at Ocean Marine, to cover a crewman while a vessel is on port risk?
A. No. We've done it.
Q. Okay. Do -- does there have to be a specific request in order to include a crew while a vessel is on port risk?
A. Yes.
Q. And referring to Exhibit No. 10, which is a letter you sent to Mr. Burke referring to Endorsement -- what became Endorsement --
A. Uh-huh.
Q. -- 6 -- or excuse me -- Exhibit 6, that change to add a crewman --
A. Uh-huh.
Q. -- was made after you spoke with Bob McVey?
A. Yes.
Q. And had you not spoken with Bob McVey, would there have been any crew coverage for the Mary & Josephine while the vessel was on port risk?
A. No.



MR. ABROMOVITZ: Objection.
MR. PETTINGELL: Objection for the same reasons we stated before and --
MR. LANGER: I'll rephrase it.
Q. Would you have included any crewmen when you were calculating the return premium had Mr. McVey not spoken to you?
A. Can you repeat that again?
Q. Sure. When -- had Mr. McVey not spoken to you --
A. Yeah.
Q. -- before you issued what is now Exhibit No. 6 --
A. Uh-huh.
Q. -- would there have been any crew complement for the Mary & Josephine --
A. No.
Q. -- in the endorsement?
A. No.
Q. I also want to clear up what I believe is some confusion about Policy Year 2. I believe you testified -- and correct me if I'm wrong -- that the vessel was first placed on port risk coverage effective December 10th of 2002; is

A. Yes.
Q. Now, on October 3rd, 2003 --
A. Uh-huh.
Q. -- after you had spoken to Mr. Russo and after you had corresponded with Sunderland, did you send a letter to Mr. Russo?
A. Yes. I did.
Q. Let me show you what's been marked as -- it says "Scola 8," but it's Exhibit No. 8. Is this a copy of the letter that you wrote to Mr. Russo on October 3rd?
A. Yes.
Q. Now, there's some handwriting --
A. Uh-huh.
Q. -- underneath the reference "August 13, '03." Do you know whose handwriting that is?
A. That's mine.
Q. Okay. And it says "12-21-03." And then what does it say under that?
A. "Per RCM," per Bobby.
Q. Okay. RCM?
A. Yes.
Q. Okay.
A. He gave me --



Q. So that --
A. -- the date.
Q. -- was information you got from Mr. McVey?
A. Yes.
Q. That wasn't, obviously, on the letter when you wrote it --
A. Oh, no.
Q. -- first to Mr. --
A. No.
Q. Wait till I finish my --
A. I'm sorry.
Q. -- question.
A. I'm sorry.
Q. -- was not on the letter when you originally wrote it to Mr. Russo?
A. It was not on the letter.
Q. Okay. Did Mr. Russo respond to your letter of October 3rd at any time?
A. No.
Q. Okay. Now, in the lower right-hand corner, there's a reference "11-25-03."
A. Uh-huh. Yes.
Q. Do you know whose handwriting that is?
A. That's mine.



Q. And what does that mean?
A. That's a diary stamp, but it's red. So it doesn't come out when you make the copy. But that's the time I diaried to find out if I didn't hear from him, I got to send out another letter, saying, Did you return fishing? What's the date?
Q. Okay. And so is it your testimony that on -- on November 25th, '03, you sent another letter?
A. Yes.
Q. You sent the exact same letter as what's been marked as Exhibit 8?
A. Yes. I made -- I -- that's -- I probably put a second re- -- big second request stamp, and I put the date that I'm sending it.
Q. Did you get a response to that letter from Mr. Russo?
A. No.
Q. Did you send a second follow-up reminder?
A. No, not at that point.
Q. At any time prior to Decem- --
A. Oh, here it is. I'm sorry.
Q. So you sent a reminder on November 21, 2003?
A. Yes.



Q. Okay. And in the lower right-hand corner --
A. I was depending (sic) for December 18th.
Q. Okay. And did you ever send that letter?
A. No. Because everything happened.
Q. Okay. Because the incident underlying --
A. Yes.
Q. -- Mr. Russo's claim occurred before December 18th?
A. Yes. Correct.
Q. At any time before December 3rd or 4th of 2003, did Mr. Russo ever respond to either of your letters?
A. No. No. Sorry.
Q. When you talked with Mr. Russo on October 3rd -- 3, 2003, did he indicate to you why the vessel was being put on port risk?
A. No. Just that it wasn't fishing and wouldn't fish till November.
COURT REPORTER: I'm sorry. I can't hear you.
THE WITNESS: I'm sorry.
A. It wasn't fishing. What was the question?
MR. ABROMOVITZ: Is there wasn't fishing --
A. It wasn't --