UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NORTH AMERICAN SPECIALTY ) | |
| INSURANCE COMPANY, ) | Civil Action |
| ) | Case No. 04-CV-04-10374-WGY |
| *Plaintiff* ) | |
| v. ) | |
| ) | |
| MARY & JOSEPHINE CORP. ) | |
| ) | |
| and ) | |
| ) | |
| MATTEO RUSSO, ) | |
| *Defendant*s ) | |

**PLAINTIFF'S OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, WITH
INCORPORATED STATEMENT OF MATERIAL FACTS
AND MEMORANDUM OF LAW**

NOW COMES Plaintiff, North American Specialty Insurance Company, by and through its counsel, Tompkins, Clough, Hirshon & Langer P.A., and pursuant to Rules 7.1(B)(2) and 56.1 of the Local Rules of the United States District Court for the District of Massachusetts, opposes Defendants' Motion for Summary Judgment and states as follows:

INTRODUCTION

This is a dispute over the terms of fishing vessel insurance coverage which was repeatedly modified at the request of the insured. Beginning in August 2001, Plaintiff issued a series of policies to Defendant Mary & Josephine Corporation covering the F/V MARY & JOSEPHINE. On December 3, 2003, Defendant Matteo Russo ("Russo"), the vessel's

captain and the son of the sole shareholder of the corporate owner, was allegedly injured while working on board the vessel.

The parties disagree as to whether the policy provided coverage for Mr. Russo's personal injury claim at the time of injury. There is no dispute that since Russo was acting as a crewman, coverage would be provided only if crew P & I coverage obtained at the time of injury. Plaintiff's evidence shows that a couple of months before the injury, the parties had expressly agreed that crew P & I coverage would not be provided. Specifically, Mr. Russo, acting on behalf of the vessel owner, contacted Plaintiff's agent, Ocean Marine Insurance Agency ("OMI"), and requested the deletion of such coverage; and the underwriter consented. Because this entails a classic factual dispute, summary judgment is inappropriate.

## STATEMENT OF MATERIAL FACTS

1. Matteo Russo acted as the insurance contact for Mary & Josephine Corporation. *See* Deposition of Robert McVey ("McVey Dep.") at 59.

2. When Russo needed to deal with the vessel's underwriter, he would contact OMI, principally Robert McVey, a co-owner of OMI. *Id.* at 16, 139-40.

3. In September 2002, Russo called OMI and requested that coverage be changed to "port risk," with no crew P & I coverage, because the vessel was tied up at the pier. *See* Deposition of Lynanne Houde ("Houde Dep.") at 43-45.

4. At Russo's request, coverage was changed to port risk for the period from September 10, 2002 to November 14, 2002. *Id.* at 40-41, 43-45.

5. OMI issued an endorsement reflecting that change after the fact, in December 2002. *Id.* at 50-52.

6. OMI's practice is not to issue such endorsements until the return premium can be calculated, generally after the boat returns to fishing and is taken off port risk. *See id.* at 100-01; McVey Dep. at 140-41.

7. A boat owner's premium for P & I coverage initially is based on the number of crew covered. *See* McVey Dep. at 40.

8. When a vessel is changed to port risk coverage, the insured is given a "lay-up" credit for the deleted crew P & I coverage, and a portion of the premium is returned (the "return premium"). *See id* at 140-41; Houde Dep. at 89-90.

9. The return premium is calculated by subtracting the premium charged for P & I coverage for each and every crew member that would be covered if the boat were operational. *See* Houde Dep. at 89-90.

10. From November 14, 2002 to December 9, 2002 the vessel was operational, and therefore it was taken off port risk coverage, and crew P & I coverage was reinstated. *See* Houde Dep. at 45.

11. Mr. Russo then asked for port risk coverage for the period from December 9, 2002 to August 13, 2003. *See id.* at 47.

12. Because Mr. McVey was aware that Russo was going to be making repairs on the vessel during that time, McVey suggested to Russo that P & I coverage for one crew member be retained. *See* McVey Dep. at 176, 182.

13. As a result, an endorsement was issued for the period from December 9, 2002 to August 13, 2003 for "port risk only," and also amending the "Crew Complement" to provide "Crew of 1 excluding Owner(s)." *See id.* at 122 and Exhibit 7; Houde Dep. at 16, 47 and Exhibit 10.

