# EXHIBIT "A"

**1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 04-10374WGY

. . . . . . . . . . . . . . . . .

NORTH AMERICAN SPECIALTY       )
INSURANCE COMPANY,             )
            Plaintiff,         )
                               )
vs.                            )
                               )
MARY & JOSEPHINE CORP. and     )
MATTEO RUSSO,                  )
            Defendants.        )

. . . . . . . . . . . . . . . . .

DEPOSITION OF LYNANNE HOUDE, a witness
called on behalf of the Defendant, Mary &
Josephine Corp., pursuant to the Federal Rules
of Civil Procedure before Jo Anne M. Shields,
Professional Shorthand Reporter and Notary
Public in and for the Commonwealth of
Massachusetts, at the Law Offices of Joseph G.
Abromovitz, P.C., 858 Washington Street,
Dedham, Massachusetts, on Tuesday, September 13,
2005, commencing at 3:34 p.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street
Boston, Massachusetts  02109
Telephone (617) 742-6900

**2**

APPEARANCES:

LEONARD W. LANGER, ESQUIRE
    TOMPKINS, CLOUGH, HIRSHON & LANGER, P.A.
    Three Canal Plaza
    P.O. Box 5060
    Portland, Maine  04112-5060
    (207) 874-6700
    for the Plaintiff

RICHARD H. PETTINGELL, ESQUIRE
    77 North Washington Street, Second Floor
    Boston, Massachusetts  02114
    (617) 778-0890
    for the Defendant, Mary & Josephine Corp.

JOSEPH G. ABROMOVITZ, ESQUIRE
    THE LAW OFFICES OF JOSEPH G.
    ABROMOVITZ, P.C.
    858 Washington Street
    Dedham, Massachusetts  02026
    (781) 329-1080
    for the Defendant, Matteo Russo

ALSO PRESENT:

    William J. Scola

    Robert McVey

**3**

I N D E X

Deposition of:   Direct Cross Redirect Recross

LYNANNE HOUDE

    By Mr. Pettingell  4              86

    By Mr. Abromovitz      80             105

    By Mr. Langer          89

E X H I B I T S

No.                                        Page

10 Letter to Matt Russo from Lynanne
   Houde dated 10/3/03                     27

11 Letter to Matt Russo from Lynanne
   Houde dated 12/18/02                    31

12 E-mail to Craig from Marie dated
   12/24/03                                86

**4**

S T I P U L A T I O N S
        It is stipulated by and between
counsel for the respective parties that the
deposition transcript is to be read and signed
by the deponent under the pains and penalties
of perjury; and that the sealing and filing
thereof are waived; and that all objections,
except as to form, and motions to strike are
reserved to the time of trial.
                    * * *

P R O C E E D I N G S
        LYNANNE HOUDE, a witness
called for examination by counsel for the
Defendant, Mary & Josephine Corp., having been
satisfactorily identified by the production of
her driver's license and duly sworn by the
Notary Public, was examined and testified as
follows:
                    * * *

DIRECT EXAMINATION
BY MR. PETTINGELL:
Q.  All right.  Could you please state your name
    and address?
A.  Lynanne Houde, 5 Kingston Street, Johnston,

Lynanne Houde                    North American Specialty Insurance Company
September 13, 2005                vs. Mary Josephine Case, et al.

Case 3:04-cv-10374-WGY    Document 27-2    Filed 02/08/2006    Page 3 of 28

5

1     Rhode Island 02919.
2  Q. And what's your occupation, ma'am?
3  A. Representative of Ocean Marine, service rep.
4  Q. And what are your duties as a service rep?
5  A. My duties is, I take -- when we obtain
6     business, I obtain the quotes from the
7     companies. I do the paperwork, the policies,
8     the financing, the invoicing, endorsements to
9     the policies, everything, cancellations,
10    reinstatements, all kinds of things --
11 Q. And how long --
12 A. -- start to finish.
13 Q. I'm sorry.
14 A. I'm sorry.
15 Q. How lo- -- how long -- well, if I say OMI, can
16    we have an agreement that that's a shorthand
17    for Ocean Marine Insurance Agency, Incorporated?
18 A. Yes.
19 Q. How long have you worked for OMI?
20 A. Fifteen years.
21 Q. And do you have any experience or training in
22    insurance?
23 A. I started in insurance in 1979.
24 Q. In what capacity?

6

1  A. Travelers Insurance, as a typist and then
2     became a senior rater. And then I got into the
3     agency business.
4  Q. All right. You say, as a senior rater?
5  A. Yes.
6  Q. What did you have to do as a senior rater?
7  A. You rate all the calculations, the hull -- I'm
8     thinking marine. I was in commercial property,
9     do the building, the contents, general
10    liability, auto, everything like that. I
11    started in the marine business in 2000 -- 2- --
12    19- -- wait a minute. 2000. Fifteen years
13    ago. I can't think. 1990.
14 Q. That's at OMI?
15 A. Yes.
16 Q. Okay. Now, with respect to your duties at OMI,
17    have they changed from when you first went to
18    work for them up to the present?
19 A. No.
20 Q. And during the period from 2001 through the
21    present --
22 A. Uh-huh.
23 Q. -- do you have occasion to be in communication
24    with people at Sunderland Marine Insurance

7

1     Company in Sunderland, England?
2  A. Yes.
3  Q. What sorts of things do you formally do in the
4     course of these communications?
5  A. We ask them to quote new business. And we give
6     them -- whatever situation we have, we go to
7     them as far as issuing an endorsement. Or the
8     renewal policies, we communicate back and
9     forth. And they have to approve everything
10    that we send out of the office. All the
11    paperwork is approved by them.
12 Q. Things such as endorsements?
13 A. Everything. Yes.
14 Q. Or return premiums?
15 A. Yes.
16 Q. And you're -- you say "we." You mean OMI?
17 A. Yes.
18 Q. And would it be fair to say your role in this
19    is -- you're the one that actually gets to send
20    the e-mails and the faxes and things of this
21    nature?
22 A. Yes.
23 Q. Sometimes, you make telephone calls?
24 A. Yes.

8

1  Q. Is there a policy at OMI about communications
2     between OMI and Sunderland on things such as
3     coverages or return premiums being in writing?
4  A. Yes.
5  Q. So if there's going to -- if -- if an
6     insured --
7  A. Uh-huh.
8  Q. -- wants to make a change in their coverage of
9     some sort, would they come to you? Or would
10    they go to somebody else at OMI?
11 A. Are you sa- -- are you asking, will the insured
12    come to me?
13 Q. Yes.
14 A. It could come to me directly. Or it could go
15    through one of the producers first, and they
16    can call me. Or, sometimes, the insured will
17    call me after they speak to the producer.
18 Q. All right. So if, hypothetically, a boat owner
19    wanted to make a change in his coverage -- say
20    he wanted to increase the amount of hull
21    coverage --
22 A. Uh-huh.
23 Q. -- and he called Mr. McVey and told him this,
24    and Mr. McVey came and told you --

Lynanne Houde                              North American Specialty Insurance Company
September 13, 2005                          vs. Mary & Josephine Corp., et al.
Case 1:04-cv-10374-WGY      Document 27-2      Filed 02/08/2006      Page 4 of 28

9

1  A. Uh-huh.
2  Q. -- the insured wants to increase his hull
3     coverage, would he then instruct you to notify
4     Sunderland?
5  A. Yes. At that point, yes, I would e-mail
6     Sunderland.
7  Q. Well, bear with --
8  A. Yeah.
9  Q. -- me here. Would he instruct you to do this?
10    Or would he just tell you, this is what's going
11    on; and you would do it as a matter of course?
12 A. I would do it. Yes. 'Cause it is a change to
13    the policy.
14 Q. And your communication with Sunderland would be
15    in the form of a -- of a request on behalf
16    of --
17 A. Yes. I would --
18 Q. -- the insured?
19 A. -- explain the situation to them: The insured
20    wants to increase his hull value. Then I would
21    ask them, What change would you like to make to
22    the hull rate?
23 Q. And if Sunderland was agreeable, they would
24    write back to you, saying yes, we'll -- we'll

10

1     agree for an increased premium of so much?
2  A. Yes.
3  Q. And then, what would you do?
4  A. I would issue the endorsement and the invoice.
5     And then I would fax the endorsement back to
6     Sunderland and wait for their approval of the
7     paperwork.
8  Q. Meaning, is this language acceptable?
9  A. Exactly.
10 Q. Okay. And assuming they -- would they then
11    come back to you, saying this language is okay?
12 A. Yes. They do.
13 Q. Then, what would you do?
14 A. Then, I would -- in the meantime, my work would
15    be checked by another girl. Our work is always
16    checked double -- twice before it goes out.
17    And if everything's okay, my invoicing, and
18    nothing's wrong, then she would give it back to
19    me; and I would mail out the endorsement and
20    the invoice.
21 Q. Okay. Now, you're here to answer questions
22    with regards to several different areas. At
23    any time in 19- -- roughly -- well, let --
24    let's stop. Are you familiar with the coverage

11

1     that Mary & Josephine Corporation obtained for
2     the fishing vessel Mary & Josephine?
3  A. Yes.
4  Q. And there were three different policy years
5     that coverage was afforded through Sunderland
6     for that vessel?
7  A. Yes.
8  Q. And the first year, it was afforded through
9     Fairfield Insurance Company?
10 A. Yes. It was.
11 Q. And Policy Year 2 was afforded through North
12    American Specialty?
13 A. Yes.
14 Q. And Policy Year 3, which ran from August of '03
15    to August of '04, also was placed through North
16    American Specialty?
17 A. Yes.
18 Q. And for purposes of shorthand, if I refer to
19    Policy Year 1 or Policy Year 2 or Policy
20    Year 3, you'll understand what I'm referring
21    to?
22 A. Yes.
23 Q. Okay. Now, with respect to Policy Year 1,
24    which was what -- August of '0- -- August 13th,

12

1     '01 to August 13th, '02 --
2  A. Yes.
3  Q. I'm sorry?
4  A. Yes.
5  Q. Okay. Did there come a time for that
6     particular policy year that Mary & Josephine
7     Corp. decided to place their boat on port risk?
8  A. Yes.
9  Q. And at the same time that they placed the boat
10    on port risk, did they also elect to change the
11    size of the crew?
12 A. I was told just to place it on port risk.
13    Mention of P&I was not mentioned at all.
14 Q. That was for Policy Year 1?
15 A. 1. Yeah.
16 Q. And who told you that?
17 A. Who told me that? I think it was Bobby.
18    Actually, the requirement -- sorry -- the
19    requirement came from Sunderland on the first
20    year because of the recommendations had to be
21    done.
22 Q. Okay.
23 A. Okay.
24 Q. You're referring to recommendations. And this

Lynanne Houde
September 16, 2005

Case 1:04-cv-10374-WGY    Document 27-2

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

Filed 02/08/2006    Page 5 of 28

**13**

1    is surveyor's recommendations?
2  A.  Yes.
3  Q.  And a request or instructions from Sunderland
4      came in, something to the effect that this
5      boat cannot go out fishing until -- it must be
6      placed on port risk until the recommendations
7      have been taken care of?
8  A.  Yes.
9  Q.  Okay.  And, at that time, was any change made
10     in the size of the crew?
11 A.  No.
12 Q.  And --
13         MR. LANGER:  Change by the insured?
14         MR. PETTINGELL:  Yes.
15 A.  No.
16 Q.  All right.  Now, with respect to Policy Year 1,
17     were the recommendations taken care of?
18 A.  Yes.  They were.  Only because I know a -- a
19     status of recommendation was ordered at a
20     certain point to see if the recommendations
21     were done.
22 Q.  All right.  Did you have any conversations at
23     all with Mr. Matt Russo or Mr. Salvatore Russo
24     about the things that were being done to take

**14**

1      care of the recommendations?
2  A.  No.  I did not.
3  Q.  At some point, did you receive notification
4      that the recommendations had been taken care
5      of?
6  A.  Yes.  I did.
7  Q.  And what notification did you receive?
8  A.  I'm -- I'm just going to look up -- well, the
9      SOR had come in from Neil Stoddard, saying all
10     the recs were done.  I know the --
11         COURT REPORTER:  I'm sorry?  From Neil?
12 A.  I'm sorry.  From Neil Stoddard, the surveyor,
13     stating that all the recommendations were done.
14     I informed Bobby of that, and he gave me
15     permission to put it back in operational.
16 Q.  And an endorsement was issued, putting the boat
17     back on operational?
18 A.  Yes.
19 Q.  And had an endorsement issued putting the boat
20     on port risk?
21 A.  Was issued.  Yes.
22 Q.  Yes.  As a result of that, the boat being on
23     port risk while the recommendations were being
24     taken care of, was there a reduction in

