# EXHIBIT "B"

Robert McVey
January 5, 2005
Case 1:04-cv-10374-WGY     Document 27-3     Filed 02/08/2006     Page 2 of 17
North American Specialty Insurance Company
vs. Mary & Josephine Corp. and Matteo Russo



VOLUME I - 1

1               UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS

2

3             CIVIL ACTION NO. 04-10374WGY

4   · · · · · · · · · · · · · · · · · ·
                           )

5   NORTH AMERICAN SPECIALTY    )
  INSURANCE COMPANY,         )

6             Plaintiff,        )

7   vs.                      )

8   MARY & JOSEPHINE CORP. and  )
  MATTEO RUSSO,            )

9             Defendants.      )

10   · · · · · · · · · · · · · · · · · ·

11

12       DEPOSITION OF ROBERT McVEY, a witness

13   called on behalf of the Defendant, Mary &

14   Josephine Corp., pursuant to the Federal Rules

15   of Civil Procedure before Jo Anne M. Shields,

16   Professional Shorthand Reporter and Notary

17   Public in and for the Commonwealth of

18   Massachusetts, at the Law Offices of Joseph G.

19   Abromovitz, P.C., 858 Washington Street,

20   Dedham, Massachusetts, on Wednesday, January 5,

21   2005, commencing at 10:00 a.m.

22

23      DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
               One State Street

24        Boston, Massachusetts 02109
       Telephone (617) 742-6900

---

2

1   APPEARANCES:

2

3   LEONARD W. LANGER, ESQUIRE
     TOMPKINS, CLOUGH, HIRSHON & LANGER, P.A.

4      Three Canal Plaza
     P.O. Box 5060

5      Portland, Maine  04112-5060
     (207) 874-6700

6      for the Plaintiff

7   RICHARD H. PETTINGELL, ESQUIRE
     77 North Washington Street, Second Floor

8      Boston, Massachusetts  02114
     (617) 778-0890

9      for the Defendant, Mary & Josephine Corp.

10

11   JOSEPH G. ABROMOVITZ, ESQUIRE
     THE LAW OFFICES OF JOSEPH G.
     ABROMOVITZ, P.C.

12      858 Washington Street
     Dedham, Massachusetts  02026

13      (781) 329-1080
     for the Defendant, Matteo Russo

14

15

16

  ALSO PRESENT:

17

     William J. Scola

18
19

20

21

22

23

24

---

3

1               I N D E X

2   Deposition of:       Direct     Cross

3   ROBERT McVEY

4     By Mr. Pettingell      10

5

6

7

8

9             E X H I B I T S

10

11   No.                         Page

12   1  Renotice of Deposition         5

13

14

15

16

17

18

19

20

21

22

23

24

---

4

1            S T I P U L A T I O N S

2       It is stipulated by and between

3   counsel for the respective parties that the

4   deposition transcript is to be read and signed

5   by the deponent under the pains and penalties

6   of perjury; and that the sealing and filing

7   thereof are waived; and that all objections,

8   except as to form, and motions to strike are

9   reserved to the time of trial.

10                 * * *

11         P R O C E E D I N G S

12      MR. PETTINGELL:  All right.  Good morning,

13   everybody.  We're here this morning on a

14   Rule 30(b)(6) deposition of North American

15   Insurance Company.  And, I guess, since today

16   is January 5th, we'll use the renotice of the

17   deposition dated January 5th for purposes of

18   what we're going to talk about.

19      And I understand, Mr. Langer, that you've

20   brought three people with you today to respond

21   to the various areas of inquiry.  So I wonder

22   if we could first mark a copy of the January

23   5th deposition notice as an exhibit.  I guess

24   that would be Exhibit 1.

Robert McVey
January 5, 2005

Case 1:04-cv-10374-WGY    Document 27-3    Filed 02/08/2006    Page 3 of 17

North American Specialty Insurance Company
vs. Mary & Josephine Corp. and Matteo Russo

5

1    {Renotice of Deposition marked as McVey
2    Exhibit No. 1.}
3    MR. PETTINGELL: Okay. So referring to
4    Exhibit 1, I wonder if you could identify who
5    you've brought and who's going to be responsive
6    to which allega- -- which paragraphs.
7    MR. LANGER: Present on behalf or as
8    designees for North American Specialty
9    Insurance Company are William Scola, Robert
10   McVey, and Lynanne Houde.
11   With regard to Paragraph 1 of the notice,
12   which asks for information regarding the
13   recitation in Paragraph 14 of the Complaint for
14   Declaratory Judgment, that, "On October 3rd,
15   2003, Defendant Russo, on behalf of Defendant
16   M&J, called OMIA and advised that the Fishing
17   Vessel MARY & JOSEPHINE had not been fishing
18   since May 2003," both Ms. Houde and Mr. McVey
19   will testify regarding conversations with Mr.
20   Russo.
21   Paragraph 2 of the notice asked that we
22   produce -- that NAS produce a witness regarding
23   the allegations in Paragraph 15 of the
24   Complaint for Declaratory Judgment, that,

6

1    "Defendant Russo specifically requested that
2    the Vessel be deemed to have had 'port risk'
3    coverage starting May 1, 2003 rather than full
4    operational coverage and stated that Defendants
5    did not want any crew protection and indemnity
6    coverage during the period that the Vessel was
7    not fishing." Mr. McVey will respond to that.
8    Paragraph 3 asks for a witness regarding
9    Paragraph 16 of the Complaint for Declaratory
10   Judgment, to wit, "OMIA immediately notified
11   NAS of Defendant's request and procured a
12   credit of $1,425.00 for the initial level of
13   P&I coverage and an additional credit of
14   $519.00 for the excess P&I coverage. Such
15   credit was provided for the P&I coverage for 3
16   1/2 crewman originally covered by the policy
17   during the policy year August 13, 2002 through
18   August 13, 2003." Ms. Houde will respond to
19   that.
20   Paragraph 14 -- excuse me -- 4 asks that
21   NAS produce a witness to testify regarding the
22   allegations in Paragraph 17 of the Complaint
23   for Declaratory Judgment, to wit, "It was
24   understood and agreed by the parties that NAS

7

1    would continue to provide port risk only
2    coverage with no coverage for any crewmen until
3    Defendants advised Vessel had returned to
4    active fishing, at which point Plaintiff would
5    reinstate full operational coverage.
6    "Additional credits would accrue to M&J
7    during this period of port risk coverage, which
8    credits would be applied either upon the
9    Vessel's return to full operational coverage or
10   the end of the policy year on August 13th,
11   2004, whichever occurred first." That would be
12   both Mr. McVey and Ms. Houde.
13   Paragraph 5 asked that NAS provide a
14   witness regarding allegations in Paragraph 18
15   of the Complaint for Declaratory Judgment, to
16   wit, 'On October 3, 2003 and again on November
17   21, 2003, OMIA informed Defendants in writing
18   that the Vessel was covered by port risk
19   coverage only and that when the Vessel returned
20   to full fishing operations, notice should be
21   provided to OMIA so that policy could be
22   amended appropriately." Ms. Houde will respond
23   to those issues.
24   And, finally, Paragraph 6, "What is meant

