# EXHIBIT "C"

Robert McVey
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-4    Filed 02/08/2006    Page 2 of 32

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

VOLUME II - 64

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO:  04-10374WGY

. . . . . . . . . . . . . . . .
                                    )
NORTH AMERICAN SPECIALTY           )
INSURANCE COMPANY,                 )
            Plaintiff,             )
                                    )
vs.                                 )
                                    )
MARY & JOSEPHINE CORP. and         )
MATTEO RUSSO,                      )
            Defendants.            )
                                    )
. . . . . . . . . . . . . . . .

CONTINUED DEPOSITION OF ROBERT McVEY, a

witness called on behalf of the Defendant, Mary

& Josephine Corp., pursuant to the Federal

Rules of Civil Procedure before Jo Anne M.

Shields, Professional Shorthand Reporter and

Notary Public in and for the Commonwealth of

Massachusetts, at the Law Offices of Joseph G.

Abromovitz, P.C., 858 Washington Street,

Dedham, Massachusetts, on Tuesday, September 13,

2005, commencing at 10:08 a.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street
Boston, Massachusetts  02109
Telephone (617) 742-6900

---

66

1          I N D E X

2    Deposition of:    Direct Cross Redirect Recross

3

4    ROBERT McVEY

5        By Mr. Pettingell 68       162, 180

6        By Mr. Abromovitz      128        173, 181

7        By Mr. Langer       174

8

9

10

11              E X H I B I T S

12   No.                                        Page

13   2  E-mail to Janet from Bob McVey
        dated 12/5/03
14                                              82

15   3  E-mail to Bob McVey from Craig
        McBurnie dated 12/8/03
16                                              92

17   4  Fax to Tracy Tate from Lynn Houde
        dated 10/3/03 consisting of one page     96
18

19   5  American Institute Port Risk
        Endorsement dated 1/18/70
        119
20   6  Endorsement dated 12/9/02              119

21   7  Insurance policy effective 8/13/03
        to 8/13/04
                                               163
22

23

24

---

65

APPEARANCES:

LEONARD W. LANGER, ESQUIRE
    TOMPKINS, CLOUGH, HIRSHON & LANGER, P.A.
    Three Canal Plaza
    P.O. Box 5060
    Portland, Maine  04112-5060
    (207) 874-6700
    for the Plaintiff

RICHARD H. PETTINGELL, ESQUIRE
    77 North Washington Street, Second Floor
    Boston, Massachusetts  02114
    (617) 778-0890
    for the Defendant, Mary & Josephine Corp.

JOSEPH G. ABROMOVITZ, ESQUIRE
    THE LAW OFFICES OF JOSEPH G.
    ABROMOVITZ, P.C.
    858 Washington Street
    Dedham, Massachusetts  02026
    (781) 329-1080
    for the Defendant, Matteo Russo

ALSO PRESENT:

    William J. Scola

---

67

S T I P U L A T I O N S

It is stipulated by and between
counsel for the respective parties that the
deposition transcript is to be read and signed
by the deponent under the pains and penalties
of perjury; and that the sealing and filing
thereof are waived; and that all objections,
except as to form, and motions to strike are
reserved to the time of trial.
                    * * *

P R O C E E D I N G S

MR. PETTINGELL:  All right.  Well, we're
here this morning as a continuation of the
30(b)(6) deposition of American -- North
American Specialty Insurance Company.  Day 1
was on January 5th of this year.  And we're
continuing with the deposition of Robert McVey.
And we -- we're all in agreement that he is
Mr. McVey, who's known to us.  And I
understand he's still under oath.

MR. PETTINGELL:  Let's go off the record
for a second.

(A brief discussion was held off the
record.)

DUNN & GOUDREAU
(617) 742-6900

68

1  DIRECT EXAMINATION
2  BY MR. PETTINGELL:
3  Q. All right, Mr. McVey. I'd like to cover a few
4     things that we didn't cover before. I wonder
5     if you could give us a description of your
6     educational history.
7  A. I have a high school education, graduated high
8     school. I went to several schools to acquire a
9     1,600-ton captain's license, firefighting
10    school, radar endorsement, first aid, CPR, that
11    type of stuff, took several courses at various
12    universities. Mass. -- I'm trying to think of
13    what school. I took net trawl manufacturing
14    and trawl construction, bottom trawl
15    construction -- mostly, fishing boat courses --
16    several insurance courses to get my agent's
17    license. That's a quick summary of . . .
18 Q. Okay. Could you tell us what formal training
19    you've had in terms of insurance courses?
20 A. I've had -- originally, I had to take the
21    agent's classes. It probably consisted of a
22    four-week class, then follow-up study for two
23    or three months to obtain my license.
24 Q. Where did you take that, sir?

69

1  A. In Rhode Island.
2  Q. What -- what facility was --
3  A. It was at CCRI, Community College of Rhode
4     Island, in Warwick, Rhode Island.
5  Q. Okay. And it was how long a course?
6  A. I think it was a couple of weeks, two to four
7     weeks. It was -- it was quite a while ago.
8  Q. And what was covered in that? What -- excuse
9     me. What was the name of that course?
10 A. It was agent's licensing. I -- I don't know
11    the name of it. I don't remember exactly. But
12    it was to obtain a agent's license.
13 Q. An insurance agent's --
14 A. Yes.
15 Q. -- license?
16 A. Insurance agent's license.
17 Q. In Rhode Island?
18 A. Yes.
19 Q. And can you tell us what the curriculum
20    consisted of, what you studied during that two-
21    to four-week course?
22 A. I remember, basically, studying property
23    casualty claims. But I don't remember a lot of
24    detail of it.

70

1  Q. Did you discu- -- did your study include
2     different policy terms and provisions?
3  A. Yes.
4  Q. Did it include terms and provisions involving
5     marine insurance?
6  A. Some.
7  Q. Can you tell us about that, please?
8  A. It was very little marine insurance, enough
9     that I couldn't even recollect what it was.
10    But they just slightly touched base on marine
11    insurance.
12 Q. You don't remember the specifics?
13 A. I -- I don't.
14 Q. And the purpose of this course was to enable
15    you to get an insurance agent's license?
16 A. Correct.
17 Q. When was this?
18 A. Probably 16 years ago.
19 Q. You do the math. Tell me when.
20 A. What year?
21 Q. Yes.
22 A. Oh, boy. I think it was about 1989, maybe.
23 Q. Have you had any additional or formal training
24    on insurance since you took this insurance

71

1     agent's licensing course?
2  A. Yes.
3  Q. All right. Could you tell us about that,
4     please?
5  A. Every year, we're required to take classes and
6     courses in continuing education.
7  Q. Required by who?
8  A. By the State of Rhode Island.
9  Q. And how many hours of continuing education are
10    you required to take per year?
11 A. I think it's approximately ten.
12 Q. Where do you -- and have you taken ten hours of
13    training every year since 1989?
14 A. Approximately.
15 Q. Where?
16 A. At times, we've had to go out of state to take
17    it. Chicago I remember once going to. I
18    remember going to New Jersey. Some of it's
19    done in-house on a -- on-line, you could take
20    some of them.
21 Q. Did any of the formal training that you took as
22    part of your continuing education include
23    issues involving marine insurance?
24 A. I really can't remember. I don't -- I don't

Robert McVey    Case 1:04-cv-10374-WGY    Document 27-4    North American Specialty Insurance Company
September 13, 2005                Filed 02/08/2006    Page 4 of 32
vs. Mary & Josephine Corp., et al.

72

```
 1       think, very much of it, if it was.
 2    Q. Now, you testified last January that it was
 3       your understanding that there was no P&I
 4       coverage under -- under a port risk policy?
 5          MR. LANGER:  Objection.  I -- I don't think
 6       that's an accurate recitation of his testimony.
 7       But --
 8          THE WITNESS:  Yeah.
 9          MR. LANGER:  -- you can answer it.
10    A. Yeah.  I don't think it's accurate either.
11    Q. All right.  Well, if I'm inaccurate, then let's
12       correct it.  What is your understanding as to
13       whether or not there is P&I coverage when a
14       vessel is under port risk?
15          MR. LANGER:  Objection.  It's been asked
16       and answered.  You can answer it again.
17    A. It's called vessel P&I, which is a little bit
18       different than crew P&I, where it, pretty much,
19       covers the liability.
20    Q. All right.  So there is a P&I cover if a vessel
21       is on port risk, but not for a crew?
22    A. Correct.
23    Q. And I stand corrected.  I believe that is what
24       you testified to back in January as well.  And
```

73

```
 1       I'd like to know, what's your basis for giving
 2       that opinion?  Where -- where did that opinion
 3       come from?
 4    A. From my 16 years of being in the business.
 5    Q. Well, can you be a little more specific?
 6    A. No, not really.
 7    Q. Well, at some point, the understanding as to
 8       there being no P&I cover for crew available if
 9       a vessel was on port risk, at some point, you
10       came to that understanding.  Do you remember
11       when?
12    A. No.
13    Q. Well, you've been in the business, as you say,
14       for 16 years.
15    A. Right.
16    Q. Was that your understanding in Year 1?
17    A. It's just experience over the 16 years.  I
18       can't pinpoint exactly when I -- I -- I gleaned
19       that bit of information and learned it.  But
20       it's a policy and procedure that we follow.
21       And . . .
22    Q. Who's "we"?
23    A. We is Ocean Marine Insurance Agency.
24    Q. Okay.  Did somebody at Ocean Marine Insurance
```

74

```
 1       tell you that if vessel was on port risk, the
 2       P&I cover that was available under the port
 3       risk cover did not include crew?
 4    A. Yes.
 5    Q. Do you know -- do you remember who?
 6    A. I would assume it might be Frank Ostrow.
 7    Q. All right.  Well, I -- I want to be fair.  If
 8       you don't really remember --
 9    A. I --
10    Q. -- and you don't --
11    A. I really don't --
12    Q. -- really know --
13    A. -- remember.
14    Q. Let me talk.  We can't both talk at --
15    A. Go ahead.
16    Q. -- the same time.  If you don't really know or
17       you don't really recall, you should -- you
18       should indicate that.  I -- I don't want you to
19       assume something, 'cause you may be incorrect.
20    A. I think I said that earlier, that I didn't -- I
21       don't recall specifically.
22    Q. Okay.  And you can't recall how long into your
23       16-year experience as an insurance agent or
24       producer at OMI you first came to that
```

75

```
 1       understanding?
 2    A. I would say it would be at the beginning of my
 3       career, within the first year or so.
 4    Q. Okay.  And whoever it was that told you this
 5       was someone at OMI?
 6    A. Yes.
 7    Q. Other than this understanding that you obtained
 8       from someone at OMI, have you ever heard from
 9       any other source that there is no P&I cover
10       available for crew if a vessel is on port risk
11       coverage?
12    A. Yes.  I've heard it from other sources.
13    Q. What sources?
14    A. I've heard it from a -- Sunderland Marine
15       people.  I've heard it from Fireman's Fund
16       people.
17    Q. Who at Sunderland Marine told you this?
18    A. I don't remember specifically.
19    Q. Do you remember specifically when they told you
20       this?
21    A. Probably 15 years ago, 16 years ago.
22    Q. Now, do you know when Mr. Russo's accident
23       occurred?
24    A. Yes.
```

Robert McVey
September 13, 2005
Case 1:04-cv-10374-WGY    Document 27-4    Filed 02/08/2006    Page 5 of 32
North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

76
1  Q. And when was that?
2  A. I believe it was December of 2003.
3  Q. Okay. Now, at the time of Mr. Russo's
4     accident, was the vessel on port risk?
5  A. Yes.
6  Q. And at what point in time did you first learn
7     that Mr. Russo's vessel was going to be going
8     on port risk?
9  A. I think it was when we renewed his vessel in
10    August.
11 Q. Of 2003?
12 A. Yeah.
13 Q. So you were aware that Mr. Russo's vessel was
14    to go on port risk several months prior to the
15    happening of his accident in December of 2003?
16 A. Yes.
17 Q. All right. Now, there was a time, wasn't
18    there, Mr. McVey, when you believed there was
19    coverage under Mr. Russo's policy for the
20    injuries he sustained at the time of his
21    December 2003 accident?
22    MR. LANGER: Objection.
23 A. I don't remember that time.
24 Q. Okay. Let's see if I can help you.

77
1     MR. LANGER: Can we just take a break for
2     two minutes?
3     MR. PETTINGELL: Yeah.
4     MR. ABROMOVITZ: I'd object to the break at
5     this point in time. I think we're in a
6     sensitive area of the questioning, and I don't
7     see any reason that we should have a break
8     where -- I want this on the record -- where
9     Mr. McVey needs to consult with his counsel.
10    MR. LANGER: Okay.
11    MR. ABROMOVITZ: So I would object to the
12    break being taken. If we were in a courtroom
13    setting, you would, actually, not be entitled
14    to a break right now.
15    MR. LANGER: Okay. Your objection is
16    noted. There's no pending question. He's
17    looking for a document to show him. I think
18    I'm entitled to talk to him about something
19    that he's already answered. It's not --
20    MR. ABROMOVITZ: I -- I will -- I will
21    state on the record my objection to this. I
22    don't think there should be any conversation
23    between Mr. Langer, counsel for NAS, and
24    Mr. McVey, a 30(b)(6) designee, about the

78
1     subject matter of his testimony --
2     MR. PETTINGELL: Well, I --
3     MR. ABROMOVITZ: -- during the course of
4     this deposition.
5     MR. PETTINGELL: I have the document. So
6     we don't have to take a delay.
7     MR. LANGER: I'd -- I'd like to talk to him
8     for a minute.
9     MR. ABROMOVITZ: My objection on the
10    record, please, on behalf of Mr. Russo.
11    (Brief recess taken.)
12 BY MR. PETTINGELL:
13    MR. LANGER: There's something you want to
14    clarify?
15    THE WITNESS: Yeah.
16 A. I'm a -- a bit confused about the time
17    frames --
18 Q. Well --
19 A. -- to that question you just asked.
20 Q. I'll put it --
21    MR. PETTINGELL: I wonder if I could have
22    the question read back.
23    (Question and Answer read back.)
24 Q. Okay. I'll put it to you again. There was a

79
1     time after Mr. Russo's injury when you believed
2     that there was, in fact, coverage available?
3  A. After his injury?
4  Q. Well, obviously, you wouldn't have thought it
5     before his injury if he hadn't been hurt yet.
6     There was a time after Mr. Russo was injured on
7     the vessel while it was on port risk where you
8     believed he was entitled to crew coverage under
9     the policy?
10    MR. LANGER: Objection. It's been asked
11    and answered. He said no.
12    MR. PETTINGELL: Well, I'm clarifying the
13    question for him.
14 A. I'll say no again.
15 Q. Okay. And the initial reason for den- --
16    denying coverage to Mr. Russo's claim to Mary &
17    Josephine Corporation was that Mr. Russo was an
18    owner of the vessel or part-owner of the
19    vessel. Do you recall that?
20    MR. LANGER: Objection. It calls for a
21    legal conclusion. Also assumes facts not in
22    evidence. Go ahead.
23 A. Yeah. I -- I recall that.
24 Q. And, at some point in time -- in fact, I think

Robert McVey
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-4    Filed 02/08/2006    Page 6 of 32

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

80

1    you made a phone call to Mr. Russo at the
2    hospital where he was undergoing treatment
3    following his injury and advised him there was
4    no coverage because he was an owner?
5  A. That's not true.
6  Q. That's not true?  Did you have a telephone
7    conversation with him at the hospital?
8  A. Yes.  I did.
9  Q. And did the topic of whether or not there was
10   coverage for his injuries ever come up during
11   that conversation?
12 A. Yes.  It did.
13 Q. Okay.  And what was the gist of the
14   conversation you had with Mr. Russo?
15 A. I called Mr. Russo up to see how he was doing,
16   and he asked if there was coverage.  And I said
17   we were working on it.  At this time, we didn't
18   know.
19 Q. Okay.  You had no discussion with him that you
20   recollect where the issue of whether or not he
21   was an owner of the vessel came up?
22 A. While he was in the hospital, again?
23 Q. Yes.
24 A. No.