14. Mr. McVey discussed with Mr. Russo the fact that absent language in the endorsement stipulating the number of crew members covered, the effect of the port risk endorsement would be that there would be no crew P & I coverage whatsoever. *See* McVey Dep. at 176-77.

15. The policy was again changed by subsequent endorsement effective February 5, 2003, when the vessel went back to operational status. *See* Houde Dep. at 48, 94.

16. On or about October 3, 2003, Mr. Russo called Mr. McVey and advised that the F/V MARY & JOSEPHINE had not been fishing and had no crew since May 2003, and would not be fishing again until further notice. *See* McVey Dep. at 88-89.

17. Russo asked for port risk coverage both retroactively, going back to May 2003, and prospectively. *See id.* at 174 and Exhibit 4.

18. Mr. Russo specifically instructed that he did not want any crew members covered. *Id.* at 89, 180.

19. Mr. Russo indicated that he did not want crew P & I coverage in order to save on premiums. *Id.* at 106, 113, 137, 140.

20. Mr. Russo did not advise, and Mr. McVey was not aware, that he would be working on the vessel during the period of port risk coverage. *Id.* at 175; *see* Houde Dep. at 105.

21. On October 3, 2003, after speaking with Mr. McVey, Mr. Russo also spoke with Lynanne Houde, a service representative at OMI. *See* McVey Dep. at 145; Houde Dep. at 5, 94-95.

22.     Mr. Russo reiterated to Ms. Houde that he wanted port risk coverage, and a commensurate premium credit, for the period from May 2003 until he advised that the boat had gone back to fishing.  *See* McVey Dep. at 145; Houde Dep. at 95-96.

23.     Pursuant to Mr. Russo's instructions, Ms. Houde asked the underwriter to put the vessel back on port risk effective May 1, 2003 and to provide another port risk credit; and the underwriter agreed.  *Id.* at 53-54; McVey Dep. Exhibits 3-4.

24.     Subsequently, a credit was given to the insured for the period from May 1, 2003 to August 13, 2003 (when the 2002-2003 policy renewal expired) based on no crew P & I.  *See* Houde Dep. at 97.

25.     A second credit was issued covering the period from August 13, 2003 to December 21, 2003, based on no crew P & I coverage.  *Id.* at 98.

26.     Mr. McVey has been with OMI for 16 years. *See* McVey Dep. at 73.

27.     Ms. Houde has worked for OMI for 15 years and has worked in the insurance business since 1979.  *See* Houde Dep. at 5.

28.     William Scola, OMI's president, has been in the insurance business since 1985.  *See* Deposition of William Scola ("Scola Dep.") at 9, 17.

29.     McVey, Houde, and Scola all agree that when a vessel is placed on port risk, no P & I coverage is provided unless there is a specific request for such coverage.  *See* McVey Dep. at 57-58; Houde Dep at 90-91; at 19, 23, 48.  Scola Dep. at 19, 23, 48.

30.     Because port risk coverage generally is not provided when there are any crew on the vessel, crew P & I is an unnecessary expense; and, indeed, it is to avoid this expense that boat owners typically seek port risk coverage.  *See* McVey Dep at 54, 57; Scola Dep. at 19, 23.

5

31. It is common knowledge among both insurers and vessel owners that port risk coverage comes with no crew P & I coverage. *See* Scola Dep. at 48.

32. Mr. Russo was informed and he understood that port risk did not entail crew P & I coverage. *See* McVey Dep. at 107, 109, 177-79.

33. After Mr. Russo sought port risk coverage with no crew P & I on October 3, 2003, Ms. Houde wrote to him twice in connection with the port risk credit, asking him to advise when the vessel would start fishing again; but Mr. Russo never responded before the date of injury. *See* Houde Dep. at 101-04; Scola Dep. Exhibit 8.

34. Consequently, at the time of injury, the vessel remained on port risk, with no crew P & I coverage. *See* McVey Dep. at 76 and Exhibit 3.

35. In conformity with OMI's customary practice, a written endorsement reflecting the change to port risk ("in consideration of a return premium of $3,117") did not issue until after the port risk period had expired on December 21, 2003. *See* Houde Dep. at 100; McVey Dep. Exhibit 7, last page.