**15**

1      premium?
2  A.  No.  Because of the reason of it being tied up
3      during the recs, they're not allowed a return
4      premium --
5  Q.  Okay.
6  A.  -- according to Sunderland.
7  Q.  All right.  Now, with respect to Policy Year 2,
8      did Mr. Russo request that his boat -- Mr. Russo
9      request that his boat go on port risk?
10 A.  Yes.  He had called.  He still had more
11     recommendations to complete, and he did not
12     know how long he was going to be tied up.
13     Therefore, I submitted that to the company to
14     put the boat on port risk until the recs were
15     done.  So we went from the effective date that
16     he gave me until the expiration date of the
17     policy on port risk because he had no idea when
18     he was going to finish doing it.  And you need
19     that last date to put on an endorsement.
20 Q.  So for purposes of the endorsement, it was
21     placed on port risk from August 13th of 2002 to
22     August 13th, 2003?
23 A.  Let me just get those dates -- I forget -- for
24     you.  Actually, okay, what dates did you say,

**16**

1      please?
2  Q.  200- --
3  A.  '2.
4  Q.  -- -2 to 2003.
5  A.  Yes.
6         MR. LANGER:  Well, the whole question was
7      from August 13th, 2002 to August 13th, 2003.
8         MR. PETTINGELL:  That's what I said.
9         MR. LANGER:  All right.
10 A.  Oh, I'm sorry.  No.  From the date that he
11     called and told us to the expiration date.
12 Q.  All right.  So do you know what date that was?
13 A.  Which was December 9th, '02.
14 Q.  So it went on port risk, for purposes of the
15     issuance of the endorsement, from 12/9/02 to
16     8/13/03?
17 A.  Yes.
18 Q.  Was any reduction in the size of the crew made
19     during that period?
20 A.  Yes.  We kept one man on.
21 Q.  Okay.  And did that generate a return of
22     premium?
23 A.  Yes.  It did.
24 Q.  Okay.  And how was the -- how was the return of



Lynanne Houde
September 13, 2005
Case 1:04-cv-10374-WGY    Document 27-2    Filed 03/08/2006    Page 6 of 28
North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

**17**

```
 1      premium calculated?
 2   A. I deleted all but one man.  So if there were
 3      four to five men -- I'd have to look to see
 4      what was on that policy.  If he had four to
 5      five,  you'd take away the three and a half --
 6      the three men, three and half men, and keep
 7      just  the one man on.
 8   Q. All right.  At some point, did the boat come
 9      off port risk?
10   A. Yes.  It did.
11   Q. When?
12   A. It went on back on February 5th, '03.
13   Q. Okay.  And was there an increase in the size of
14      the crew?
15   A. Yes.
16   Q. Also on February 5th?
17   A. Yes.  To the expiration date.
18   Q. And what did the crew increase to?
19   A. Three to four, excluding owners.
20   Q. So is it fair to say the reduction in premium
21      was not for the complete policy period; it was
22      for a portion of the policy period?
23   A. Yes.
24   Q. Now, how was that calculated?
```

**18**

```
 1   A. You would add the to- -- you would bring the
 2      men up to the total of three to four.  You'd be
 3      charged the 2 1/2 extra 'cause you only had one
 4      man on.  And then you'd prorate it from
 5      February 5th to August 13th.  And he had an
 6      additional premium due at that point.
 7   Q. So was he given a credit towards what he had to
 8      owe for the following year?
 9   A. Yeah.  What I -- I believe, on this one, what I
10      did do is, I took the difference of the two;
11      and he paid the difference.  Because the
12      additional premium was more -- no, actually --
13      excuse me; I'm wrong.  The return was larger.
14      So we ended up giving him a credit on that.
15   Q. So he, actually, didn't have to make a down
16      payment for -- for Year 3?
17   A. Oh, no, no.  That has nothing to do with
18      Year 3.
19   Q. Okay.  Now, in terms of P&I coverage, how was
20      the premium calculated?  Well, let me back up a
21      little bit.  Are there different insurance
22      carriers involved --
23   A. Yes.
24   Q. -- for the P&I?  What -- what is the nature of
```

**19**

```
 1      the P&I coverage?
 2   A. Okay.  Sunderland covers the first 250,000 P&I,
 3      and then we have excess carriers who carry over
 4      the 250.  If they want 750 up to 250 up to
 5      5,000,000, we go through them --
 6   Q. What was the --
 7   A. -- to whatever total they want.
 8   Q. I'm sorry.  And what was the two different
 9      types of P&I co- -- cover?
10   A. Two different companies.  Yes.
11   Q. One -- one is excess, and one's --
12   A. One's primary.
13   Q. -- primary?  And, I take it, each of the
14      companies charges a different premium for the
15      coverage that they're providing?
16   A. Yes.
17   Q. So for purposes of calculating a return
18      premium, you have to do a different calculation
19      based upon the amount of premium that the
20      excess carrier's charging, for example, from
21      what the primary --
22   A. Exactly.
23   Q. -- carrier's charging?
24   A. Yes.  You have to calculate from that first
```

**20**

```
 1      point when you renewed it, add or subtract
 2      or . . .
 3   Q. All right.  Now, in addition to P&I cover --
 4      well, strike that.  What is the -- is there --
 5      well, let me strike that.  In a dif- -- dif- --
 6      in addition to the P&I cover, there's hull
 7      coverage as well, isn't there?
 8   A. Yes.
 9   Q. Is there -- is there a return premium due as a
10      result of the vessel being on port risk for the
11      hull coverage?
12   A. No.
13   Q. Is there a difference in the risk to a vessel
14      tied up to a pier as opposed to a vessel that's
15      act- -- actively conducting fishing operations?
16         MR. LANGER: Objection.  Foundation.
17   Q. You may not know.  I don't know.
18   A. Oh, no.  I don't know what is --
19   Q. All right.
20   A. -- what's happening here.
21         THE WITNESS: You objected.
22         MR. LANGER: I objected.  You -- if you can
23      answer the question, you can answer it.
24         THE WITNESS: Okay.
```

29

1    Q.  Okay.
2        MR. PETTINGELL:  All right.  Off the
3    record.
4        (A brief discussion was held off the
5        record.)
6    Q.  Looking at Exhibit 3, this pertains to Policy
7        Year 3.  Correct?
8    A.  Exhibit 3 you're talking about?
9        MR. LANGER:  Yeah.  Just read this.
10   A.  Yes.
11   Q.  And, by that, I mean, the -- the vessel was
12       placed on port risk for Policy Year 3 for a
13       period of time; is that right?
14   A.  Yes.
15   Q.  And this is a -- a letter from Craig McBurnie
16       at Sunderland to Mr. McVey?
17   A.  Yes.  It is.
18   Q.  And in this letter -- well, had you ever seen
19       this letter before today?
20   A.  I don't recall.  No.
21   Q.  All right.  In this letter, he states in the
22       third paragraph, "In addition, cover at present
23       is restricted to Port Risks only following your
24       fax of October 3rd.  Last year we did the same

30

1        (as per Lynn's of 17th September '02) and
2        deleted crew P&I coverage entirely until
3        fishing recommenced."
4    A.  September --
5    Q.  "It looks" --
6    A.  -- 17th.
7    Q.  -- "we are providing vessel P&I coverage only
8        at present and I would say this means the crew
9        are not covered at the time of the incident."
10       Do you see what I've read there?
11   A.  Yes.
12   Q.  Now, coming back to the prior year, do you have
13       a recollection of requesting that Su- -- that
14       Sunderland delete crew P&I coverage entirely
15       while the vessel was on port risk?
16   A.  This per- -- that pertains to the second
17       year --
18   Q.  Yes.
19   A.  -- September '02?
20   Q.  Right.
21   A.  Yes.  We put him on port risk coverage.
22   Q.  Do you remember asking that they delete the
23       crew P&I coverage entirely in Policy Year 2
24       while it was on port risk?

31

1    A.  Well, Policy Year 2 is when we kept it at one.
2        There were other port risk credits.  But this
3        particular one is just one man.
4        MR. LANGER:  Okay.  But he's not asking
5        about --
6        THE WITNESS:  See, I'm not sure which one
7        he's asking --
8        MR. LANGER:  -- September 17th.  Was there
9        a port risk period in September?
10       MR. ABROMOVITZ:  Let me make a copy of
11       that.
12       MR. LANGER:  All right.
13       THE WITNESS:  September '02 and November
14       '02.  It could be that one.  See, I'm not sure.
15   Q.  I have your September 17th e-mail here.
16   A.  Yes.
17       MR. ABROMOVITZ:  Hang -- hang on one
18       second.
19       MR. PETTINGELL:  We'll mark that the next
20       exhibit.
21       (Letter to Matt Russo from Lynanne Houde
22       dated 12/18/02 marked as Houde Exhibit
23       No. 11.)
24   Q.  Okay.  Have you got Exhibit 11 in front of you?

32

1    A.  Yes.  I do.
2    Q.  All right.  Now, again, in Exhibit 3,
3        Mr. McBurnie makes reference to yours of 17th
4        September, '02.
5    A.  Uh-huh.  Yes.
6    Q.  To your knowledge, is that the e-mail that's
7        being referred to?
8        MR. LANGER:  Objection.  Foundation.
9        THE WITNESS:  I forget what he asked.
10       MR. LANGER:  Well, the question is -- is,
11       do you know whether the reference in
12       Exhibit 3 --
13       THE WITNESS:  Yeah.
14       MR. LANGER:  -- is, in fact, referring to
15       what has now been marked as Exhibit 11?
16   A.  Yes.
17   Q.  Did you send any other e-mails on
18       September 17th, 2002 to Sunderland other than
19       the document that's been marked as Exhibit 11?
20       MR. LANGER:  If you know.
21   A.  I don't recall.  I don't have everything with
22       me.  So . . .
23       MR. PETTINGELL:  You know, Len, you keep
24       saying to the deponents, "If you know."

Lynanne Houde                    North American Specialty Insurance Company
Case 1:04-cv-10374-WGY    Document 27-2    Filed 02/08/2006    Page 8 of 28
September 13, 2005                vs. Mary & Josephine Corp., et al.

33

1    Obviously, the question assumes if they know.
2        MR. LANGER: I understand that you knew --
3        MR. PETTINGELL: In some quarters --
4    please. In some quarters, at least, in
5    Massachusetts, that language has been
6    interpreted by courts to be coaching of the
7    witness. And I would ask, if you want to
8    object, that's fine. But please don't tell the
9    witness, "If you know." Obviously, if you
10   know.
11       MR. LANGER: I -- well, if you don't know
12   specifically, then say, I don't know.
13       THE WITNESS: Okay.
14       MR. LANGER: Don't guess whether this is
15   the only e-mail --
16       THE WITNESS: Uh-huh.
17       MR. LANGER: -- that you sent to Sunderland
18   at all on September 17th.
19       THE WITNESS: Okay.
20       MR. LANGER: All right?
21   A. So I don't know.
22   Q. All right. Well, then, I'd like you to check
23      through your documents and see whether there
24      are any other e-mails going to Sunderland

34

1    dated --
2    A. I don't --
3    Q. -- September 17th.
4    A. I don't have all the correspondence.
5        MR. LANGER: Well, the reason I objected
6    is, she may have sent e-mails to Sunderland on
7    85 other boats on that day that had nothing to
8    do with the Mary & Josephine. The question
9    was, did you send any other e-mails to
10   Sunderland on September 17th? If you want to
11   limit it to the Mary & Joseph-- Josephine on
12   that day, she probably can --
13       MR. PETTINGELL: Well, so I will adopt that
14   limitation.
15       MR. LANGER: Okay.
16   Q. Did you send any other e-mails to Sunderland
17      referencing the coverage to be afforded to the
18      Mary & Josephine on September 17th, 2002 other
19      than the document that's been marked as
20      Exhibit 11?
21   A. I don't know.
22   Q. Then, I'd like you to take -- I'm sorry we
23      have -- have to do this. You're going to have
24      to go through all of the --

35

1        MR. LANGER: Go through what you have with
2    you.
3        THE WITNESS: No, no. I don't have that
4    here. I have -- it's the actual file --
5        MR. LANGER: Okay.
6        THE WITNESS: -- which -- I will tell you,
7    there --
8        MR. PETTINGELL: There aren't -- I can tell
9    you that, based upon the documents you -- off
10   the record.
11       (A brief discussion was held off the
12       record.)
13   Q. Let's come back to Exhibit 11. Is it fair to
14      say that that is an e-mail to Sunderland
15      pertaining to the Mary & Josephine?
16   A. Yes.
17   Q. All right. And, in that e-mail, do you ask
18      that Sunderland delete crew P&I coverage
19      entirely until fishing is recommenced?
20       MR. LANGER: Objection. The document
21       speaks for itself.
22   A. Yes. It says no P&I. Delete it entirely. And
23      then, once it goes back fishing, re- -- yeah.
24   Q. Okay. And who instructed you to make such a

36

1    request of Sunderland?
2    A. We're talking Policy Period 2?
3    Q. For Exhibit 11. Yeah.
4    A. Well, it doesn't show a policy period. So I'm
5    trying to figure out which year it's -- it's
6    been --
7    Q. This is to Policy --
8    A. Policy Period 2. Okay. And who asked me to do
9    that?
10   Q. All right. Who asked you to send that --
11   A. Okay. And that was --
12   Q. -- make that request to Sunderland?
13   A. The owner asked for it.
14   Q. Did you -- you have a memory of specifically
15      speaking to Mr. Russo?
16   A. I'd have to say no on this one. I'm not sure.
17   Q. All right. I guess that's my question, whether
18      you spoke with Mr. Russo about this request for
19      Policy Period --
20   A. September '02.
21   Q. -- 2.
22   A. Let me see where. It's December 9th.
23   Q. September 17 --
24   A. September 17th. Okay.