8

1    by 'port risk coverage' as same was intended by
2    either NAS or OMIA during calendar year 2003,"
3    Mr. Scola will respond to that.
4    MR. PETTINGELL: All right. Fine. Thank
5    you. I would propose that we start with
6    Mr. McVey, followed by Ms. Houde, and then
7    Mr. Scola. So with that, I would ask that -- I
8    would -- I -- I think we're going to have three
9    separate depositions.
10   I understand that it's a 30(b)(6) notice of
11   the insurance carrier. But, obviously, the
12   people you're producing also have individual
13   knowledge that is going to be binding on them
14   individually, as well as areas that are binding
15   on the company. So I -- I think we need three
16   different --
17   MR. LANGER: I understand you're going to
18   swear each witness.
19   MR. PETTINGELL: Right.
20   MR. LANGER: But it is NAS that's been
21   noticed --
22   MR. PETTINGELL: I understand.
23   MR. LANGER: -- for this deposition. And
24   that's why we're here. I don't represent Ocean

Robert McVey
January 5, 2005
Case 1:04-cv-10374-WGY    Document 27-3    Filed 02/08/2006    Page 4 of 17

North American Specialty Insurance Company
vs. Mary & Josephine Corp. and Matteo Russo

9

1    Marine Insurance Agency.  So I can't represent
2    that this is a deposition of Mr. McVey or Ocean
3    Marine Insurance Agency because they may want
4    to retain their own counsel and do whatever
5    they want to do.
6         MR. PETTINGELL:  I understand.
7         MR. LANGER:  So --
8         MR. PETTINGELL:  What we're saying is,
9    there's going to be three separate --
10        MR. LANGER:  There'll be three -- I
11   understand there'll be three --
12        MR. PETTINGELL:  -- witnesses deposed.
13        MR. LANGER:  -- three separate witnesses
14   appearing on behalf of NAS in response to the
15   notice of deposition.
16        MR. PETTINGELL:  Fine.
17        MR. ABROMOVITZ:  Let's go off the record
18   for one second.
19        (A brief discussion was held off the
20        record.)
21             ROBERT McVEY, a witness called
22   for examination by counsel for the Defendant,
23   Mary & Josephine Corp., his identity having
24   been stipulated to by all attorneys and duly

10

1    sworn by the Notary Public, was examined and
2    testified as follows:
3                      * * *
4               DIRECT EXAMINATION
5    BY MR. PETTINGELL:
6         MR. PETTINGELL:  Off the record for a
7    second.
8         (A brief discussion was held off the
9         record.)
10        MR. PETTINGELL:  I understand that
11   Mr. McVey does not have, with him, a photo ID.
12   However, he is known to us.  And I think all
13   parties are prepared to stipulate that Mr.
14   McVey is who he claims to be.  Is that agreed?
15        MR. ABROMOVITZ:  Sure.
16        MR. LANGER:  I -- I will stipulate that he
17   is Robert McVey.
18        MR. PETTINGELL:  All right.
19   Q.   Sir, could you please state your name?
20   A.   My name is Robert McVey.
21   Q.   And your business address?  Well, your home
22        address, if you --
23   A.   My home address is 140 Kettle Pond Drive.
24        That's in South Kingstown, Rhode Island 02879.

11

1    Q.   And you understand, Mr. McVey, that you are
2         here to testify as a designate of North
3         American Insurance Company concerning certain
4         areas that have previously been identified in
5         the deposition notice?
6    A.   Yes.
7    Q.   Fine.  And I'm going to -- well, let me ask
8         you, sir, who are you employed by?
9    A.   Ocean Marine Insurance Agency.
10   Q.   And, for ease of reference, can we just refer
11        to Ocean Marine Insurance Agency from this
12        point forward as OMI?
13   A.   Yes.
14   Q.   If I say that, you'll know who I mean and . . .
15   A.   Yes.
16   Q.   As a shorthand.  What is -- first of all,
17        what -- what does OMI do?
18   A.   OMI do is an insurance agency that procures
19        insurance mostly for commercial fishing boats.
20   Q.   And where are they located?
21   A.   We have our main offices in Warwick, Rhode
22        Island.  We have an office in Point Judith,
23        Rhode Island.  We have an office in Fairhaven,
24        Rhode Island.  And we have a -- a satellite

12

1    office in Maine.
2    Q.   And, if you know, are you aware of the
3         relationship between OMI and North American
4         Insurance Company?
5    A.   Vaguely.
6         MR. LANGER:  Let -- let me just interject
7    at this point.  He can answer.  But there are
8    six very specific categories that we were
9    supposed to produce people --
10        MR. PETTINGELL:  And you have.
11        MR. LANGER:  -- for.  They -- one of those
12   categories was not the relationship between
13   OMIA and NAS or NAS at all.  It was very
14   specific, factual allegations that were set
15   forth in the Complaint.  So I'll let him
16   testify, but I -- I am going to hold everybody
17   fairly closely to the areas that we're
18   designating.
19        MR. PETTINGELL:  Well, off the record.
20        (A brief discussion was held off the
21        record.)
22        MR. PETTINGELL:  Mr. Langer and I have had
23   a -- a discussion concerning questions that go
24   beyond the scope of the six paragraphs listed

Robert McVey
January 5, 2005

Case 1:04-cv-10374-WGY     Document 27-3     Filed 02/08/2006     Page 5 of 17

North American Specialty Insurance Company
vs. Mary & Josephine Corp. and Matteo Russo

13

1   in the 30(b)(6) deposition notice.
2       And I certainly agree that, to the extent I
3   ask a witness questions outside the area of the
4   30(b)(6) designation, that while the witness's
5   answer is going to be binding on the witness to
6   the extent that they have personal knowledge,
7   it is not North American's position that the
8   witness answer any questions beyond the scope
9   of the six paragraphs is to be a 30(b)(6)
10  designate answering those questions.
11      And, therefore, it would be North
12  American's position that's it's not binding.
13      MR. LANGER: And you agree with that?
14      MR. PETTINGELL: I agree with that, you
15  know, subject to if I ask a question where --
16  well, I agree with that.
17      MR. LANGER: Okay. And Mr. Abromovitz
18  agrees with that --
19      MR. ABROMOVITZ: Yes.
20      MR. LANGER: -- on behalf of Mr. Russo?
21      MR. PETTINGELL: Right.
22      MR. ABROMOVITZ: Yes.
23      MR. LANGER: Okay. I'd like to take a
24  quick break to talk with Mr. McVey and

14

1   Mr. Scola and explain my position with that and
2   ask them if that's satisfactory. Then --
3       MR. PETTINGELL: Fine. And -- and I will
4   say one additional thing. To the extent that
5   we get into areas beyond the six paragraphs,
6   where I have the deponent here as a -- and --
7   and I'm asking a question that is within their
8   individual knowledge, if you, Mr. Langer, feel
9   that you would like to take a break and consult
10  with the -- with the witness -- and I
11  understand you don't represent them
12  individually; you represent North American -- I
13  have no problem with that.
14      My reason in doing this is because the
15  parties are from Rhode Island. The parties
16  have knowledge as individuals which I feel
17  is -- is germane. And I think it saves
18  everybody a lot of time to -- to deal with it
19  while they're here, as opposed to renoticing
20  the deposition and making everybody come back
21  another day.
22      MR. LANGER: I understand that. And -- and
23  I'm all for saving time. However, there are --
24      MR. PETTINGELL: But you are --

15

1       MR. LANGER: -- some issues that need to be
2   addressed before we do that.
3       MR. PETTINGELL: Let's do it.
4       (Brief recess taken.)
5   BY MR. PETTINGELL:
6       MR. PETTINGELL: I'm going to ask the court
7   reporter to read back the last question and
8   answer, and we'll pick up from there.
9       (Question and Answer read back.)
10  Q.  And you say "vaguely." What's -- what's your
11      loose understanding? I understand you --
12  A.  The loose understanding is that --
13      MR. LANGER: Object to the form of the
14      question.
15  Q.  Well, what's your understanding?
16  A.  Is that they represent Sunderland in
17      Massachusetts in some form or another, which
18      I'm not that aware of.
19  Q.  Okay. And by Sunderland, you mean who?
20  A.  Sunderland Marine Insurance Company.
21  Q.  And who are they?
22  A.  They are one of the underwriters that we use to
23      insure fishing vessels.
24  Q.  And by underwriter, is that analogous to