81

1  Q. Okay.  I'd like to show you a -- I'd like to
2    show you a document --
3      MR. PETTINGELL:  And for the record -- for
4    your purposes, this is Bates stamped 000369.
5      MR. LANGER:  This highlighting is not part
6    of the original document, I'm assuming.
7      MR. PETTINGELL:  That's correct.  That's my
8    highlighting.  It's the only way I can read
9    them.
10 Q. -- and ask, sir, if you'd look at that and tell
11   me whether or not you recognize it.
12     (A brief discussion was held off the
13     record.)
14     MR. LANGER:  The question is, do you
15   recognize the document?
16 A. Yeah.  Yes.  I recognize it.
17 Q. All right.  Can you tell me what that document
18   is?
19     MR. ABROMOVITZ:  Can we mark it first?
20     MR. PETTINGELL:  All right.  Let's mark it
21   as Exhibit 2.
22     MR. LANGER:  With the understanding that
23   the highlighting is --
24     MR. PETTINGELL:  The highlighting is not on

82

1    the original document.
2      MR. ABROMOVITZ:  Well, why don't we go off
3    the record.
4      (A brief discussion was held off the
5      record.)
6      (E-mail to Janet from Bob McVey dated
7      12/5/03 marked as McVey Exhibit No. 2.)
8      MR. PETTINGELL:  Off the record.
9      (A brief discussion was held off the
10     record.)
11     (Question read back.)
12 Q. The document we've marked as Exhibit 2, can
13   you -- can you tell us what that document is,
14   please, sir?
15 A. This is a correspondence that I sent to
16   Sunderland Marine regarding the accident Matt
17   Russo had.
18 Q. And what's the date of the correspondence?
19 A. December 5th.
20 Q. This is --
21 A. 200- --
22 Q. -- an e-mail, is it?
23 A. Yes.  It is.
24 Q. And it says "From:  Deweydog@aol.com."

83

1  A. Yes.
2  Q. Is that your -- or was that your e-mail address
3    at the -- the time, December 5th, 19- -- 2003?
4  A. Yes.
5  Q. And I wonder, sir, if you could read the first
6    paragraph into the record.
7  A. "I have just finished going over the claim
8    involving Matt Russo and realized that he is
9    covered as a crew member.  His father Sal is
10   listed as 100% -- 100% ownership with Matt
11   being the captain.  Matt is listed as
12   part-owner on their other 2 vessels, the F/V
13   Josephine and the F/V Damariscotta.  They are
14   covered for three to four men on the Mary &
15   Josephine."
16 Q. So as of December 5th, 2003 when you sent this
17   e-mail -- and this e-mail went to who?
18 A. Janet Cook.
19 Q. And who's Janet Cook?
20 A. She's the claims advisor of the claims, in
21   charge of claims at Sunderland Marine.
22 Q. In England?
23 A. Yes.
24 Q. All right.  At the time that you sent Ms. Cook

Robert McVey
Case 1:04-cv-10374-WGY     Document 27-4     Filed 02/08/2008     Page 7 of 32
September 13, 2005
North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

**84**

```
1       this e-mail we've marked as Exhibit 2, you were
2       of the opinion that Mr. Russo was covered as a
3       crew member; he was entitled to coverage under
4       the policy?
5           MR. LANGER:  Objection.
6   A.  Not necessarily.
7   Q.  Perhaps you can explain to me then what you
8       meant when you said you -- you "just finished
9       going over the claim involving Matt Russo and
10      realized that he is covered as a crew member?
11  A.  Well, we didn't realize at the time that he was
12      on port risk.
13  Q.  You didn't know --
14  A.  Because -- we -- we knew, but it kind of
15      slipped out.
16  Q.  So at the ti- --
17  A.  Once --
18  Q.  I -- I beg your pardon.  I -- I don't want to
19      cut you off.  Go ahead.
20  A.  Once we went back over the claim, we realized
21      that the boat wasn't fishing; and it was on
22      port risk.
23  Q.  I see.  So when you -- when you sent this
24      e-mail marked as Exhibit 2, you had forgotten
```

**85**

```
1       that the vessel Mr. Russo was working on was on
2       port risk?
3   A.  No.  I hadn't forgotten.  This is, pretty much,
4       a generic makeup of the course of the year.
5       They were covered for three to four men.  And
6       when the boat was actively fishing, when they
7       were covered, Matt was a covered crewman.
8   Q.  Uh-huh.  Well, I'm referring to the first
9       sentence in the first paragraph where you
10      state, "I have just finished going over the
11      claim involving Matt Russo and realized that he
12      is covered as a crew member."
13  A.  Yeah.  When the boat was actively fishing, he
14      was listed as a crew member.
15  Q.  Well, coming up to the top, the subject of this
16      e-mail is "Matt Russo F/V Mary and Josephine."
17      And, in the first paragraph, you're talking
18      about the "claim involving Matt Russo."  So
19      when you say he's covered as a crew member,
20      that doesn't mean that you believed that he
21      was -- that his claim was a covered claim under
22      the policy?
23          MR. LANGER:  Objection.
24  A.  Correct.
```

**86**

```
1           MR. LANGER:  Form of the question.  Wait
2       till he finishes his question --
3           THE WITNESS:  Sorry.
4           MR. LANGER:  -- before you answer it.
5   Q.  You say that wha- -- my statement was correct?
6   A.  Repeat it again.
7           MR. PETTINGELL:  Can I have it read back,
8       please.
9           (Question read back.)
10          MR. LANGER:  Objection to the form.
11      Foundation.  Calls for a legal conclusion.
12          MR. PETTINGELL:  Well, you stated your
13      objection and the basis for it.  And I thank
14      you.  But this is Mr. McVey's language, and I'm
15      trying to understand what he means when he says
16      "covered."
17          MR. LANGER:  Well, then, ask him what he
18      means, rather than telling him what you think
19      he means.
20          MR. PETTINGELL:  Well, I'll ask my question
21      the way I want.
22          MR. LANGER:  Fine.  I'll object to it.
23          MR. PETTINGELL:  And you can object to it.
24  Q.  At the time that you wrote this e-mail,
```

**87**

```
1       Mr. McVey, you were aware that Sunderland was
2       denying coverage.  At least, one of the bases
3       for denying coverage was that Mr. Russo was an
4       owner of the vessel.
5           MR. LANGER:  Object to the form and the
6       foundation of the question.
7   A.  I think they were looking into the fact that he
8       might have been an owner, but I don't think the
9       claim was directly denied because he was an
10      owner.
11  Q.  All right.  Do you know whether or not the
12      claim was ever denied on the basis that
13      Mr. Russo was an owner of the vessel?
14  A.  No.  I don't.
15  Q.  Okay.  In any event, the first paragraph of
16      Exhibit 2, referring to that first paragraph of
17      Exhibit 2, is it fair to say you were telling
18      Ms. Cook that he was not an owner?
19  A.  Yes.
20  Q.  And your statement that you -- and I quote --
21      "I have finished going over the claim involving
22      Matt Russo and realized that he is covered as a
23      crew member."
24  A.  When he was being a crew when the boat was
```

88

| | |
|---|---|
| 1 | active. |
| 2 | Q. Well, was the boat active at the time of his |
| 3 | injury? |
| 4 | A. No. |
| 5 | Q. Why did you pick this particular time, |
| 6 | December 5th, 2003, to pass that bit of |
| 7 | information on to Ms. Cook at Sunderland? |
| 8 | A. I don't remember the context.  But she might |
| 9 | have been asking me how many crew was on the |
| 10 | boat when it was insured for active fishing. |
| 11 | Q. Now, were you involved at all in placing the |
| 12 | vessel on port risk only coverage? |
| 13 | A. Yes. |
| 14 | Q. And what was your involvement? |
| 15 | A. I received a phone call from Matt Russo, |
| 16 | telling me to put the boat -- that the boat |
| 17 | hadn't been fishing and will not be fishing.  I |
| 18 | reiterated that information to Lynn. |
| 19 | Q. Do you remember when that phone call was? |
| 20 | A. The beginning of October, I believe, 2003. |
| 21 | Q. Was there any discussion during that telephone |
| 22 | call about a reduction in the size of the crew |
| 23 | on the vessel? |
| 24 | A. Yes. |

90

| | |
|---|---|
| 1 | A. Ms. Houde. |
| 2 | Q. What was your understanding as to what she was |
| 3 | going to do with the information you had passed |
| 4 | on to her? |
| 5 | A. I really don't know what Lynn's procedures are |
| 6 | when she's in the office. |
| 7 | Q. Speaking generally, is it your understanding |
| 8 | that that information was to be communicated to |
| 9 | Sunderland? |
| 10 | A. I really don't know. |
| 11 | Q. Okay.  This is something that would be better |
| 12 | left for -- |
| 13 | A. Yeah. |
| 14 | Q. -- Ms. Houde to discuss? |
| 15 | A. Exactly. |
| 16 | Q. All right.  Fair enough.  Okay.  I may have |
| 17 | just asked you this, but your answer is not |
| 18 | clear to me so I understand it.  What was your |
| 19 | purpose in telling Ms. Houde that Mr. Russo |
| 20 | didn't want to have any crew coverage while the |
| 21 | vessel was on port risk? |
| 22 | A. The purpose was 'cause she keeps the records, |
| 23 | and she does the paperwork involvement. |
| 24 | Q. Was it necessary that something formally happen |

89

| | |
|---|---|
| 1 | Q. Would you tell us about that, please? |
| 2 | A. Mr. Russo indicated to me -- told me that there |
| 3 | was no crew on the vessel; there hadn't been, I |
| 4 | believe, since May; and there will not be till |
| 5 | further notice. |
| 6 | Q. Did he instruct you that he wished to have the |
| 7 | size of the crew reduced under the policy? |
| 8 | A. Yes. |
| 9 | Q. And when was this call? |
| 10 | A. The beginning of October. |
| 11 | Q. And what is your memory of -- of what Mr. Russo |
| 12 | asked you to do? |
| 13 | A. He said that the boat hadn't been fishing -- I |
| 14 | believe, again -- since May and presently |
| 15 | wasn't fishing, wasn't going to be fishing; and |
| 16 | he did not want any crew covered on the boat. |
| 17 | Q. Okay.  And, in response to that, what did you |
| 18 | do? |
| 19 | A. I talked to Lynn and gave her the information. |
| 20 | Q. For what purpose? |
| 21 | A. So we could see if we could get him some money |
| 22 | back on his policy. |
| 23 | Q. Now, was it your understanding that Lynn -- and |
| 24 | by Lynn, you mean Ms. Houde? |

91

| | |
|---|---|
| 1 | with respect to the policy in order to effect a |
| 2 | change in coverage or the change in coverage |
| 3 | that Mr. Russo was asking you for? |
| 4 | A. Again, that would probably be more Ms. Houde's |
| 5 | department than mine. |
| 6 | Q. I understand that.  But you passed it on to her |
| 7 | for purposes of recordkeeping. |
| 8 | A. Right. |
| 9 | Q. And what -- what was your understanding of why |
| 10 | that was necessary, your understanding of why |
| 11 | that was necessary? |
| 12 | A. So Matt Russo wouldn't have to pay a premium on |
| 13 | his crew when he wasn't using it. |
| 14 | Q. So you were passing this information on to |
| 15 | Ms. Houde so that she could get a return |
| 16 | premium, if possible, for -- |
| 17 | A. Yes. |
| 18 | Q. -- the client?  Okay.  Now, do you recall -- is |
| 19 | that what I gave you there?  Do you recall |
| 20 | getting a response back from Sunderland to your |
| 21 | e-mail of December 5th that we've marked as |
| 22 | Exhibit 2? |
| 23 | A. No.  I don't. |
| 24 | MR. ABROMOVITZ:  What are you looking for? |

92

```
 1        MR. PETTINGELL:  An unmarked copy of this.
 2   Q.  Let me show you a document -- this is Bates
 3        stamped 382 -- and ask if you'd take a moment
 4        and look at it.
 5        MR. PETTINGELL:  I'm going to have this
 6        marked as Exhibit 3.
 7        (E-mail to Bob McVey from Craig McBurnie
 8         dated 12/8/03 marked as McVey Exhibit
 9         No. 3.)
10   Q.  Have you had a chance to review it?
11   A.  Yes.
12        MR. PETTINGELL:  Okay.  Why don't we mark
13        that as the next exhibit, as Exhibit 3.
14        THE WITNESS:  We marked it already.
15        MR. LANGER:  We marked it.
16        MR. ABROMOVITZ:  It's marked.
17   Q.  Can you tell us what that document, Exhibit 3,
18        is?
19   A.  It's correspondence to me from Craig McBurnie
20        from Sunderland Marine.
21   Q.  Okay.  Now, calling your attention to the third
22        paragraph of that correspondence, was this the
23        first indication you received from Sunderland
24        that one of the bases for their denial of
```

93

```
 1        coverage for Mr. Russo's claim was that
 2        Sunderland had deleted crew P&I coverage
 3        entirely until fishing recommenced?
 4        MR. LANGER:  Objection to the form and
 5        foundation of the question.  Assumes facts not
 6        in evidence.
 7   A.  Could you read that back, please?
 8        (Question read back.)
 9   A.  I'm not sure.
10   Q.  Do you remember having any discussions with
11        anybody at Sunderland, telephone conversations,
12        where the fact that crew P&I coverage had been
13        deleted entirely while the vessel was on port
14        risk at any time prior to this December 8th,
15        2003 correspondence?
16        MR. LANGER:  You mean, between the date of
17        the accident and December 8th?
18        MR. PETTINGELL:  Yes.  Thank you.
19   A.  I can't recollect any.
20   Q.  Now, there's a handwritten notation that
21        appears, "Per Bill."  Do you see that?
22   A.  Yes.
23   Q.  Whose handwriting is that, if you know?
24   A.  I really don't know.
```