36. Plaintiff contests Paragraphs 9, 11 and 18 of Defendants' Statement of Material Facts. *See* Plaintiff's Statement of Material Facts at Paras. 8-9, 22-25, and 29-32.

ARGUMENT

1. Plaintiffs' Evidence Shows that at the Time of Injury the Contract of Insurance was Subject to a Valid Oral Modification Providing No Crew P & I Coverage.

Courts have long acknowledged that parties can create a valid oral contract of insurance. *See*, *e.g.*, *Acadia Insurance Co. v. Allied Marine Transport LLC*, 151 F. Supp. 2d 107, 125 (D. Me. 2001); *McBride v. Home Insurance Co*. 1952 AMC 938 (E.D. La. 1952); *London Clothes, Ltd. v. Maryland Casualty Co.*, 318 Mass. 692, 697, 63 N.E.2d 577 (1945);

6

*See generally 4 Holmes' Appleman on Insurance 2d* §17.2 (1998); 43 Am. Jur. 2d *Insurance* §193 (2003). By the same token, a written policy may be modified by a new parol, or oral, agreement. *Emery v. Boston Marine Insurance Co.*, 138 Mass. 398, 412 (1885); 12 Appleman, *Insurance Law and Practice* §7136 (1981); 43 Am. Jur. 2d *Insurance* §361.

      The fact that an insurance contract has been reduced to writing "does not prevent its change, enlargement, or continuance by a subsequent parol agreement." 2 *Couch on Insurance 3d* §25:11 (1997). An oral modification request by the insured is viewed as similar to a binder given at the beginning of the contractual relationship, and thus "is similarly enforceable according to its terms." *Id*. Even if the policy purports to prohibit oral modification, such a provision, like any other part of the contract, may be modified orally. *See id.*, §25:13. Thus, where a provision in a policy stated that "it shall not be binding until countersigned" by the agents, it was nevertheless held that it could be "materially varied and changed by subsequent agreements, orally entered into by the parties at any time before there has been a breach of its stipulations." *Kennebec Co. v. Augusta Insurance & Banking Co.*, 72 Mass. 204, 207, 212 (1856). Here, nothing in the policy prohibited oral modification.

      In *McBride, supra*, the court held that oral notification by an insurance agent to the underwriters that a tug should be removed from port risk coverage and that full operational coverage should be re-instated was binding even though precise agreement on all of the terms had not been reached. Rather, the terms could be shown or implied by the acts of the parties, "including the previous dealings of the parties, and all attending circumstances." *Id.*, citing (among other authorities) *Eames v. Home Insurance Co.*, 94 U.S. 621 (1876).

      In *Acadia Insurance Co. v. Allied Marine Transport*, *supra*, Judge Carter came to a similar conclusion. He held that an oral binder lifting a "port risk only" restriction in a

7

marine policy was enforceable. *Allied Marine*, 151 F. Supp. 2d at 125. He further ruled that even if all of the terms of the new coverage had not been agreed upon, there would still be a valid contract, consisting, "in the absence of a special agreement, of the usual provisions of contracts employed to effect like insurance." *Id*. *Accord*, *Grande v. St. Paul Fire & Marine Insurance Co.*, 365 F. Supp. 2d 57, 63 (D. Me. 2005), *aff'd,* 2006 U.S. App. LEXIS 2567(1st Cir. Feb 2, 2006). Hence, even if Mr. Russo had ordered "port risk only" coverage, without specifying the deletion of crew P & I coverage, the evidence would support a finding that the usual practice was to delete such coverage whenever a vessel was put on a port risk endorsement and that, therefore, the parties' modified contract did not include such coverage.

However, Mr. Russo did not merely ask for port risk coverage, which he understood to entail the deletion of crew P & I coverage; rather, he specifically instructed OMI, in his discussion with Mr. McVey, that *he did not want crew P & I coverage*. In the very recent case of *Grande v. St. Paul Fire & Marine Insurance Co.*, 2006 U.S. App. LEXIS 2567 (1st Cir. Feb. 2, 2006), the First Circuit agreed with the *Allied Marine* holding, but emphasized that the usual policy terms are controlling only "in the absence of a special agreement." *Id.* at *9, quoting *Allied Marine*, 151 F. Supp. 2d at 125. Where the insured and the insurer's agent agree that certain coverage will or will not be in force, that oral agreement delimits the scope of coverage. *See id.* at *9-10.