Case 1:04-cv-10374-WGY    Document 27-2    Filed 02/08/2006    Page 9 of 28
Lynanne Clarke
September 13, 2005
North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

37

1   Q.  -- 2002.
2   A.  Sorry about that.
3       THE WITNESS:  September 10th, that's --
4       MR. LANGER:  We're ready when you are.
5   Q.  I think my question is out there.
6   A.  Okay.
7       MR. LANGER:  The question was whether she
8       had a specific recollection?
9       MR. PETTINGELL:  Of speaking with Mr. Russo
10      about this.
11  A.  Yes.  On September 10th, Matt ser- -- well,
12      Matt called the service at 6:30 at night,
13      wanting to put the vessel on port risk.  And
14      that's when I submitted it to the company and
15      sent out my letter.
16  Q.  Do you have some notes -- this was something
17      off the service.  Do you have some notes that
18      reflects this?
19  A.  The -- I -- not with me.  The actual message
20      from -- from the service, I don't have that
21      with me.
22  Q.  What's your practice --
23  A.  This is in my underwriting file.
24  Q.  Okay.

38

1   A.  Yeah.
2       MR. PETTINGELL:  So we don't have the
3       underwriting file?
4       MR. LANGER:  Yeah.  You've got it.  Yeah.
5       MR. PETTINGELL:  We do?
6       MR. LANGER:  My understanding is, you've
7       got their entire file.
8       MR. PETTINGELL:  I don't recall -- off the
9       record.
10      (A brief discussion was held off the
11      record.)
12      (Brief recess taken.)
13  BY MR. PETTINGELL:
14  Q.  As I understand your testimony, ma'am, sometime
15      prior to September 17th, 2002 when you sent
16      Exhibit 11 to Mr. Burke, your message service
17      picked up a message from Mr. Russo wanting to
18      put the vessel on port risk and wanting to --
19      to leave all crew P&I cover for the period that
20      it was on port risk; is that right?
21  A.  Yes.
22  Q.  And that's what led you to send what's been
23      marked as Exhibit 11 to Mr. Burke?
24  A.  Yes.

39

1   Q.  Now, I'd like you to look at Exhibit 10.  And
2       you've already had a chance to look at that,
3       have you?
4   A.  Yes.
5   Q.  And this is another -- is this an e-mail or --
6       I guess, another e-mail from you to Mr. Burke,
7       in which you indicated that you had faxed a
8       port risk endorsement for his approval after
9       speaking to Bob.  And, by that, you mean
10      Mr. McVey?
11  A.  Yes.
12  Q.  "Since it will take approximately 2 months for
13      all the recommendations to be completed, we can
14      (sic) amend the vessel to Port Risk by deleting
15      all but 1 man from P&I.  When the vessel
16      returns fishing, we'll add the men -- the man
17      back on."  Did I read that right?
18  A.  Yeah.
19  Q.  I'm sorry?
20  A.  Yes.  You did.
21  Q.  Okay.  So, at least, for Policy Period 2, it
22      appears that Mr. Russo, for whatever reason,
23      changed his mind and only wanted to reduce the
24      crew complement to one man rather than doing

40

1       away with all P&I cover, crew P&I cover; is
2       that correct?
3       MR. LANGER:  Just in an effort to clarify,
4       I think we're talking about two different
5       periods.
6       MR. PETTINGELL:  No.  They're all Policy
7       Period 2.
8       MR. LANGER:  I understand that.  But it's
9       two different periods within Policy Period 2.
10  Q.  Well, let's see.  Was the vessel on port risk
11      for more than one period during Policy
12      Period 2?
13  A.  It was one -- I issued four endorsements to
14      that policy period regarding --
15  Q.  All for port risk?
16  A.  Yes.
17  Q.  Okay.  What periods was it on port risk?
18  A.  Okay.  The first one was from September 10th,
19      '02 to 11/14/02.
20  Q.  Just a second here.  Okay.
21  A.  Then I issued another -- the boat was tied up
22      from May 1st, '03 to August 13th, '03.  Then we
23      put the boat on port risk from December 9th, '02
24      to August 13 -- I think that's the one I just

41

```
 1        said.  I'm looking at my calculations, plus the
 2        endorsement --
 3   Q.   All right.  Let me --
 4   A.   -- which was --
 5   Q.   -- make sure I'm getting this.  Did you say
 6        September of '02?
 7   A.   Yes.
 8   Q.   Now, that would be Policy Period 1, wouldn't
 9        it?
10   A.   No.  Policy 2.
11        MR. LANGER:  August to August.
12   Q.   Oh, September.  Okay.  I'm sorry.  All right.
13        MR. ABROMOVITZ:  Okay.  We have
14        September 10th, '02 to November 14th, '02.
15        What was the second --
16        MR. LANGER:  Then she said 5/1/03 --
17        THE WITNESS:  '3 to 8/13/03.
18        MR. LANGER:  And then there was 12/9/02 to
19        8/13/03.
20        THE WITNESS:  Right.
21        MR. ABROMOVITZ:  And then there's a fourth
22        one?
23   A.   Then there was another -- well, then we amended
24        it back to operational.  Then there were two
```

42

```
 1        more port risk credits, one from September --
 2        September 10th, '02 to November -- if I can
 3        just see that.
 4   Q.   And what is --
 5        MR. ABROMOVITZ:  We'll go off the record.
 6        (A brief discussion was held off the
 7        record.)
 8        MR. ABROMOVITZ:  Let's -- let's go back on
 9        the record.  Yeah.  Let's -- let's get some of
10        this on the record.
11   Q.   Okay.  For Policy No. 2 --
12   A.   Uh-huh.
13   Q.   -- you're saying your records indicate there
14        were a number of, what, at least, four
15        occasions when the -- four changes as to the
16        status of the vessel --
17   A.   Yes.
18   Q.   -- were made?  All right.
19   A.   Actually, more.
20   Q.   And what's the -- when's --
21        MR. LANGER:  Speak up.  Don't --
22   A.   Yeah.  Actually, there was more.
23   Q.   There's more than that?
24   A.   There was a total of -- there were a total
```

43

```
 1        of -- bear with me a minute.  I'll tell you
 2        exactly how many changes were done.  Actually,
 3        it is four, a total of four changes during the
 4        second period.
 5   Q.   And what was the first one?
 6   A.   The first one was the December 9th, '02 --
 7        well, in my -- wait a minute.  Which is the
 8        oldest here?  Hold on.  Okay.  September 10th,
 9        '02.  September 10th, '02 to November 14th,
10        '02, we gave a credit of 1,923.
11   Q.   And when did that -- when was a request made
12        for that particular change?
13   A.   That was when Mr. Russo called on
14        September 10th on the answering service and
15        requested that the vessel be put on port risk.
16   Q.   The 10th of what year?
17   A.   '02.
18   Q.   And so that was at the -- the beginning of
19        Policy 2?
20   A.   Yes.  Yes.
21   Q.   And what did he -- what message did he leave?
22   A.   He left a message on the service, stating he
23        wanted the vessel be put on port risk, the time
24        that he called.  And it's just a brief message
```

44

```
 1        when it's on the service.
 2   Q.   And, at that time, was it your understanding
 3        that the -- the vessel was already tied up at
 4        the -- the pier?
 5   A.   Yes.  On the day that he called.
 6   Q.   All right.  In fact, had he advised you at that
 7        time that he wanted coverage for port risk only
 8        effective May 1st, 200- -- oh, this is --
 9        excuse me.  How long had the vessel been tied
10        up at the pier?
11   A.   September 2nd.  September 2nd, '02 -- let me
12        find it -- to November 14th, '02.
13   Q.   That's what he wanted?
14   A.   Yes.
15   Q.   And the vessel was already tied up at the pier?
16   A.   Yes.
17   Q.   Okay.  And had -- as a -- in addition to that,
18        he wanted to delete a hundred percent of crew
19        coverage, crew P&I coverage?
20   A.   He did not say he wanted any P&I coverage.
21   Q.   I'm sorry?
22   A.   He did not want any P&I coverage.
23   Q.   Yeah.  He stated he didn't want any P&I
24        coverage.  And did an endorsement issue
```

45

1  deleting P&I coverage?
2  A. The -- we had done the port risk endorsement,
3  stating it was tied up from September 10th to
4  November 14th.
5  Q. All right. Now, what's the next change?
6  A. I believe the next one in order was -- that was
7  September 10th. Then, on December 9th, '02 to
8  August 13th, '02, we put the vessel back --
9  '03 -- I'm sorry. I'm getting my dates --
10  December 9th, '02 to August 13th, '03, we
11  amended the policy from operational to port
12  risk; and we left just one man on.
13  Q. Okay. September -- December 9th?
14  A. December 9th.
15  Q. What happened from November 14th to
16  December 9th?
17  A. The boat was operational.
18  Q. And did it have P&I coverage?
19  A. During the operational portion, yes.
20  Q. Was there an endorsement issued indicating
21  that, as of December 9th, it was going
22  operational again?
23  A. That was -- that -- we -- that was put back
24  under a- -- operational on February 5th, '03 to

46

1  August 13th, '03.
2  Q. So in February, an endorsement issued
3  reflecting something retroactive?
4  A. No. On February 5th, he told us he went back
5  fishing. So at that point, I issued the
6  endorsement to the expiration date, amending it
7  from port risk back to operational and adding
8  the three to four men back on.
9  Q. All right. So from September through
10  February 5th, the vessel was on port risk. And
11  then, February 5th, it went back operational?
12  A. It was September 10th to November 14th and then
13  December 9th to August 13th, '03.
14  Q. Was there an endorsement showing that,
15  December 9th to August 13th, '03?
16  A. Yes.
17  Q. Do you have a copy of it?
18  A. Yes. I think it's --
19  MR. LANGER: That's Exhibit 6.
20  MR. PETTINGELL: Okay. Can I see it?
21  (Mr. Langer conferring with witness.)
22  Q. Exhibit 6 --
23  MR. PETTINGELL: This is on the record.
24  Q. Exhibit 6 shows the vessel going on port risk?

47

1  A. Yes.
2  Q. An amendment of the crew warranty to one?
3  A. Yes.
4  Q. Since it's going onto port risk on December 9th,
5  it must have been on operational before that;
6  or you wouldn't have to have an endorsement
7  effective December 9th going onto port risk.
8  Or I'm missing something.
9  MR. LANGER: Is that a question?
10  MR. LANGER: It's a statement of fact.
11  MR. ABROMOVITZ: I believe the question, do
12  you have one showing the vessel becoming
13  operational again?
14  THE WITNESS: Yes. February 5th.
15  MR. ABROMOVITZ: You have an endorsement?
16  Q. Of what year?
17  A. 2003.
18  MR. PETTINGELL: What's the -- something's
19  not -- off the record.
20  (A brief discussion was held off the
21  record.)
22  Q. Do we have an endorsement showing it?
23  A. Yes.
24  Q. And when was that issued?