16

1   insurance -- or -- or the entity providing
2   insurance coverage --
3   A.  Correct.
4   Q.  -- as far as you mean?
5   A.  Yes.
6   Q.  Okay. Is there anybody else at -- at OMI who,
7   so far as you're aware, would have a better
8   understanding of the relationship between OMI
9   and Sunderland?
10  A.  I would think, Bill Scola. He's more the
11  business manager end of it. He might have a
12  better understanding.
13  Q.  Okay. Now, as I understand your testimony,
14  OMI, speaking generally, is involved in
15  procu -- in -- I don't want to put words in
16  your mouth -- in arranging insurance for and
17  insuring fishing vessels --
18  A.  Correct.
19  Q.  -- providing insurance for fishing vessels? I
20  mean, I -- you tell me.
21  A.  Providing insurance for fishing vessels.
22  Q.  Okay. And what is your positions at OMI?
23  A.  My position is a producer and co-owner.
24  Q.  Co-owner I understand. What do you mean by

Robert McKey
January 5, 2005

Case 1:04-cv-10374-WGY    Document 27-3    Filed 02/08/2006    Page 6 of 17

North American Specialty Insurance Company
vs. Mary & Josephine Corp. and Matteo Russo

17

1    producer?
2  A. Producer means that I go out and seek out new
3     accounts and handle the existing accounts.
4  Q. When you say "go out and seek new accounts,"
5     do you mean selling insurance --
6  A. Yeah.
7  Q. -- or selling the -- the services that OMI
8     provides to owners of fishing vessels?
9  A. Correct.
10 Q. And when you say servicing the accounts, by
11    that, do you mean you're the contact man
12    between OMI and the -- the boat owners?
13 A. That's correct.
14 Q. Now, with us today as a further 30(b)(6)
15    designate for some other areas is Ms. Houde.
16    What's her position at OMI?
17 A. Ms. Houde is the liaison between the producers.
18    She wears many hats. But one of them is, she
19    handles the paperwork and sometimes the direct
20    dialogue from what I want done with a boat to
21    the various insurance companies that we use.
22 Q. So -- and we're speaking generally. You talk
23    to the boat owner and discuss the nature of the
24    insurance that the boat owner wants?

18

1  A. That's correct.
2  Q. And then you talk to Ms. Houde?
3  A. Correct.
4  Q. And Ms. Houde is the one that has the contact
5     with the insurance carriers or the
6     underwriters?
7  A. Sometimes.
8  Q. Do you have that direct contact?
9  A. Yes.
10 Q. And in terms of -- all right. What -- does
11    Ms. Houde ever have direct contact with the --
12    with the boat owners?
13 A. Yes.
14 Q. What -- what -- what occasions would -- would
15    involve her having such contact?
16 A. If a person, a particular fisherman, wants to
17    make a change in his policy -- for instance, he
18    wants to add or subtract one of his crew -- he
19    probably would call Lynn.
20 Q. So your contact would be at the beginning of
21    the issuance of a policy?
22 A. Yes. And all the way through.
23 Q. Would a boat owner ever call you about
24    changing -- changes in the policy?

19

1  A. Yes.
2  Q. And would you take care of such changes, or
3     would you refer that to Ms. Houde?
4  A. I would consult with Ms. Houde.
5  Q. Would there be occasions where you would refer
6     the boat owner directly to her?
7  A. Yes.
8  Q. Okay. Now, talking -- talking generally, back
9     in the -- back in the period 2001, 2002, 2003,
10    was the procedure that OMI used to deal with
11    fishermen who wanted insurance, essentially,
12    the same throughout those years?
13 A. Pretty much.
14 Q. And you've indicated you're a producer. So if
15    we were to take a -- a hypothetical boat owner,
16    could you walk me through how -- how the
17    process works?
18    MR. LANGER: Object to the form of the
19    question. You can answer.
20 A. If we have a phone call or -- or a referral,
21    and somebody's looking for insurance on their
22    boat, I usually make arrangements to meet the
23    person.
24 Q. All right. Would the call come in to you?

20

1  A. Sometimes.
2  Q. But whoever the call came in to, it would be
3     referred to you; is that correct?
4  A. Well, it could be referred to one of the other
5     agents. But it -- it could be referred to me.
6  Q. Are there other people that do what you do at
7     OMI?
8  A. Yes.
9  Q. Let's assume it's referred to you. Fair
10    enough?
11 A. Right.
12 Q. What's the next step in the process?
13 A. The next step is, usually, I contact the
14    person, find out what their insurance needs
15    are, ask them questions about the boat, such as
16    the age, claims record. I do this over the
17    phone.
18 Q. Uh-huh.
19 A. And if it looks like it's a -- viable or
20    potential client that we're interested in, I
21    make arrangements to meet him in person at the
22    boat usually.
23 Q. Uh-huh. Do you examine the boat?
24 A. Yes.

Robert McVey
January 5, 2005

Case 1:04-cv-10374-WGY     Document 27-3     Filed 02/08/2006     Page 7 of 17

North American Specialty Insurance Company
vs. Mary & Josephine Corp. and Matteo Russo

21

1  Q. And your examination of the boat, is this a --
2     a detailed survey of the -- are you familiar
3     with the term "survey"?
4  A. Yes.
5  Q. Is this -- and -- and what's your understanding
6     of the -- of the word "marine survey" of a --
7     of a fishing vessel?
8  A. A marine surveyor is --
9  Q. No. A marine survey --
10 A. A marine --
11 Q. -- not surveyor.
12 A. -- survey --
13 Q. Yes.
14 A. -- is a detailed analysis of the boat: the
15    hull, the systems, the engine, the condition,
16    evaluation, et cetera.
17 Q. All right. And at the time that you meet with
18    the prospective client at the boat, do you
19    yourself conduct such a survey or inspection of
20    the vessel?
21 A. No.
22 Q. You just generally look at it to see the
23    condition?
24 A. Correct.

22

1  Q. And you talk to the owner concerning what?
2  A. Concerning what his needs are as far as
3     insuring his vessel, such as hull value,
4     navigation, claims record.
5  Q. All right. And assuming -- I take it, this is
6     a -- this is a process by which you make a
7     decision at that point whether you want to
8     continue to go forward or -- or not?
9  A. Yeah. It could be.
10 Q. Assuming you decide that this is someone that
11    you'd like to do business with, what's the next
12    step?
13 A. I usually give the person an application, have
14    him fill it out, mail it to me or -- or bring
15    it to the office. And I usually instruct him,
16    if he has any questions while he's filling it
17    out, to call me.
18 Q. Okay. And what sort of things are on the
19    application form?
20 A. Corporation name, experience of the owner or
21    captain, navigation limits, how many crew
22    complement, how much P&I insurance he wants for
23    the crew, how much hull insurance he wants,
24    does he want pollution insurance, does he want

23

1     lumper's insurance, does he need machinery
2     coverage, age of the vessel, et cetera.
3  Q. Now, you've used some terms; and we all know
4     what they mean. But to establish the record,
5     you used the term "navigation limits." What do
6     you mean by that?
7  A. How far offshore he's going to fish as -- as to
8     where he's going to go.
9  Q. So this would be the area where the boat would
10    be operating?
11 A. Correct.
12 Q. And am I correct that this would be the area,
13    assuming you provide insurance, for which the
14    vessel would be insured?
15 A. Correct.
16 Q. And if the boat goes over to the West Coast and
17    that's not the area that you insured him for,
18    then that would be beyond the navigational
19    limits?
20 A. That would be correct.
21 Q. All right. You mentioned hull insurance. What
22    do you mean by that?
23 A. That's the vessel itself, how much he needs for
24    the actual vessel if -- if something happened,