94

```
 1   Q.  Okay.  Can you read the handwriting to
 2        yourself?
 3   A.  Yes.
 4   Q.  And do you have any knowledge as to what that
 5        refers to?
 6        MR. LANGER:  Don't guess.  If you know,
 7        fine.
 8   A.  I don't.
 9   Q.  Okay.  Fair enough.  That's not your
10        handwriting?
11   A.  No.
12   Q.  Well, I suspect that the "Bill" is Mr. Scola.
13        So we'll -- we can always go on to him when we
14        take his deposition.  Now, Mr. Russo's
15        corporation had obtained insurance for the Mary
16        & Josephine through OMI for two years prior to
17        the incident in which he was injured on his
18        boat in December of 2003; is that correct?
19   A.  That's correct.
20   Q.  And were you involved in -- strike that.  And
21        I -- I think you testified back in January that
22        you were involved in the initial placement of
23        coverage?
24   A.  Yes.
```

95

```
 1   Q.  You provided quotes for coverage?
 2   A.  Yes.
 3   Q.  Is that also correct with respect to Policy
 4        Year 2?
 5   A.  Correct.
 6   Q.  So in the second -- excuse me -- third
 7        paragraph where Mr. McBurnie, an underwriter at
 8        Sunderland, writes to you that "Last year,
 9        we" -- well, strike that.  "In addition, cover
10        at present is restricted to Port Risks only
11        following your fax of October 3rd.  Last year,
12        we did the same (as per Lynn's of 17th
13        September '02) and deleted crew P&I coverage
14        entirely until fishing recommenced."
15        Were you involved at all in a request that
16        crew P&I coverage be deleted entirely for
17        Policy Year 2 while the vessel was on port
18        risk?
19   A.  I don't remember.
20   Q.  Okay.  This reference to a -- your fax of
21        October 3rd, do you have that fax with you here
22        today?
23   A.  I think we might.
24        MR. LANGER:  Do you have it?
```

96

```
 1   A. I don't have it.  No.  I do not have it.
 2        MR. PETTINGELL:  Let's go off the record.
 3   We'll save a lot of time if we can find it.
 4        (A brief discussion was held off the
 5         record.)
 6        MR. PETTINGELL:  With Mr. Langer's
 7   assistance, we found the fax.
 8        MR. SCOLA:  Then it must be the calculation
 9   that's missing.
10        MR. PETTINGELL:  And it appears that it was
11   a fax sent by Ms. Houde.  So --
12        MR. ABROMOVITZ:  Do you want to mark it
13   now, Dick, or no?
14        MR. LANGER:  He referred to it.  We might
15   as well mark it.
16        MR. ABROMOVITZ:  Yeah.
17        MR. PETTINGELL:  Yeah.  Why don't we mark
18   it.
19        (Fax to Tracy Tate from Lynn Houde dated
20         10/3/03 consisting of one page marked as
21         McVey Exhibit No. 4.)
22        MR. PETTINGELL:  And this is Exhibit 4?
23        COURT REPORTER:  Yes.
24   Q. Mr. McVey, I'd like you to look at what we've
```

97

```
 1   marked as Exhibit 4 and ask you if, to your
 2   knowledge, that is the fax that you were
 3   referring to and which, apparently, is referred
 4   to in the correspondence to you that we've
 5   marked as Exhibit 3?
 6        MR. LANGER:  Just to make it clear, you
 7   just asked him whether it was a -- a fax he
 8   referred to, and then you said in the
 9   correspondence to him.  So can you just clarify
10   the question?
11   Q. Well, have you seen the document we've marked
12   as Exhibit 4 before?
13   A. No.
14   Q. Okay.  Following your receipt of the
15   correspondence marked as Exhibit 3 from Craig
16   McBurnie, which made reference to your fax of
17   October 3rd last year -- excuse me --
18   October 3rd, did you make any effort to see
19   what he was referring to?
20   A. I wouldn't have any reason to.
21   Q. Well, so the answer to my question is, you did
22   not?
23   A. No.
24   Q. Okay.  And, I take it -- I think I take it that
```

98

```
 1   the document marked Exhibit 4 you've never seen
 2   before today?
 3   A. I don't recollect seeing it before.  No.
 4   Q. Then we can move on.  Now, at the time that you
 5   and Mr. Russo had a conversation about the
 6   vessel going on port risk, what was your
 7   understanding of the purpose for the vessel
 8   going on port risk?
 9   A. It was to save Mr. Russo some premium.
10   Q. And that's because the vessel hadn't been
11   fishing.  So he was trying to retroactively
12   save some premium?
13   A. Correct.
14   Q. Was there any other reason that the boat was to
15   go on port risk that you were aware of?
16   A. Not that I'm aware of.
17   Q. Okay.  Do you recall whether or not -- strike
18   that.  We had some discussion last January
19   about an annual survey of vessels that were
20   being insured with the Sunderland being
21   undertaken.  Do you recall that?
22   A. Vaguely, I recall.
23   Q. All right.  And it's a requirement of
24   Sunderland that the vessels that it is
```

99

```
 1   providing insurance for have to be surveyed
 2   every year, don't they, prior to renewal?
 3   A. Approximately, every year.
 4   Q. All right.  And was this done with regard to
 5   Mr. Russo's vessel or the Mary & Josephine?
 6        MR. LANGER:  At which point?
 7        MR. PETTINGELL:  Prior to the renewal.
 8        MR. LANGER:  Which renewal?
 9        MR. PETTINGELL:  2003, Policy Year 3.
10   A. I don't remember.
11   Q. Do you recall any year -- now, there were three
12   policies issued for this vessel; is that
13   correct?
14   A. I believe so.
15   Q. The first year covered from August of 2001 to
16   August of 2002?
17   A. Yes.
18   Q. The second year covered from August of 2002 to
19   August of 2003?
20   A. Yes.
21   Q. And the vessel was up for renewal, which would
22   have covered from August of 2003 to August of
23   2004?
24   A. Yes.
```

Robert McVey
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-4    Filed 02/08/2008    Page 11 of 32

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

100

1  Q. And that policy was, in fact, issued, wasn't
2     it?
3  A. Yes.  It was.
4  Q. All right.  And do you recall whether or not a
5     survey was done as a requirement of the
6     insurance company for any of those three policy
7     years?
8  A. Yes.
9  Q. Which years?
10 A. I can remember the first year --
11 Q. All right.
12 A. -- 'cause I was actively involved with it at
13    that time.  And I know that it was done after
14    that, but I don't remember when.
15 Q. And as a result of the surveys that were
16    performed on the vessel, were recommendations
17    made by the surveyor for things that should be
18    done to the vessel?
19 A. Yes.
20 Q. And were those recommendations conditions of
21    the Sunderland providing insurance to the
22    vessel?
23 A. I would say yes.
24 Q. Do you recall, for, at least, one of the three

101

1     policy years, the Sunderland requiring that the
2     vessel go on port risk and not go fishing until
3     those recommendations had been taken care of?
4  A. Yes.
5  Q. Do you remember what year?
6  A. I believe it was the first year.
7  Q. Okay.  And with respect to the third policy
8     year, do you recall whether or not the survey
9     came up with recommendations that had to be
10    taken care of before the vessel could go
11    fishing?
12 A. No.
13 Q. Who at OMI would recall whether or not that was
14    the case?
15 A. I don't recall the boat being told to tie to
16    the dock because of surveys.
17 Q. Okay.  That wasn't my question.  I want to --
18 A. Rephrase it --
19 Q. I want to be --
20 A. -- or ask again.
21 Q. -- precise.  My question was, do you recall
22    whether, for the third year, there were
23    recommendations that had to be complied with
24    before the vessel went out fishing?

102

1  A. No.  I don't recall that.
2  Q. Do you recall whether there were
3     recommendations that had to be complied with as
4     a condition to coverage for Policy Year 3?
5  A. Within a certain time frame, probably.
6  Q. I'm not sure I understand your answer.
7  A. Well, certain recommendations, we give time
8     allotments at.  Some are longer than others.
9  Q. Okay.  I think -- I think we understand each
10    other, but I want to make certain the record's
11    clear.  You're not saying that, for the third
12    policy year, anybody was instructing Mr. Russo
13    to tie his boat up at port risk until the
14    recommendations were done?
15 A. Yeah.  I'm not saying that.  Correct.
16 Q. All right.  But you're saying there may well
17    have been recommendations -- surveyor's
18    recommendations which Mr. Russo had to take
19    care of.  And the normal practice was to give a
20    certain amount of -- period of time for the
21    recommendations to be taken care of.  But the
22    boat could be fishing during that period?
23 A. Yes.
24 Q. And it's your recollection that was the case

103

1     with Mary & Josephine for Policy Year 3?
2  A. I really don't recollect the survey on Policy
3     Year 3.
4  Q. Okay.
5  A. There was nothing problematic.  So there was no
6     reason for me to really be involved with it.
7  Q. All right.  At what point would you become
8     involved?  You say "problematic."  At what
9     point would you become involved with a boat and
10    recommendations?
11 A. If there was a recommendation severe enough to
12    warrant Sunderland saying the boat can't go
13    fishing, then I would probably get involved.
14 Q. Okay.  So if an annual survey took place and --
15    and it said, you've got to put a fire
16    extinguisher in the pi- -- pilot house or
17    something like that, that isn't something that
18    would cause you to become involved.  You would
19    just wait until you got something back from the
20    insured indicating that this had been taken
21    care of?
22 A. Correct.
23 Q. Do you recall whether or not Mr. Russo
24    indicated to you that he had planned to take

Robert McVey                                    North American Specialty Insurance Company
September 13, 2005                               vs. Mary & Josephine Corp., et al.

Case 1:04-cv-10374-WGY     Document 27-4     Filed 02/08/2006     Page 12 of 32

---

**104**

1    care of recommendations on the Mary & Josephine
2    during the period that the vessel was on port
3    risk prior to taking the boat out fishing for
4    Policy Year 3?
5  A. I don't.
6  Q. I asked if you recall. Are you saying you --
7    you just don't have a memory one way or the
8    other? Or that definitely didn't happen?
9  A. I don't think it happened.
10 Q. You don't think it happened?
11 A. It -- it -- not to my recollection, it didn't
12   happen.
13 Q. Okay. I think we're at the same point. Did
14   you ever tell Mr. Russo that there was no crew
15   P&I cover while his vessel -- or the vessel he
16   was captain of was on port risk?
17 A. I discussed it with him when he called me in
18   the beginning of October. So I probably would
19   have said, we'll try to take care of it.
20 Q. I'm not certain that was responsive to my
21   question. Did you ever tell Mr. Russo that
22   while his boat -- the boat that he was captain
23   of was on port risk, there was no crew P&I
24   coverage --

---

**105**

1  A. Yes. I did.
2  Q. -- for the policy? You have a memory of doing
3    that?
4  A. Yeah.
5  Q. Okay. When did you tell him that, sir?
6  A. Probably when he called me in October.
7  Q. You say "probably."
8  A. Yeah.
9  Q. Do you have a memory of telling him in October?
10 A. Vaguely.
11 Q. Of what year?
12 A. 2003.
13 Q. Did you ever tell him at any time that there
14   was no crew coverage available if the vessel
15   was on port risk at any time before October of
16   2003?
17 A. I don't recall.
18 Q. But you do have a memory of telling him that in
19   October of 2003?
20 A. We discussed it, I believe, when he called me
21   in October. Yes.
22 Q. Could you tell us about that conversation,
23   please, sir?
24 A. I had a call from Matt Russo, telling me that

---

**106**

1    the boat hadn't fished. Again, I think it's
2    since May of 2003. It was not fishing
3    presently, and it probably wasn't going to fish
4    till several months into the year. And he did
5    not want any P&I, no crew at all.
6  Q. Okay. And what did you respond?
7  A. I responded, we'll take care of it.
8  Q. Did you tell him, well, don't worry; there's no
9    P&I just as soon as you put it on port risk
10     MR. LANGER: Objection to the form of the
11   question.
12 Q. By virtue of putting it on port risk, there's
13   no crew P&I coverage?
14 A. He asked me for zero P&I coverage.
15 Q. Right. And my question was, did you tell him,
16   well, don't worry, it's automatic; if you put
17   the boat on port risk coverage, there is no
18   crew P&I cover?
19 A. I never use the word "automatic" in dealing
20   with insurance issues.
21 Q. Well, isn't it your testimony that you
22   understand that if the vessel is on -- if a
23   vessel is on port risk coverage, there is no
24   crew P&I cover?

---

**107**

1  A. That's correct.
2  Q. And that's automatic. Right?
3  A. Yeah.
4  Q. That's just by virtue of having a boat go on
5    port risk. There's vessel P&I coverage, but
6    the crew P&I coverage is cancelled?
7  A. Is nonexistent.
8  Q. Is nonexistent. That's your understanding?
9  A. Yes.
10 Q. And that's your understanding based upon your
11   16 years of experience in the industry?
12 A. Yes.
13 Q. And someone at OMI told you that. You don't
14   remember who?
15     MR. LANGER: Objection. It's been asked
16   and answered. He's been through this twice
17   now. Do we need to go through it again?
18     MR. PETTINGELL: Yeah.
19     MR. LANGER: Well, I'm going to instruct
20   him --
21     MR. PETTINGELL: Well, we're not --
22     MR. LANGER: -- not to answer that for --
23   you're -- you're just asking him the same
24   questions again and again.