In *Grande*, a boat owner requested insurance to cover the vessel's upcoming trip from Florida to Maine, and the insurer's agent affirmed that the vessel was covered before commencement of the voyage. *Id.* at *1-3. The vessel was destroyed during the trip. After the incident, the owner received the insurance policy, containing a navigational restriction which was invoked to deny coverage. *Id.* at *3. The First Circuit held that because the

insured had described the route the vessel was to take to the agent and the agent had affirmed coverage, a jury could find that the parties had an oral agreement to insure the vessel for the entire course of the trip. *Id.* at *9-10.

Here, the oral agreement was much more precise than in *Grande*. Russo specifically instructed OMI that he did not want crew P & I coverage, and the insurer and OMI agreed. Defendants received two substantial premium refunds based on the excision of crew coverage. Hence, the parties had a binding oral agreement modifying the terms of coverage, and this oral agreement was in effect on December 3, 2003. The terms of the written policy prior to the oral modification therefore are irrelevant, regardless of whether such written terms lacked ambiguity.

Likewise irrelevant is the written endorsement that was not issued until February 16, 2004, more than two months after the date of injury. *See Grande*, *supra*. Even if relevant, this endorsement does not preclude the evidence of the oral insuring agreement in effect on December 3, 2003. Defendants point out that the endorsement refers "merely" to "Port Risk only" coverage and does not specify the removal of crew P & I coverage; but this begs the question of what port risk coverage entails. Although Defendants cite a couple of cases describing the nature of port risk coverage, these decisions do not address whether such coverage does or does not entail the absence of crew P & I coverage. Indeed, Plaintiff is not aware of any legal authority that addresses this issue.

The scope of "port risk" is not a *legal* but a *factual* issue. It is a technical term used in the marine insurance industry. To determine its meaning, it is entirely appropriate to consider evidence of the custom and usage in the industry, as well as the parties' specific understanding of the term. *See generally* 17A Am. Jur. 2d *Contracts* §§358, 360, 361

9

(2004). The evidence shows, first, that the custom and practice in the industry is not to provide crew P & I coverage when a vessel is on "port risk"; and second, that Mr. Russo, OMI, and the underwriter all understood that port risk coverage means that the vessel would not have crew P & I insurance. This is only common sense; port risk coverage is appropriate only when a vessel is laid up and does not have any crew working on her; to maintain, and to charge for, crew P & I coverage in these circumstances would be both unnecessary and unfair to the insured. Furthermore, before OMI issued the endorsement, the underwriter had made it clear that crew P & I coverage had been removed. *See* McVey Dep. Exhibit 3 (e-mail to Bob McVey dated December 8, 2003). The only reason that this was not expressly stated in the endorsement was that it was unnecessary to do so.

    2. <u>Material Issues of Fact Preclude Summary Judgment.</u>

Defendants have the burden of proving that Mr. Russo's alleged injury falls within the scope of insurance coverage that was in effect at the time of the incident. *See, e.g.*, *Antilles Steamship Co., LTD. v. Members of American Hull Insurance Syndicate,* 733 F. 2d 195, 199 (2nd Cir. 1984); *S. Felicione & Sons Fish Co. v. Citizens Casualty Co.*, 430 F. 2d 136, 138 (5th Cir. 1970) ("It is too well settled to require citation that the burden of proving a loss by a peril insured against is on the insured."); *Jibbar v. Calvert Fire Insurance Co.*, 623 F. 2d 41, 44 (8th Cir. 1980); *Allied Marine*, 151 F. Supp. 2d at 122; *see generally* 2 Schoenbaum, *Admiralty and Maritime Law* §19-17 at 347 (4th ed. 2004) ("The burden of proving the loss was caused by a peril insured against is on the assured."). Although an insured typically may meet this burden by comparing the terms of the written policy with the facts establishing the claim, this assumes that the written policy terms were in effect at the

time of loss. Here, the evidence shows that those terms had been repeatedly modified by oral agreement.

A party moving for summary judgment must demonstrate an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2448, 2553, 91 L. Ed. 2d 265 (1986). In determining if this burden is met, the court must view the record in the light most favorable to the non-moving party and "give that party the benefit of all reasonable inferences to be drawn in its favor." *Ortega-Rosario v. Alvarado-Ortiz*, 917 F.2d 71, 73 (1st Cir. 1990).