48

1  MR. LANGER: It's in one of these packets.
2  A. It was effective February 5th. I don't know
3  the exact date it was issued. It had to be
4  around February, the date that it -- you know,
5  effective date of the change.
6  Q. That's February 5th, '03 --
7  A. Yes.
8  Q. -- to August 13, '03?
9  A. Yes.
10  Q. Fully operational and a crew of three-four?
11  A. Yes.
12  Q. Now, there seems to be an overlap here; because
13  we also have an endorsement from December 9th,
14  '02 to August 13, '03 showing a crew of one on
15  the boat on port risk.
16  MR. LANGER: Can I help you, Dick? Or do
17  you want to --
18  MR. PETTINGELL: Sure.
19  MR. LANGER: As I understand it, it went on
20  port risk December 9th. At that time, the
21  policy was amended port risk only from
22  December 9th to the end of the policy period.
23  MR. PETTINGELL: Right. With a crew of
24  one.

Lynanne Houde
September 13, 2005

Case 1:04-cv-10374-WGY   Document 27-2   Filed 02/08/2006   Page 12 of 28

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

**49**

1     MR. LANGER: In February, the request was
2  to make it operational again. So the policy
3  was endorsed going back operational effective
4  February 5. That would supercede the
5  August 13th date in the earlier endorsement
6  putting it on port risk.
7     MR. PETTINGELL: Okay.
8  Q. And it had been -- an endor-- endorsement
9  issued on August 15th, '03, right --
10     MR. LANGER: An endorsement on August 15th,
11  '03?
12  Q. -- placing the vessel on port risk from
13  September 10th, '02 to November 14th, '02 that
14  was retroactive?
15  A. That was just the standard port -- it was just
16  not fishing.
17     MR. LANGER: And when was that issued?
18  Q. That was done --
19     THE WITNESS: That was issued -- that was
20  for 1,923. That was issued September -- it was
21  effective September 10th.
22     MR. LANGER: That, actually --
23     THE WITNESS: But it was issued --
24  Q. August 15th of '03?

**50**

1  A. Let me just check my records here. Actually, I
2  issued that credit on December 9th, '02 'cause
3  we didn't find out that it had stopped fishing
4  until November 14th.
5  Q. Is it fair to say that that endorsement, which
6  pertained to Policy No. 2, is an endorsement
7  that was issued at the end of the -- or after
8  Policy 2 had expired to reflect what had been
9  going on with the boat; in other words, an
10  attempt by Mr. Russo to collect some return
11  premium because he wasn't fishing actually
12  during that period, although nobody knew it --
13     MR. LANGER: Which endorsement?
14  Q. -- at the insurance company?
15     MR. LANGER: Which endorsement are you
16  talking about?
17     MR. PETTINGELL: The endorsement which
18  placed the vessel on port risk from
19  September 10th, '02 to 11/14/02.
20     MR. LANGER: I -- I think she just
21  testified that she issued that credit in
22  December --
23     THE WITNESS: December.
24     MR. LANGER: -- of '02.

**51**

1     MR. PETTINGELL: Well, that's the credit.
2  I'm talking about the endorsement.
3  A. I would have done it at that point. So that's
4  the 1,923. The endorsement was in here.
5  Q. Let's find it.
6  A. It's Endorsement 3, dated September 10th.
7  Q. Does it say when the endorsement was --
8  A. No. There's no date on the endorsement itself.
9  But I calculated it in December.
10  Q. Well, if you had a -- if, hypothetically, you
11  had a cover letter dated August 13th, '03
12  enclosing the endorsement or sending the
13  endorsement to Mr. Russo --
14  A. Uh-huh.
15  Q. -- and this is hypothetical -- would that
16  suggest that the endorsement was issued on or
17  about the time of the cover letter?
18  A. Yes.
19     MR. LANGER: Objection.
20  Q. All right.
21     MR. LANGER: Wait -- wait --
22     THE WITNESS: I'm sorry.
23  Q. And, in -- in either case, would you agree that
24  the endorsement was issued in '03 to reflect

**52**

1  something that had occurred in the prior policy
2  year in '02?
3     MR. LANGER: Objection. Do -- do you know
4  when the endorsement was issued and sent to
5  Mr. Russo for the period November -- excuse
6  me -- September to November of '02?
7     THE WITNESS: I don't know the exact date.
8  But I calculated it on December 9th. So it's
9  processed at that point.
10  Q. According to your records?
11     MR. LANGER: You can answer yes or no.
12  A. Yes.
13     MR. PETTINGELL: Off the record.
14     (A brief discussion was held off the
15     record.)
16  Q. Is it unusual for you to be issuing an
17  endorsement at the end of a policy period to go
18  back and reflect a policy change -- let me give
19  you a -- for the prior policy period? For
20  example, if a vessel owner had their boat tied
21  up from September to November and hadn't told
22  you I'm tying my boat up, and you were carrying
23  it as fully operational --
24  A. Uh-huh.

Lynanne Houde    Case 1:04-cv-10374-WGY    Document 27-2    Filed 02/08/2006    Page 13 of 28
September 13, 2005    North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

53

1  Q. -- and then, when he went into the next policy
2     year, he came to you and said, look, the boat
3     wasn't fishing during that period; can I get
4     the thing placed retroactively on port risk and
5     get a return premium? Did Mr. Russo ever come
6     to you with such a request?
7  A. Yes.
8  Q. And did you pass that request on to Sunderland?
9  A. Yes. I did.
10 Q. And did Sunderland ever honor that request?
11 A. Yes. They did.
12 Q. More than one occasion?
13 A. Yes.
14 Q. All right. So with respect --
15    MR. PETTINGELL: Off the record for a
16    second.
17    (A brief discussion was held off the
18    record.)
19    MR. PETTINGELL: Withdraw the start of that
20    next question.
21 Q. Now, Exhibit 4, is that the fax of October 3rd?
22 A. Yes. Yes. It is.
23 Q. Can you tell me, please, what Exhibit 4 is and
24    what it is an attempt to do?

54

1  A. To tell the insur- -- tell Sunderland that the
2     insured just contacted us that the vessel was
3     not fishing way back to May and that he wanted
4     credit for that period and did not know --
5     well, he did. He said he would be returning
6     sometime in November '03.
7  Q. So this is, in fact, an example of the question
8     I just put to you?
9  A. Yes.
10 Q. And did Sunderland go along with the request
11    for a -- a return premium?
12 A. Yes. They did.
13 Q. Retroactively?
14 A. Yes.
15 Q. And Exhibit 3 is a response to your fax --
16    MR. LANGER: Objection.
17 Q. -- is that correct?
18 A. No. It's not.
19 Q. Well, one, two, third paragraph, "In addition,
20    cover at present " --
21 A. Oh.
22 Q. -- "is reduced to Port Risks only following
23    your fax of October 3rd."
24 A. Okay. Again, that fax, that was sent to Bobby.

55

1     I did not see that until just today. So . . .
2  Q. All right. And it says, "Last year, we did the
3     same" -- as per your September 17th, '02
4     e-mail -- "and deleted crew P&I coverage
5     entirely until fishing recommenced." Now, in
6     your fax of October 3rd, Exhibit 4, do you
7     request that P&I coverage entirely be deleted?
8  A. No. I just -- we put it on port risk. It does
9     not mention P&I.
10 Q. Okay. Now, what is your understanding of the
11    meaning of port risk with respect to coverage
12    that is available for P&I?
13 A. The vessel is just sitting at the dock. It's
14    not fishing. There's no work being performed.
15    It's just sitting there. No one's, you know,
16    working on it, fishing, or moving it.
17 Q. Is P&I coverage with a crew still available?
18 A. I'm not that familiar with port risk crew.
19 Q. That's -- that's fine.
20 A. I'm sorry.
21 Q. If you don't know, that's a perfect answer.
22    Did you ever have any discussions with
23    Mr. Russo as to whether or not P&I coverage
24    would be available while a vessel was on port

56

1     risk?
2  A. No. I did not.
3  Q. Beyond -- well, strike that. In terms of the
4     various requests for coverage changes that you
5     prepared and sent to Sunderland --
6  A. Uh-huh.
7  Q. -- is it fair to say that if it was a request
8     that was passed on to you by Mr. McVey that you
9     would simply then prepare and pass on the
10    request that Mr. McVey had presented to you?
11 A. Yes.
12 Q. And, in some instances, you talked directly to
13    the vessel owner; and then you passed their
14    requests along?
15 A. Yes. I would discuss it with Bobby first. And
16    then I --
17 Q. Right.
18 A. -- would go to Sunderland.
19    COURT REPORTER: I'm sorry. I can't hear
20    you.
21 A. I would talk -- I'm sorry. I would go to Bob
22    McVey first. And then we would submit it to
23    the company.
24 Q. Now, apparently, at the -- in September or

Lynann Case ude04-cv-10374-WGY    Document 27-2 North American Specialty Insurance Company Page 14 of 28
September 13, 2005                          vs. Mary & Josephine Corp., et al.
Filed 02/08/2006

57

```
1     sometime prior to September of '02 --
2  A. Okay. Yeah.
3  Q. -- you had a conversation, as I understand your
4     testimony, with Mr. Russo which led to your
5     requesting that P&I coverage be deleted
6     entirely while the vessel was on port risk.
7     And that would be --
8        MR. ABROMOVITZ: Exhibit 11.
9        MR. LANGER: Exhibit 11.
10 Q. -- Exhibit 11.
11 A. Yes.
12 Q. Other than that conversation with Mr. Russo
13    in --
14       MR. ABROMOVITZ: You got to give them back
15    when you're finished, or we'll be really
16    screwed up here.
17 Q. -- in September of '02, did you ever have any
18    other discussions with him where he talked
19    about -- where you and he discussed his
20    deleting crew P&I coverage while the vessel was
21    on port risk?
22 A. No. No.
23 Q. And the September '02, Exhibit 11, that
24    pertained to which policy?
```

58

```
1  A. The second year.
2  Q. And, ultimately, it was later changed to
3     include one crew member, wasn't it, for the --
4  A. Yes.
5  Q. -- second year --
6  A. It was.
7  Q. -- while it was on port risk?
8  A. That was --
9        MR. LANGER: I object to the foundation and
10    form of the question.
11       MR. PETTINGELL: Well, she sent the fax.
12 Q. Look at Exhibit --
13       MR. ABROMOVITZ: 10.
14 Q. -- 10.
15       MR. LANGER: Okay. The objection is based
16    on the fact that you're running together these
17    two separate periods when it was on port risk.
18    And -- and that's why I'm objecting.
19 Q. Did -- did you understand my question? I mean,
20    are you clear what I was asking?
21 A. About an endorsement was issued September 9th,
22    '02.
23 Q. And that was also for Policy --
24 A. Period 2.
```

59

```
1  Q. -- Period 2? Right. Did you ever have any
2     discussions with Mr. Russo -- I may have asked
3     this, and I apologize -- once a return premium
4     had been calculated as to how it had been
5     calculated, what money was allocated to what?
6  A. No.
7        MR. PETTINGELL: I think you loaned me
8     that.
9  Q. One more thing I want to check. Now, did you
10    ever have a conversation with Mr. Russo in
11    which he advised you that he did not want any
12    crew protection and indemnity coverage while
13    the vessel was on port risk for Policy No. 3?
14 A. I did not personally have a conversation with
15    him.
16 Q. Did he leave any messages for you on your
17    service?
18 A. No, not at that point. I believe he had spoken
19    to Bob.
20 Q. I'm sorry?
21 A. I believe he spoke to Bob McVey.
22 Q. Did Mr. McVey tell you he had had such a
23    conversation with Mr. Russo --
24 A. Yes.
```

60

```
1  Q. This is for Policy 3?
2  A. Yes.
3  Q. -- in which he had indicated to Mr. McVey that
4     he did not want any P&I coverage?
5  A. Yes.
6  Q. As a result of that conversation with
7     Mr. McVey, did you pass that request on to
8     Sunderland?
9  A. Yes. I did.
10 Q. And is that contained in a letter or e-mail or
11    fax?
12 A. It should be. Again, it's not in my notes. I
13    would have gone to that directly.
14 Q. Would that be the October 3rd --
15 A. Yes.
16 Q. -- of 200- --
17 A. This one. October 3rd, '03. Yeah.
18 Q. What -- what exhibit is that?
19 A. 4.
20       (Mr. Langer conferring with witness.)
21       THE WITNESS: Oh, yes.
22 Q. All right. You don't make any mention in --
23       THE WITNESS: That's right.
24       MR. LANGER: Well, tell him.
```