24

1     as far as total loss --
2  Q. All right.
3  A. -- what he would need to replace it or what he
4     thinks the value -- market value is.
5  Q. And how about P&I insurance?
6  A. P&I insurance covers the crew individually for
7     injuries, accidents.
8  Q. Does it provide any -- any coverage of any
9     other sort other than for the crew?
10 A. It also covers vessel P&I.
11 Q. You're using a term "P&I." What do you mean by
12    that?
13 A. Protection and indemnity.
14 Q. All right. And what sort of coverage -- your
15    understanding, what sort of coverage is that?
16 A. It would cover, I would say, third-party
17    liability if he hit another vessel or hit a
18    dock or -- other than a crewman being injured.
19 Q. So if somebody were to step on the boat with
20    permission and -- and injure themselves and
21    brought a lawsuit against the vessel, that
22    would be covered by the P&I?
23       MR. LANGER: Object- --
24 A. Probably.

Robert McVey                Case 1:04-cv-10374-WGY      Document 27-3      Filed 02/08/2006 Page 8 of 17 Insurance Company
January 5, 2005                                                          North American Specialty Insurance Company
                                                                         vs. Mary & Josephine Corp. and Matteo Russo

25

```
 1        MR. LANGER:  Objection to the form.  Basis.
 2   Q.  And the application would indicate how much P&I
 3        coverage the owner wanted?
 4   A.  Correct.
 5   Q.  Once you've got the application back, filled
 6        out, what's the next step in the process?
 7   A.  The next step is, we will look it over in the
 8        office to see --
 9   Q.  Who's "we"?
10   A.  -- if it's -- myself, maybe Bill or maybe me
11        and Frank or Chris or -- or maybe myself and
12        Lynn -- to make sure it's filled out properly.
13   Q.  And by Bill, you mean Mr. Scola?
14   A.  Mr. Scola.
15   Q.  By Frank, you mean Frank Ostro?
16   A.  Mr. Ostro.
17   Q.  All right.  What's Mr. -- what's your
18        understanding of Mr. Scola's position in the
19        com- -- in OMI?
20   A.  Mr. Scola's position is, basically, the, I
21        would say, office manager or CFO, producer.
22        He's also a salesman.
23   Q.  Okay.  And what sort of discussion would be
24        involved in reviewing an application?  And,
```

26

```
 1        again, we're talking general.
 2   A.  We might discuss the size of the boat and the
 3        navigation area, how far offshore he wants to
 4        go.  We might discuss that the boat may be too
 5        small for the distance the guy wants to go
 6        fishing.
 7            We might discuss -- for instance, if he
 8        wanted to insure the boat for a half a million
 9        and he only wanted 250,000 on the crew, we
10        might discuss that, thinking he's not covered
11        enough.  We might discuss his past claims
12        history.  We might discuss what port he fishes
13        out of.
14   Q.  What's the significance of the port that he
15        fishes out of?
16   A.  Some ports have a tendency to be more
17        problematic getting crew complements.
18   Q.  Okay.  Assuming that, after this discussion
19        that takes place internally at OMI, a decision
20        is made that this is a boat that OMI would like
21        to provide insurance for, what's the next step
22        in the process?
23   A.  The next step, if we feel that it's worthy
24        to -- to submit, we submit it to one of the
```

27

```
 1        insurance carriers.
 2   Q.  And how does that work?
 3   A.  That usually works by faxing them or e-mailing
 4        them the application, usually followed through
 5        by a phone call to discuss it in a little more
 6        detail verbally.
 7   Q.  Now, who in the office would be the person
 8        tasked with submitting the application to
 9        the -- to the underwriter?  Or is that you?
10   A.  That would be Ms. Houde.  There's several other
11        people that do it.  But, myself personally, it
12        would be Ms. Houde.
13   Q.  And by your answer, do I understand that, at
14        any given time, OMI has more than one insurance
15        underwriter that it would submit a -- a vessel
16        for consideration to?
17   A.  Yes.
18   Q.  Once the -- and, again, I don't want to put --
19        I don't want to put words in your mouth.  If
20        you disagree with my characterization, you
21        know, please let us know.  But I take it that
22        you would submit an application with a
23        recommendation that the particular underwriter
24        that you're submitting it to consider providing
```

28

```
 1        insurance?
 2   A.  That's correct.
 3   Q.  And once the recommendation is submitted,
 4        what's the next step in the process?
 5   A.  Like I said, they receive the application.  The
 6        underwriter looks it over.  They might have
 7        some questions regarding certain facets of the
 8        application.  They might call us.  Usually,
 9        within 48 hours, they send us back
10        a affirmative or a negative as far as their
11        participation in insuring the vessel.
12   Q.  If they were to say no, do you then try one of
13        the other underwriters that you're -- OMI is
14        dealing with?
15   A.  Possibly.
16   Q.  If they say yes, what's the next step?
17   A.  The next step?  Usually, when they say yes,
18        they give us a quote or a price as to how much
19        their end of the insurance is going to cost.
20        We also have many other facets that have to be
21        factored in to get the guy a quote on a full
22        premium.  Once we procure that, then I'll make
23        contact with the owner.
24   Q.  Well, let's stop there.  If I understand what
```

Robert McVey
January 5, 2005

Case 1:04-cv-10374-WGY     Document 27-3     Filed 02/08/2006     Page 9 of 17

North American Specialty Insurance Company
vs. Mary & Josephine Corp. and Matteo Russo

---

**29**

1    you're saying, you submit an application with a
2    recommendation to an underwriter. And, again,
3    by the term "underwriter," you mean what
4    would -- people would generally refer to as an
5    insurance company?
6  A. Correct.
7  Q. And you get a response back saying yes; we're
8    prepared to provide the coverage that is
9    requested for a premium of X dollars --
10 A. Uh-huh. Yes.
11 Q. -- is that right? You then take that
12    information, and -- and you do something in
13    addition before you go to the -- to the owner
14    of the vessel --
15 A. Correct.
16 Q. -- with a quote? What is -- what is done
17    internally at OMI before the quote -- before a
18    quote is presented to the owner?
19 A. We also have to find out how much other
20    insurance he needs as far as -- the insurance
21    company, primary insurance company, usually
22    only insures the first 250,000. If he wants
23    more than that --
24 Q. Are we talking hull insurance? P&I insurance?