Robert McVey
September 13, 2005

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

108
```
 1         MR. PETTINGELL:  You know, you're -- you're
 2    breaking my train of thought.
 3         MR. LANGER:  Well, I don't mean to do that.
 4    But you've --
 5         MR. PETTINGELL:  But --
 6         MR. LANGER:  -- been through this --
 7         MR. PETTINGELL:  But --
 8         MR. LANGER:  -- twice.
 9         MR. PETTINGELL:  Let me finish it, and
10    we'll move on.
11         MR. LANGER:  Good.
12         MR. PETTINGELL:  Can we have my question
13    read back, please.
14         MR. ABROMOVITZ:  I'll also state -- let me
15    just state on the record that, in this
16    jurisdiction, you cannot instruct the witness
17    not to answer a question.  You can suspend the
18    deposition.  You can get a court order and a
19    protective order.  You cannot tell him not to
20    answer a question.
21         MR. LANGER:  Okay.  Then we'll do that.
22         MR. PETTINGELL:  It's not necessary.
23    Just --
24         MR. LANGER:  Keep going.
```

109
```
 1         MR. PETTINGELL:  -- let's get this -- let's
 2    get by this and move on.
 3         (Question read back.)
 4    Q.  Is that correct?
 5    A.  That's correct.
 6    Q.  All right.  And my question is, did you, sir,
 7        ever tell Mr. Russo that that's what happened
 8        if the vessel went on port risk coverage, that
 9        the --
10    A.  Yes.
11    Q.  -- would be -- you did tell him that?
12    A.  (Witness indicates).
13    Q.  When did you tell him that?
14    A.  I don't remember exactly when I told him.
15    Q.  Well, do you remember what year?
16    A.  He was on and off port risk so much that it's
17        hard to recollect exactly when I told him, but
18        we discussed it.
19    Q.  Now, the Mary & Josephine was covered three
20        policy years.  Right?
21    A.  Not quite three.  I don't think it made it
22        through the third one.
23    Q.  Well, there was three policy years
24        contemplated?
```

110
```
 1    A.  Yes.
 2    Q.  And the vessel was on port risk in the first
 3        policy year?
 4    A.  Yes.
 5    Q.  And coverage was placed through Sunderland?
 6    A.  Yes.
 7    Q.  Coverage was not placed by Sunderland with
 8        North American Specialty Insurance Company in
 9        that first policy year.  It was placed with a
10        different company, wasn't it?
11    A.  I believe so.
12    Q.  Fairfield?
13    A.  I believe, Fairfield.
14    Q.  All right.  And then, in the second policy
15        year, coverage was placed by Sunderland with
16        North American Specialty?
17    A.  Correct.
18    Q.  And the vessel went on port risk?
19    A.  Correct.
20    Q.  And there was a third policy issued, wasn't
21        there?
22    A.  Yes.
23    Q.  And coverage was placed by Sunderland with
24        North American Specialty?
```

111
```
 1    A.  Yes.
 2    Q.  And that's the policy where the vessel went on
 3        port risk and was on port risk at the time of
 4        Mr. Russo's injury?
 5    A.  Yes.
 6    Q.  In each of those years -- now, you've told us
 7        that, in October, I think you said, or sometime
 8        prior to the renewal of coverage -- perhaps, it
 9        would have been earlier than October because
10        coverage was renewed for Policy Year 3
11        beginning in August of 2003, wasn't it?
12    A.  Correct.
13    Q.  And I apologize if I asked you this.  Do you
14        remember when Mr. Russo and you had a
15        conversation where he indicated he wanted the
16        vessel to go on port risk?
17         MR. LANGER:  Objection.  It's been asked
18    and answered.
19         MR. PETTINGELL:  I'm just trying to --
20    A.  I'm not positive.  It could have been in Oc- --
21        October when he called me.
22    Q.  Okay.  Now, you've testified that you -- you
23        have a memory of a conversation with Mr. Russo
24        where you told him that if the vessel was on
```

Robert Veves
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-4    Filed 02/08/2008    Page 14 of 32

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

112

1      port risk, there was not going to be any crew
2      P&I coverage.  Did you have that conversation
3      prior to the vessel going on port risk in 2003?
4    A.  Yes.
5    Q.  Was it in -- was it during the year of 2003?
6    A.  I'm not sure.
7    Q.  Did you have that conversa-- -- did you have
8      such a conversation with Mr. Russo for Policy
9      Year 2?
10   A.  Possibly.
11   Q.  You don't remember?
12   A.  I don't.
13   Q.  How about Policy Year 1?
14   A.  Yeah.  I remember Policy Year 1.
15   Q.  What do you remember about Policy Year 1?
16   A.  I remember that he was put on port risk to make
17      repairs on his vessel.
18   Q.  Well, I'm restricting my question to that
19      conversation that you say you had with
20      Mr. Russo where you told him that if the boat
21      was on port risk, there would be no crew P&I
22      coverage.  Did you have that -- such a
23      conversation with Mr. Russo for Policy Year 1?
24   A.  Again, I'm not positive.  I'm not sure.

113

1    Q.  All right.  So you're not sure for 1, Policy
2      Year 1; and you're not sure for Policy Year 2?
3    A.  No.
4    Q.  And you are -- you do have such a recollection
5      with regards to Policy Year 3?
6    A.  Yes.
7    Q.  And you can't tell us when in 2003 that took
8      place?
9    A.  Like I said, I believe it took place in our
10      phone conversation in October.
11   Q.  Okay.  Can you tell us how the conversation
12      went?
13   A.  I took a call from Matt Russo.  And, again, he
14      said that the boat hadn't fished in several
15      months, was not fishing at that time, and had
16      no intention of fishing till several months
17      into the year.  And he would call me when the
18      boat went back actively fishing.  And he did
19      not want any crew P&I on the vessel so he could
20      save money --
21   Q.  Uh-huh.
22   A.  -- specifically said zero crew.
23   Q.  Right.  And at that point, you said to him,
24      don't worry.  If it goes on port -- words to

114

1      the effect -- and -- and you don't have to
2      accept my -- my words -- but words to the
3      effect that, don't worry; if the boat goes on
4      port risk, there is no crew P&I coverage?
5           MR. LANGER:  Objection.  It's been asked
6      and answered --
7           MR. PETTINGELL:  Well, it --
8           MR. LANGER:  -- as to what --
9           MR. PETTINGELL:  -- hasn't been --
10          MR. LANGER:  -- he said.
11          MR. PETTINGELL:  -- answered.
12          MR. LANGER:  Yes.  It has.
13   A.  No.  I wouldn't say that.
14   Q.  But you do have a recollection -- at least, as
15      I understand your testimony -- of telling that
16      to Mr. Russo?
17   A.  I believe there's a good chance we had
18      discussed that because of the -- the nature of
19      the vessel to --
20   Q.  Well --
21   A.  But I don't remember specifically when.
22   Q.  -- a good chance is different than you having
23      an explicit recollection of doing something,
24      sir.  And I'm trying to establish whether you

115

1      have a memory of saying that to Mr. Russo or
2      whether you think you did.
3    A.  I said it to Mr. Russo, but I don't remember
4      when.
5    Q.  What was Mr. Russo's response?
6    A.  As to what?
7    Q.  To your telling him that if the boat was on
8      port risk, there would not be any coverage for
9      crew.
10   A.  As long as it wasn't costing him money for crew
11      P&I, I think he was happy with that.
12   Q.  Do you recall Mr. Russo, at any time during any
13      of the three policy years, indicating that he
14      did want to have crew coverage while the vessel
15      was on port risk?
16   A.  No.
17   Q.  It's your recollection that, for each of the
18      three policy years, he did not want any crew
19      coverage whatsoever?
20   A.  Specifically on port risk?
21   Q.  Yes.
22   A.  I don't remember him ever wanting crew
23      coverage.
24   Q.  Okay.  Not for Policy Year 1?

Robert McVey
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-4    Filed 02/08/2008    Page 15 of 32

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

116

1   A.  No.
2   Q.  Not for Policy Year 2?
3   A.  No.
4   Q.  And you have an express memory not for Policy
5       Year 3?
6   A.  Correct.
7   Q.  Okay.
8           MR. PETTINGELL:  I'm getting close to the
9       end, I think.  Off the record for a second.
10          (A brief discussion was held off the
11          record.)
12          (Brief recess taken.)
13      BY MR. PETTINGELL:
14          MR. PETTINGELL:  All right.  I only have, I
15      think, one more area I want to go into.  And
16      there's a document that I seem to have, in my
17      inimitable style, mislaid.  So why don't I pass
18      the witness to Mr. Abromovitz, and I'll come --
19      with the understanding I can come back and --
20      oh, I found it.  Too -- too late.
21  Q.  Now, coming back to the fact that there were
22      three different policies issued in three
23      different policy years, the first one, I think
24      we have already established, was issued by

117

1       Fairfield.
2   A.  Correct.
3   Q.  And the next two were North American Specialty.
4       Each of those policies had different policy
5       numbers, didn't they, renewal policies?
6   A.  I'm not sure of that.  I'm not aware of that.
7   Q.  Well, I show you a letter dated September 17th,
8       2002 from Lynanne Houde -- and -- and we don't
9       need to mark that -- and ask you whether that
10      makes reference to a renewal policy by policy
11      number.
12          MR. LANGER:  Well, the document speaks for
13      itself.
14          MR. PETTINGELL:  Well, I understand.  But
15      I'm focusing the witness in on something that
16      he said he didn't recall.
17          MR. LANGER:  Read the first paragraph to
18      yourself.  For the record, Mr. Pettingell's
19      referring to a letter dated September 17th,
20      2002 from Lynanne Houde to Matteo Russo.
21  A.  Okay.
22  Q.  And does that refer to a policy number?
23  A.  Yes.
24  Q.  And that policy number would be what?

118

1   A.  I have no idea.
2   Q.  Well, it's because you don't have the document
3       in front of you.
4   A.  You want me to read the policy number?
5   Q.  Yes.
6   A.  Okay.  It would read DMM0000003-00.
7   Q.  And would that refer to the Policy No. 2 that
8       we've been referring as Policy Year 2, which
9       would be from August 13th of 2002 to
10      August 13th, 2004 --
11          MR. LANGER:  Well, the document speaks --
12  Q.  -- '3?
13          MR. LANGER:  -- for itself.
14          MR. PETTINGELL:  I understand.
15  A.  I believe so.
16  Q.  Okay.  And I think you've already indicated
17      that, during that Policy Year No. 2, Mr.
18      Russo's vessel went on port risk?
19  A.  Correct.
20          MR. PETTINGELL:  Time out.
21          (A brief discussion was held off the
22          record.)
23  Q.  Okay.  Let me show you a document and ask if
24      you can look at it.

119

1           MR. PETTINGELL:  Would you make some copies
2       of that?  Then we'll make copies of this after.
3       Off the record.
4           (A brief discussion was held off the
5           record.)
6           (American Institute Port Risk Endorsement
7           dated 1/18/70 marked as McVey Exhibit
8           No. 5.)
9           (Endorsement dated 12/9/02 marked as McVey
10          Exhibit No. 6.)
11  Q.  Now, looking at what we've just marked as
12      Exhibit 6, do you have that document before
13      you?
14  A.  Yes.
15  Q.  Have you had a chance to read it?
16  A.  No.  I'm reading it now.
17          (Pause.)
18  Q.  Let me know, please, when you're finished
19      looking at it.
20  A.  Finished.
21  Q.  All right.  Can you tell us what that document
22      is marked as Exhibit 6?
23  A.  It looks like an endorsement.
24  Q.  What's an endorsement?

Robert McVey
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-4    North American Specialty Insurance Company
                                           Filed 02/08/2006    Page 16 of 32
                                           vs. Mary & Josephine Corp., et al.

120

1  A.  An endorsement is something added to an
2      existing policy.
3  Q.  Would it be fair to say it's a document that's
4      issued reflecting a policy change of some
5      sort --
6  A.  Yes.
7  Q.  -- change in coverage?
8  A.  Yes.
9  Q.  To your knowledge, do they always issue when
10     there's a --
11         MR. LANGER:  Objection.
12 Q.  -- change in coverage?
13         MR. LANGER:  It's been asked and answered.
14     This was covered in some detail in January.
15 A.  I don't know that they're always issued.
16 Q.  Okay.  And looking at the lower right-hand
17     corner, there's reference to a policy number.
18     Do you see that?
19 A.  I do.
20 Q.  And would you agree with me, sir, that that
21     policy number that is referenced there is the
22     policy number that is for Policy Year No. 2?
23 A.  Yeah.  The same.
24 Q.  Okay.  What changes does this endorsement

121

1      reflect?
2          MR. LANGER:  Objection.  The document
3      speaks for itself.
4  A.  It says "amended from Operational to Port
5      Risk."
6  Q.  Okay.  And does it reference a particular port
7      risk endorsement?
8  A.  Yes.
9  Q.  American Institute Port Risk Endorsement dated
10     January 18, 1970?
11 A.  Yes.
12 Q.  Is that a policy form that you're familiar
13     with?
14 A.  Somewhat familiar with it.
15 Q.  Well, you've seen it before?
16 A.  Yes.
17 Q.  Looking at the document we've marked as
18     Exhibit 5, take a moment to look at that.
19     (Pause.)
20 A.  I've read it.
21 Q.  Okay.  Is Exhibit 5 the American Institute Port
22     Risk Endorsement dated January 18, 1970 that
23     you're somewhat familiar with?
24 A.  Somewhat.

122

1  Q.  And would you agree, sir, that Exhibit 5 is the
2      American Institute Port Risk Endorsement
3      referred to in Exhibit 6?
4          MR. LANGER:  If you know.
5  A.  It's referred to.  Yes.
6  Q.  All right.  So what's stated on Exhibit 6,
7      "Adding:  American Institute Port Risk
8      Endorsement" January 18, 1970, what that's
9      referring to is what has been marked as
10     Exhibit 5?
11 A.  Correct.
12 Q.  All right.  Thank you.  Now, coming back to
13     Exhibit 6, there's also a change with respect
14     to the crew complement, isn't there?
15 A.  Yes.
16 Q.  It says, "The Crew Complement is amended to
17     'Crew of 1 excluding Owners.'"
18 A.  Correct.
19 Q.  Now, that language doesn't appear every time a
20     vessel is put on port risk, does it?
21 A.  No.
22 Q.  That's something that was done just with regard
23     to Policy No. 2?
24 A.  That's correct.

123

1  Q.  It says, "The Navigation Limit is amended to:
2      'Port Risk Only.  Warranted No Fishing.'"  Do
3      you --
4  A.  Yes.
5  Q.  -- see that?  Is that something that does
6      appear routinely on -- on endorsements when a
7      vessel goes on port risk?
8  A.  Yes.
9  Q.  All right.  And reading down a little further,
10     "Endorsement Section I & II, ALL OTHER TERMS
11     AND CONDITIONS REMAIN UNCHANGED."  Do you see
12     that language?
13 A.  Yes.
14 Q.  Do you know what that means?
15 A.  Yes.
16 Q.  What does it mean?
17 A.  Just what it says it means.
18 Q.  Well, can you explain to us?
19         MR. LANGER:  What is his understanding?
20     I'm -- I'm --
21         MR. PETTINGELL:  Well, he said he's
22     somewhat familiar with port risk.  He said
23     he's -- he said port risk doesn't provide a
24     crew P&I cover.  I think I'm entitled to

Robert McVey
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-4    Norfolk Dedham Specialty Insurance Company
Filed 02/08/2008    Page 17 of 32
vs. Mary & Josephine Corp., et al.