The standards for granting summary judgment are even stricter where (as here) the movant has the burden of proof at trial, in view of the factfinder's prerogative to disbelieve affirmative evidence. The movant's evidence must be so powerful that no reasonable jury would be free to disbelieve it. *See, e.g.*, *Cockrel v. Shelby County School District*, 270 F.3d 1036, 1056 (6th Cir. 2001); *Eddison v. Reliable Life Insurance Co.*, 664 F.2d 1130, 1131 (9th Cir. 1981); *Gilbert Imported Hardwoods, Inc. v. Holland*, 176 Supp. 2d 569, 578 (S.D.W. Va. 2001); *Lawyer v. Hartford Life & Accident Insurance Co.*, 100 F. Supp. 2d 1001, 1008 (W.D. Mo. 2000); 11 *Moore's Federal Practice* §56.13(1) at 56-138 (3d ed. 2004).

Plaintiff has presented admissible evidence which, if believed, would mean that no coverage for Mr. Russo's claim was in effect at the time of the incident. Although Defendants assert that modification could not have occurred in this instance because there was no "meeting of the minds," they simply ignore the substantial evidence to the contrary. The deposition testimony of both Robert McVey and Lynanne Houde shows that the changes in coverage were precisely what Mr. Russo requested.

Illustratively, in *McDermott v. Continental Insurance Co.*, 69 Ohio App. 3d 489, 591 N.E.2d 251 (1990), a trucker had insured his vehicles with Continental Insurance for the period from December 16, 1984 to December 16, 1985. Like Russo, the trucker "was very active in overseeing his insurance policies and made frequent changes in his coverage." *Id.* at 491. In February 1985, he contacted his agent and requested deletion of collision coverage on a certain trailer. *Id*. The agent wrote a memorandum of the deletion and sent it for implementation to Continental, which received it on February 27, 1985; it typically took thirty to sixty days to process deletions. *Id*. On March 17, he received a bill which did not reflect deletions from the original and which he did not pay. *Id.* at 491-492. On March 18, he told the agent to delete all coverage for the trailer except liability coverage. *Id.* at 492. On April 19, the trailer overturned, sustaining significant damages. When notified of the loss, the agent initially assured the trucker that the loss was covered but later informed him that comprehensive and collision coverage had been deleted pursuant to his directions. *Id*. The trial court found that the trailer was insured for collision and comprehensive coverage under the policy. *Id*. The appellate court reversed, holding that the policy had been orally modified at the time of the accident, even though the trucker had not received express written approval of the change of coverage from the insurer. *Id.* at 495-96.

Whether a contract of insurance has been changed by a subsequent agreement is generally a question for the jury. *2 Couch on Insurance 3d* §25:27. "Defendants might say that the conversations were different or urge different inferences, but these would be typical jury issues." *Grande, supra*, at *10.

12

CONCLUSION

For the foregoing reasons, there are genuine issues of fact as to whether the policy had been modified as of the date of injury to delete crew P & I coverage.  If so, then judgment must be entered for Plaintiff, not Defendants.  Hence, the Court should deny Defendants' Motion for Summary Judgment.

Dated at Portland, Maine this 8th day of February, 2006.

NORTH AMERICAN SPECIALTY
INSURANCE COMPANY
By its counsel:


/s/   Leonard W. Langer__

/s/   Marshall J. Tinkle___
BBO No. 565513


TOMPKINS, CLOUGH, HIRSHON & LANGER, P.A.
Three Canal Plaza
P. O. Box 15060
Portland, ME  04112-5060
(207) 874-6700

CERTIFICATE OF SERVICE

I, Leonard W. Langer, hereby certify that on February 8, 2006, I electronically filed the within document with the Clerk of the Court using the CM/ECF system which will send a notification of such filing(s) to the following:  Joseph G. Abromovitz, Esq. 858 Washington St., Dedham, MA  02026, counsel for Defendant Matteo Russo, and Bertram E. Snyder Esq., Looney & Grossman, 101 Arch Street, Boston, MA 02110-1112, counsel for Defendant Mary & Josephine Corp.


/s/   Leonard W. Langer

NAS/M&J
Mot Opp to SJ
2.8.06

13