Lynanne Houde
September 13, 2005
Case 1:04-cv-10374-WGY    Document 27-2    Filed 02/08/2006    Page 15 of 28
North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

**61**

1    A. Yeah. Mr. McVey -- Mr. Russo had called Bobby.
2      And he called me after that, telling me that he
3      wanted the boat on port risk. It's in my notes
4      right here.
5    Q. Okay. When was that?
6    A. October 3rd.
7    Q. Fine. He told you he wanted the boat on port
8      risk?
9    A. Yes.
10   Q. Did he say to you during that conversation that
11      he did not want any P&I crew coverage?
12   A. He did not tell me that. No.
13   Q. All right. And as a result of your
14      conversation with Mr. Russo on October 3rd, is
15      that what led you to send the fax dated
16      October 3rd, which has been marked as
17      Exhibit 4?
18   A. Yes.
19   Q. And, in that fax, you request that the vessel
20      be placed on port risk from May 1st of '03 to
21      August 13th of '03?
22   A. Yes.
23   Q. And, again, this is one of those instances
24      where you're trying to get retroactive --

**62**

1    A. Yes.
2    Q. -- premium? And Sunderland came back to you
3      and agreed to that?
4    A. Yes. They did.
5    Q. And do we have the letter that they -- the fax
6      or whatever that they sent back to you? Is
7      that the --
8       MR. ABROMOVITZ: Let me see what you have.
9    Q. Is that Exhibit --
10       MR. PETTINGELL: That's the one -- off the
11      record.
12       (A brief discussion was held off the
13       record.)
14   Q. Is that Exhibit 3?
15       MR. LANGER: Objection. It's been asked
16      and answered. The question is, is Exhibit 3
17      the response you got from Sunderland to the
18      Exhibit 4?
19   A. Yes.
20       MR. LANGER: It is?
21   Q. I realize it went to Mr. McVey.
22   A. No.
23       MR. LANGER: Listen to the question --
24       THE WITNESS: Okay. I'm sorry.

**63**

1       MR. LANGER: -- and pay attention --
2       THE WITNESS: Yeah. Okay.
3       MR. LANGER: -- to what's going on. The
4      question was, is Exhibit 3 the response you got
5      from Sunderland to the e-mail that's been
6      marked as Exhibit 4?
7    A. I did not get the response personally.
8    Q. It went to Mr. McVey?
9    A. It went to Mr. McVey.
10   Q. But is it your understanding that's the res-- --
11      that Exhibit 3 is the response from Sunderland
12      back to OMI --
13       MR. LANGER: In response to your request --
14   Q. -- to your October 3rd fax?
15       MR. LANGER: Do you understand the
16      question?
17       THE WITNESS: Yeah. I'm try- -- I'm
18      getting mixed up here.
19       MR. LANGER: Well, wait a minute. The
20      question is, did you get an e-mail back --
21       THE WITNESS: Yes.
22       MR. LANGER: -- when you sent your letter
23      to Tracy Tate on October 3rd?
24   A. Yes. I would --

**64**

1       MR. LANGER: Did --
2    A. -- have. Yes.
3       MR. LANGER: Okay. Was it the e-mail from
4      Craig McBurnie to Bob McVey dated December 8th,
5      2003?
6       THE WITNESS: Yes.
7    Q. Well, are you aware of any other --
8    A. See, I would have gotten one personally,
9      approving it.
10       MR. LANGER: Well, that's the question.
11       THE WITNESS: Okay.
12       MR. LANGER: That's the question.
13       THE WITNESS: All right. What --
14   A. I would have something personally from Tracy,
15      saying it's approved.
16       MR. LANGER: Okay.
17   Q. You would expect that you would have?
18   A. Yes. I would have. Otherwise, I wouldn't have
19      issued the paperwork.
20   Q. By paperwork, what do you mean?
21   A. The endorsement which we just discussed.
22   Q. Do we have a copy of the response that you
23      personally got sometime after October 3rd of
24      '03?

65

1      MR. LANGER:  If it was in the --
2  A.  I don't have it.
3      MR. LANGER:  -- file, you would have gotten
4  it.
5      MR. PETTINGELL:  I don't doubt that a bit.
6  Off the record.
7      (A brief discussion was held off the
8       record.)
9      MR. PETTINGELL:  Do you remember seeing
10 one, Len?  Honestly.
11     MR. LANGER:  Yes.
12     MR. ABROMOVITZ:  Let's go off the record.
13 You're looking -- you're looking for a response
14 to Lynn from Tracy at Sunderland to the fax of
15 August 3rd, 2003 --
16     MR. LANGER:  Correct.
17     MR. ABROMOVITZ:  -- that precipitated the
18 issuance of an endorsement?
19     MR. LANGER:  Right.  It would have approved
20 the port risk calculations that she's made --
21     THE WITNESS:  A copy.
22     MR. LANGER:  -- and authorized issuing the
23 endorsements.
24     MR. ABROMOVITZ:  And do we have the

66

1  endorsement that was issued marked as an
2  exhibit yet?
3      THE WITNESS:  That would be --
4      MR. ABROMOVITZ:  Because the one I'm
5  looking at is --
6      MR. LANGER:  No.  You only have the one --
7  that went from August 13th --
8      MR. ABROMOVITZ:  February 5th to
9  August 13th.
10     MR. LANGER:  And there's another one -- no.
11 There's one from May 5th -- May 1st to
12 August 13th --
13     THE WITNESS:  It's this one, right here.
14     MR. LANGER:  -- '03.
15     MR. ABROMOVITZ:  Right.
16     THE WITNESS:  Right here.
17     MR. LANGER:  And there's another one from
18 August 14th to December 21.
19     MR. ABROMOVITZ:  That's the one we're
20 looking for.
21     THE WITNESS:  Oh, August to the -- the last
22 one?
23     MR. LANGER:  That's the -- that one's
24 already been marked as the last page --

67

1      MR. ABROMOVITZ:  Okay.
2      MR. LANGER:  -- of Exhibit 7.
3      MR. ABROMOVITZ:  That was issued in
4  February '04?
5      MR. LANGER:  Right.
6      MR. ABROMOVITZ:  Okay.
7      MR. LANGER:  And where's the one that
8  covers the period -- yeah.  Where's the one
9  that covers the --
10     THE WITNESS:  Right here.
11     MR. LANGER:  -- period -- okay.
12     MR. PETTINGELL:  Which period are we
13 looking for?
14     MR. LANGER:  I thought you were looking at
15 the -- at the endorsement that covered the
16 period May 1, '03 to August 13th, '03.  It's
17 Endorsement No. 4.
18     MR. PETTINGELL:  I actually have an
19 endorsement that goes from December 9th, '02 to
20 August 13th, '03.  That's --
21     MR. LANGER:  That's -- yeah.  But then,
22 that goes back to Exhibit 6.
23     MR. PETTINGELL:  All right.
24     MR. ABROMOVITZ:  Well, you've got an

68

1  exhibit -- Endorsement No. 4 that we don't have
2  as part of Exhibit No. 7.
3      MR. LANGER:  'Cause it's a different
4  policy.  It's Policy Year 2.
5      MR. PETTINGELL:  Policy 3.
6      MR. ABROMOVITZ:  Oh, okay.
7      MR. PETTINGELL:  So this 7 goes to --
8      MR. ABROMOVITZ:  Policy 3.
9      MR. LANGER:  Exhibit 7 is Policy Year 3.
10     MR. ABROMOVITZ:  Right.
11     MR. LANGER:  The Endorsement No. 4 that
12 we're talking about is Policy Year 2 and covers
13 the period May 1, '03 to August 13, '03.
14     MR. ABROMOVITZ:  Okay.  I'll try to sort
15 this out --
16     MR. PETTINGELL:  No.  I don't think --
17     MR. ABROMOVITZ:  -- when I ask some
18 questions.
19     MR. PETTINGELL:  -- that's right.
20     MR. ABROMOVITZ:  Well, let me -- let me --
21 let me see if I can --
22     MR. PETTINGELL:  Let's stay off the record
23 for a second.
24     (A brief discussion was held off the

Lynanne Houde
September 13, 2005

Case 1:04-cv-10374-WGY     Document 27-2     Filed 02/08/2006     Page 17 of 28

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

69

1        record.)
2        MR. ABROMOVITZ:  Yeah.  Let -- let's stay
3    on -- let's keep her eye on the ball.  The
4    question is, did she get a return fax or e-mail
5    to her letter of October 3rd, 2003 that was
6    sent to Tracy.  If she did, let's see it.
7        MR. LANGER:  Well, the answer is, you would
8    have gotten it or you wouldn't have issued
9    the --
10       THE WITNESS:  That's exactly -- I would --
11       MR. ABROMOVITZ:  But what -- what
12   endorsement then issued?  That's what I'm
13   trying to figure out.
14       THE WITNESS:  This one, right there.
15       MR. PETTINGELL:  But off the record for a
16   second.
17       (A brief discussion was held off the
18       record.)
19       (Questions and Answers were read back.)
20   Q.  All right.  Let me see if I can get us back
21       here.  Exhibit 11 is an e-mail that you sent to
22       Mr. Burke pertaining to which policy year?
23   A.  2.
24   Q.  All right.  And this was something that was

70

1        also sent retroactively, to get a
2        retroactive --
3    A.  This was --
4    Q.  -- premium return?
5        MR. LANGER:  No.
6    A.  No.
7    Q.  This was a request for something new?
8    A.  This was September 10th.  This second part
9        was -- okay.
10   Q.  The letter's dated --
11   A.  Yes.
12   Q.  -- September 17th --
13   A.  Okay.
14   Q.  -- your e-mail?
15   A.  Uh-huh.
16   Q.  And what was the purpose of this e-mail?
17   A.  To obtain a credit for him from September to
18       No- -- well, we had -- I told him that he's not
19       fishing as of September 10th.
20   Q.  And he wanted to go on port risk --
21   A.  Yes.
22   Q.  -- through November 14th?
23   A.  At that point, I didn't have a date.
24   Q.  Or -- that's right.  He wanted to go on port

71

1        risk?
2    A.  Yes.
3    Q.  And did you get a response from Mr. Burke?
4    A.  Yes.
5    Q.  And he authorized the vessel going on port
6        risk?
7    A.  Yes.
8    Q.  And did he also agree to delete crew P&I
9        coverage for the period that the vessel was on
10       port risk?
11   A.  Yes.
12   Q.  So looking at this second paragraph of
13       Exhibit 11, that's a specific request to delete
14       P&I cover --
15   A.  Yes.
16   Q.  -- both retroactively and until such time as
17       the vessel goes back fishing?
18   A.  From September 10th until it goes back fishing.
19   Q.  Right.  Well, the e-mail is dated September 17th.
20   A.  Yes.
21   Q.  Okay.  And then we have Exhibit 10, which is a
22       fax from you to, again, Mr. Burke, or an
23       e-mail?
24   A.  Yes.  E-mail.