---

**30**

1  A. We're talking P&I insurance at this time.
2  Q. Okay.
3  A. So if he wants more than the primary they're
4    willing to give them, which is usually 250,000,
5    we have to go through Lloyd's of London, one of
6    the companies there, one of the brokers.
7  Q. And that's to get additional insurance up to
8    whatever limit the owner is looking for?
9  A. Correct.
10 Q. So you get another quote from underwriters at
11    Lloyd's as to how much they would charge to
12    provide the additional insurance?
13 A. That's correct.
14 Q. How about the hull coverage?
15 A. The hull coverage, usually, the primary
16    companies, 99 percent of the time, will do the
17    full hull coverage.
18 Q. All right. So if a boat owner wanted to insure
19    his vessel for $750,000 and that was deemed to
20    be an appropriate valuation on the boat for the
21    hull, and he wanted a million dollars P&I
22    coverage, your first submission to an
23    underwriter would come back, typically, Okay.
24    We'll insure the -- the hull for 750,000; and

---

**31**

1    we'll provide the first $250,000 of P&I for X
2    dollars.
3        And then you would go to Lloyd's and -- and
4    procure an additional 750,000 P&I coverage?
5  A. Correct.
6  Q. And you would find out how much that was going
7    to cost?
8  A. Correct.
9  Q. And add that on?
10 A. Correct.
11 Q. Factor that in? And if the insured, in
12    addition, wanted pollution coverage, oil
13    pollution coverage, would you go to a -- a
14    different underwriter for that?
15 A. Yes.
16 Q. And that would get added on?
17 A. Yes.
18 Q. So this is the process that you mean?
19 A. Yes.
20 Q. And then, once you got a bottom-line figure,
21    that would be submitted to the owner?
22 A. Correct.
23 Q. And at that point, if the owner felt it was too
24    much, the owner could back away and go look

---

**32**

1    elsewhere?
2  A. Absolutely.
3  Q. Sometimes, that happens?
4  A. Unfortunately.
5  Q. And, sometimes, it doesn't happen?
6  A. That's good.
7  Q. Let's assume the owner -- you go with a quote
8    to the owner. And the owner says that's too
9    high; but, okay, I'll pay it. And you've got
10    an agreement. What happens next in the process
11    of getting insurance for this boat?
12 A. Well, first, we have to find out when he wants
13    to make the purchase. Sometimes, there's bank
14    involvement. And once we have everything
15    order -- in order on our end, we just wait for
16    him to give us a date. And we get everything
17    organized, and we take care of it on that
18    particular date he wants it.
19 Q. All right. And are you the one that is,
20    essentially, the contact at OMI with the owner
21    throughout this process?
22 A. Most of the time.
23 Q. And if it isn't you, it's Ms. Houde?
24 A. It could be Ms. Houde. Or if -- I could be out

---

Robert McVey
January 5, 2005

Case 1:04-cv-10374-WGY      Document 27-3      Filed 02/08/2006      Page 10 of 17

North American Specialty Insurance Company
vs. Mary & Josephine Corp. and Matteo Russo

**33**

1    or whatever. It could be one of the other
2    partners.
3  Q. All right. Once the boat owner has agreed to
4    pay the -- has agreed to the size of the
5    premium and a date when coverage is to commence
6    has been agreed upon, what happens next from
7    your end, OMI -- OMI's end?
8  A. We arrange financing. Sometimes, that has to
9    be done. And, usually, if there's a bank
10   involved, we'll deal with the bank on the day
11   of the closing and provide him with the
12   necessary documents to satisfy the bank that
13   he's insured.
14  Q. Okay. And how, physically, is that done?
15  A. Physically? Such as?
16  Q. Paperwork.
17  A. Usually, it's done by e-mail or fax.
18  Q. And is there something called a binder that's
19   issued?
20  A. Yes.
21  Q. And what's a -- are you familiar with the term
22   "binder"?
23  A. Yes.
24  Q. And what's a binder?

**34**

1  A. A binder is, basically, a document that -- from
2    the insurance company that shows coverages,
3    specific coverages, on this particular date
4    that it's issued.
5  Q. And who -- who issues the binder? Does that
6    come directly from the underwriter? Or is that
7    something that comes from OMI?
8  A. That comes from OMI.
9  Q. And I take it, at some point later on, the
10   policy itself would be issued?
11  A. Correct.
12  Q. And where does the policy come from? The
13   underwriter or OMI?
14  A. O- -- OMI.
15  Q. I take it, OMI has an understanding of the
16   policy terms and provisions that a specific
17   underwriter that it's dealing with requires?
18  A. Correct.
19  Q. And so that -- well, let's -- let's say, is
20   Sunderland one of the underwriters that OMI
21   would deal with?
22  A. Yes.
23  Q. Let me stop. The plaintiff in this case is
24   North American Specialty Insurance Company.

**35**

1    And we've used the term "Sunderland." Are you
2    aware of a -- of a relationship between
3    Sunderland and North American Specialty
4    Insurance Company?
5  A. Yes.
6      MR. LANGER: Objection. Foundation.
7  Q. And what's your understanding of that
8    awareness? No. What's your understanding of
9    that relationship?
10  A. It's, like I -- I said earlier, it's -- it's a
11   vague understanding that Sunderland uses them
12   for whatever reasons --
13  Q. All right.
14  A. -- their reasons. I really don't know.
15  Q. Fine. Do you ever go directly to North
16   American Specialty, or do you go through
17   Sunderland?
18  A. I go through Sunderland.
19  Q. You are aware that -- strike that. On
20   occasion, OMI has issued coverage to boat
21   owners where North American Specialty Insurance
22   Company is providing the coverage?
23  A. I'm not sure about that. No.
24  Q. Okay. Where you have a -- a new vessel that

**36**

1    you're providing insurance for for the first
2    time, does OMI always issue a binder?
3  A. I believe, most of the time.
4  Q. And when in relation to the date when coverage
5    is supposed to begin does the binder get sent
6    to the -- to the boat owner?
7  A. Usually, the day of when the coverage is
8    needed.
9  Q. All right. Are you involved yourself in --
10   in -- in the issuance of the binders?
11  A. Not very often.
12  Q. Who -- who at OMI would be the one who would do
13   that?
14  A. With my particular business, it would probably
15   be Ms. Houde.
16  Q. Okay. Excuse me. And, again, I want to
17   stress, if I'm asking -- you know, if I get
18   into an area where you think Ms. Houde would be
19   really the -- the one that should answer it,
20   you know, don't hesitate to -- to let us know
21   that.
22  A. I won't.
23  Q. Normally -- you know, we're talking generally
24   during the period from 2001 to 2003 -- how long

Robert McVey
January 5, 2005

Case 1:04-cv-10374-WGY     Document 27-3     Filed 02/08/2006     Page 11 of 17

American Specialty Insurance Company
vs. Mary & Josephine Corp. and Matteo Russo

---

**37**

1    after the initial binder is issued would the --
2    the policy itself be issued?
3  A.  It depends on which insurance company we're
4    dealing with.  Usually, within two weeks.
5  Q.  Why does it take -- why does it take two weeks
6    or more?
7  A.  Well, in Sunderland's particular case, it's
8    Europe.  There's many facets of the policy, as
9    I suggested earlier, that have to be all
10   brought together.
11 Q.  Uh-huh.
12 A.  And by the time it makes its way from one
13   company or another to our office and we
14   formulate the package, it -- it takes a little
15   bit of time.
16 Q.  When you say "it makes its way," what makes its
17   way?
18 A.  The different binders from -- from different
19   companies.
20 Q.  All right.  So we have a situation where you've
21   got hull coverage and primary P&I coverage and
22   excess P&I coverage and pollution coverage.
23   You're getting binders -- OMI is getting
24   binders in from the different companies or

---

**38**

1    underwriters providing that coverage?
2  A.  That's correct.
3  Q.  Prior to the issuance of the binders from the
4    underwriters and companies to OMI, I take it,
5    you have already received some sort of written
6    confirmation that they are going to accept the
7    coverage?
8  A.  Yes.
9  Q.  And it's based upon that fax or e-mail that
10   you -- OMI relies upon in issuing its own
11   binder?
12 A.  Yes.
13 Q.  And then, once you get the additional -- once
14   you get the formal binders from the
15   underwriters, then you put together the policy
16   forms and issue a policy, again, you being OMI?
17 A.  That's correct.
18 Q.  Okay.  Who calculates, to your understanding,
19   the premium to be charged for the various
20   coverages?
21 A.  Well, most of them are -- are set, like the
22   pollution, the Lloyd's policies.  Sometimes,
23   there's potential negotiating on our behalf
24   with the primary companies occasionally.