124

1    inquire as to his knowledge in this.
2         MR. LANGER: I'm -- I'm concerned. It --
3    it goes back to that this deposition is limited
4    to five -- six questions. And when we decided
5    last January if you wanted to ask outside those
6    six questions to avoid coming back another
7    time, I would allow that; but it would not be
8    binding on NAS. And I want to make sure that
9    that's -- agreement is still in effect.
10   Because it's not within --
11        MR. PETTINGELL: I believe you have
12   designated Mr. Scola as the 30(b)(6) designate
13   to talk about --
14        MR. LANGER: Port risk.
15        MR. PETTINGELL: -- the scope of port risk
16   coverage.
17        MR. LANGER: I have.
18        MR. PETTINGELL: Yes.
19        MR. LANGER: Okay.
20        MR. PETTINGELL: And when I question
21   Mr. Scola, he will be binding on himself
22   individually and on NAS. Mr. McVey is not
23   binding on NAS with what he says. But he
24   certainly is going to bind himself. And he's

125

1    testified that, based upon his 16 years'
2    experience in the industry -- well, I don't
3    have to repeat that.
4         MR. LANGER: I understand what he's
5    testified to. I just --
6         MR. PETTINGELL: So --
7         MR. LANGER: -- want to make it --
8         MR. PETTINGELL: -- I asked --
9         MR. LANGER: -- clear that you're outside
10   the scope of any of the questions as far as
11   Mr. McVey is concerned.
12        MR. PETTINGELL: No. As far as NAS is
13   concerned.
14        MR. LANGER: Well, as far as NAS and how
15   they've designated Mr. McVey.
16        MR. PETTINGELL: Agreed.
17        MR. LANGER: Right.
18        MR. PETTINGELL: Joe, do you agree with
19   that?
20        MR. ABROMOVITZ: Sure.
21        MR. PETTINGELL: Okay.
22   Q. I think my question was to the phrase "ALL
23   OTHER TERMS AND CONDITIONS REMAIN UNCHANGED."
24   What's your understanding of what that means,

126

1    sir?
2    A. Whatever the conditions and terms were of the
3    port risk endorsement that -- that remain
4    unchanged.
5    Q. Of the port risk endorsement, sir? Or Policy
6    No. DMM000003-00?
7    A. I'm not quite sure if it -- if it pertains to
8    that or the policy that you mentioned or if
9    it's the port risk policy.
10   Q. Okay. Well, let me ask you to look at Exhibits
11   5 and 6. Do you have them?
12   A. Yes.
13   Q. Could you tell me where, in Exhibits 5 and 6,
14   the endorsements that pertain to the vessel
15   going on port risk, there's an indication
16   that -- if there is one -- that there is no
17   crew P&I cover as a result of the vessel going
18   on port risk?
19   A. And which document are we referring to?
20   Q. Well, you've got 5 and 6. Those are the two
21   endorsements that pertain to the vessel going
22   on port risk.
23   A. Document No. 6 refers to a "Crew Complement
24   amended to Vrew of 1 excluding Owners."

127

1    Q. Right. But we've already established that that
2    is not a -- that is not language that appears
3    in every instance. That was something specific
4    to what Mary & Josephine Corp. was requesting
5    for Policy Year 2.
6         (Pause.)
7    A. I'm assuming that's "ALL OTHER TERMS AND
8    CONDITION REMAINS UNCHANGED" are pertaining to
9    Paragraph 1 and 2 of the property risk
10   endorsement.
11   Q. Okay. Do you know that to be true, sir?
12        MR. LANGER: Objection. He's answered the
13   question.
14        MR. PETTINGELL: Well, he used the word
15   "assume." I just want to establish whether he
16   knows that to be true or whether he's just
17   making an assumption 'cause he doesn't know.
18        MR. LANGER: If you know, tell him.
19   A. Yeah.
20        MR. LANGER: If you don't know, say you
21   don't --
22   A. I would say yes.
23   Q. You do know that?
24   A. Yeah.

Robert McVey
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-4    Filed 02/08/2006    Page 18 of 32

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

128

1    Q.  That's what it refers to?
2    A.  Right.
3            MR. PETTINGELL:  Okay.  Thank you.  I'll
4        pass the witness.
5            MR. ABROMOVITZ:  Sure.
6                CROSS-EXAMINATION
7    BY MR. ABROMOVITZ:
8    Q.  Mr. McVey, as you know, my name is Joe
9        Abromovitz.  I represent Matthew Russo in this
10       matter.  I just have a few questions.  Let me
11       start with Exhibit No. 6.  Is it your testimony
12       that the port risk endorsement that changes the
13       crew complement to, quote, "Crew of 1 excluding
14       Owners," end quote, excluded coverage, P&I
15       coverage, to Matthew Russo in this case?
16   A.  If it was --
17           MR. LANGER:  At -- wait a minute.  At what
18       period of time?
19   Q.  At the time of the accident.  Well, let me --
20       let me ask -- strike -- strike the question.
21       Was a similar port risk endorsement issued
22       relative to Policy No. 3 for the year August
23       '03 to August '04?
24   A.  No.

129

1    Q.  Why not?
2    A.  Because Matt specifically asked for zero crew.
3    Q.  Was there a written port risk endorsement at
4        all issued for Policy Year No. 3, August '03 to
5        August '04?
6    A.  I'm not sure.
7    Q.  Who would know that?
8    A.  Lynn would probably know that.
9    Q.  Okay.  Is it your experience that any time a
10       vessel goes on port risk that there should be a
11       written document reflecting a port risk
12       endorsement that's issued by the underwriter?
13   A.  Yes.
14   Q.  And the underwriter in this case is NAS?
15   A.  Sunderland or NAS.  I deal with Sunderland, not
16       NAS.
17   Q.  Do you know who, with reference to Exhibit 6,
18       do you know who issued Exhibit 6?
19   A.  I'm pretty sure Sunderland would.
20   Q.  Why would the endorsement such as Exhibit
21       No. 6 come from Sunderland and not North
22       American Specialties when North American
23       Specialties appears on the bottom of Exhibit 6?
24   A.  I'm really not too familiar with their

130

1        relationship as far as how they do business.
2        I -- I deal with Sunderland.  I don't deal with
3        NAS.
4    Q.  In this particular case, with reference to
5        Policy Year No. 2 and Exhibit No. 6, is this a
6        document that is actually generated not by your
7        company, but by either Sunderland or North
8        American Specialties?
9    A.  This document would be generated by one of
10       them.
11   Q.  Okay.  On the request from somebody --
12   A.  From us.
13   Q.  -- in your office?
14   A.  Yes.  From -- from OMI.
15   Q.  Okay.  Have you seen a port risk endorsement
16       for Policy Year No. 3 -- this is the period of
17       August '03 to August '04 -- relative to the
18       Mary & Josephine?
19   A.  I have not.
20   Q.  So you don't know whether one actually exists
21       or not.  Correct?
22   A.  Correct.
23   Q.  Let me go back to some of your earlier
24       testimony today.  I believe you testified that

131

1        there's -- there's a concept in the marine
2        insurance called vessel P&I and then a separate
3        concept called crew P&I; is that correct?
4    A.  That's correct.
5    Q.  How do you define vessel P&I?
6    A.  I would, pretty much, define that as a -- a
7        liability policy, third-party liability policy.
8    Q.  Okay.  Meaning -- meaning --
9    A.  Affecting --
10   Q.  -- what --
11   A.  -- the conc- --
12   Q.  -- in the conte- --
13   A.  Affecting anything but the vessel itself,
14       something outside the vessel.
15   Q.  All right.  So let -- let's assume that, in the
16       Policy Year -- strike that.  And it's your
17       further testimony that, at the time of Matt
18       Russo's accident, the Mary & Josephine -- the
19       fishing vessel Mary & Josephine did not have
20       crew P&I, but had vessel P&I.  Correct?
21   A.  Correct.
22   Q.  All right.  And that means that if a crew
23       member was injured aboard the vessel, there
24       would be no coverage?

Robert McVey
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-4    Filed 02/08/2008    Page 19 of 32

Northeast Offshore Specie Insurance Company
vs. Mary & Josephine Corp., et al.

132

1  A. Correct.
2  Q. But let's say I went and visited Matt Russo,
3     who was working on the boat during the period
4     of time that that vessel P&I was in effect, and
5     I got hurt due to some defective condition on
6     the vessel and I'm not a member of the crew,
7     would I be covered?
8        MR. LANGER: Objection. Calls for a legal
9     conclusion.
10       MR. ABROMOVITZ: Well, I'm asking his
11    understanding.
12 A. I would say, probably.
13 Q. Okay. And let's assume that the -- during the
14    same period of time -- this is when the vessel
15    is covered under vessel P&I and not crew P&I
16    when the vessel's tied up at the dock -- let's
17    assume that, through something done by
18    Mr. Russo as captain of the boat, the dock is
19    actually damaged. Would the vessel be covered
20    for damage to the dock, your understanding?
21       MR. LANGER: The same objection. It calls
22    for a legal conclusion.
23 A. I believe it would.
24 Q. Okay. Have you seen anything in any of the

133

1     policies that were issued through your company
2     that were in effect -- this is a policy or
3     endorsement -- that were in effect for the
4     period of August '03 to August '04 that defines
5     vessel P&I coverage in the manner in which
6     you've defined it?
7  A. I haven't seen anything that I recollect. No.
8  Q. Have you seen anything in the policies -- and,
9     again, I'm referring to Policy -- for policy
10    year '03, August '03 to August '04 -- have you
11    seen anything in the policy that says there was
12    no crew coverage for P&I during that policy
13    year?
14 A. We have a document here from Sunderland that
15    says that there was no crew P&I.
16 Q. What document are you referring to, sir?
17 A. I think it was a letter that he sent to me.
18 Q. Are you referring to Exhibit No. 3?
19 A. Yes.
20 Q. Okay. How about in the insurance policy
21    itself, have you seen anything in the insurance
22    policy or any endorsement issued by or on
23    behalf of NAS that says there was no crew
24    coverage for P&I while this vessel was at the

134

1     dock in December of '03 when Matt Russo was
2     injured?
3  A. I haven't seen it.
4  Q. Let's go to Exhibit No. 6, which is the
5     preceding policy year, the policy year of
6     August '02 to August of '03. What is your
7     understanding as what is meant by -- with
8     reference to a port risk endorsement of "Crew
9     of 1 excluding Owner"?
10 A. Sometimes, in a situation where we know there's
11    going to be somebody on the vessel,
12    particularly if a crewman's on there as a
13    watchman or he's doing work, we suggest that
14    they keep one guy covered.
15 Q. Were you aware that at the time of Matt Russo's
16    accident in December 2003 that what Mr. Russo
17    was doing was carrying out one of the repairs
18    that was recommended by the surveyor of the
19    vessel?
20 A. I was not aware of that.
21 Q. Did your office arrange for the survey on the
22    vessel for that particular policy year?
23 A. Possibly.
24 Q. Would that be something that, given your

135

1     relationship with Sunderland or NAS, if a
2     survey was requested by the underwriter that
3     your office would arrange?
4  A. It -- it could be done automatically.
5  Q. Okay. Would -- you're familiar with Marine
6     Safety Consultants, are you not?
7  A. Yes.
8  Q. Are you aware that they had done a survey on
9     this particular vessel?
10 A. At what time?
11 Q. In connection with the repairs that were being
12    carried out to the outriggers at the time of
13    Matt Russo's accident.
14 A. Was I aware at what point?
15 Q. Sure. Let me ask the question this way.
16 A. Please.
17 Q. Matt Russo was injured during the course of
18    performing some work in connection with
19    installing new outriggers while the vessel was
20    at the dock in Gloucester. Correct?
21 A. I believe so. I'm not exactly sure what he was
22    doing. But --
23 Q. Well, take a look at your Exhibit No. 2, which
24    is your e-mail to Janet at Sunderland dated 05



Robert McVey                                                    North American Specialty Insurance Company
September 13, 2005                                              vs. Mary & Josephine Corp., et al.

Case 1:04-cv-10374-WGY    Document 27-4    Filed 02/08/2006    Page 20 of 32

136

1   December of 2003. And take a look at the last
2   paragraph of that -- of that letter. And I'll
3   quote into the record. "A brief synopsis of
4   the accident: They were installing new
5   outriggers at the dock and Matt was atop
6   outrigger measuring the stays when the cleat
7   holding the outrigger let go and crashed down
8   with Matt on top of it."
9       Did I read that correctly?
10  A.  Yes.
11  Q.  Do you know why it was that Matt Russo was
12      installing new outriggers at the time of his
13      accident?
14  A.  No.
15  Q.  Where did you get the information that that's
16      the work that Matt was performing at the time
17      he was hurt?
18  A.  From Matt himself.
19  Q.  And this is during your telephone conversation
20      with him when he was in the hospital?
21  A.  Yes.
22  Q.  Was there anything of which you're aware in the
23      Sunderland policy that prevented the captain of
24      the boat from carrying out some of the repairs

137

1       recommended by the surveyor when performing the
2       survey at a request of an underwriter such as
3       NAS?
4   A.  Repeat that again, please, Joe.
5   Q.  Sure. I'm going to ask you to assume that at
6       the time Matt Russo got hurt that the out- --
7       new outriggers were being installed on the
8       recommendation of the surveyor, Marine Safety
9       Consultants.
10      Assuming that to be so, was there anything
11      under the Sunderland pol- -- strike that --
12      anything under the NAS policy that was in
13      existence at the time of Matt Russo's accident
14      from August '03 to August '04 that said, if
15      Matt Russo gets hurt while performing this
16      work, there is no coverage?
17      MR. LANGER: Objection. Calls for a legal
18      conclusion.
19  Q.  Your understanding of the policy.
20  A.  My understanding of the pol- -- he would not be
21      covered if he --
22  Q.  Why not?
23  A.  -- got hurt. Because he specifically asked me
24      to drop all crew -- crew P&I from his policy on

138

1       the Mary & Josephine to save money.
2   Q.  Can you show me anything in the policy itself
3       or any endorsements issued in connection with
4       the policy that support your position?
5   A.  No.
6   Q.  Now, assuming there is nothing in writing to
7       support your position that there was no crew
8       coverage for Matt Russo, was there anything in
9       the policy or any of the endorsements to the
10      policy that prevented a crew member aboard the
11      vessel, such as Matt Russo, from carrying out
12      the recommendations made by the surveyor?
13      MR. LANGER: You mean, regardless of
14      whether there was coverage or not?
15  Q.  Let's start with regardless of whether there
16      was coverage or not.
17  A.  It -- it's his vessel. He could do whatever he
18      wants.
19  Q.  Okay. And assuming there was nothing in the
20      policy that says Matt Russo was not covered at
21      the time he was hurt, is there anything else in
22      the policy that says, if Matt Russo was injured
23      during the work -- doing the work recommended
24      by the surveyor, he would not be covered?