72

1    Q.  And, in this, you reference that you had faxed
2        a port risk endorsement to him for his
3        approval?
4    A.  Uh-huh.
5    Q.  And then, after speaking to Bob -- that's
6        Mr. McVey -- you changed what you were
7        requesting and requested, instead of a complete
8        deletion of P&I cover, an amendment of the crew
9        complement to one man?
10   A.  Yes.
11   Q.  And you got back this, saying "Seems okay,"
12       giving you approval?
13       MR. LANGER:  The document speaks for
14       itself.
15   Q.  Well, I mean, is that your understanding?  Was
16       this faxed back to you or --
17   A.  I don't remember -- I don't know who wrote
18       that.  But I have written approval of it to me.
19   Q.  Okay.  And then you have the October 3rd fax
20       which now pertains to the next policy, Policy
21       Period 3?
22   A.  Yes.
23   Q.  And what are you requesting in that?
24   A.  That we go back to May -- May 1st when he

Lynanne Houde
Case 1:04-cv-10374-WGY    Document 27-2    Filed 02/08/2006    Page 18 of 28
North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.
September 13, 2005

73

```
 1        stopped fishing, give him a credit until the
 2        expiration date. And then, when we find out
 3        what day he returns fishing in November, we
 4        would, at that time, issue him a second credit
 5        for that policy period.
 6   Q.   Did you make any request in your October 3rd
 7        fax to Sunderland that they delete or change
 8        the size of the crew?
 9   A.   No.
10   Q.   And you say you got a response. But we don't
11        have a copy of that.
12   A.   Right.
13   Q.   And we'll straighten that out later.
14   A.   Yes.
15   Q.   But we do have the letter to Mr. McVey which
16        makes reference -- and you have now seen this
17        letter --
18   A.   Yes.
19   Q.   -- this is Exhibit 3 -- which makes reference
20        to, as of December 8th of 2003, "coverage is
21        restricted to Port Risks only" following your
22        fax of October 3rd. And that's what you had
23        requested?
24   A.   Yes.
```

74

```
 1   Q.   And then, "Last year, we did the same (as per
 2        Lynn's of 17 September '02) and deleted crew
 3        P&I coverage entirely until fishing
 4        recommenced." Now, that's what you had
 5        requested for the prior year in your --
 6   A.   That's --
 7   Q.   -- September 17th, '02 e-mail to Tracy?
 8   A.   That's a different policy period.
 9            MR. LANGER: Just listen to the question
10        that he's asking.
11   Q.   That's what you had requested. Right?
12            MR. LANGER: In September of '02, did you
13        request deletion of crew P&I?
14   Q.   What -- what exhibit is that?
15   A.   11.
16            MR. LANGER: 11.
17   A.   Yes.
18   Q.   That's what you were asking in Exhibit 11?
19   A.   Yes.
20   Q.   Then, after that Exhibit 11, again, talking
21        Policy Year 2 --
22   A.   Uh-huh.
23   Q.   -- you changed your request to maintaining one
24        crewman --
```

75

```
 1   A.   Yes.
 2   Q.   -- for that policy?
 3   A.   Yes.
 4   Q.   All right. So for Policy Year 2, you have
 5        written evidence in your file indicating that
 6        you made a specific request of Sunderland that
 7        they place the vessel on port risk and that
 8        they delete the P&I cover?
 9   A.   Yes.
10   Q.   And then, after that, as a follow-up, in
11        effect, you said, wait a minute. The insured's
12        changed his mind. We want to keep one crewman
13        on --
14            MR. LANGER: Objection.
15   Q.   -- while it's on port risk?
16            MR. LANGER: Objection to the form of the
17        question.
18   Q.   And that's -- would you agree with that?
19            MR. LANGER: Objection.
20            THE WITNESS: Do I have to answer?
21            MR. LANGER: Yeah. If -- if you understand
22        it, you can answer it.
23   A.   I'm -- I'm really getting confused with all
24        these dates. Which?
```

76

```
 1   Q.   Policy 2.
 2   A.   Yes.
 3   Q.   December 11th of 2002. I don't know what
 4        exhibit this is.
 5            MR. ABROMOVITZ: It's got a number at the
 6        top.
 7   Q.   Exhibit 10.
 8            MR. ABROMOVITZ: Can I have that one back?
 9   A.   Okay.
10   Q.   I'll give you the question again after you've
11        read the exhibit.
12   A.   Yeah.
13   Q.   All set?
14   A.   Yes.
15   Q.   All right. Policy 2 --
16   A.   Uh-huh.
17   Q.   -- you -- you, on behalf of OMI and Matt Russo,
18        made a request to Sunderland that the vessel go
19        on port risk --
20   A.   Uh-huh.
21   Q.   -- this was on September 17th of '02 -- and
22        that the P&I cover be deleted. This was for
23        Policy Year 2, during the period that it was on
24        port risk.
```

77

```
 1          MR. ABROMOVITZ: Exhibit 11.
 2  Q.  Does that fairly state what you did on --
 3  A.  September --
 4  Q.  -- September 17th?
 5  A.  -- and then December. Yeah. We dele- -- we
 6      were deleting all the men.
 7  Q.  Right. You wanted -- you made a request --
 8  A.  Yeah.
 9  Q.  -- that the vessel go on port risk --
10  A.  Uh-huh.
11  Q.  -- and that all of the P&I be deleted --
12  A.  Yes.
13  Q.  -- until the vessel went back --
14  A.  Uh-huh.
15  Q.  -- fishing; is that correct?
16  A.  Yes.
17  Q.  And then, after September 17th, as contained in
18      Exhibit 10 --
19  A.  Uh-huh.
20  Q.  -- you indicate that you had faxed a port risk
21      endorsement for his approval; but, now, there
22      had been a change. And instead of deleting all
23      of the men during the time on port risk, they
24      wanted to keep one man on P&I covered?
```

78

```
 1          MR. LANGER: Objection. Can we go off the
 2      record?
 3          MR. PETTINGELL: I'd like an answer to this
 4      question. Then we can.
 5  A.  Okay.
 6          MR. LANGER: Are you -- object. I think it
 7      mischaracterizes the testimony.
 8          MR. PETTINGELL: Well --
 9          MR. LANGER: Go ahead and answer.
10  A.  It's just that there's three months'
11      difference, and I -- it wouldn't take David
12      three months to get back to me. I don't think
13      this pertains to this one.
14  Q.  You think -- oh, okay. You thi- -- that's
15      fair. You think that Exhibit 10 pertains to a
16      different period?
17  A.  Yes.
18  Q.  Okay. Other than your September 17th of '02
19      e-mail, Exhibit 3 --
20  A.  Uh-huh.
21  Q.  -- did you ever make any other request of
22      Sunderland on behalf of Mary & Josephine
23      Corporation to delete a hundred percent of the
24      P&I cover while the vessel was on port risk?
```

79

```
 1  A.  Okay. You said Exhibit 3. I -- that didn't
 2      come to me. So are --
 3  Q.  I'm sorry. Not Exhibit 3.
 4          MR. LANGER: Exhibit 4?
 5  Q.  Exhibit 11, I think it is, your September 17th
 6      fax.
 7  A.  Could you re- -- repeat the question?
 8  Q.  I'll try to rephrase it. On September 17th --
 9  A.  Uh-huh.
10  Q.  -- of '02, you sent an e-mail to Sunderland and
11      requested two things. You requested that the
12      vessel go on port risk, and you requested that
13      a hundred percent of the crew complement be
14      deleted from P&I.
15  A.  Yes.
16  Q.  All right. And that pertained to Policy 2?
17  A.  Yes.
18  Q.  Did you ever make any other request of
19      Sunderland for Policy 3, for example, where you
20      asked that they delete a hundred percent of the
21      crew complement from P&I cover while the vessel
22      was on port risk?
23  A.  No.
24  Q.  To your knowledge, did anybody else at OMI make
```

80

```
 1      such a request of Sunderland?
 2  A.  No.
 3  Q.  And that would be for Policy Year 3?
 4  A.  Yes.
 5          MR. PETTINGELL: All right. Now, if I
 6      could just find the notice duces tecum -- it's
 7      probably here somewhere. I've probably got it
 8      in my lap. I just have this last thing to
 9      check. Then I believe I'm done.
10          MR. ABROMOVITZ: Dick, while you're doing
11      that, why don't I ask a couple of questions.
12          MR. PETTINGELL: Yeah. Go ahead.
13                  CROSS-EXAMINATION
14  BY MR. ABROMOVITZ:
15  Q.  Ms. Houde, as of October 2003, had you ever
16      seen any written company policy as to what
17      happened to P&I crew coverage when a commercial
18      fishing vessel was on port risk?
19  A.  No.
20  Q.  What was your understanding as of October 2003,
21      if you had one, as to what effect a vessel -- a
22      commercial fishing vessel being on port risk
23      would have upon the continuation of crew P&I
24      coverage, if you had it?
```

81

```
 1   A.  I don't unders- -- I don't know anything about
 2       that.
 3   Q.  Okay.  Go to your notes from your conversation
 4       in October 2003 with Matt Russo.
 5   A.  Uh-huh.
 6   Q.  Do you have those available?
 7   A.  Uh-huh.
 8   Q.  Tell me what your practice was in that time
 9       frame of making notes to your underwriting
10       file.  What did you do, and why did you do it?
11   A.  I just wrote down his request, exactly what he
12       told me, that the boat had not been fishing
13       since May; and it would not fish till sometime
14       in November '03.  At that point, I went to
15       underwriters and explained to them that was
16       happening, that we would -- requested a port
17       risk be done from May to August since the
18       poli- -- policy already expired.  And then,
19       once he returns in November, at that point, we
20       would issue the port risk credit.
21   Q.  Can you read into the record everything you
22       wrote down in connection with your October 3rd,
23       2003 conversation with Matt Russo?
24   A.  Just read this?
```

82

```
 1       MR. LANGER:  Just read that.
 2   A.  Okay.  "Back on October 3rd, '03, per the
 3       insured, we told Sunderland vessel was not
 4       fishing as of May 1st, '03 and would not fish
 5       until November '03.  The account renewed as
 6       operational and the port risk credit" --
 7       COURT REPORTER:  Excuse me.
 8   Q.  Slow down just a little bit.
 9   A.  I -- I'm sorry.  "The account renewed as
10       operational, and the port risk credit from 8/13
11       to November ?, '03."
12       MR. LANGER:  8/13/03.  Read the entire
13       date.
14   A.  "8/13/03 to November" -- I put a question mark,
15       '03 'cause we didn't know the date -- "would be
16       issued when he returned the -- the letter
17       showing the vessel began fishing again.  The
18       original letter dated 10/3/03 never returned.
19       I sent Matt a reminder letter on 11/21/03,
20       asking for the date the vessel will begin
21       fishing.  Letter never returned.  So vessel was
22       still not fishing because insured never
23       notified us."
24   Q.  Now, the notes that you just read in, when were
```

83

```
 1       those prepared?
 2   A.  When was this actually being prepared?
 3   Q.  Yes.
 4   A.  I did it on November 18th, '04.
 5   Q.  And was that done in connection with this
 6       lawsuit?
 7   A.  Yes.
 8   Q.  Okay.  These were not notes that you prepared
 9       contemporaneous with the events as they took
10       place back in October '03.  Correct?
11   A.  I don't understand.  Can you --
12   Q.  Sure.  The notes you just read --
13   A.  Yeah.
14   Q.  -- are sort of your summary of what happened,
15       and you -- and they were prepared because of
16       this lawsuit?
17   A.  Yes.
18   Q.  Okay.  When -- back in the time frame of
19       October '03, did you have any conversations
20       with Bob McVey relative to the port risk status
21       of the fishing vessel Mary & Josephine
22       concerning P&I coverage?
23   A.  No.
24   Q.  Did you have any understanding, based upon your
```

84

```
 1       conversation with either Mr. McVey, Mr. Scola,
 2       Mr. Ostrow, or anyone else at OMI, as to what
 3       happened to P&I coverage that was in existence
 4       on a commercial fishing vessel once that vessel
 5       went into port risk?
 6   A.  No.
 7       MR. PETTINGELL:  Are you waiting, or are
 8       you actually --
 9       MR. ABROMOVITZ:  No.  I'm just checking my
10       notes.
11       (A brief discussion was held off the
12       record.)
13   Q.  Prior to December 3rd, 2003, the date of Matt
14       Russo's accident, what endorsements were
15       physically issued in connection with the policy
16       that went into effect on August 13th, 2003?
17   A.  Let me just check one thing.  After
18       December 3rd, there was one --
19   Q.  No, no.  This -- this polic- -- policy --
20   A.  3.
21   Q.  -- for Year No. 3 --
22   A.  Yeah.
23   Q.  -- went into effect on August --
24   A.  Yes.
```

Lynanne Houde
September 13, 2005

Case 04-cv-10374-WGY    Document 27-2    Filed 02/08/2008    Page 21 of 28

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

85

1   Q.  -- 13th, 2003.
2   A.  Uh-huh.
3   Q.  Matt Russo's accident happened on December 3rd,
4       2003.
5   A.  Uh-huh.
6   Q.  Insofar as an endorsement that was actually
7       prepared prior to December 3rd, 2003, was there
8       one?
9   A.  No.
10  Q.  Okay.  The policy endorsement that actually was
11      executed -- the first one that was executed
12      after Matt Russo's accident was sometime in
13      February 2004?
14  A.  It was -- it was for the period August 13th,
15      '03 to December 21st, '03.
16  Q.  And the date of that endorsement?
17  A.  There's no date on the endorsement.  But it
18      was -- again, I calculated it on January 6th,
19      '04.
20  Q.  January 6th, '04.  Okay.  So is it fair to say
21      that your job in the office at OMI was to
22      prepare the paperwork in connection with
23      policies of insurance that were issued for
24      commercial fishing vessels?