---

**39**

1  Q.  Uh-huh.  How about with respect to hull and
2    P&I?
3  A.  Occasionally, we might have an input as to
4    suggest different prices.
5  Q.  And what's that based on?
6  A.  That's based on if a particular boat owner has
7    a great track record and it's a new boat and he
8    may be -- might be having another boat being
9    built for the future.  So we might give him
10   a -- a -- a consideration that we wouldn't give
11   somebody that had an older boat.
12 Q.  And you're looking to, potentially, get the new
13   boat too?
14 A.  Correct.
15 Q.  Well, you're in business.  Right?
16 A.  I would hope so.
17 Q.  Okay.  You say you have a recommendation.
18   That's a recommendation that goes to the
19   underwriter?
20 A.  A recommendation on what?
21 Q.  As to premium, giving them the credit or
22   something, a break.
23 A.  Yeah.  Yes.
24 Q.  But I get the sense from your answer that,

---

**40**

1    essentially, the premium is -- the ultimate say
2    on the premium is set by the underwriter?
3  A.  Most of the time, yes.
4  Q.  Okay.  Now, I think you testified earlier that
5    there were occasions when a boat owner would
6    want to make changes in his coverage, such as
7    changing the size of the crew; is -- is that
8    correct?
9  A.  Yes.
10 Q.  And how does the size of a vessel's crew affect
11   the P&I coverage?  Because that's what we're
12   talking about; is that correct?
13 A.  Correct.
14 Q.  Okay.  How was -- how does the size of a
15   vessel's crew affect the P&I coverage afforded
16   to the vessel?
17 A.  The premium is based on a per-man coverage.
18   Obviously, if there's three men, there's more
19   risks than two men.  So we charge them on a
20   per-man basis.
21 Q.  So if a vessel owner has initially obtained
22   coverage for two men and decides to go to six
23   men and notifies you that he wants to do that,
24   that's going to result in an increase in

---

Robert McKay
January 5, 2005
Case 1:04-cv-10374-WGY    Document 27-3    Filed 02/08/2006    Page 12 of 17
can Fishing Insurance Company
vs. Mary & Josephine Corp. and Matteo Russo

41

1    premium?
2    A.  That's correct.
3    Q.  And who -- and, similarly, if he's fishing with
4        six men and wants to go down to two men, you're
5        going to get a decrease in premium?
6    A.  That's correct.
7    Q.  Who computes the difference in the premium?
8    A.  That would probably be Ms. Houde.
9    Q.  All right.  Who would the request to make the
10       change in crew size, for example, normally go
11       to?
12   A.  It would normally go to myself or Ms. Houde.
13   Q.  A phone call could come in to either of you?
14   A.  Correct.
15   Q.  If the phone call came in to you, is that
16       something you would handle?  Or is it something
17       you would normally refer the boat owner to
18       Ms. Houde?
19   A.  I would handle it in conjunction with Ms. Houde.
20   Q.  What do you mean by that, "in conjunction
21       with"?
22   A.  Like, I'd go in and meet with her on several
23       times a week; and we discussed what's -- what
24       the situations are for each given day or week

42

1        or -- and we'll discuss changes.  And --
2    Q.  All right.
3    A.  -- she'll deal with them accordingly.
4    Q.  Okay.  And with respect to a change, again,
5        let's say, in crew size, I take it, at some
6        point, the underwriter would have to be
7        informed of that?
8    A.  That's correct.
9    Q.  Is that something you would do?  Or is it
10       something Ms. Houde would do?
11   A.  It would probably be more Ms. Houde.
12   Q.  So -- well, do you ever -- are you ever the one
13       that would be involved directly with the
14       underwriter on that?
15   A.  Occasionally.
16   Q.  Is that a question -- questions concerning that
17       that would be better left for Ms. Houde?
18   A.  Yes.
19   Q.  Okay.  How does the process differ that you've
20       just described in terms of the placement of the
21       coverage, putting -- I'm not talking changes,
22       but just the initial placement of coverage.
23       When a policy is coming up for renewal, are
24       there any differences?

43

1    A.  Such as?  I don't really understand the
2        question.
3    Q.  Yeah.  It was a horrible question.  As a
4        producer, you've explained, I think, pretty
5        well your role when a -- a new -- a boat owner
6        comes to you, a new boat that you're not -- you
7        haven't been dealing with before, looking for
8        insurance.  I take it, insurance is provided
9        for, typically, for a 12-month period?
10   A.  Yes.
11   Q.  And at the end of that 12-month period, the
12       initial policy expires?
13   A.  Correct.
14   Q.  How -- how are things handled in terms of
15       providing insurance in Year 2?
16   A.  Again, we usually hear from the insurance
17       company a month before the renewal.  And they
18       might suggest a rate increase or decrease,
19       depending on the hist- -- claims history of the
20       particular vessel or the market conditions of
21       the insurance in general.  And, usually, within
22       a month before the policy, we send out the new
23       renewal quote to a prospective boat owner.
24   Q.  Okay.  And who sends that?  You or Ms. Houde?

44

1    A.  Ms. Houde.
2    Q.  All right.  And is that something to the -- to
3        the effect, okay, this year, to get you the
4        same coverage, it's going to cost you the same;
5        it's going to go up; it's going to go down?
6        It's a quote?
7    A.  Yeah.  Yes.
8    Q.  And then, you hear from the owner -- does
9        somebody contact the owner?
10   A.  We usually contact the owner.
11   Q.  And what's the purpose of that contact?
12   A.  To find out if he has any changes, if the
13       situation is still the same as it was going
14       forward as last year, and just kind of touch
15       base and give him a little personal touch
16       sometimes.
17   Q.  Okay.  And the owner agrees to pay the -- the
18       quote.  And, I take it, if there's any changes,
19       that is then submitted to the underwriters for
20       consideration, pretty much the same process
21       that you've already described?
22   A.  Correct.
23   Q.  And if there are no changes and the owner
24       agrees to pay the premium for the -- for the

45

1    next year, is that communicated to the
2    underwriter?
3  A.  Yes.
4  Q.  And then binders are -- are issued.  Is a
5    binder issued in that situation or just a new
6    policy?
7  A.  A -- a binder is issued.
8  Q.  And then a renewal policy?
9  A.  Usually, it's the same policy unless there's
10    changes.
11  Q.  Is new paper -- a new policy sent or -- when
12    you say, "it's the same policy" --
13  A.  I don't believe we send a new policy.  I think
14    we just send a binder if there's no coverage
15    changes.
16  Q.  Who would be involved in doing that at OMI?
17  A.  Probably, Ms. Houde.
18  Q.  All right.  Now, on the occasions where changes
19    to a policy occur, is anything sent to the boat
20    owner reflecting the changes?
21  A.  It depends upon when they're made.
22  Q.  Can you explain what you mean by that?
23  A.  Well, do you mean at renewal or mid- --
24    mid-term policy or . . .