139

1   A.  Not that I'm aware of.
2   Q.  Is it fair to say that, in your dealings with
3       the Mary & Josephine Corporation insofar as
4       insurance coverage being placed for the vessel
5       Mary & Josephine, you dealt primarily with Matt
6       Russo?
7   A.  Correct.
8   Q.  Did you deal with Sal Russo at all?
9   A.  No.
10  Q.  Have you ever had a conversation with Sal
11      Russo?
12  A.  No.
13  Q.  How about Matt Russo's brother Gerry, have you
14      ever -- ever had any conversations with Gerry
15      concerning placement of insurance coverage
16      aboard the -- or for the fishing vessel Mary &
17      Josephine?
18  A.  No.
19  Q.  Is it fair to say that if Matt Russo needed to
20      contact somebody on behalf of the underwriter,
21      he would contact someone in your office, OMI?
22  A.  Yes.
23  Q.  And you would be the principal contact for Matt
24      Russo?

Robert McVey
September 13, 2005
Case 1:04-cv-10374-WGY    Document 27-4    Filed 02/06/2006    Page 21 of 32
Northern Assurance Insurance Company
vs. Mary & Josephine Corp., et al.

140

```
1   A. Yes.
2   Q. And that's the nature of the relationship that
3      you fellows had during the couple of years that
4      you did business together?
5   A. Correct.
6   Q. It's your testimony that Matt Russo requested
7      an endorsement, in your conversation in early
8      August '03, excluding all crew P&I for the
9      fishing vessel Mary & Josephine.  Correct?
10  A. He didn't use the word "endorsement."
11  Q. Well, let me ask the question this way.  It's
12     your testimony that during your conversation in
13     early October 2003 that Matt Russo requested
14     that because the vessel was on port risk that
15     there be no P&I coverage?
16  A. That's correct.
17  Q. Yet, two months later, as of the time of his
18     accident, no endorsement had issued from the
19     company to that effect; is that correct?
20  A. I believe so.
21  Q. Do you know why that is?
22  A. Well, I -- I do.  I can -- part of the reason
23     is, when -- it's called a lay-up credit; and we
24     usually wait till he tells us the boat's going
```

141

```
1      back fishing so we can prevent a lot of
2      paperwork from -- if he says, I'm not going or
3      I'm going.  So we usually wait till he says the
4      boat is off port risk.  Then we calculate the
5      time and the monies involved and return him
6      lay-up credits.
7   Q. How -- how much work is involved in issuing an
8      endorsement saying there is no crew coverage?
9   A. I don't issue them.  So I really don't know.
10  Q. Is that Lynn Houde's job?
11  A. Yes.
12  Q. And when a customer such as Matt Russo requests
13     the elimination of crew coverage, is it your
14     job then to communicate that information to
15     Lynn Houde, who then deals with the underwriter
16     in generating the paperwork?
17  A. That's correct.
18  Q. Now, in this particular case, is it your
19     testimony that you -- you communicated to Lynn
20     Houde the request of Matt Russo that crew
21     coverage be eliminated during the period the
22     vessel was on port risk in this third policy
23     year?
24  A. Yes.
```

142

```
1   Q. Was there anything in writing that you gave
2      her, either written or e-mail or anything to
3      that effect?
4   A. I believe it was done by phone call or in
5      person.
6   Q. Okay.  And so the answer to my question is,
7      there is no written memo or e-mail from Bob
8      McVey to Lynn Houde to the effect of, Matt
9      Russo wants you to take P&I coverage off the
10     vessel while it's on port risk.  Is that
11     statement correct?
12  A. That's correct.
13  Q. And it was Lynn's job then to communicate the
14     desire of the vessel owner to the underwriter
15     to effect the issuance of an endorsement.
16     Correct?
17  A. That's correct.
18  Q. And it wasn't done in this case either because
19     she hadn't gotten around to it, or she didn't
20     do her job properly.  Correct?
21         MR. LANGER:  Objection.
22  A. No.  I wouldn't --
23         MR. LANGER:  Mischaracterize it.
24  A. -- say that.
```

143

```
1          MR. LANGER:  It mischaracterizes the
2      testimony and assumes facts not in evidence.
3      And it's argumentative.
4   Q. Let me ask the question this way.  Have you
5      seen anything in writing, by way of a memo,
6      e-mail, anything, going from Ms. Houde to
7      either Sunderland or NAS wherein it was
8      communicated to the underwriter that the vessel
9      owner wanted to eliminate crew P&I during the
10     period of time that the vessel was on port
11     risk?
12  A. Yes.
13  Q. Where did you see it?
14  A. I thought we had one of these documents here
15     that was sent, this one dated October 3rd,
16     "Dear Tracy."
17         MR. LANGER:  It's Exhibit 4.
18  A. Exhibit 4.
19  Q. Okay.  Where in this document do you read a
20     communication from Lynn Houde to Tracy that
21     says the vessel owner wants no P&I coverage
22     while the vessel is on -- P&I crew coverage
23     while the vessel is on port risk?
24  A. It says, "Insured just called to let us know
```

Robert McVey
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-4    Filed 02/08/2006    Page 22 of 32

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

144

1    the vessel has not been fishing since May 1st,
2    2003. He forgot to call us earlier. The
3    account did renew on 8/13/03."
4 Q. So where does it say that Matt Russo is asking
5    that the company issue an endorsement for port
6    risk coverage different than was issued the
7    previous year, as reflected in Oc- -- in -- in
8    Exhibit No. 6?
9 A. It -- it doesn't. I think he followed up with
10   a phone call to Lynn.
11 Q. You're saying that Matt Russo called Lynn
12   sometime after October 3rd, 2003?
13 A. No. I think it was on October 3rd.
14 Q. So the same day that you spoke to Matt Russo
15   about what his desires were with coverage, you
16   believe that Matt Russo also spoke to Lynn
17   Houde?
18 A. Yes.
19 Q. Why do you say that?
20 A. Because I think I instructed Matt to call Lynn
21   to tell her direct. I might have been on the
22   road, driving in my vehicle. And I probably
23   told him, why don't you call Lynn and -- which
24   we do often because Lynn is the one that would

145

1    be taking care of that end of the policy.
2 Q. And did Lynn tell you that she, in fact, spoke
3    with Matt Russo on October 3rd, 2003?
4 A. Yes.
5 Q. And what did she tell you that he said to her?
6 A. He reiterated what he said to me, that he
7    didn't want any crew coverage.
8 Q. Have you seen any communications between Lynn
9    Houde and -- strike that. First of all, who is
10   Tracy, Tracy Tate at SM?
11 A. That's Sunderland.
12 Q. Okay. Other than this fax, Exhibit 4, dated
13   October 3rd, 2003, have you seen any
14   communications between Lynn Houde and
15   Sunderland Marine referencing the desire of
16   Matt Russo, on behalf of M & J Corporation, to
17   eliminate crew coverage for P&I while the
18   vessel was on port risk?
19 A. I haven't. But I very rarely do see -- see
20   correspondence between Lynn and Sunderland.
21 Q. So are you saying there may be additional
22   correspondence that's not been produced in
23   connection with this case?
24      MR. LANGER: Objection.

146

1 A. There could be.
2 Q. Do you know why any --
3 A. I don't see how -- why --
4 Q. -- additional --
5 A. No.
6 Q. -- correspondence has not been produced
7    that's --
8 A. I don't think --
9 Q. -- been requested?
10 A. I don't know --
11      MR. LANGER: Objection.
12 A. -- if there is correspondence. As I said, I
13   don't see it. So I don't know what's there.
14 Q. Okay. Let's go to your e-mail to Janet of
15   December 5th, 2003. Do you have that in front
16   of you, Mr. McVey?
17 A. Yes. I do.
18 Q. Okay. Prior to sending this e-mail, what, if
19   anything, did you review in connection with the
20   policy of insurance issued through your office
21   for the Mary & Josephine Corporation regarding
22   the fishing ves- -- fishing vessel Mary &
23   Josephine for the policy year Aug- -- August
24   '03 to August '04?

147

1 A. I believe I reviewed his application.
2 Q. Did you look at the policy itself?
3 A. I don't recollect if I did or not.
4 Q. Insofar as the filing system as maintained in
5    the offices of OMI in the time frame of
6    December '05, would there be a -- do you have a
7    separate folder per policy year per vessel? Or
8    how do you guys file?
9 A. We have a -- a file that contains all the
10   policy years, a single file.
11 Q. Okay. And when a vessel owner such as --
12   strike that. Are you saying there was a single
13   file for the M & J -- Mary & Josephine
14   Corporation for the fishing vessel Mary &
15   Josephine from the very beginning of the
16   placement of the coverage through the last
17   policy issued?
18 A. Yes.
19 Q. Okay. Did you look through that file prior to
20   sending the e-mail on December 5th, 2003,
21   Exhibit No. 2?
22 A. I -- I probably did.
23 Q. Okay. And is it fair to say you saw no written
24   endorsement in connection with that policy that

148
1    eliminated crew coverage for that policy year,
2    P&I crew coverage?
3  A. That's correct.
4  Q. Now, let's go to the third paragraph of your
5    letter. You testified that it was your opinion
6    when you wrote this e-mail that there was no
7    insurance to cover Matt Russo's accident?
8  A. Yeah.
9  Q. Then why did you go on to say, quote, "If all
10   goes well, hopefully, we can keep this claim
11   within reason given the nature of the
12   injuries," end quote?
13 A. Because what we were prepared to do, as an
14   agency and with Sunderland, was to help Matt
15   out financially regardless of whether he was
16   covered or not, which we do --
17 Q. Did you do that?
18 A. -- which we do often.
19 Q. Did you do that in this case?
20 A. Matt rebuffed our efforts.
21 Q. Did you ever pay any of Matt Russo's medical
22   bills?
23 A. Not that I'm aware of.
24 Q. In what way did Matt rebuff your efforts to

149
1    help him out, as you do in cases like this?
2  A. He went and hired an attorney.
3  Q. Oh. You've never done that, Mr. McVey? That's
4    withdrawn.
5  A. I didn't say it was a bad thing. I just said
6    he went and hired an attorney.
7        MR. PETTINGELL: Lawyers have to eat too,
8    you know. Off the record.
9  Q. Isn't it true, Mr. McVey, that you -- when you
10   wrote this e-mail to Sunderland on December 5th,
11   2003, it was your opinion that there was
12   coverage under the P&I policy for Matt Russo's
13   injuries? Isn't that a fact?
14 A. No. I'd say it was ambiguous.
15 Q. Did you indicate any of that ambiguity in the
16   body of your e-mail? And Exhib- --
17       MR. LANGER: Objection.
18 Q. -- we're referring to Exhibit No. 2.
19       MR. LANGER: The document speaks for
20   itself.
21 A. This is taken -- if it was taken in the context
22   of which this was sent to Janet, then it takes
23   on a different meaning as it is on paper.
24 Q. So tell me the context in which you sent this

150
1    e-mail to Janet.
2  A. Well, there was some ambiguity as to far as --
3    as far as if Matt was an owner. As she
4    mentions in here from correspondence with
5    Marine Safety, they was under the impression
6    that Matt was an owner. I went and looked up
7    his policy and -- and straightened out that
8    situation, said he was not a owner, that Sal
9    was a hundred-percent owner.
10 Q. Why was that significant?
11 A. Excuse me?
12 Q. Why was that significant, whether Matt was an
13   owner or not?
14 A. Because, if he was an owner, he probably
15   wouldn't have been covered under the policy.
16 Q. Was that typical in connection with insuring
17   fishing vessels out of the port of Gloucester
18   in that time frame?
19 A. I wouldn't specify Gloucester. It was
20   significant to most fishing vessels.
21 Q. Okay. Most fishing vessels that were insured
22   through your agency in the time frame of 2003
23   excluded P&I coverage for owners who were also
24   crew members?

151
1  A. Yes.
2  Q. Okay. And you learned that Matt Russo was not
3    an owner, but he was a crew member?
4  A. Correct.
5  Q. In what other way was -- give me the other
6    contexts in which -- strike the question.
7    Other than addressing the issue of whether Matt
8    Russo was or was not a part-owner of the
9    corporation called the Mary & Josephine
10   Corporation, what else were you attempting to
11   convey to Janet at Sunderland Marine by your
12   e-mail of December 5th, 2003?
13 A. I was just trying to clarify. When the boat
14   was operational, they were insured for three to
15   four men, including Matt, for the policy when
16   it was operational, and to also let them know
17   that he wasn't a -- he wasn't an owner. Excuse
18   me. I was just making clarifications on the
19   policy which she might have asked for earlier.
20 Q. Okay. Can we agree that during the period of
21   time that the policy did cover Matt Russo as
22   captain of the vessel that he was one of the
23   three or four men that was contemplated to
24   be -- to be within the scope of the P&I

Robert McVey
September 13, 2005

Case 1:04-cv-10374-WGY     Document 27-4     Filed 02/08/2005     Page 24 of 32

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

152

1    coverage?
2         MR. LANGER: Objection. Seeks a legal
3    conclusion.
4    Q. Your understanding of the policy as it was
5       issued.
6    A. Yes. He would be. Excuse me.
7    Q. As of the time frame of December 2003, in your
8       experience, Mr. McVey, was it unusual for a
9       captain or crew members of -- of the vessel to
10      be carrying out recommendations made by a
11      surveyor?
12         MR. LANGER: Objection to the form of the
13      question.
14   A. Repeat that again.
15   Q. Sure.
16   A. I don't -- I don't . . .
17   Q. Let's -- let me start the question this way.
18      Is it fair to say that, prior to the issuance
19      of this particular policy starting in August
20      2003 to August 2004, you were not aware of any
21      edict or order that came down from NAS that
22      said, we will not insure this vessel unless
23      certain survey recommendations are carried out?
24   A. I'm not aware of that.

153

1    Q. And as of December of 2003, is it fair to say
2       you had been in the marine insurance industry
3       for more than ten years?
4    A. Correct.
5    Q. And is it also fair to say that, during that
6       more than ten years of experience, you've had
7       many situations in which surveyors made
8       recommendations to insurers that the vessel
9       undergo certain repairs before the insurance
10      attaches?
11   A. That's correct.
12   Q. And is it also fair to say that during your
13      ten-plus years of experience as of that time
14      that you were aware that, many times, the
15      actual repairs that are recommended by the
16      surveyor are carried out by the crew of the
17      vessel?
18   A. That's correct.
19   Q. So there would be nothing unusual with Matt
20      Russo carrying out a surveyor recommendation as
21      of the time of his injury in December of 2003?
22   A. No.
23   Q. My statement's correct?
24   A. Yeah. It's correct.