86

1   A.  Yes.
2   Q.  And is it also fair to say that prior to
3       December 3rd, 2003, with reference to the
4       policy year that started on August 13th, 2003,
5       there were no written endorsements that were
6       made part and parcel to that insurance policy
7       before December 3rd, 2003?
8   A.  Correct.
9       MR. ABROMOVITZ:  Thank you.  That's all I
10      have.
11              REDIRECT EXAMINATION
12  BY MR. PETTINGELL:
13  Q.  I'd like to show you a document marked --
14      MR. PETTINGELL:  Well, I'm sorry.  Mark it
15      as Exhibit 12, and then I'll --
16      (E-mail to Craig from Marie dated
17      12/24/03 marked as Houde Exhibit No. 12.)
18  Q.  I'd like to show you a document which we've
19      previously marked as Exhibit 12 and ask you to
20      take a look at it.  Have you done that?
21  A.  Yes.
22  Q.  All right.  Now, first off, this is a --
23      appears to be an e-mail from someone at -- at
24      Sunderland?

87

1   A.  No.  From Marie from our office to Sunderland.
2   Q.  From Marie.  All right.  Who's Marie?
3   A.  She's one of the girls that I work with.
4   Q.  All right.
5   A.  I was not supposedly in that day.  I was out
6       sick, either vacation or -- or I don't
7       remember.
8   Q.  They give you vacations?
9   A.  Yes.
10  Q.  Wow.  You deserve one after today.  All right.
11      This is a letter from Marie.  Does she,
12      essentially, do the same thing you do?
13  A.  Yes.
14  Q.  To Craig McBurnie?
15  A.  Yes.
16  Q.  And Craig McBurnie is at Sunderland --
17  A.  Yes.
18  Q.  -- is that right?
19  A.  Yes.
20  Q.  All right.  Now, had you had any discussions
21      with Marie at all concerning the subject matter
22      of this letter?
23  A.  No.
24  Q.  All right.  How about after the letter went

88

1       out?
2   A.  I have to say I don't know if she issued that
3       or if I did.  Wait a minute.  The coverage the
4       next ten days.  That was the last credit.  So I
5       ended up issuing the actual paperwork.  But the
6       correspondence was between Marie and the
7       company.
8   Q.  All right.  In the second line, it says, "The
9       crew P&I is already in place."  Now, I realize
10      you didn't send -- you're not --
11  A.  Uh-huh.
12  Q.  -- the one that authored this.  But do you have
13      any knowledge as to what Marie was referring to
14      in making the statement, "The crew P&I is
15      already in place"?
16  A.  No.  I don't.
17      MR. PETTINGELL:  Off the record for a
18      second.
19      (A brief discussion was held off the
20      record.)
21  Q.  During the period of December 2003 while you --
22      you were at OMI, would OMI ever issue an
23      endorsement changing crew P&I without authority
24      from Sunderland?

Lynanne Houde
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-2    Filed 02/08/2006    Page 22 of 28

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

89

1    A. No.
2        MR. PETTINGELL: Okay. Thank you.
3        MR. LANGER: Are you done?
4        MR. PETTINGELL: Yeah.
5        MR. ABROMOVITZ: I -- I have nothing
6    further, Len, unless you have some questions.
7        MR. LANGER: I have a couple of questions.
8        (A brief discussion was held off the
9        record.)
10
11            CROSS-EXAMINATION
12    BY MR. LANGER:
13   Q. Ms. Houde, I want to try and clarify a couple
14      of questions. I think Mr. Abromovitz asked you
15      a question and Mr. Pettingell asked you a
16      question about crew P&I and port risk. When a
17      vessel is on port risk and you're calculating a
18      return premium, do you provide credit for all
19      the crew members that had been covered while it
20      was operational or only some of them?
21   A. All of them.
22   Q. So you give a return premium for all the P&I --
23      the crew P&I coverage that would have been
24      effective had the boat been operational?

90

1    A. Yes.
2    Q. So while a vessel is on port risk coverage,
3       there is no crew and I -- no crew P&I coverage
4       available?
5    A. Right.
6        MR. PETTINGELL: Objection.
7        MR. ABROMOVITZ: Objection.
8        MR. PETTINGELL: Do we need to state the
9    grounds, Len? Let's see. Calls for a legal
10   conclusion. Foundation. Just whatever he
11   said.
12   Q. Has that been the practice at Ocean Marine for
13      as long as you've been there?
14       MR. ABROMOVITZ: Object to the form.
15       MR. PETTINGELL: Objection. Has what been
16   the practice?
17   Q. Has deleting all crew P&I coverage while a
18      vessel has been on port risk always been the
19      policy while you've been at Ocean Marine?
20   A. Yes.
21       MR. ABROMOVITZ: Object. I'm -- let me get
22   in an objection to the form.
23   Q. And referring to Exhibit No. 6, when a
24      vessel -- the vessel was placed on port risk --

91

1    A. Uh-huh.
2    Q. -- but one crew was covered --
3    A. Uh-huh.
4    Q. -- would that be unusual, in your experience
5       while you were at Ocean Marine, to cover a
6       crewman while a vessel is on port risk?
7    A. No. We've done it.
8    Q. Okay. Do -- does there have to be a specific
9       request in order to include a crew while a
10      vessel is on port risk?
11   A. Yes.
12   Q. And referring to Exhibit No. 10, which is a
13      letter you sent to Mr. Burke referring to
14      Endorsement -- what became Endorsement --
15   A. Uh-huh.
16   Q. -- 6 -- or excuse me -- Exhibit 6, that change
17      to add a crewman --
18   A. Uh-huh.
19   Q. -- was made after you spoke with Bob McVey?
20   A. Yes.
21   Q. And had you not spoken with Bob McVey, would
22      there have been any crew coverage for the Mary
23      & Josephine while the vessel was on port risk?
24   A. No.

92

1        MR. ABROMOVITZ: Objection.
2        MR. PETTINGELL: Objection for the same
3    reasons we stated before and --
4        MR. LANGER: I'll rephrase it.
5    Q. Would you have included any crewmen when you
6       were calculating the return premium had
7       Mr. McVey not spoken to you?
8    A. Can you repeat that again?
9    Q. Sure. When -- had Mr. McVey not spoken to
10      you --
11   A. Yeah.
12   Q. -- before you issued what is now Exhibit
13      No. 6 --
14   A. Uh-huh.
15   Q. -- would there have been any crew complement
16      for the Mary & Josephine --
17   A. No.
18   Q. -- in the endorsement?
19   A. No.
20   Q. I also want to clear up what I believe is some
21      confusion about Policy Year 2. I believe you
22      testified -- and correct me if I'm wrong --
23      that the vessel was first placed on port risk
24      coverage effective December 10th of 2002; is

Case 1:04-cv-10374-WGY   Document 27-2   Filed 02/08/2006   Page 23 of 28
Lynanne Houde,
September 13, 2005
North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

93

1    that correct?
2  A. Yes.
3  Q. And that was at Mr. Russo's request?
4  A. On September 9th, '02, Sunderland and Bob
5     instructed me --
6  Q. Okay. So the period --
7  A. -- because of the recs. Yeah.
8  Q. This is on September 17th. I'm --
9  A. Oh, I thought you --
10 Q. -- talking about September --
11 A. September.
12 Q. -- 17th.
13 A. I'm still looking at December. Okay. I'm
14    sorry.
15 Q. On September 17th --
16 A. Okay.
17 Q. -- you sent a letter to Mr. Burke, asking that
18    the vessel Mary & Josephine be placed on port
19    risk coverage at the request of the owner?
20 A. Yes.
21 Q. Okay. And it remained on port risk coverage
22    with no crew P&I for the period September 10
23    through November 14th?
24 A. Yes.

94

1  Q. As of November 14th, did it go back on
2     operational coverage?
3  A. Yes.
4  Q. Okay. And then it was taken off operational
5     coverage again on December 9th, 2002?
6  A. Yes.
7  Q. And that was when there was one crew at the
8     request of Mr. McVey?
9  A. Yes.
10 Q. And it stayed on port risk starting
11    December 9th, 2002 until February of '03?
12 A. Yes. To the -- with that endorsement --
13 Q. At which point --
14 A. -- to February 5th, I believe.
15    February 5th.
16 Q. Of '03?
17 A. '03.
18 Q. At which point, it went back on operational --
19 A. Yes.
20 Q. -- status again?
21 A. Yes.
22 Q. When you received a telephone call from
23    Mr. Russo -- well, let me strike that. Did you
24    speak with Mr. Russo on October 3rd?

95

1  A. Yes.
2  Q. What did he tell you?
3     MR. PETTINGELL: Of which year?
4  Q. Of 2003. Excuse me. What did he tell you?
5  A. That the boat was not fishing back since
6     May 1st and wouldn't go back till sometime in
7     November '03.
8  Q. And he wanted Sunderland to give him a credit
9     for port risk coverage going all the way back
10    to the last policy year on -- from May 1 until
11    the end of the policy year in August of '03?
12 A. Correct.
13 Q. And did that credit include a credit for all
14    the crew P&I coverage?
15 A. Yes.
16 Q. Now, there were -- he also asked for the vessel
17    to be on port risk from the beginning of the
18    policy year, which is August of '03 forward?
19 A. Yes.
20 Q. And that would be August 13th of '03 until
21    October 3rd of '03 --
22 A. Yeah.
23 Q. -- when he talked to you --
24 A. Uh-huh.

96

1  Q. -- is that right?
2  A. Yes.
3  Q. And it would then continue on into the future
4     until he told you that the boat had gone back
5     fishing again?
6  A. Correct.
7     MR. ABROMOVITZ: Object to the form. I
8     think she said November 14th or something like
9     that.
10    THE WITNESS: I did?
11 Q. Okay. Do you recall whether he told you -- on
12    October 3rd, did he tell you when it was going
13    to go back fishing?
14 A. No. Sometime in November.
15 Q. Sometime in November?
16 A. Yes. I got my question mark.
17 Q. And was that return premium for that period
18    calculated with no crew P&I coverage?
19    MR. ABROMOVITZ: Objection. What period
20    are you referring to?
21    MR. LANGER: The period from August 13th of
22    '03 until the boat went back fishing.
23    MR. PETTINGELL: I think the testimony was
24    May 1st.

Lynanne Houde
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-2    Filed 02/08/2006    Page 24 of 28

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

97

1    MR. LANGER:  No.  The testimony was that it
2    was notified it went back fishing on
3    December 21st of '03.
4  Q.  Is that correct?
5    MR. PETTINGELL:  Could you -- I'm sorry,
6    Len.  I'm very confused by your question, and I
7    think the record's confusing.  Could you re --
8    restate that?  Because you kind of had -- you
9    had us starting at May 1st, as I understood the
10   question.  And now I think you're asking
11   something different.
12    MR. ABROMOVITZ:  Yeah.  You got a couple of
13   them running together in terms of the --
14    MR. PETTINGELL:  Which is --
15    MR. ABROMOVITZ:  -- the credits.
16    MR. PETTINGELL:  -- easy to do.
17  Q.  There's a credit from May 1, '03 to
18   August 13th, '03; is that correct?
19  A.  Yes.
20  Q.  That's the end of Policy Year 2?
21  A.  Yes.
22  Q.  That was based on a return premium, including
23   no crew P&I?
24  A.  Yes.

98

1  Q.  Then there was another credit that was issued
2   covering the period from August 13th, '03 to
3   December 21, '03?
4  A.  Correct.
5  Q.  And was that return premium calculated with no
6   crew P&I?
7  A.  Yes.
8  Q.  And other than Exhibit 6, when there was
9   specifically requested that there be one crew
10   included during a port risk period, were all of
11   the credits that Mr. Russo requested from
12   Policy Year 1, 2, or 3, were they all -- the
13   return premiums all calculated based on there
14   being no crew P&I coverage?
15  A.  Yes.
16  Q.  In your various conversations with Mr. Russo,
17   did he ever suggest to you in any way that he
18   expected to be having crew P&I coverage while
19   the vessel was on port risk?
20  A.  No.
21  Q.  When you talked with Mr. McVey on
22   October 3rd -- do you remember that
23   conversation?
24  A.  Yes.