46

1  Q.  Let's say -- let's say, mid-term policy.  Let's
2    say -- and, again, we're talking, generally,
3    hypothetical.  The boat owner decides to change
4    the size of the crew.  He's fishing with five
5    men, and he wants to change to two men.  The
6    boat owner calls you and -- and says, Mr. McVey,
7    I decided I want to cut back the size of my
8    crew to two.
9      As I understand your testimony, you would
10    then sit down with Ms. Houde and discuss this,
11    would figure out a -- how much of a reduction
12    in premium would be required.  But would any
13    paper go out to the insured reflecting that
14    such a change in the policy had been made?
15  A.  No.
16  Q.  Have you ever heard of the term "endorsement"?
17  A.  Yes.
18  Q.  What's your understanding of an endorsement?
19  A.  An endorsement could be a paper issued on a new
20    facet of the policy that he didn't have or
21    something that he wanted to change.
22  Q.  And would an endorsement be issued if -- well,
23    strike that.  Is it your understanding that an
24    endorsement would not be issued to reflect a

47

1    change such as the size of the crew?  And,
2    again, if this is an area that you'd like to
3    have somebody --
4  A.  No.
5  Q.  -- else --
6  A.  It's --
7  Q.  -- deal with --
8  A.  -- it's -- it's -- it's -- it's endorsed at the
9    end of the policy year.
10  Q.  Well, you have to explain what you mean by
11    that.
12  A.  In other words, if somebody calls up -- we have
13    a lot of people calling up that want to add a
14    man or drop a man.  If they want to delete
15    several crewmen -- they might want to go
16    scalloping for a month and then go back to
17    dragging.
18  Q.  Uh-huh.
19  A.  And, usually, what we do is, we don't calculate
20    that till the end of the policy year because
21    they could be calling us every two weeks or
22    every other week.  So we, usually, make a note
23    of it; and we audit it at the renewal policy.
24    We usually contact the client, and he tells us

48

1    what the boat did and didn't do.  And then we
2    calculate if he has a return premium coming
3    back.
4  Q.  And that would be at the end of the policy
5    period?
6  A.  Yes.
7  Q.  And at that point, would an endorsement issue
8    to reflect the changes that had been made?
9  A.  Possibly.
10  Q.  Not always?
11      MR. LANGER:  Objection --
12  A.  Not always.
13      MR. LANGER:  -- to the form the question.
14  Q.  I'm sorry?
15      MR. LANGER:  I object --
16      MR. PETTINGELL:  No.  I heard the
17    objection.  I didn't hear the answer.
18  Q.  Not always?  I just didn't hear the answer.
19      MR. PETTINGELL:  Just a second.  Did the
20    court reporter hear the answer?
21      COURT REPORTER:  Yes.  He said "not
22    always."
23  Q.  Not always.  Okay.  You're -- now, I'll ask a
24    new question.  Your answer, "not always,"

49

1   suggests that, on occasion, endorsements are
2   issued after the policy period?
3   A.  You mean, at the end of the policy --
4   Q.  At the end of the policy period, to reflect
5       changes made during the --
6   A.  Sometimes.
7   Q.  -- prior year.  Sometimes, that does happen;
8       and, sometimes, it doesn't?
9   A.  Yes.
10  Q.  What would trigger such an endorsement being
11      issued after the fact as opposed to not being
12      issued after the fact?
13  A.  Well, again, there's many facets of OMI.  We
14      have a small boat program that we underwrite
15      in-house.  That probably wouldn't be.  Where, a
16      larger boat, there might be one issued.  So I
17      mean, we -- we do a lot of different types of
18      business.  So . . .
19  Q.  Who would make the determination as to whether
20      or not an endorsement should be sent to the
21      insured?
22  A.  Probably, Ms. Houde.
23  Q.  All right.  Are there occasions when
24      endorsements are issued by OMI during the

50

1       policy period?
2   A.  Occasionally.  Possibly.
3   Q.  And who would make the determination as to
4       whether an endorsement should be issued during
5       the policy period?
6   A.  It would depend on who the agent was and what
7       the circumstances were.
8   Q.  Well, when you say the word "agent," who are
9       you referring to?
10  A.  I'm referring to myself, Chris Burma, Frank
11      Ostro, or Bill Scola.
12  Q.  And by agent, is that synonymous with the --
13      the term you used earlier, "producer"?
14  A.  Yes.
15  Q.  By agent, you mean the -- the person at OMI who
16      has the contact with the owner of the boat?
17  A.  Correct.
18  Q.  So, for example, if you were dealing with a
19      boat owner, it would be your determination as
20      to whether or not an endorsement reflecting a
21      change in the policy should be issued during
22      the policy year?
23  A.  Perhaps.
24  Q.  Perhaps.  You mean, it might be somebody else's

51

1       determination?
2   A.  It -- it could be.  Yeah.
3   Q.  Or it could be yours?
4   A.  Yes.  It could be mine.  It could be somebody
5       else's.
6   Q.  All right.  Who other than you would make such
7       a determination that a poli- -- that an
8       endorsement reflecting a policy change should
9       issue during the policy term?
10  A.  It could be myself and Mr. Scola or myself and
11      Mr. Ostro or myself and Mr. Burma or all four
12      of us.
13  Q.  How about with respect to North American
14      Specialty Insurance Company paper, who would
15      make such a determination?
16  A.  I have no idea.
17  Q.  It wouldn't be your determination that a -- an
18      endorsement should issue if it were a policy
19      issued through Sunderland?
20  A.  In -- in -- regarding North American Specialty?
21  Q.  Well --
22  A.  I don't follow you.
23  Q.  We've been talking generally up to this point.
24  A.  Uh-huh.

52

1   Q.  You're aware, that in this particular
2       litigation which has led to your being here
3       today, Mary & Josephine Corporation had a
4       hull and P&I policy issued ultimately from
5       North American Specialty Insurance Company; is
6       that correct?
7   A.  That's correct.
8   Q.  All right.  And if I understand, OMI's dealings
9       to obtain that policy from North American
10      Specialty Insurance Company was done through
11      Sunderland; is that right?
12          MR. LANGER:  Objection.
13  A.  That's right.
14  Q.  And when we say "Sunderland," who -- is
15      there -- what's the complete name of that
16      entity?
17  A.  Sunderland Marine Insurance Company or Agency.
18  Q.  All right.  And they're located where?
19  A.  In Sunderland, England.
20  Q.  And, again, specifically with regard to Mary &
21      Josephine Corp., am I correct that OMI
22      requested coverage through Sunderland; and,
23      ultimately, the binders came back that it would
24      be North American Specialty Insurance Company

Robert McVey
January 5, 2005

Case 1:04-cv-10374-WGY    Document 27-3    Filed 02/08/2006    Page 15 of 17

North American Specialty Insurance Company
vs. Mary & Josephine Corp. and Matteo Russo

53

1    that was providing the coverage?
2    A.  Yes.
3    Q.  All right.  With regards to coverage issued by
4        North American Specialty Insurance Company, who
5        at OMI, if anybody, would make the
6        determination as to whether or not a change in
7        the policy coverage would have an endorsement
8        issued during the policy year?
9    A.  It depends on the circumstances.
10   Q.  Well, would you ever make such a determination?
11   A.  Yeah.
12   Q.  What circumstances would lead you to make such
13       a determination?
14   A.  If a -- a potential example or a possible
15       example, if somebody was selling their boat,
16       the boat was not going to be fished for six
17       months waiting for the sale to transpire, we
18       might specifically endorse that as a port risk
19       policy.  Or if he's having work done to the
20       vessel, it might be endorsed as a builder's
21       risk policy.
22   Q.  Okay.  Would there be any other reason that
23       you're aware of that would cause an endorsement
24       reflecting a change in the policy provisions to