154

1    Q. Have you been involved in other cases where
2       there was a crew member was
3       injured while a vessel was at port and
4       recommendations made by a surveyor were being
5       carried out?
6    A. Not that I'm aware.
7         MR. LANGER: Hold on. Do you mean that
8       while it was in operational coverage or port
9       risk coverage?
10   Q. Any coverage.
11   A. You have to repeat that again, please.
12   Q. Sure. Is Matt Russo the first crew member of a
13      vessel that was injured, in -- in your
14      experience as an insurance agent, when a vessel
15      was undergoing repairs while at -- at a dock?
16   A. I don't believe he was the first.
17   Q. Okay. Do you remember other cases where that
18      occurred?
19   A. I don't, specifically. But I know we've had
20      claims where people were working on the vessel
21      at the dock.
22   Q. Other cases where the underwriter was NAS?
23   A. That, I'm not sure of.
24   Q. Other cases where coverage was denied because

155

1    there was no crew P&I coverage while the vessel
2    was at port risk?
3    A. I'm not sure of that either.
4    Q. Would your office have files that would reflect
5       that?
6    A. Possibly.
7    Q. During the time frame of August '03 to August
8       '04, what other underwriters did your office
9       represent in connection with issuing P&I
10      policies for commercial fishing vessels?
11   A. At that time, I think it was Fireman's Fund and
12      Sunderland Marine. I think that was the only
13      two.
14   Q. Okay. And do you know, roughly, how many
15      vessels were insured through your office for
16      P&I coverage in that time frame?
17   A. I don't.
18   Q. Can you give me a range?
19         MR. LANGER: Don't guess. If you don't
20      know . . .
21   A. I don't know.
22   Q. More than a hundred?
23   A. More than a hundred.
24   Q. More than 200?

156

1  A. More than 200.
2  Q. Did your office write risks primarily for
3     vessels fishing in the north Atlantic?
4  A. Yes.
5  Q. And did it write risks for vessels
6     participating in not only the dragging trades,
7     but also scalloping and lobstering?
8  A. That's correct.
9  Q. What percentage of the vessels that were
10    underwritten at that time frame were
11    underwritten by NAS or Sunderland entities
12    rather than Fireman's Fund?
13 A. I really don't know.
14 Q. Was it 50/50?
15 A. I don't --
16    MR. LANGER:  Objection.
17 A. -- believe so.  It's probably -- could be --
18    MR. LANGER:  Don't guess.
19 A. I don't know.
20 Q. More Sunderland than Fireman's Fund?
21 A. More Fireman's Fund, I believe.
22 Q. In your experience, how did the Fireman's Fund
23    policies for P&I coverage differ from the NAS
24    or Sunderland policies?

157

1  A. I don't believe there's much difference.
2  Q. And when your office would underwrite a policy
3     of insurance in the time frame of August '03 to
4     August '04, did you have any written
5     instructions from either Fireman's Fund or
6     Sunderland as to what to write and when to
7     write?
8  A. Could you be a little more specific --
9  Q. Sure.
10 A. -- please?
11 Q. Sure.  To your knowledge, in -- in order to
12    underwrite insurance, let's say, for Fireman's
13    Fund, did you do that pursuant to some written
14    agreement with Fireman's Fund?
15 A. Yes.
16 Q. And were there some guidelines that Fireman's
17    Fund provided to your office in terms of when
18    to insure a vessel and when -- when to insure a
19    vessel and when not to insure a vessel?
20 A. There could be, but I'm not aware of anything
21    specific.
22 Q. How about the arrangement with Sunderland or
23    NAS, was that also pursuant to a written
24    agreement?

158

1  A. I have no idea.
2  Q. Who made those arrangements?
3  A. Sunderland and NAS.
4  Q. I'm sorry.  How about -- with referen- --
5     when -- in this particular case, did you
6     consider the underwriter to be NAS or
7     Sunderland?
8  A. Sunderland.
9  Q. And in connection with your office as doing
10    business with Sunderland, did you have some
11    sort of written agreement with them insofar as,
12    you know, when to write a risk and when not to
13    write a risk?
14 A. We have a contract, but not specifically
15    involving particular risks.
16 Q. Okay.  And the contract you have with
17    Sunderland is of a similar nature of the
18    contract that you have with Fireman's Fund?
19 A. Similar.
20 Q. Did you ever generate any document yourself or
21    cause to be generated any document that was
22    directed to the Mary & Josephine Corporation
23    that informed the Mary & Josephine Corporation
24    that when its vessel was on port risk, there

159

1     was no P&I crew coverage?
2  A. At any time?  Or --
3  Q. Before this accident, December 5th, 2003 -- or
4     December 3rd, 2003.
5  A. I believe so.
6  Q. Okay.  And is this a document that came from
7     you?
8  A. No.  It wouldn't have came from me personally.
9     No.
10 Q. Okay.  Let me -- let me start with the
11    question, and let me break it down a little
12    bit.  Did you ever cause any type of
13    communication in writing to be issued under --
14    under your name "Bob McVey" on behalf of -- of
15    OMI to anybody on behalf of the Mary &
16    Josephine Corporation prior to December 5th,
17    2003 to the effect that when a vessel was on
18    port risk, there was no crew P&I available?
19 A. I don't believe so.
20 Q. Did you ever direct anybody, prior to
21    December 3rd, 2003, to direct any such
22    communication to anybody on behalf of the Mary
23    & Josephine Corporation that said, in
24    substance, that when a vessel is on port risk,

Robert McVey
Case 1:04-cv-10374-WGY    Document 27-4    Filed 02/08/2006    Page 26 of 32
September 13, 2005
North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

160

1    there is no crew P&I coverage?
2  A.  Yes.
3  Q.  Okay.  Who did you direct to issue such a
4    communication?
5  A.  Probably, Ms. Houde.
6  Q.  And do you remember when that was?
7  A.  We've had so many changes with this particular
8    vessel that I'm really -- couldn't pinpoint it.
9  Q.  Have you ever seen any such document issued by
10    Ms. Houde to the owners of the Mary & Josephine
11    Corporation dated before December 2 --
12    December 3, 2003 to the effect that when your
13    vessel is on port risk, there is no crew P&I
14    coverage?
15  A.  I don't recollect that specifically.
16  Q.  All right.  If there was such a document, you'd
17    expected it to be in the -- you'd expect it to
18    be in the file for the Mary & Josephine
19    Corporation as regards the fishing vessel Mary
20    & Josephine.  Correct?
21  A.  I would expect that.  Yeah.
22  Q.  I believe, in response to one of
23    Mr. Pettingell's questions, you've indicated
24    that, in your conversation with Matt Russo in

161

1    early October 2003 when he told you that he did
2    not want any P&I coverage at all for his crew
3    while the vessel was at port risk that you told
4    him you would -- you would take care of it.
5    Was that -- was that your testimony?
6  A.  I believe so.  Yes.
7  Q.  Okay.  And how would you go about taking care
8    of it?
9  A.  I would reiterate his information to Lynn.
10  Q.  I thought you told me before that you told Matt
11    Russo to call Lynn himself?
12  A.  I did.  We both did.
13  Q.  Okay.  So you're saying you said to Lynn that
14    Matt Russo doesn't want any coverage for -- P&I
15    coverage for crew while the vessel's in port
16    and that Matt Russo, you understood, also
17    called Lynn and told her that himself?
18  A.  That's correct.
19  Q.  Other than your conversation with Matt Russo on
20    October 3rd, 2003 or thereabouts wherein you
21    claim that you communicated to you his desire to
22    remove all P&I crew coverage for the Mary &
23    Josephine while the vessel was on port risk,
24    did you have any other conversations with him

162

1    regarding the insurance for the vessel prior to
2    December 3rd, 2003?
3  A.  I don't believe so.
4  Q.  Do you know if Lynn Houde did?
5  A.  I'm not sure.
6  Q.  Has she ever told you that she did?
7  A.  No.
8  Q.  Did Bill Scola indicate to you whether he ever
9    discussed underwriting issues with Matt Russo
10    between October 3rd, 2003 and December 3rd,
11    2003?
12  A.  No.
13  Q.  Have you ever seen anything issued from
14    Mr. Scola to the M & J Corporation, Mary &
15    Josephine Corporation, prior to December 5th,
16    2003 to the effect that while the vessel is on
17    port risk coverage, there is no P&I crew
18    coverage for any of the crew members?
19  A.  Not that I can recollect.
20       MR. ABROMOVITZ:  Thank you.  That's all I
21    have.
22       MR. PETTINGELL:  I have a couple of
23    follow-up on things that you touched on.
24           REDIRECT EXAMINATION

163

1    BY MR. PETTINGELL:
2  Q.  I'm showing you a document, sir.  And I
3    would --
4       MR. LANGER:  Shall we mark it?
5  Q.  I would suggest to you that this is a copy of
6    the policy that was issued for Policy Year 3.
7       MR. LANGER:  Before you ask any more
8    questions, let's just mark it so that we'll
9    have a record of what it is he's talking about.
10       (Insurance policy effective 8/13/03 to
11       8/13/04 marked as McVey Exhibit No. 7.)
12  Q.  While you're looking at it, Policy Year 3 --
13    we -- you've already testified, would run from
14    August 13th of 2003 to August 13th of 2004.
15  A.  Yes.  Sorry.
16  Q.  So the document which has been marked as
17    Exhibit 7, would you agree that is a copy of
18    the policy that was issued for Policy Year 3?
19       MR. LANGER:  Look it over and make sure
20    it's a complete copy as you understand it, if
21    you know.
22  A.  Some of it's not very legible.  But . . .
23       MR. PETTINGELL:  While he's look- --
24    looking, for the record, the policy contains,

Robert McVey
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-4    Filed 02/08/2006    Page 27 of 32

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

164

1      at the top, Policy No. OMM000003-01.
2          MR. LANGER: I think that's a D, not a
3      zero.
4          MR. PETTINGELL: I think you're correct.
5      DMM.
6          (Pause.)
7  A.  It appears to be a -- a complete policy.
8  Q.  All right. Now, looking -- looking at the last
9      page on Exhibit 7, where the language appears,
10     "This endorsement changes the policy," do you
11     see that?
12 A.  Under "Changes"?
13 Q.  The last page of this.
14 A.  Yeah.
15 Q.  Now, the last page, would you agree, has got
16     "Policy Endorsement Number 3"?
17 A.  Yes.
18 Q.  All right. And that has a policy change
19     effective August 13th, 2003?
20 A.  Yes.
21 Q.  What does that mean?
22 A.  It means that it's covered for port risk only.
23 Q.  No, no, no. The fact that the change is
24     effective on August 13, 2003, what does that

165

1      mean?
2  A.  I don't understand what you mean, what does it
3      mean.
4  Q.  Well, let me try this. Policy changes
5      effective August 13, '03, do you see that
6      language?
7  A.  Yes.
8  Q.  Does that mean to you that whatever changes are
9      contained in the endorsement are effective as
10     of August 13, 2003?
11 A.  Yeah. Correct.
12 Q.  Okay. Now, coming down to the bottom, can you
13     see the date that the policy was issued --
14     the -- excuse me -- Endorsement 3 was issued?
15 A.  Yes.
16 Q.  When was it issued?
17 A.  What it says here is February 16th, '04.
18 Q.  All right. So we have -- and is this signed by
19     someone?
20 A.  It's signed by Frank Ostrow.
21 Q.  Who's Mr. Ostrow?
22 A.  He is the former president of OMI.
23 Q.  Okay. Did he hold that position or a position
24     in OMI on February 16, 2004?

166

1  A.  Yes.
2  Q.  And, to your knowledge, did he have signing
3      authority for purposes of signing endorsements,
4      policy endorsements?
5  A.  Yes.
6  Q.  And by virtue of his signature, he was an
7      authorized representative of whatever company
8      he was issuing the endorsement for?
9          MR. LANGER: Objection.
10 A.  Yes.
11         MR. LANGER: It asks for a legal
12     conclusion.
13 Q.  All right. That's your understanding though?
14 A.  It's my understanding. Yes.
15 Q.  All right. Now, prior to the issuance and
16     effective date -- prior to the effective date
17     of Endorsement No. 3, would you agree with me
18     that, as far as the policy language itself is
19     concerned, the vessel was not covered for port
20     risk?
21         Now, there's a distinction I'm making here.
22     I'm talking about the policy language as
23     opposed to the effect of the endorsement. I'm
24     saying, before the endorsement was issued, the

167

1      coverage would have been available -- that
2      would have been available to the vessel would
3      be what is contained in the policy, not
4      counting Endorsement 3.
5  A.  Yes.
6  Q.  Do you agree with that?
7          MR. LANGER: Objection. It asks for a
8      legal conclusion.
9  Q.  All right. And under the language of Policy
10     No. -- we'll call it Policy No. 3, Exhibit 7,
11     prior to the issuance of Endorsement No. 3 and
12     the effective date of Endorsement No. 3, was
13     there available, under the terms of the policy,
14     what we have been referring to as crew P&I
15     coverage?
16         MR. LANGER: Objection. Calls for a legal
17     conclusion.
18 A.  I would say no.
19 Q.  You would say no?
20 A.  Yeah.
21 Q.  And what's the basis of your statement that
22     there would not be?
23 A.  Because that's what our client asked that there
24     not be.

168

1  Q.  I don't think you understood my question, and
2      that's my fault.  The policy, if you look at
3      Exhibit 7, was issued from -- had -- had
4      effective dates from August 13th of 2003 to
5      August 13th, 2004; is that correct?
6  A.  Yeah.  Correct.
7  Q.  And would you agree that the policy provisions
8      contain the -- the scope of the coverage that
9      would be available under the policy before any
10     changes in -- in -- in coverage are made?
11 A.  Yes.
12 Q.  All right.  So -- and -- and I understand it's
13     your testimony that Mr. Russo requested that
14     there be no P&I coverage while the vessel was
15     on port risk.  I understand that's your
16     testimony.
17         And, in fact, Endorsement No. 3 to
18     Exhibit 7, the last page, states that "It is
19     hereby understood and agreed in consideration
20     of a return premium of $3,117 that the F/V Mary
21     & Josephine is covered for Port Risk only-no
22     fishing effective August 13, 2003 to
23     December 21, 2003."  Right?
24 A.  Correct.