99

1  Q.  -- he indicated that he had spoken with
2   Mr. Russo?
3  A.  Yeah.  Prior to my conversation, yes.
4  Q.  So before Mr. Russo called you, he had talked
5   with Mr. McVey?
6  A.  Yes.
7  Q.  And what did Mr. McVey tell you about what
8   Mr. Russo wanted for coverage --
9    MR. PETTINGELL:  Objection.
10  Q.  -- on October 3rd?
11  A.  I can answer that?
12  Q.  Yes.
13    MR. PETTINGELL:  Yes.
14  A.  He -- that he wanted the boat to go on port
15   risk.
16  Q.  Okay.  And based on the prior experience you
17   have had with the Mary & Josephine, did you
18   understand that when it would go on port --
19    MR. PETTINGELL:  Objection.
20    MR. LANGER:  Can I finish the question?
21    MR. PETTINGELL:  Yeah.  But you're leading.
22   So I'm just objecting.
23  Q.  What was your understanding when Mr. McVey told
24   you that it was going to go on port risk

100

1   coverage at Mr. Russo's request as to whether
2   there would be any crew P&I coverage while the
3   vessel was on port risk?
4  A.  There would be none.
5  Q.  The endorsement that was finally prepared for
6   the period August '03 through December 21, '03,
7   which is attached to Exhibit 7 as Policy
8   Endorsement No. 3, I think you indicated you
9   calculated that in January?
10  A.  Yes.
11  Q.  Why did it -- why was it not calculated until
12   January?
13  A.  I did it when I was instructed to.  I can't
14   answer that.
15  Q.  Who -- who instructed you to do it at that
16   point?
17  A.  Bobby and Bill.
18  Q.  Could you have calculated the return premium
19   due Mary & Josephine prior to December 21, '03?
20  A.  Not if we don't have a date, no.
21  Q.  Was it Ocean Marine's practice to wait until
22   after they had been informed that the vessel
23   went back fishing before calculating the return
24   premium?

Lynanne Houde
September 13, 2005

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

---

**101**

1  A.  Yes.
2  Q.  Now, on October 3rd, 2003 --
3  A.  Uh-huh.
4  Q.  -- after you had spoken to Mr. Russo and after
5      you had corresponded with Sunderland, did you
6      send a letter to Mr. Russo?
7  A.  Yes.  I did.
8  Q.  Let me show you what's been marked as -- it
9      says "Scola 8," but it's Exhibit No. 8.  Is
10     this a copy of the letter that you wrote to
11     Mr. Russo on October 3rd?
12 A.  Yes.
13 Q.  Now, there's some handwriting --
14 A.  Uh-huh.
15 Q.  -- underneath the reference "August 13, '03."
16     Do you know whose handwriting that is?
17 A.  That's mine.
18 Q.  Okay.  And it says "12-21-03."  And then what
19     does it say under that?
20 A.  "Per RCM," per Bobby.
21 Q.  Okay.  RCM?
22 A.  Yes.
23 Q.  Okay.
24 A.  He gave me --

---

**102**

1  Q.  So that --
2  A.  -- the date.
3  Q.  -- was information you got from Mr. McVey?
4  A.  Yes.
5  Q.  That wasn't, obviously, on the letter when you
6      wrote it --
7  A.  Oh, no.
8  Q.  -- first to Mr. --
9  A.  No.
10 Q.  Wait till I finish my --
11 A.  I'm sorry.
12 Q.  -- question.
13 A.  I'm sorry.
14 Q.  -- was not on the letter when you originally
15     wrote it to Mr. Russo?
16 A.  It was not on the letter.
17 Q.  Okay.  Did Mr. Russo respond to your letter of
18     October 3rd at any time?
19 A.  No.
20 Q.  Okay.  Now, in the lower right-hand corner,
21     there's a reference "11-25-03."
22 A.  Uh-huh.  Yes.
23 Q.  Do you know whose handwriting that is?
24 A.  That's mine.

---

**103**

1  Q.  And what does that mean?
2  A.  That's a diary stamp, but it's red.  So it
3      doesn't come out when you make the copy.  But
4      that's the time I diaried to find out if I
5      didn't hear from him, I got to send out another
6      letter, saying, Did you return fishing?  What's
7      the date?
8  Q.  Okay.  And so is it your testimony that on --
9      on November 25th, '03, you sent another letter?
10 A.  Yes.
11 Q.  You sent the exact same letter as what's been
12     marked as Exhibit 8?
13 A.  Yes.  I made -- I -- that's -- I probably put a
14     second re- -- big second request stamp, and I
15     put the date that I'm sending it.
16 Q.  Did you get a response to that letter from
17     Mr. Russo?
18 A.  No.
19 Q.  Did you send a second follow-up reminder?
20 A.  No, not at that point.
21 Q.  At any time prior to Decem- --
22 A.  Oh, here it is.  I'm sorry.
23 Q.  So you sent a reminder on November 21, 2003?
24 A.  Yes.

---

**104**

1  Q.  Okay.  And in the lower right-hand corner --
2  A.  I was depending (sic) for December 18th.
3  Q.  Okay.  And did you ever send that letter?
4  A.  No.  Because everything happened.
5  Q.  Okay.  Because the incident underlying --
6  A.  Yes.
7  Q.  -- Mr. Russo's claim occurred before
8      December 18th?
9  A.  Yes.  Correct.
10 Q.  At any time before December 3rd or 4th of 2003,
11     did Mr. Russo ever respond to either of your
12     letters?
13 A.  No.  No.  Sorry.
14 Q.  When you talked with Mr. Russo on
15     October 3rd -- 3, 2003, did he indicate to you
16     why the vessel was being put on port risk?
17 A.  No.  Just that it wasn't fishing and wouldn't
18     fish till November.
19     COURT REPORTER:  I'm sorry.  I can't hear
20     you.
21     THE WITNESS:  I'm sorry.
22 A.  It wasn't fishing.  What was the question?
23     MR. ABROMOVITZ:  Is there wasn't fishing --
24 A.  It wasn't --

---

Lynanne Houde
September 13, 2005

Case 04-cv-10374-WGY    Document 27-2    Filed 02/08/2006    Page 26 of 28

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

---

**105**

1    MR. ABROMOVITZ: -- and it wouldn't fish
2    till November.
3        THE WITNESS: Exactly. Yes.
4  Q. During that con- -- during that conversation on
5    October 3rd, did Mr. Russo mention to you
6    anything about recommendations that had to be
7    done on the fishing vessel Mary & Josephine?
8  A. No.
9        MR. LANGER: I have no other questions.
10       MR. ABROMOVITZ: I just have a couple.
11            RECROSS-EXAMINATION
12   BY MR. ABROMOVITZ:
13 Q. Ms. Houde, with reference to the credit that
14   was calculated for the period of time in late
15   2003 when the fish- -- the fishing vessel Mary
16   & Josephine wasn't fishing --
17 A. Yes.
18 Q. -- when did you make that calculation for the
19   credit for the unused P&I?
20 A. January 6th, '04.
21 Q. Okay. And did you mail a check for the Mary &
22   Josephine Corporation?
23 A. Yes. I did.
24 Q. Is it fair to say that check was never cashed?

---

**106**

1  A. I'm not in accounting. I couldn't say that.
2  Q. And who told you to prepare the credit at
3    that -- to calculate and prepare a credit at
4    that time?
5  A. Bobby and Craig -- Bobby and Bill.
6  Q. Were you aware at that point that Mr. Russo had
7    already sustained his injury back in December
8    '03?
9  A. Yes.
10       MR. PETTINGELL: Can you establish who she
11   means by Bobby and Bill?
12       THE WITNESS: I'm sorry.
13 Q. Bobby would be Bobby McVey, and Bill is Bill
14   Scola?
15 A. Bill Scola. Yes.
16 Q. Okay.
17 A. Yes.
18 Q. Thank you. And what formula did you follow in
19   calculating the credit that was prepared in
20   January '04?
21 A. We gave back all the P- -- we gave back a
22   credit for 3 1/2 men, all the men on the boat,
23   and a credit on the hull also.
24 Q. And a credit on the hull?

---

**107**

1  A. Yes.
2  Q. And what portion of the hull did you give back?
3  A. Well, you take the number -- I can just tell
4    you what it -- you take the number of days that
5    it was tied up times .001. You get a factor.
6    And then you multiply that times the hull
7    premium. That gives you the return premium.
8  Q. And a credit for the crew is based upon the
9    full 3 1/2 men complement?
10 A. Yes.
11 Q. For how many months?
12 A. Just for the period that it was tied up.
13 Q. And that was what period?
14 A. August 13th, '03 to December 21st, '03.
15 Q. When last had you been instructed to prepare a
16   credit for P&I coverage for the Mary &
17   Josephine prior to January 2003?
18 A. I'm not following you.
19 Q. Sure. This was not the first -- strike that.
20   Prior to January 2004, had you ever prepared
21   other credits for P&I premiums that were paid,
22   but then were credited back to the owners of
23   the Mary & Josephine?
24 A. Yes.

---

**108**

1  Q. When last had you done that?
2  A. The prior year.
3  Q. Okay. And when during that -- when, actually,
4    was the calculation done and the check sent?
5  A. On the '02-'03 policy, you mean?
6  Q. Yes.
7  A. Okay. I can give you the date of the checks.
8  Q. Sure.
9  A. Okay. There was a check -- what's the date?
10   August 26th, '03 for 1,923. There was a check
11   done December 2nd, '03 for 1,717.
12 Q. Which of those were P&I, and which of those
13   were hull?
14 A. It's a combination.
15 Q. Okay. So August 26th.
16 A. August 26th, December 2nd. Those are the two
17   that were sent during that policy per- -- well,
18   they were -- they were sent at that time. But
19   my last check was on the last year.
20 Q. Okay. So they were -- they were sent in August
21   and December '03 --
22 A. Yes.
23 Q. -- for the policy period that ran August '02 to
24   August '03?

---

```
                                           109
1  A.  Yes.
2        MR. ABROMOVITZ:  Thank you.  That's all I
3  have.
4        MR. LANGER:  I have nothing else.
5        (Whereupon the deposition was concluded at
6        5:57 p.m.)
7                    *****
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
                                           111
1                 C E R T I F I C A T E
2  COMMONWEALTH OF MASSACHUSETTS
   COUNTY OF NORFOLK, ss.
3
4        I, Jo Anne M. Shields, a Professional
5  Shorthand Reporter and Notary Public in and for
6  the Commonwealth of Massachusetts, do hereby
7  certify that LYNANNE HOUDE, the witness whose
8  deposition is hereinbefore set forth, was duly
9  sworn by me and that such deposition is a true
10 and accurate record, to the best of my
11 knowledge, skills and ability, of the testimony
12 given by such witness.
13       I further certify that I am not
14 related to any of the parties in this matter by
15 blood or marriage and that I am in no way
16 interested in the outcome of this matter.
17       IN WITNESS WHEREOF, I have hereunto set
18 my hand and affixed my seal of office this 24th
19 day of September, 2005.
20
21                    _____
                      Notary Public
22
```

```
                                           110
1            SIGNATURE PAGE
2
3
4        I, LYNANNE HOUDE, do hereby certify that I
5  have read the foregoing transcript of my
6  testimony, and I further certify that said
7  transcript is a true and accurate record of
8  said testimony.
9        Dated at _____, this ____
10 day of _____, 2005.
11
12
13                    _____
                      LYNANNE HOUDE
14
15
16
17
18
19
20
21
22
23
24
```

```
                                           112
1            ERRATA SHEET
2  CHANGES TO THE DEPOSITION OF LYNANNE HOUDE
3  INSTRUCTIONS TO WITNESS:  1) Please note any
   desired corrections to your testimony by page
4  and line number.  2) Enter text as it appears
   in the transcript.  3) Enter text as it should
5  appear.
6  PAGE      LINE          CORRECTION
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
```

David Burke

| | |
|---|---|
| From: | Lynn Houde [lynn@omiainc.com] |
| Sent: | 11 December 2002 17:29 |
| To: | David Burke |
| Subject: | Mary & Josephine Corp.    F/V Mary & Josephine |



Dear David:

I faxed you the Port Risk endorsement for your approval.  After speaking to Bob, since it will take approximately 2 months for all the recs to be completed, can we amend the vessel to Port Risk by deleting all but 1 man from P&I.  Then when the vessel returns fishing we will add the man back on.

I await your instructions.

Seems ok.

Can you Confirm.

Regards,

Lynn

---

This message has been checked for all known viruses by Star Internet.

000457