54

1        be issued during the policy period?
2    A.  There -- there could be several reasons.
3    Q.  Want to tell me?
4    A.  Well, I just told you a couple of them.  Most
5        of the time, if a boat's active, like I said,
6        we don't do endorsements until the end of the
7        policy period.
8    Q.  All right.  You indicated a term "port risk."
9        And I understand Mr. Scola's here to bind the
10       plaintiff in this case as to the understanding
11       of North American Specialty Insurance Company
12       as to the meaning of that term.  What's your
13       understanding of the term "port risk"?
14           MR. LANGER:  Objection to the form of the
15       question and foundation.  Seeks a legal
16       conclusion.  But go ahead.  You can answer.
17   Q.  Well, you've used the -- you've used the term.
18       What did you mean by port risk?
19   A.  My understanding of port risk is a vessel that
20       is tied to the dock, no crew involvement, not
21       fishing, not being worked on, just sitting
22       there idle at the dock.
23   Q.  Okay.  As part of the process of getting
24       insurance for a boat, is there a requirement by

55

1        the various underwriters that there be an
2        annual marine survey of the condition of the
3        vessel?
4    A.  Usually.
5    Q.  And, quite often, as a result of such a survey,
6        the surveyor, the person conducting the
7        inspection of the vessel, will come up with or
8        may come up with several recommendations that
9        the surveyor feels changes -- if I -- if I
10       can -- that should be made in the boat in order
11       to make the boat safer?
12   A.  Yes.
13           MR. LANGER:  Objection.
14   Q.  And those surveyors' recommendations, as a
15       condition for obtaining coverage, have to be
16       complied with, don't they?
17   A.  Correct.
18           MR. LANGER:  Objection.
19           MR. PETTINGELL:  The basis of the
20       objection?
21           MR. LANGER:  Well, there are many different
22       circumstances as to whether a recommendation
23       may or may not be tied to coverage.  You're
24       assuming that every recommendation is tied to

56

1        coverage.  So I objected.
2            MR. PETTINGELL:  Okay.
3    Q.  And, in fact, you've had occasions where you've
4        had to tell boat owners, if you don't get the
5        recommendations taken care of, you're going to
6        lose your coverage?
7    A.  That happens occasionally.
8    Q.  All right.  So it's -- would you agree it's not
9        unusual to have a boat have to effect some
10       repairs in order to satisfy the conditions of
11       coverage?
12           MR. LANGER:  Objection.
13   A.  That's not unusual.
14   Q.  If a boat were tied up to the dock for an
15       extended period of time -- let's say a month --
16       while a surveyor's recommendations were being
17       taken care of, whatever the repairs that the
18       surveyor wanted in order to satisfy the
19       underwriter's requirements, would that be
20       something that the boat owner could obtain port
21       risk coverage for?
22           MR. LANGER:  Objection.  Foundation.  Form
23       of the question.
24   A.  No.

57

1  Q. It's your opinion that, even though the boat
2     wasn't fishing or doing anything like that, the
3     boat owner would, if he had been working on the
4     boat, would have to have full operational
5     coverage?
6  A. Correct.
7  Q. Is it your understanding that there is no --
8     well, strike that. Based upon your
9     understanding of port risk coverage, when a
10    boat is on port risk, can a boat also have P&I
11    coverage?
12       MR. LANGER: Objection to form and
13    foundation of the question.
14 A. It wouldn't have crew P&I. It might have
15    vessel P&I.
16 Q. What's -- what's the distinction, in your mind,
17    between crew P&I and vessel P&I?
18 A. Crew P&I is specifically covering a crewman for
19    injury, where port risk, there's not supposed
20    to be any crew on the boat. Vessel P&I is more
21    like general liability.
22 Q. So it's your understanding that if a boat is on
23    port risk, it automatically loses coverage for
24    the crew?

58

1        MR. LANGER: Objection.
2  A. Correct.
3  Q. Have you ever heard of a boat being on port
4     risk coverage that did have coverage for the
5     crew?
6  A. No.
7  Q. Okay.
8        MR. PETTINGELL: Can we take a break?
9     (Brief recess taken.)
10    BY MR. PETTINGELL:
11 Q. All right. Up to this point, Mr. McVey, we've
12    been talking generally. I'd like to now focus
13    more specifically on Mary & Josephine Corp.
14    with regard to the fishing vessel "Mary &
15    Josephine." Now, did there come a time when
16    you personally were involved in placing
17    coverage on the Mary & Josephine?
18 A. Yes.
19 Q. And do you remember when that was?
20 A. I believe it was in 2001.
21 Q. And what was -- how did that come about?
22 A. I had a call from Matt Russo, inquiring as to
23    his procurement of insurance from OMI.
24 Q. He called you?

59

1  A. Yes.
2  Q. And who's Mr. Russo --
3  A. He is --
4  Q. -- your understanding?
5  A. -- the contact that I dealt with with the Mary
6     & Josephine, captain, manager.
7  Q. And as a result of the call the -- you got from
8     Mr. Russo, what did you do?
9  A. I took a ride to Gloucester and met him, had
10    lunch with him.
11 Q. Uh-huh. And what did you discuss with him?
12 A. We discussed his past history, his insurance
13    needs, and the basic state of the fisheries
14    and . . .
15 Q. Looked at the boat?
16 A. Yeah. Looked at the boat.
17 Q. And based upon that, did you form a -- an
18    opinion as to whether or not the Mary &
19    Josephine was a boat that OMI might be
20    interested in getting insurance for?
21 A. Yes.
22 Q. And what steps did you do to bring that about?
23 A. I left, with him, an application with
24    instructions how to fill it out, told him, if

60

1     he had any problems or questions, to call me.
2     That's -- then he sent us the application.
3  Q. Do you have the -- do you have a copy of the
4     application here with you today?
5  A. I believe so.
6  Q. I wonder if you could pull it out, please.
7        MR. LANGER: Do you have it with you?
8        THE WITNESS: I don't have it. I think
9     Lynn might have it.
10       MR. PETTINGELL: Off the record.
11    (Brief recess taken).
12    (Whereupon the deposition was suspended at
13    11:35 a.m. due to a medical emergency.)
14            *****
15
16
17
18
19
20
21
22
23
24

Robert McVey
January 5, 2005

Case 1:04-cv-10374-WGY    Document 27-3    Filed 02/08/2006 American Society of Insurance Company
vs. Mary & Josephine Corp. and Matteo Russo
Page 17 of 17

61

1    **SIGNATURE PAGE**

2

3

4    I, ROBERT McVEY, do hereby certify that I

5    have read the foregoing transcript of my

6    testimony, and I further certify that said

7    transcript is a true and accurate record of

8    said testimony.

9    Dated at _____, this ____

10   day of _____, 2005.

11

12

13   _____

     ROBERT McVEY

14

15

16

17

18

19

20

21

22

23

24

62

1    **C E R T I F I C A T E**

2    COMMONWEALTH OF MASSACHUSETTS
     COUNTY OF NORFOLK, ss.

3

4    I, Jo Anne M. Shields, a Professional

5    Shorthand Reporter and Notary Public in and for

6    the Commonwealth of Massachusetts, do hereby

7    certify that ROBERT McVEY, the witness whose

8    deposition is hereinbefore set forth, was duly

9    sworn by me and that such deposition is a true

10   and accurate record, to the best of my

11   knowledge, skills and ability, of the testimony

12   given by such witness.

13   I further certify that I am not

14   related to any of the parties in this matter by

15   blood or marriage and that I am in no way

16   interested in the outcome of this matter.

17   IN WITNESS WHEREOF, I have hereunto set

18   my hand and affixed my seal of office this 17th

19   day of January, 2005.

20

21   _____

     Notary Public

22

63

1    **ERRATA SHEET**

2    CHANGES TO THE DEPOSITION OF ROBERT McVEY

3    INSTRUCTIONS TO WITNESS: 1) Please note any
     desired corrections to your testimony by page

4    and line number. 2) Enter text as it appears
     in the transcript. 3) Enter text as it should

5    appear.

6    PAGE      LINE        CORRECTION
     _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____