169

1  Q.  And Endorsement No. 3, I take it, puts into
2      effect what you understood Mr. Russo told you
3      he wanted in the October telephone conversation
4      that you had?
5  A.  That's correct.
6  Q.  All right.  Before that conversation took
7      place, before Endorsement No. 3 went into
8      effect -- and it went into effect, by its
9      terms, on August 13th at the beginning of the
10     policy period -- the balance of the policy
11     contained the original policy terms and
12     provisions of the -- of the policy.  Right?
13 A.  Yes.
14 Q.  And under the policy terms as written before
15     the effective date of Endorsement No. 3, was
16     there coverage under the policy for what we
17     have been terming crew P&I coverage?
18         MR. LANGER:  Objection.  Seeks a legal
19     conclusion.  Go ahead.  The do- -- I mean, the
20     document speaks for itself.  If you're asking
21     him for --
22         MR. PETTINGELL:  Well, I'm asking him for
23     his opinion, his understanding.
24         MR. LANGER:  He's -- he's told you it

170

1      didn't.
2          MR. PETTINGELL:  Well, I asked the --
3          MR. LANGER:  What more do --
4          MR. PETTINGELL:  -- the bas- --
5          MR. LANGER:  -- you want?
6          MR. PETTINGELL:  Please.  I -- I don't want
7      to argue with you.  I asked the basis for that.
8      And it was apparent to me he didn't understand
9      my question.  So I'm trying it again.
10         MR. PETTINGELL:  Repeat your answer.
11 Q.  Well, don't repeat your answer.  Please answer
12     the question.  If it's a different answer, then
13     give a different answer.  If it's the same,
14     give the same.
15 A.  The same answer I gave before.
16 Q.  And that is?
17 A.  Can you read it back to me?
18         (Question read back.)
19 A.  I would say no.
20 Q.  Okay.  If Endorsement 3 had never issued and
21     was not a part of the policy -- I'm changing
22     things; okay -- would there have been coverage
23     under Policy No. 3, marked as Exhibit 7, for
24     what has been termed as crew P&I cover?

171

1          MR. LANGER:  Objection.  Calls for a legal
2      conclusion.  The document speaks for itself.
3  A.  I would say no.
4  Q.  And why is that?
5  A.  Because we gave Matt Russo a return premium
6      from May until policy issue at August on his
7      asking for it.  So, therefore, this policy
8      wouldn't be the same.
9  Q.  Okay.  You're saying, by virtue of your
10     returning the premium, that was reflective of a
11     change in coverage as stated in Endorsement No. 3
12     to Exhibit 7?
13         MR. LANGER:  Objection to the form of the
14     question.
15 A.  It would be prior to Endorsement 3, I believe,
16     the way you're talking about --
17 Q.  Okay.
18 A.  -- and by virtue of his asking us.
19 Q.  All right.  That's fair.  How about if he
20     hadn't asked you and you didn't return a
21     premium, would there have been crew P&I cover
22     under the policy?
23 A.  Yes.
24 Q.  And there would have been coverage -- rather

Robert McVey
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-4    Filed 02/08/2006    Page 29 of 32

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

172

1    than have you flip through the pages because
2    they're not numbered -- there would have been
3    crew cover for how many crew?
4  A. Three to four men.
5  Q. And it would have included -- well, doesn't it
6    say a little more?
7  A. It says "excluding Owners."
8  Q. And since we've established that Mr. Russo was
9    not an owner, if Mr. Russo was part of that
10    crew, assuming Endorsement 3 had not issued,
11    there would have been coverage for him under
12    this policy as well?
13    MR. LANGER: Objection. Seeks a legal
14    conclusion.
15  A. That's -- that's correct.
16  Q. Now, in Exhibit 7, Endorsement No. 3 was
17    issued. And Endorsement No. 3 states, "In
18    consideration of a return premium of" -- a
19    stated amount -- "the Mary & Josephine is
20    covered for Port Risk only-no fishing effective
21    August 13 to December 21, 2003." Do you agree?
22  A. Yes.
23  Q. Would you find the place in Exhibit 7 in Policy
24    No. 3 where it states that there is no crew

173

1    coverage?
2    MR. LANGER: While it's on port risk, you
3    mean?
4    MR. PETTINGELL: Yes.
5    MR. LANGER: Is there anything in the
6    policy that says that if it's on port risk,
7    there's no crew coverage?
8  A. I don't believe so. But I -- I don't think it
9    says anything in here regarding that.
10    MR. PETTINGELL: Thank you. All right. I
11    have nothing further.
12    MR. ABROMOVITZ: Just a couple of other
13    questions.
14    RECROSS-EXAMINATION
15  BY MR. ABROMOVITZ:
16  Q. You indicated that Mr. Ostrow was the former
17    president of your company?
18  A. Yes.
19  Q. Where is he now?
20  A. Mr. Ostrow passed away.
21  Q. When did he pass away?
22  A. April.
23  Q. Did you -- I'm sorry. I wasn't aware of that.
24    Have you ever seen anything from Mr. Ostrow to

174

1    anybody on behalf of Mary & Josephine
2    Corporation to the effect of a position on
3    behalf of OMI or Sunderland or NAS that when a
4    vessel is on port risk coverage, there is no
5    crew P&I coverage?
6  A. No.
7    MR. ABROMOVITZ: Thank you. That's all I
8    have.
9    MR. LANGER: I have a couple of questions.
10    CROSS-EXAMINATION
11  BY MR. LANGER:
12  Q. Mr. McVey, was your conversation with Mr. Russo
13    on October 3rd of 2003 the first time he talked
14    to you about putting the boat on port risk for
15    what Mr. Pettingell has called Policy Year
16    No. 3?
17  A. I believe so.
18  Q. And, in fact, he asked you to put it on port
19    risk retroactive, in fact, back into part of
20    Policy Year No. 2?
21  A. That's correct.
22  Q. And you carried out his wishes by passing that
23    information along to Ms. Houde?
24  A. That's correct.

175

1  Q. And you believe that, at some point either on
2    or shortly after October 3rd of 2003, Mr. Russo
3    called Ms. Houde?
4  A. I'm pretty sure he called her.
5  Q. When you talked to Mr. Russo on October 3rd,
6    around October 3rd, did he tell you that he
7    would -- would be working on his boat or the
8    Mary & Josephine, doing recommendations
9    provided by a surveyor?
10  A. No.
11  Q. Were you aware at any time prior to hearing of
12    Mr. Russo's accident that there were any
13    surveyor recommendations that had to be
14    completed on the Mary & Josephine?
15  A. I wasn't aware of any.
16  Q. Who -- who makes decisions regarding whether a
17    particular claim is covered by the policy?
18  A. I would say, the insurance companies, the
19    underwriters.
20  Q. You -- you don't make that decision?
21  A. No.
22  Q. Just so we're clear, I think you testified -- I
23    just want to be clear; I'm referring to Exhibit
24    No. 6 -- the reference to the crew complement

176

1   being amended to a crew of one, excluding the
2   owners; is that correct?
3   A. That's correct.
4   Q. Was that a result -- the fact that one crew
5   member was still going to be included, was that
6   a result of a request from Mr. Russo? Or was
7   that the result of a suggestion you made to
8   Mr. Russo?
9   A. That was a suggestion that -- that I made to
10  Mr. Russo.
11  Q. So absent the language in Exhibit No. 6 about
12  having one crew, would there have been any crew
13  P&I covering the Mary & Josephine during that
14  period of port risk coverage?
15  A. No.
16  Q. Did you explain to Mr. Russo -- well, strike
17  that. Do you remember when you spoke to
18  Mr. Russo about the vessel going on port risk
19  coverage effective December 9, 2002; in other
20  words, the port risk period covered by
21  Exhibit 6? Do you remember when you talked to
22  him about that?
23  A. Before the boat was tied up.
24  Q. Okay. And did you discuss with him at that

177

1   time the fact that, absent such an endorsement
2   as appears in Exhibit 6 including a crew, there
3   would be no crew P&I coverage?
4   A. Yes.
5   Q. You just don't remember when you spoke with him
6   about that?
7   A. It would be prior to the boat tied up to do the
8   repairs. I don't remember exactly when.
9   Q. Has Mr. Russo ever suggested to you at any
10  time, in any of the conversations you've had
11  with him about the vessel being on port risk
12  coverage, that he expected that the cover --
13  that, during those port risk periods, there
14  would be what you've defined as crew P&I
15  coverage?
16  A. No. He never suggested that.
17  Q. During your conversations with him regarding
18  port risk coverage for the vessel, was his
19  primary concern always one of saving money?
20      MR. ABROMOVITZ: Objection.
21      MR. PETTINGELL: Objection.
22  A. Yes.
23  Q. During your conversations with Mr. Russo
24  regarding port risk coverage for the vessel,

178

1   what was, in your conversations, what was his
2   primary concern?
3   A. It was financial, saving money.
4   Q. And what -- what was your best recollection of
5   why he wanted to put the boat on port risk
6   coverage?
7      MR. PETTINGELL: At which policy?
8   Q. Well, let's --
9      MR. PETTINGELL: If we're talking about
10  Policy 2, I want to be clear.
11  Q. On -- on Policy No. 2, why was -- was the boat
12  put on port risk coverage for more than one
13  period during that time, if you know?
14  A. More than one period in Policy 2?
15  Q. Yes.
16  A. I -- I don't recollect more than once.
17  Q. Now, when it was put on port risk coverage
18  during Policy Year 2, do you recall why it was
19  put on port risk at that point?
20  A. I believe he had to make repairs on his vessel.
21  Q. Okay. And that was the time you discussed with
22  him that, absent including one crew, there
23  would be no crew P&I?
24      MR. PETTINGELL: Objection.

179

1   A. Correct.
2   Q. Okay. And did you also tell him that he would
3   save money by not having any other crew?
4   A. Yes.
5   Q. He understood that?
6   A. Yes.
7   Q. And then you had another conversation with him
8   in October of '03?
9   A. Correct.
10  Q. And the purpose -- your understanding of that
11  conversation was, he wanted to save money?
12  A. Correct.
13  Q. Is there any question in your mind that
14  Mr. Russo knew on October 3rd of 2003 that he
15  was asking that the Mary & Josephine not have
16  crew P&I coverage during the period of the port
17  risk endorsement?
18      MR. ABROMOVITZ: Objection.
19      MR. PETTINGELL: Objection to the form.
20  A. Say that again. I'm sorry.
21  Q. Is there any question in your mind that when
22  you talked with Mr. Russo on October 3rd that
23  he was asking that all crew P&I coverage be
24  excluded?



Robert McVey
September 13, 2005

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

180

1    A. He made that very clear, to exclude all crew.
2       MR. LANGER: I have no other questions.
3          FURTHER REDIRECT EXAMINATION
4    BY MR. PETTINGELL:
5    Q. Mr. McVey, Policy Year 1, did Mr. Russo put the
6       vessel on port risk?
7    A. Yes.
8    Q. Did he keep -- excuse me.  Did he keep crew P&I
9       coverage to some extent?
10   A. I don't believe so.
11   Q. Do you know?
12   A. I don't think he did.
13   Q. Policy Year 2, did Mr. Russo put the vessel on
14      port risk coverage?
15   A. Yes.
16   Q. Did he keep, to some extent, crew P&I coverage
17      in place?
18   A. Yes.
19   Q. And you're saying, Policy Year 3, he instructed
20      you that he wanted to do away with all P&I
21      cover while the vessel was on port risk?
22   A. That's correct.
23   Q. And you didn't say anything to him for Policy
24      Year 3 to the effect that just by putting it on

181

1       port risk, you would automatically do away with
2       crew P&I cover?
3          MR. LANGER: Objection to the form of the
4       question.
5    A. I -- I probably mentioned that to him.  Yeah.
6    Q. Well, did you?
7    A. Yeah.  I believe I did.
8    Q. And you also mentioned it to him at Policy
9       Year 2?
10   A. Yes.
11   Q. Are you sure about that?
12   A. I -- I believe, in Policy Year 2, I suggested
13      that he put the man on there.
14   Q. Okay.  All right.  So you told him in Policy
15      Year 2, just by being on port risk, there is no
16      crew P&I cover?
17   A. That's correct.
18   Q. And you're sure -- sure about that?
19         MR. LANGER: Objection.  It's
20      argumentative.
21   A. I'm reasonably sure.
22         MR. PETTINGELL: Pass the witness.
23             RECROSS-EXAMINATION
24   BY MR. ABROMOVITZ:

182

1    Q. With reference to Policy Year 2 and the
2       endorsement identified as Exhibit No. 6, you
3       testified that it was at your suggestion that
4       the port risk endorsement included coverage for
5       one crew member; is that correct?
6    A. Yes.
7    Q. Why did you suggest coverage for one crew
8       member in that year?
9    A. Because I knew that he was going to be involved
10      on the boat, and I wanted to make sure that if
11      something happened that he would have coverage.
12   Q. You knew that he was going to be involved on
13      the boat doing what?
14   A. Repairs of sorts.
15   Q. Okay.  Similar to what he was doing on
16      December 3rd, 2003 when he got hurt?
17         MR. LANGER: Objection.  Foundation.
18   A. Could be.  I mean, I don't know specifically.
19      But . . .
20   Q. Well, you know from your e-mail of
21      December 5th, 2003 that Mr. Russo was hurt
22      while he was performing repairs on the boat.
23      Correct?
24   A. Yes.

183

1          MR. ABROMOVITZ: Thank you.  That's all.
2          MR. LANGER: I have no other questions.
3       (Whereupon the deposition was concluded at
4       12:58 p.m.)
5                      *****
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Robert McVey
September 13, 2005

Case 1:04-cv-10374-WGY   Document 27-4   North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.
Filed 02/08/2008   Page 32 of 32

184

<u>SIGNATURE PAGE</u>

1
2
3
4       I, ROBERT McVEY, do hereby certify that I
5   have read the foregoing transcript of my
6   testimony, and I further certify that said
7   transcript is a true and accurate record of
8   said testimony.
9       Dated at _____, this ____
10  day of _____, 2005.
11
12
13
                    _____
                    ROBERT McVEY
14
15
16
17
18
19
20
21
22
23
24

185

C E R T I F I C A T E

1
2   COMMONWEALTH OF MASSACHUSETTS
    COUNTY OF NORFOLK, ss.
3
4       I, Jo Anne M. Shields, a Professional
5   Shorthand Reporter and Notary Public in and for
6   the Commonwealth of Massachusetts, do hereby
7   certify that ROBERT McVEY, the witness whose
8   deposition is hereinbefore set forth, was duly
9   sworn by me and that such deposition is a true
10  and accurate record, to the best of my
11  knowledge, skills and ability, of the testimony
12  given by such witness.
13      I further certify that I am not
14  related to any of the parties in this matter by
15  blood or marriage and that I am in no way
16  interested in the outcome of this matter.
17      IN WITNESS WHEREOF, I have hereunto set
18  my hand and affixed my seal of office this 21st
19  day of September, 2005.
20
21
                    _____
                    Notary Public
22

186

<u>ERRATA SHEET</u>

1
2   <u>CHANGES TO THE DEPOSITION OF ROBERT McVEY</u>
3   INSTRUCTIONS TO WITNESS:  1) Please note any
        desired corrections to your testimony by page
4   and line number.  2) Enter text as it appears
        in the transcript.  3) Enter text as it should
5   appear.
6   PAGE       LINE         CORRECTION
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____