# EXHIBIT "E"

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 04-10374WGY

. . . . . . . . . . . . . . . . . .
                                    )
NORTH AMERICAN SPECIALTY            )
INSURANCE COMPANY,                  )
            Plaintiff,              )
                                    )
vs.                                 )
                                    )
MARY & JOSEPHINE CORP. and          )
MATTEO RUSSO,                       )
            Defendants.             )
. . . . . . . . . . . . . . . . . .

DEPOSITION OF WILLIAM J. SCOLA, a

witness called on behalf of the Defendant, Mary

& Josephine Corp., pursuant to the Federal

Rules of Civil Procedure before Jo Anne M.

Shields, Professional Shorthand Reporter and

Notary Public in and for the Commonwealth of

Massachusetts, at the Law Offices of Joseph G.

Abromovitz, P.C., 858 Washington Street,

Dedham, Massachusetts, on Tuesday, September 13,

2005, commencing at 2:01 p.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street
Boston, Massachusetts 02109
Telephone (617) 742-6900

**Page 2**

APPEARANCES:

LEONARD W. LANGER, ESQUIRE
    TOMPKINS, CLOUGH, HIRSHON & LANGER, P.A.
    Three Canal Plaza
    P.O. Box 5060
    Portland, Maine  04112-5060
    (207) 874-6700
    for the Plaintiff

RICHARD H. PETTINGELL, ESQUIRE
    77 North Washington Street, Second Floor
    Boston, Massachusetts  02114
    (617) 778-0890
    for the Defendant, Mary & Josephine Corp.

JOSEPH G. ABROMOVITZ, ESQUIRE
    THE LAW OFFICES OF JOSEPH G.
    ABROMOVITZ, P.C.
    858 Washington Street
    Dedham, Massachusetts  02026
    (781) 329-1080
    for the Defendant, Matteo Russo

ALSO PRESENT:

    Robert McVey

**Page 3**

I N D E X

Deposition of:          Direct  Cross  Redirect

WILLIAM J. SCOLA

    By Mr. Pettingell      4              52

    By Mr. Abromovitz             39

E X H I B I T S

No.                                        Page

8   Letter to Matt Russo from Lynanne
    Houde dated 10/3/03                      50

9   Letter to Matt Russo from Lynanne
    Houde dated 12/18/02                     51

**Page 4**

S T I P U L A T I O N S

        It is stipulated by and between

counsel for the respective parties that the

deposition transcript is to be read and signed

by the deponent under the pains and penalties

of perjury; and that the sealing and filing

thereof are waived; and that all objections,

except as to form, and motions to strike are

reserved to the time of trial.

                    * * *

P R O C E E D I N G S

        WILLIAM J. SCOLA, a witness

called for examination by counsel for the

Defendant, Mary & Josephine Corp., having been

satisfactorily identified by the production of

his driver's license and duly sworn by the

Notary Public, was examined and testified as

follows:

                    * * *

            DIRECT EXAMINATION

BY MR. PETTINGELL:

Q.  Sir, could you please state your name?

A.  William Scola.

Q.  And your address?

William J. Scola
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-6    North American Specialty Insurance Company
Filed 02/06/2006    Page 3 of 21
vs. Mary & Josephine Corp., et al.

5

1  A.  110 William Henry Road, North Scituate, Rhode
2      Island.
3  Q.  And what is your occupation?
4  A.  Insurance broker.
5  Q.  What is an insurance broker?
6  A.  Someone who provides insurance coverage to
7      people, a mediator between a company and a
8      client.
9  Q.  You're not an insurance company in and of
10      yourself?
11  A.  No.
12  Q.  And when you're obtaining insurance, who do you
13      represent?
14      MR. LANGER:  Objection.  Calls for a legal
15      conclusion.
16  Q.  You can answer.
17  A.  When we obtain insurance, we represent the
18      interest of the client.
19  Q.  Well, who's the client?
20  A.  The purchaser of the insurance.
21  Q.  So if we were talking about somebody who owned
22      a fishing vessel and wanted to get insurance
23      for their fishing boat, you would be
24      representing the vessel owner?

6

1  A.  Yes.
2  Q.  Now, you've been present during Mr. McVey's
3      testimony?
4  A.  Yes.
5  Q.  And you heard his explanation of how he would
6      contact boat owners and take it further to the
7      point of getting a quote from an underwriter?
8  A.  Yes.
9  Q.  And for purposes of this case, is it fair to
10      say that the underwriter that OMI was
11      attempting to purchase insurance or procure
12      insurance from was Sunderland?
13  A.  Yes.
14  Q.  Okay.  Now, does OMI have a contractual
15      arrangement with Sunderland?
16      MR. LANGER:  Let me -- let me -- again, for
17      the purposes of this deposition, Mr. Scola is
18      here to respond to Paragraph 6 of the notice,
19      which is, "What is meant by port risk
20      coverage?"
21      MR. PETTINGELL:  Uh-huh.
22      MR. LANGER:  He's not here to discuss Ocean
23      Marine's contractual relationship with
24      underwriters or anybody else, at least, as far

7

1      as North American Specialty is concerned.  If
2      Mr. Scola, at any time, wants to stop the
3      questioning and consult his own counsel, he is
4      certainly free to do that.
5      MR. PETTINGELL:  We've been through this
6      before, Len.
7      MR. LANGER:  I --
8      MR. PETTINGELL:  He's --
9      MR. LANGER:  -- understand that.
10      MR. PETTINGELL:  He's also a deponent sworn
11      under oath, and he's certainly capable of
12      answering questions that fall within the
13      purview of his knowledge.
14      MR. LANGER:  But he's not here by subpoena.
15      He is here --
16      MR. PETTINGELL:  No.
17      MR. LANGER:  -- strictly pursuant to a
18      30(b)(6) to respond to one paragraph of the
19      notice.  And so, therefore, he's here at his
20      own volition to the extent he answers questions
21      beyond Paragraph 6.  And if, at any time, he
22      chooses not to answer the questions or he wants
23      to consult his counsel, he is free to do that.
24      MR. PETTINGELL:  Well, you've advised him

8

1      of that; and you've stated that on the record
2      now twice today.  And I think we had it stated
3      back in January.  So my question stands.
4  A.  Could you repeat that question?
5  Q.  Does OMI currently have any sort of contractual
6      arrangement with Sunderland?
7  A.  We do.  It does.
8  Q.  It does.  And did it have such an arrangement
9      back during the period of time that Policy 1,
10      Policy 2, and Policy 3 was being obtained for
11      Mary & Josephine Corp.?
12  A.  It did.
13  Q.  And what was that arrangement?
14  A.  It was, simply, that Ocean Marine was allowed
15      to present business to Sunderland Marine.
16  Q.  What do you mean by "allowed to present
17      business"?
18  A.  Well, we were allowed to present business to
19      Sunderland Marine as opposed to other companies
20      that wouldn't be allowed to present business to
21      them.
22  Q.  By "other companies," you mean other
23      brokerages?
24  A.  Other brokerages.  Yeah.

William J. Scola                                   North American Specialty Insurance Company
September 13, 2005                                  vs. Mary & Josephine Corp., et al.

Case 1:04-cv-10374-WGY     Document 27-6     Filed 02/08/2006     Page 4 of 21

9

1   Q. Was it a form of agency agreement, to your
2      knowledge?
3   A. I couldn't answer that question.
4   Q. Okay. I may not have asked you this. What's
5      your position at OMI?
6   A. Presently?
7   Q. Yes.
8   A. President.
9   Q. Okay. And how about going back to the year
10     2001?
11  A. Treasurer.
12  Q. You were an officer of OMI at that time?
13  A. Yes.
14  Q. And you're currently the CEO?
15  A. Yes.
16  Q. In that capacity, do you have an understanding
17     of the nature of the agreement that OMI has
18     with Sunderland?
19  A. I believe I just explained that.
20  Q. Well, I'm asking if you have an opinion as to
21     whether or not it's an agency agreement --
22        MR. LANGER: Object to the extent --
23  Q. -- what your understanding is, sir.
24  A. I --

10

1         MR. LANGER: Object to the extent it seeks
2      a legal conclusion.
3   A. Yeah. I just don't -- I -- I don't know the
4      legal definition of agency agreement. I really
5      can't answer that question.
6   Q. Okay. Other than being permitted by Sunderland
7      to approach them with business, does the
8      agreement authorize OMI to do anything else?
9   A. Not to my knowledge, no.
10  Q. Okay. Now, throughout the period from 2001 to
11     2003, policy en- -- policy endorsements were
12     issued to either Policy 1, Policy 2, or
13     Policy 3. You know what I mean when I refer to
14     those policies?
15  A. I do.
16  Q. Yes. Does the agreement that OM- -- or OMI
17     has, or had at that time, with Sunderland
18     authorize OMI to issue such endorsements on
19     behalf of Sunderland or its designated
20     companies?
21        MR. LANGER: You mean, without any kind of
22     prior authority?
23        MR. PETTINGELL: My question stands.
24  Q. Does it authorize them to issue?

11

1   A. May I answer this my own way? It may take a --
2   Q. Yes.
3   A. -- a minute. We are authorized to type up
4      endorsements on behalf of Sunderland Marine,
5      have them approved by Sunderland Marine, and
6      then mail them out from our office, if that
7      answers the question for you.
8   Q. It does.
9   A. Okay.
10  Q. Is OMI also authorized, under the terms of its
11     agreement with Sunderland, to have someone sign
12     the endorsements on behalf of Sunderland as a
13     rep -- as an authorized representative of
14     Sunderland?
15  A. I believe they are. Yeah.
16  Q. Okay. OMI wouldn't issue an endorsement, I
17     take it, without first running it by -- running
18     the question of whether an endorsement should
19     issue by Sunderland and getting their approval?
20  A. Yes.
21  Q. Yes, that's a correct statement?
22  A. Yes. We would get their approval prior to
23     sending it out. Yes.
24  Q. Okay. The ultimate decision on whether or not

12

1      an endorsement should issue lies with
2      Sunderland?
3   A. Correct.
4   Q. Okay. Now, who was involved at OMI back during
5      the years 2001 through 1003 with issuing
6      endorsements, the physical --
7   A. Can --
8   Q. -- process?
9   A. The physical --
10  Q. I understand --
11  A. -- process of it? That -- that would be --
12     certainly, Ms. Houde was involved at that time.
13     Mrs. Lemoges, I believe, was involved at that
14     time. I -- I don't -- memory fails me. I
15     mean, I don't know if anyone else was involved
16     physically with actually typing them up.
17  Q. Okay. And we have, at least, one example. I
18     think it's the last page of Exhibit 7 is a --
19     Endorsement No. 3 to Policy No. 3 that was
20     signed by Mr. Ostrow as authorized
21     representative.
22  A. I believe that's correct.
23  Q. All right. Did you have -- did you ever,
24     during that period of time, sign endorsements

William J. Scola                                    North American Specialty Insurance Company
September 13, 2005                                   vs. Mary & Josephine Corp., et al.

Case 3:04-cv-10374-WGY    Document 27-6    Filed 02/06/2006    Page 5 of 21

13

1    as a -- an authorized representative?
2  A. I don't believe I did.
3  Q. Okay. Now, did -- did an endorsement issue
4     every time there was a change in coverage under
5     a policy?
6  A. That would be the normal and accepted way.
7  Q. Okay. Were there exceptions to the rule?
8  A. I really can't think of any.
9  Q. And what was the purpose of issuing an
10    endorsement, Mr. Scola?
11 A. Just to reflect the change in the policy.
12 Q. Well, why?
13 A. For any reason. I mean, a variety of reasons.
14 Q. Well, if you could tell us what they are.
15 A. When -- in this instance, when a client calls
16    and asks to be put on port risk, we would issue
17    the endorsement to reflect that that policy was
18    put on port risk at a certain date.
19 Q. Well, was one of the reasons to memorialize in
20    writing a change in the contract of insurance
21    between Sunderland and the insured?
22 A. Yes. That would be a reason.
23 Q. And was one of the reasons to send it to the
24    client so that the client would have

14

1     confirmation in writing that the policy
2     change -- the requested policy change had taken
3     place?
4  A. That would be a reason.
5  Q. And was one of the reasons because, if there
6     was some mistake made, it would afford the
7     insured with an opportunity to correct the
8     mistake or, at least, raise the fact that, hey,
9     this isn't what I -- what I wanted?
10 A. That was usually done ahead of the endorsement.
11    We would -- we would send out letters verifying
12    conversations to show what had taken place in
13    that conversation. And, at that point, that
14    gives the client an opportunity then to call
15    and say that is not what I wanted to have done.
16 Q. So is it fair to say that the normal practice
17    of OMI was that, if there was to be a change in
18    coverage under a given policy, there was some
19    sort of writing that went from O- -- OMI to the
20    insured, either in the form of a confirmatory
21    letter or in the form of an endorsement?
22 A. That's the way it should work.
23 Q. So that the -- the insured would --
24 A. Be aware.

15

1  Q. -- be aware of what was happening?
2  A. Exactly. And that he would -- to fully answer
3     the question, that the insured would know that
4     we were aware of what was happening.
5  Q. Right. Just good business?
6  A. Yes.
7  Q. Okay. Now, I wonder if you could tell us what
8     your duties are at OMI as president?
9  A. I have a feeling that may be beyond the scope
10    of why I'm here today.
11 Q. Well, maybe. But I've got to know who you are
12    and -- and have some understanding of where
13    you're coming from. Otherwise, your testimony
14    is sort of out there in a -- in a vacuum.
15 A. Well --
16 Q. You can be general.
17 A. Yeah. I mean, I -- I'd have to be general. I
18    mean, I certainly have responsibility for
19    seeing to it that the company is run properly,
20    that we're using proper procedures, that we're
21    doing what our clients wish us to do, that
22    we're doing what the insurance companies wish
23    us to do. And, I guess, as president, the buck
24    stops there.

16

1        MR. PETTINGELL: Off the record.
2        (A brief discussion was held off the
3        record.)
4        MR. PETTINGELL: Back on the record.
5  Q. Now, going back to the period of time when
6     Mr. Ostrow was the president --
7  A. Uh-huh.
8  Q. -- were your duties different to any degree?
9  A. To a lesser degree. Obviously, Frank --
10    Mr. Ostrow took on many of those same
11    responsibilities at that time as president.
12 Q. Could you give us a rundown of your educational
13    history?
14 A. I have a master's in business, a college degree
15    and a master's degree.
16 Q. Okay. When did you obtain the master's in
17    business?
18 A. Oh, a long time ago. 1972.
19 Q. That's a long time ago.
20 A. Yeah.
21 Q. Okay. And could you give us a rundown of
22    your -- your work experience?
23 A. Work experience prior to the insurance
24    industry, I -- I worked in a bank for

William J. Scola
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-6    Filed 02/08/2006    Page 6 of 21

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

17

```
 1      approximately five years.  I worked in a
 2      manufacturing business for approximately five
 3      years.  And then I got into the insurance
 4      business.
 5   Q. When was that?
 6   A. 1985.
 7   Q. And in what capacity did you get into the
 8      insurance business?
 9   A. A complete novice.
10   Q. Well, we all have to start somewhere.  But, I
11      mean, who were you working for?
12   A. I worked with Frank Ostrow --
13   Q. Was this --
14   A. -- in -- in a predecessor company to Ocean
15      Marine Insurance Agency.
16   Q. Okay.  And in what capacity were you working
17      with Mr. Ostrow in OMI's predecessor?
18   A. Principally, learning.  I knew nothing about
19      marine insurance at the time.
20   Q. Okay.  And that was beginning in 198- --
21   A. '85.
22   Q. '85?
23   A. Yes.
24   Q. Okay.  And have you continued to work up to the
```

18

```
 1      present time for OMI or its predecessor
 2      company?
 3   A. Yes.
 4   Q. All right.  Did you have any formal training in
 5      insurance?
 6   A. No.
 7   Q. So it was --
 8   A. Other than a -- a few classroom situations, as
 9      Mr. McVey went through, to maintain licensing
10      and things like that.  However, those were so
11      minimal in marine insurance as to be worthless
12      towards marine.
13   Q. Okay.  And do you hold any licenses in Rhode
14      Island?
15   A. Yes.
16   Q. What licenses?
17   A. Producer's license.
18   Q. Is that the --
19   A. Equivalent to a broker's license.
20   Q. I -- I'm just curious.  Is that the term in
21      Rhode Island?
22   A. Producer's license.  Yes.
23   Q. Massachusetts, it would be a -- a broker's
24      license?
```

19

```
 1   A. I'm not really sure.
 2   Q. Okay.
 3   A. It may be.  I -- I -- I am licensed in
 4      Massachusetts, but I don't even know the term.
 5   Q. Okay.  I don't think it's germane.  Well, maybe
 6      it is.  But . . .
 7         Now, you heard Mr. McVey's testimony
 8      concerning the -- his opinion as to the scope
 9      of P&I coverage available under a -- a port
10      risk cover?
11   A. I did.
12   Q. What is -- what is your understanding,
13      Mr. Scola, of the scope of P&I cover that is
14      available under a port risk policy?
15   A. Under a -- in my experience, under a normal
16      port risk policy, there is no need for crew
17      coverage.  And, hence, there is no crew P&I
18      coverage under a port risk policy under normal
19      situations.
20   Q. Now, you said "a normal port risk policy."  How
21      about a situation where you have a hull and P&I
22      policy in the form of the policy which has been
23      marked as Exhibit 7?
24   A. Correct.  Yeah.
```

20

```
 1   Q. Now, the last page of Exhibit 7 has an
 2      endorsement, Endorsement No. 3, which covers
 3      for port risk only from August 13, 2003 to
 4      December 21st, 2003.
 5   A. Yes.
 6   Q. If Endorsement 3 had never been issued and the
 7      policy terms and provisions were as set out in
 8      Exhibit 7 with the exception of Endorsement 3,
 9      would there have been what has been referred to
10      in Mr. McVey's deposition as crew P&I cover
11      available under the policy?
12         MR. LANGER:  Objection to the extent it
13      calls for a legal conclusion.
14   A. Can you repeat that question again now?
15   Q. Sure.  Exhibit 7 is -- has been testified to, a
16      copy of Policy No. 3 --
17   A. Uh-huh.
18   Q. -- and my question is, had Endorsement 3 never
19      been issued -- I understand it did; I'm
20      changing it --
21   A. Okay.
22   Q. -- that wasn't part of the policy terms and
23      provisions -- would there have been what has
24      been referred to as crew P&I coverage available
```

William J. Segla
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-6    North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.
Filed 02/08/2006    Page 7 of 21

**21**

```
 1      under the policy?
 2           MR. LANGER:  The same objection.
 3   A.  All right.  Let me -- let me answer that
 4      question.  Had circumstances been totally
 5      different --
 6   Q.  Yes.
 7   A.  -- there were no phone calls made --
 8   Q.  Yes.
 9   A.  -- there were no endorsement -- there was no
10      endorsement issued, the policy was renewed in
11      August as an operational policy, it would have
12      been an operational policy.
13   Q.  And by "operational policy," you mean a policy
14      that the vessel could have gone out fishing?
15   A.  Could have gone out fishing.
16   Q.  Under that circumstance, under the language as
17      set forth in Exhibit 7, there would have been
18      coverage for the crew?
19           MR. LANGER:  The same objection.
20   A.  Under an operational policy, there would have
21      been coverage for the crew.
22   Q.  Well, if one -- if -- if Exhibit 7 did not have
23      Exhibit -- Endorsement No. 3 --
24   A.  And it was an operational policy.
```

**22**

```
 1   Q.  -- would it be regarded as an operational
 2      policy by you?
 3   A.  Yes.
 4   Q.  All right.  And Endorsement 3 was issued.  And
 5      I'm -- I'd like to give you Exhibit 7 --
 6           MR. LANGER:  He has it --
 7   A.  I have it.
 8           MR. LANGER:  -- in front of him.
 9   Q.  -- and ask you if you could show me where in
10      the policy language and endorsements it states
11      that there is no coverage for crew?
12   A.  For the time period August 13th, 2003 to
13      December 21st, 2003, the fishing vessel is
14      covered for port risk only, no fishing.
15           MR. ABROMOVITZ:  Are you looking at --
16           THE WITNESS:  At this endorsement.
17           MR. ABROMOVITZ:  -- Exhibit No. 7?
18           THE WITNESS:  Yes.
19           MR. ABROMOVITZ:  Endorsement No. 3 to
20      Exhibit 7?
21           THE WITNESS:  Yes.
22           MR. ABROMOVITZ:  Okay.
23           THE WITNESS:  Yeah.
24   Q.  I understand that's what Endorsement No. 3
```

**23**

```
 1      says.  But I asked you something different.
 2      Where in the policy does it say there is no
 3      coverage for crew?
 4   A.  You mean, where is it written there is no
 5      crew -- quote, there is no crew coverage or
 6      words to that effect?
 7   Q.  Yes.
 8   A.  The -- there -- there are no words written to
 9      that effect in this policy.  There is only this
10      endorsement that reflects it was on port risk.
11   Q.  I see.  So you're saying, by virtue -- and
12      we're just restricting ourselves to the
13      policy now -- by virtue of the fact that
14      there's an endorsement that places the vessel
15      on port risk for a period of time, that is
16      where one would look for the conclusion that
17      there is no crew cover?
18   A.  That, and the fact, from what I heard from
19      Mr. McVey's testimony, that the client
20      requested that there be no crew coverage and
21      the boat be put on port risk.
22   Q.  Well, I understand that that's what Mr. McVey
23      says.  But I'm asking in terms of the policy
24      itself, the language of the policy that was in
```

**24**

```
 1      effect at the time of --
 2   A.  The -- the only --
 3   Q.  -- Mr. Russo's injury.
 4   A.  The only reference I can make to no crew
 5      coverage is the fact that it's on port risk.  I
 6      can -- I can make no reference to other facts,
 7      such as the boat cannot go offshore.  It
 8      doesn't say that in this endorsement, but it
 9      certainly is implied in this endorsement.  It
10      simply says "NO FISHING."
11   Q.  Well, I'm not talking about -- now -- now,
12      that's a navigational warranty, isn't it, what
13      would be referred to as a navigational
14      warranty?
15   A.  It's another warranty, yes, a navigational --
16   Q.  All right.
17   A.  -- warranty.  Yeah.
18   Q.  And by navigational warranty and -- you
19      understand that to mean the geographical area
20      that the vessel was permitted to travel in?
21   A.  Yes.
22   Q.  And if one were to go through the various pages
23      of this policy, you would find a navigational
24      warranty limiting the geographical area,
```

William J. Seola                    North American Specialty Insurance Company
September 13, 2005                  vs. Mary & Josephine Corp., et al.

Case 1:04-cv-10374-WGY    Document 27-6    Filed 02/08/2006    Page 8 of 21

25

1    wouldn't you?
2  A. You would.
3  Q. All right.  That would be spelled out; is that
4    correct?
5  A. It would be spelled out where the boat could --
6    how far offshore the boat could fish --
7  Q. All right.
8  A. -- yes, when it was operational.
9  Q. Okay.
10  A. Yeah.
11  Q. Now, there's also spelled out in here something
12    referred to as a crew warranty.
13  A. There is.
14  Q. In fact, the crew warranty is spelled out as
15    warranted three-four crew, inclu- -- excluding
16    owners?
17  A. Yes.
18  Q. Okay.  And am I correct that nowhere in
19    Exhibit 7 is there any express language saying
20    the crew warranty is now changed to zero?
21  A. There is no express language that says the crew
22    warranty is changed to zero.
23  Q. All right.  What we have is language that says
24    "in consideration of a return premium of $3,117

26

1    that Mary & Josephine is covered for Port Risk
2    only-no fishing effective August 13, 2003 to
3    December 21, 2003."
4  A. Uh-huh.
5  Q. Is that right?
6  A. That's what we have.
7  Q. Okay.  And the language that should put someone
8    on notice that there's no crew cover is the
9    fact that it's on port risk?
10  A. Yes.
11      MR. PETTINGELL:  Have we got Exhibits 4
12    and 5?
13      MR. ABROMOVITZ:  The originals?  They
14    should be there.
15      MR. PETTINGELL:  Well, I want 5 and 6.  I'm
16    sorry.
17      THE WITNESS:  I have them.  Yeah.
18      MR. PETTINGELL:  5 and 6.
19      THE WITNESS:  Yeah.
20      MR. PETTINGELL:  Can I peek at them?
21    'Cause I can't --
22      THE WITNESS:  Yes.  You can.
23      MR. PETTINGELL:  -- can't find my copies.
24  Q. Now, Exhibits 5 and 6 --

27

1      MR. PETTINGELL:  Off the record.
2      (A brief discussion was held off the
3      record.)
4  Q. Exhibits 5 and 6 are endorsements that were
5    made in -- made to Policy 2.  Would you agree
6    with that?
7  A. Yes.  I -- honestly, I don't -- I don't know
8    about 5.  Oh, yes.  It has a policy number on
9    it.  Yeah.
10  Q. Right.  Policy 1 was a Fairfield policy.
11  A. Yeah.  Okay.
12  Q. And this is a Sunderland policy, this being
13    Policy 2?
14  A. North American Specialty.
15  Q. I'm sorry.
16  A. Yes.  Same -- same.
17  Q. I misspoke.
18  A. I mean, I --
19  Q. Well, Fairfield --
20  A. -- we'll treat them as the same.
21  Q. Yeah.  I'm sorry.  NAS.  Now, if you look at
22    Exhibit 6 --
23  A. Yeah.
24  Q. -- this also places the Mary & Josephine on

28

1    port risk, doesn't it?
2  A. Yes.
3  Q. And it adds to the policy a particular port
4    risk endorsement policy form, American
5    Institute Port Risk Endorsement dated
6    January 18, 1970?
7  A. Yes.
8  Q. And, in fact, Exhibit 5, if you look at it, is
9    that particular form?
10  A. Yes.
11  Q. Now, there's also -- well, reading down, "The
12    Navigation Limit is amended to:  PORT RISK
13    ONLY.  WARRANTED NO FISHING."
14  A. Where -- are you on --
15  Q. Exhibit 6.
16  A. -- 6 --
17  Q. Yes.
18  A. -- again?  Okay.
19  Q. Correct?
20  A. Yes.
21  Q. And then we have something else that's changed
22    in the policy by virtue of -- of Exhibit 6.
23    And that's "The Crew Complement is amended to:
24    a Crew of 1."

William J. Scola
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-6    North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.
Filed 02/08/2006    Page 9 of 21

29

1   A. I see that.
2   Q. Is that correct?
3   A. Yes.
4   Q. And Mr. McVey has testified that that language
5      reflecting a change in the crew complement is
6      not something that would automatically appear
7      as a matter of course in an endorsement that
8      was changing port risk. That's something --
9      in -- in effect, two things are being done with
10     a single endorsement. Would you agree with
11     that?
12  A. Two things are being done with a single
13     endorsement?
14  Q. Yes.
15  A. Would you tell me what those are?
16  Q. Policy is -- coverage was amended to go from
17     operational to port risk.
18  A. Correct.
19  Q. And the crew compliment was amended.
20  A. Yes.
21  Q. In Exhibit 7, if you go to Endorsement 3 to
22     Exhibit 7, there's only one policy change being
23     taken care of in that endorsement. And that's
24     to go from operational to port risk.

30

1   A. Correct.
2   Q. And, sometimes, when you issue an endorsement
3      on behalf of North American, more than one
4      policy change can appear in a single
5      endorsement; is that correct?
6   A. It did, in this one.
7   Q. Okay. By "this one," you're referring to --
8   A. I'm referring to No. 6.
9   Q. Exhibit 6?
10  A. Yeah.
11  Q. All right. Come down a little further in
12     Exhibit 6, and one, two, three, fourth line up
13     from the bottom, it sa-- states, "ALL OTHER
14     TERMS AND CONDITIONS REMAIN UNCHANGED." Do you
15     see that language?
16  A. Yes.
17  Q. What's that language mean?
18     MR. LANGER: Objection to the extent it
19     seeks a legal conclusion.
20  A. In my opinion, what that means is that all the
21     terms and conditions of Section 1 and 2 are
22     unchanged.
23  Q. And what is Section 1 and 2? Is that the
24     policy itself?

31

1   A. The policy. Yes.
2   Q. So where the owner of the policy -- owner of
3      the vessel is listed on the policy or the
4      amount of coverage, dollar amount of hull
5      coverage or dollar amount of P&I coverage
6      appears, they're not changed by virtue of
7      Endorsement 6?
8   A. That's right. The hull coverage wouldn't be
9      changed.
10  Q. And --
11  A. The dollar amount of the hull coverage, I --
12  Q. Right.
13  A. -- should say. Yeah.
14  Q. And the dollar amount of the P&I coverage
15     wouldn't change?
16  A. Correct.
17  Q. All right. And, therefore, Mr. Scola, would
18     you agree that if you didn't have the second
19     change reflected in Exhibit 6 --
20  A. The second one being?
21  Q. "The Crew Complement is amended to: 'Crew of 1
22     excluding Owners.'" I realize that appeared
23     there.
24  A. Uh-huh.

32

1   Q. But if that language did not appear --
2   A. Yeah.
3   Q. -- everything else on Exhibit 6, with the
4      exception of those two lines, is the same?
5      MR. LANGER: Objection.
6   Q. I want you to assume that.
7      MR. LANGER: Objection to the form of the
8      question.
9   A. Could you -- do you --
10  Q. All right.
11  A. Could you repeat that question for me?
12  Q. Look at Exhibit 6.
13  A. Yeah.
14  Q. If the two lines that say "The Crew Complement
15     is amended to Crew of 1 excluding Owners," do
16     you see that?
17  A. Yeah.
18  Q. If that did not appear on Exhibit 6, it wasn't
19     there --
20  A. Yeah.
21  Q. -- just a big blank spot --
22  A. Yeah.
23  Q. -- right there --
24  A. Yeah.

33

1   Q. -- and all the other language remained the
2      same -- are you with me?
3   A. I'm with you.
4   Q. All right. Now, you have the language that
5      says "This policy is hereby amended from
6      Operational to Port Risk. Adding: American
7      Institute Port Risk Endorsement (01/18/70),"
8      which is Exhibit 5.
9   A. Uh-huh.
10  Q. All right. You also have the language that
11     says "Endorsement Section I and II, ALL OTHER
12     TERMS AND CONDITIONS REMAIN UNCHANGED."
13     Doesn't that mean that the crew warranty would
14     remain unchanged?
15        MR. LANGER: Objection.
16  A. Not in my opinion.
17  Q. And why is that, sir?
18  A. Because the -- this endorsement puts the vessel
19     on port risk.
20  Q. And where is the language that says, by virtue
21     of going on port risk, there is no -- I'll use
22     the phrase --
23  A. I -- I --
24  Q. -- "P" -- let -- let me finish.

34

1   A. I'm sorry. Go ahead.
2   Q. -- "crew P&I cover"?
3   A. I don't see language to that effect on here.
4      However, in -- in -- just in common knowledge
5      of the reason for port risk and what people use
6      it for and what know it to be, there is no need
7      for crew coverage on a port risk vessel unless
8      there are unusual circumstances. I go back to
9      that again. That is why the -- it says there's
10     a crew of one covered on here to add that
11     coverage in what otherwise would be considered
12     by the underwriter to be no crew.
13  Q. Well, you say that's common knowledge in the
14     industry?
15  A. It is, to me and people I know.
16  Q. Meaning?
17  A. I -- I can't speak for everyone in the
18     industry, obviously. But, I -- I mean, when a
19     client calls to put his boat on port risk, he,
20     typically, will take off all the crew to save
21     money because he has no need for crew. He's
22     not doing anything --
23  Q. I see.
24  A. -- to that vessel.

35

1   Q. Well, let's explore that a little bit. You've
2      been working in the insurance industry as a
3      broker with OMI or a predecessor since 1985?
4   A. Yes.
5   Q. And is it fair to say your knowledge and
6      understanding of coverage under marine policies
7      stems from things you've learned over the
8      period of time from 1985 to the present, the
9      last 20 years, I guess?
10  A. Yes.
11  Q. All right. Are you suggesting that all vessel
12     owners know as much about insurance, marine
13     insurance, as you do?
14        MR. LANGER: Objection to the form of the
15     question.
16  A. That's not at all what I'm suggesting.
17  Q. All right.
18  A. Not at all.
19  Q. So --
20  A. But -- but, however --
21  Q. Well --
22        MR. LANGER: Let him fin- -- let him finish
23     his answer. Let him finish the answer.
24  Q. Not at all what you're suggesting. Is there

36

1      something else you were suggesting?
2   A. I was suggesting that it's common knowledge
3      that most people would understand how and why
4      to put a vessel on port risk, what the reason
5      for it is, and why they know why they would
6      want to do it.
7   Q. Isn't one of the reasons that vessel owners put
8      their vessels on port risk because they're not
9      going to be going out fishing?
10  A. Yes.
11  Q. Isn't it true, Mr. Scola, that the exposure to
12     someone being hurt on a vessel while out
13     conducting fishing ex- -- exercises or on an
14     operational vessel is greater than on a vessel
15     tied up to the pier?
16  A. I would say that the exposure is greater while
17     out fishing. There are more chances of things
18     going wrong. However, you can certainly get
19     hurt, when you're on a vessel doing repairs,
20     very badly.
21  Q. Isn't one of the reasons that a vessel owner
22     might tie a -- might request a vessel go on
23     port risk because they have repairs that they
24     want to conduct, and they're looking to save

37

1    money because there's a reduced premium because
2    the ex- -- the risk is not as great?
3  A.  That may be a reason that a vessel owner would
4    want to go on port risk.  That's not,
5    necessarily, a reason why an underwriter would
6    want to place that vessel on --
7  Q.  Okay.
8  A.  -- port risk.
9  Q.  Well, I'm talking about --
10  A.  Oh, I -- I'm telling you what the real world is
11    like though.
12  Q.  Please.  I'm speaking about what a vessel owner
13    might want to do.  And you understand -- I
14    think you've answered that you understand that
15    that, certainly, is something that vessel
16    owners might want?
17  A.  Yes.
18  Q.  If a vessel owner is working on a vessel tied
19    up at port risk, sometimes, vessel owners have
20    repairmen come aboard:  welders, things of that
21    nature.
22  A.  They do.
23  Q.  And, frequently, to save money, vessel owners
24    have the crew come aboard and do repairs

38

1    themselves?
2  A.  They will.  Yeah.
3  Q.  I mean, that's not --
4  A.  Not unusual.
5  Q.  -- unheard of?
6  A.  No.
7  Q.  Okay.
8       MR. PETTINGELL:  Just a second, please.
9       (Brief recess taken.)
10  BY MR. PETTINGELL:
11  Q.  You're here in response to the notice of
12    deposition duces tecum, and you're being
13    offered as NAS's designate with respect to
14    Paragraph 6.  One of the things it asks you to
15    bring with you to the deposition is "Any and
16    all writings of whatever kind or nature that
17    define the term 'port risk coverage' as same as
18    being relied upon by Plaintiff" -- that's
19    NAS -- "in its Complaint."  Have you brought
20    any documents with you?
21  A.  I haven't.
22       MR. PETTINGELL:  Mr. Langer, have you got
23    any documents?
24       MR. LANGER:  I'm not aware of any written

39

1    definitions of port risk that explain as -- as
2    defined by Mr. Scola --
3       MR. PETTINGELL:  Okay.
4       MR. LANGER:  -- in his answers to your
5    questions.
6  Q.  Are you aware of any such documents, sir?
7  A.  I'm not.
8  Q.  Okay.
9       MR. PETTINGELL:  I think, with that, I'm
10    going to pass the witness.  I told you we'd be
11    short.
12       MR. ABROMOVITZ:  Just one moment.
13           CROSS-EXAMINATION
14  BY MR. ABROMOVITZ:
15  Q.  Mr. Scola, I think you testified earlier in the
16    deposition that, once a request for an
17    endorsement or change to the insurance policy
18    came from the -- the insured -- in this case, a
19    vessel owner -- typically, what would happen
20    is, a letter would go out to the insured
21    confirming any communications regarding a
22    proposed change to coverage; is that correct?
23  A.  Yes.
24  Q.  Did one go out in this case to the Mary &

40

1    Josephine Corporation?
2  A.  I believe I saw one to that effect.  Yes.
3  Q.  And this would be an endorsement -- now, I'm
4    referring specifically to the policy year
5    August '03 to August '04.  Are you saying that
6    there was a letter that was -- went from your
7    office to the owners of the Mary & Jo- -- Mary
8    & Josephine Corporation sometime in that policy
9    period in connection with a requested change?
10  A.  I seem to recall -- and I'm su- -- we -- we
11    probably have one here in the room somewhere --
12    a letter that was sent by Lynn Houde in
13    October, on the day or the day after she spoke
14    with Matt Russo, regarding placing this vessel
15    on port risk from -- for a couple of different
16    time periods.
17       But I'm not -- I -- I can't be specific.
18    But I -- I think one went from May to August,
19    and the other went from August forward.  But
20    it's -- it's here somewhere, if you want to see
21    it.
22  Q.  Okay.  Have you seen anything in any of these
23    letters that indicate to the vessel owner, Mary
24    & Josephine Corporation, that when the vessel

William J. Scola
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-6    Filed 02/08/2006    Page 12 of 21

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

41

1    was put on port risk, there was no crew P&I
2    coverage, any words to that effect in the body
3    of any of these letters?
4 A. No. I don't recall seeing that there -- there
5    was no crew P&I coverage. The only wording I
6    remember is that it was -- it was requested to
7    be put on port risk.
8 Q. Prior to December 3rd, 2003, the date of Matt
9    Russo's accident, had you ever had any
10    conversations with him whatsoever?
11 A. Not that I can recall, no.
12 Q. Prior to December 3rd, 2003, had you ever had
13    any conversations with Sal Russo, Matt's
14    father?
15 A. Not that I can recall.
16 Q. Prior to December 3rd, 2003, had you had any
17    conversations with anybody on behalf of the
18    Mary & Josephine Corporation?
19 A. No, not -- I don't recall speaking with anyone
20    from that corporation.
21 Q. Would it be fair to say that prior to
22    December 3rd, 2003, you had no written
23    communication with anybody on behalf of the
24    Mary & Josephine Corporation, you, yourself?

42

1 A. Not to my knowledge, Mr. Abromovitz. I mean,
2    it -- it's possible. I don't recall everything
3    that took place. But I don't remember this, if
4    there was anything.
5 Q. Do you remember any exchange of e-mails between
6    you and anybody on behalf of the Mary &
7    Josephine Corporation prior to December 3rd --
8    December -- December 3rd, 2003?
9 A. No. I -- I don't remember communicating with
10    anyone from Mary & Josephine Corporation.
11 Q. Prior to December 3rd, 2003, did you have any
12    communication with anybody from the Russo
13    family concerning vessels other than the
14    fishing vessel Mary & Josephine?
15 A. I believe I -- I had conversations with either
16    Matt's brother or cousin -- I'm not sure who it
17    was -- about a different vessel altogether that
18    wasn't part of that corporation.
19 Q. Okay.
20 A. Yeah.
21 Q. That was owned by somebody in the Russo family?
22 A. Someone else. Yes.
23 Q. Do you remember the essence of any of these
24    conversations?

43

1 A. We had insurance on another vessel.
2 Q. At any point in time, in connection with
3    conversations with anyone else from the Russo
4    family relative to vessels other than the Mary
5    & Josephine, did you ever communicate to any of
6    these other persons your understanding of what
7    a vessel being on port risk did to the
8    existence of crew P&I coverage?
9 A. If anyone put a vessel on port risk, anyone --
10    either in this family or outside of this
11    family -- and they asked me to put a vessel on
12    port risk, I would have explained the situation
13    to them at the time as to what it was.
14 Q. Were any of the other Russo vessels -- strike
15    that. Were any of the other vessels owned or
16    operated by the Russo family ever put on port
17    risk other than the fishing vessel Mary &
18    Josephine?
19 A. I'm sorry. I don't -- I don't know. Maybe.
20    Maybe not. I just don't know.
21 Q. Do you have any recollection prior to
22    December 3rd, 2003, in connection with any
23    vessel owned or operated by a member of the
24    Russo family, of advising somebody in writing

44

1    that if the vessel went on port risk, there was
2    no crew P&I coverage?
3 A. I have no recollection of that.
4 Q. Does your office maintain separate files from
5    the -- for the vessels insured by -- through
6    OMI other than the fishing vessel Mary &
7    Josephine?
8 A. I -- I'm not sure I understand the question.
9    But I think I -- I know where you're getting
10    at. We maintain a separate file for each
11    vessel that is insured by us.
12 Q. Have you had occasion prior to today of looking
13    in the other files -- this is for vessels owned
14    or operated by the Russo family other than the
15    Mary & Josephine -- to determine if there's any
16    correspondence in there to anybody from the
17    Mary & Joseph- -- anybody from the Russo
18    family, informing them that if a vessel's on
19    port risk coverage, there is no P&I crew
20    coverage?
21 A. I did not have occasion to look.
22 Q. And if either of those vessels -- I'm going to
23    ask you to assume there were two other vessels
24    that were operated by a member of the Russo

William J. Scola
September 13, 2005

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

---

**45**

1    family prior to December 2nd, 2003 -- if those
2    vessels were ever on port risk -- placed on
3    port risk, the documentation in connection with
4    placing the vessel on port risk would be in
5    those respective files?
6    A. It should be.
7    Q. Thank you. In connection with the last page of
8       Exhibit 7, the port risk endorsement signed by
9       Mr. Ostrow --
10   A. Uh-huh. Yes.
11   Q. -- do you know if, at that time -- this is as
12      of February '04 -- there was anything in
13      writing concerning OMI's arrangement with
14      Sunderland or NAS that granted Mr. Ostrow
15      authority to sign as their authorized
16      representative?
17   A. I believe your question asks me if there was
18      anything in writing?
19   Q. Yeah.
20   A. I don't think so.
21   Q. Okay. What is your understanding presently as
22      to the relationship between Sunderland and
23      North American Specialties, Sunderland Marine
24      and North American Specialties?

---

**46**

1    A. North American Specialty has some type of an
2       arrangement, to -- to my knowledge, within the
3       state of Massachusetts. That's the only state
4       that I know of. There may be others -- because
5       I don't do business all over the United States
6       with Sunderland -- where policies are issued
7       using the name of North American Specialty.
8          To the extent of how that o- -- how that
9       operates, I really don't understand it or have
10      any knowledge of -- of the business arrangement
11      or the intricacies or even, actually, why that
12      is. I assume it's for some legal reason that
13      Sunderland does this.
14   Q. Does OMI have a direct relationship with North
15      American Specialties?
16   A. We do have to communicate with North American
17      Specialties as far as having things approved,
18      certain things that they need to see ahead of
19      time. I believe they get copied on things that
20      we send Sunderland.
21   Q. And I think you said very early in your
22      testimony today that the arrangement that OMI
23      has is -- pursuant to this written arrangement
24      with Sunderland is, you have the right or

---

**47**

1    the -- how did you express it -- the
2    opportunity to present business to Sunderland?
3    A. That's right.
4    Q. Okay. When you present business to Sunderland
5       with reference to a vessel operating under
6       Massachusetts, is it your understanding that
7       you're also presenting a business opportunity
8       to North American Specialties?
9    A. I -- I don't know what their arrangement is.
10   Q. When you present a business opportunity to
11      insure a commercial fishing vessel to
12      Sunderland at present, if Sunderland accepts
13      the opportunity, do they always write the risk
14      through North American Specialties?
15   A. Within the state of Massachusetts.
16   Q. And who does Sunderland use through vessels
17      operating out of Rhode Island?
18   A. They -- they use themselves.
19   Q. They have their own company, Sunderland Marine?
20   A. Sunderland Marine.
21   Q. Okay.
22   A. Yes.
23   Q. I don't mean to beat this to death. But I
24      understand from your testimony that you cannot

---

**48**

1    refer to any written materials from any source
2    that supports your understanding that when a
3    vessel is placed on port risk, there is no crew
4    P&I coverage. Correct?
5    A. You know, I probably didn't exhaust every
6       avenue to see -- to -- to read everything
7       that's out there on that. Nothing comes to
8       mind in writing. As I said in my testimony,
9       it's, pretty much, common knowledge that a --
10      an underwriter who accepts port risk just
11      naturally knows that he's not accepting crew
12      coverage with that.
13   Q. Common knowledge among whom?
14   A. Common knowledge among underwriters, common
15      knowledge among claim people, common knowledge
16      among agents and brokers, common knowledge
17      among fishermen who own vessels who place them
18      on port risk.
19   Q. But you, yourself, prior to December 2nd or
20      December 3rd, 19- -- strike that. You
21      yourself, prior to December 3rd, 2003, have no
22      personal knowledge of what Matt Russo
23      understood the insurance situation would be as
24      of that date, do you, sir? You never spoke to

---

William J. Scola
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-6    Filed 02/08/2006    Page 14 of 21

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

49

```
1        him?
2   A.   I never spoke with him.  So I guess I don't
3        have knowledge.  But I -- certainly, be -- in
4        preparation for this, I looked through the file
5        to see what his -- as a client, you know, what
6        he did with his account.  And it was on-and-off
7        port risk without crew many occasions and --
8        and on with -- with one crew on another
9        occasion.  So I assume that someone with that
10       much experience knows what's going on.  I could
11       be wrong, but I just have to assume that.
12  Q.   Is it fair to say that, prior to the port risk
13       endorsement of February 16th, 2004 to Exhibit
14       No. 7, the policy at issue in this case --
15  A.   I'm with you.  Yeah.
16  Q.   -- there was no written endorsement in the file
17       as of December 3rd, 2003?
18  A.   There was no written endorsement with respect
19       to port risk --
20  Q.   Yes.
21  A.   -- for that policy -- Policy Year 3.
22  Q.   Yes.
23  A.   That's correct.
24  Q.   Okay.  So let me just make sure this -- we got
```

50

```
1        this clear on the record.
2   A.   Yeah.
3   Q.   You agree with me, do you not, sir, that prior
4        to Matt Russo's accident December 3rd, 2003,
5        there was no written endorsement put -- placing
6        this vessel on port risk that was part and
7        parcel to the insurance policy at issue in this
8        case?  Do you agree with that, sir?
9   A.   I agree.  And I -- I also extend that there was
10       a letter that was sent to him, showing that he
11       asked to have it placed on port risk.
12  Q.   There was --
13  A.   And that is --
14  Q.   -- a letter that --
15  A.   That was in the file.
16  Q.   -- that went out from Ms. Houde?
17  A.   That's correct.
18  Q.   Well, we'll chat with her about that.
19           MR. PETTINGELL:  Well, off the record for a
20       second.
21           (A brief discussion was held off the
22           record.)
23           (Letter to Matt Russo from Lynanne Houde
24           dated 10/3/03 marked as Scola Exhibit
```

51

```
1            No. 8.)
2            (Letter to Matt Russo from Lynanne Houde
3            dated 12/18/02 marked as Scola Exhibit
4            No. 9.)
5   Q.   Mr. Scola, with reference to Exhibit No. 8,
6        which is Ms. Houde's letter of October 3rd,
7        2003, is that the letter that you referred
8        to --
9   A.   Yes.
10  Q.   Let me get it out, please.
11  A.   Oh, I'm sorry.
12  Q.   Is that the letter that you were making
13       reference to when you indicated that you
14       believe you saw, in the file, a letter going to
15       Mr. Russo confirming his request that the
16       policy -- that the vessel be placed back on
17       port risk coverage and the policy amended?
18  A.   Yes.
19  Q.   Okay.  And then, I understand from Mr. Langer's
20       testimony that, sometime after December 2- --
21       or as Mr. Langer's off-the-record statement
22       that, sometime after December 12th, 2003, the
23       date the vessel -- the vessel again became
24       operational was handwritten in on Exhibit
```

52

```
1        No. 8, 12/21/03?
2   A.   Yes.  It must have been handwritten in 12/21 or
3        after.
4            MR. ABROMOVITZ:  Okay.  Thank you.  That's
5        all I have.
6                    REDIRECT EXAMINATION
7   BY MR. PETTINGELL:
8   Q.   Just a few more, Mr. Scola.
9            MR. PETTINGELL:  Oh, I'm sorry, Len, unless
10       you want to go first, whatever your pleasure
11       is.
12           MR. LANGER:  I have -- I have no questions.
13       I'm beginning to feel a little like a ping-pong
14       ball between the -- the two defendants.  But
15       I'll reserve my comments until --
16           MR. PETTINGELL:  Okay.  Well, it might make
17       sense to go at the end, if you wish.
18  Q.   But, anyway, coming back to Exhibit 9 -- I'm
19       sorry -- Exhibit 8 --
20           MR. PETTINGELL:  Oh.  Something's wrong
21       here.  Oh, I see what I did.
22  Q.   -- this is the only writing that you are aware
23       of running from OMI to Mary & Josephine Corp.
24       that references, I guess, by extension, that
```

53

1    there's no crew warranty because it says the
2    vessel's going on port risk?
3  A. That, and another letter that went out after
4    that as a reminder that was --
5  Q. All right.
6  A. -- the same letter again. Yeah.
7  Q. Okay. And other than the fact that it states
8    that the vessel's on port risk, it, certainly,
9    doesn't contain any language, express language,
10    saying, and there's no crew P&I coverage?
11        MR. LANGER: Objection. The document
12    speaks for itself.
13  A. It doesn't say that -- the words you used.
14  Q. And you're unaware of any writing to Mary &
15    Josephine Corp. that does state in clear and
16    concise language that, during the period the
17    vessel is on port risk, there will be no crew
18    P&I coverage?
19  A. I'm unaware of anything in writing. Correct.
20  Q. All right. And I think you said it's your
21    understanding that that's common knowledge?
22  A. I did say that.
23  Q. But you'll also agree you have no knowledge of
24    what Mr. Russo's understanding of insurance is?

54

1  A. I don't believe that's what I said.
2  Q. Well, I'm asking you.
3  A. We --
4  Q. Do you, sir, know what Mr. Russo's knowledge of
5    the coverage available under port risk
6    insurance policies was at the time that
7    Exhibit 8 was sent out?
8  A. I never spoke with him about it. So I really
9    shouldn't say anything. I'm only reflecting
10    upon what I see he has done with his insurance
11    coverage by going on port risk without crew,
12    with crew over quite a few -- probably more
13    than any client I know in that short a period
14    of time.
15  Q. Mr. Russo would tie his boat up and reduce the
16    size of the crew on the --
17  A. Eliminate the crew.
18  Q. -- on the vessel during --
19  A. Eliminate the crew.
20  Q. -- the period -- we have to talk one at a time.
21  A. I'm sorry.
22  Q. -- would reduce the size of the crew during the
23    period that the vessel was tied up?
24  A. Yes.

55

1  Q. And it's your recollection that, at times, he
2    reduced it to zero?
3  A. Yes.
4  Q. Do you know what policy year he did that in,
5    sir, reduced it to zero?
6  A. I -- I cannot remember. I mean, I could look
7    it up with some research. I could tell you.
8  Q. Are you certain that he ever re- -- that --
9    that he reduced it to zero for any of the
10    policies?
11  A. To answer accurately, he was given port risk
12    credits with zero crew coverage at times and,
13    at other times, with crew coverage.
14  Q. Other times, he reduced it to less than full
15    crew coverage?
16  A. I don't know if he did, or it was suggested by
17    Mr. McVey. I'm not sure how that worked.
18  Q. Well, ultimately, the scope of the coverage
19    that Mr. Russo or Mary & Josephine Corporation
20    was requesting was for them to decide, wasn't
21    it?
22        MR. LANGER: Can you repeat that question?
23        THE WITNESS: Could you read that one to me
24    again?

56

1  Q. Ultimately --
2  A. Yeah.
3  Q. -- the scope of coverage that Mary and
4    Josephine Corporation was requesting was for
5    them to decide, wasn't it?
6  A. Was for Mary & Josephine to decide.
7  Q. Yes.
8  A. It was their decision.
9  Q. Right.
10  A. Yes.
11  Q. The fact that somebody suggested that you might
12    want to keep one man on didn't mean they had to
13    follow that advice?
14  A. They did not.
15  Q. Okay. And other than the fact that Mary &
16    Josephine Corporation appeared to have a habit
17    of putting their vessel on port risk and making
18    changes in the size of the crew, you don't have
19    any knowledge of what Mr. Russo's awareness of
20    the scope of coverage available under port risk
21    was, do you?
22  A. You know, I -- I don't know how you can say
23    that af- -- after seeing what was done with his
24    policy by him.

William J. Scola        North American Specialty Insurance Company
September 13, 2005        vs. Mary & Josephine Corp., et al.

Case 1:04-cv-10374-WGY        Document 27-6        Filed 02/08/2006        Page 16 of 21

57

```
 1   Q.  Well --
 2   A.  I -- I have to assume that what he -- he is
 3       doing, he's doing with his knowledge of why
 4       he's doing it.  If he -- you know, if he was
 5       doing it strictly at random each time he did
 6       it, I just can't believe that.
 7   Q.  I think Mr. McVey testified that it was his
 8       impression that changes made by Mr. Russo on --
 9       or was requesting on behalf of his corporation
10       were to save money.
11   A.  He did testify to that.  Yes.
12   Q.  All right.  And based upon your review of the
13       files, Mary & Josephine Corporation was
14       receiving return premiums --
15   A.  It was.
16   Q.  -- during the period that the vessel was on
17       port risk?
18   A.  Yes.
19   Q.  So if, in fact, Mr. Russo was trying to save
20       money for his corporation by placing the vessel
21       on port risk, it would appear he was
22       successful?
23   A.  It would appear.
24   Q.  All right.  But anywhere in the files
```

58

```
 1       pertaining to the three policies of insurance
 2       issued to Mary & Josephine Corporation, is
 3       there anything in writing to the effect that,
 4       during the period the policy was -- the vessel
 5       is on port risk, there is no coverage for crew
 6       P&I?  Does that appear anywhere?
 7           MR. LANGER:  Objection.  It's been asked
 8       and answered.  Go ahead.
 9   A.  I've answered that question in relation to
10       Policy No. 3.
11   Q.  Okay.
12   A.  I -- I'm not sure about Policy 1 and 2.  I just
13       haven't memorized everything that's in there.
14   Q.  Do you regard yourself as an expert in
15       insurance, sir?
16   A.  No.
17   Q.  Do you regard yourself as an expert on the
18       scope of coverage available under a port risk
19       cover?
20   A.  I don't regard myself as an expert.  No.  I
21       don't teach marine insurance.
22   Q.  All right.  You're aware -- well, you have your
23       understanding of the scope of such coverage --
24   A.  Yes.  Yeah.
```

59

```
 1   Q.  -- based upon your 20 years' practical
 2       experience in the industry?
 3   A.  Yeah.
 4   Q.  And if we're -- isn't it true you don't know,
 5       as you sit here today, what scope of knowledge
 6       Mr. Russo had back in 200- -- August of -- or
 7       October of 2003 with respect to the scope of
 8       coverage available under a port risk --
 9           MR. LANGER:  Objection.
10   Q.  -- cover?
11           MR. LANGER:  Objection.  It's been asked
12       and answered now three times.  He's explained
13       each time what his answer was and why he
14       believed that.
15           MR. PETTINGELL:  You've objected.  Will you
16       please stop interrupting?
17           MR. LANGER:  I -- I'm going to interrupt,
18       Dick, because you ask him the same question
19       again and again.  He gives you the same answer
20       again.
21           MR. PETTINGELL:  Well --
22           MR. LANGER:  And then you ask the same
23       question.
24           MR. PETTINGELL:  Humor me.
```

60

```
 1           MR. LANGER:  I'm not going to humor you
 2       much longer 'cause, you know, we have one more
 3       witness to do.
 4           MR. PETTINGELL:  I'm aware of that.
 5           MR. LANGER:  And you're asking the same
 6       question again and again.
 7   Q.  And I'd like an answer.
 8   A.  I believe, from what Mr. Russo requested us to
 9       do or requested Mr. McVey to do on different
10       occasions, that he was aware of the coverage or
11       the lack of coverage that he had when he was
12       doing it.  That is my answer.
13   Q.  Okay.  So based upon the fact that he was
14       making those changes, you're making an
15       assumption as to the scope of his knowledge?
16   A.  I'm making an assumption.  I did not speak to
17       him directly.
18   Q.  Okay.  Fair enough.  And, in Exhibit 8, we have
19       the written confirmation going out to Mary &
20       Josephine Corp. that the vessel's going on port
21       risk.  And, from that assumption as to Mr. Russo's knowledge, you
22       risk.  And, from your assumption as to Mr. Russo's knowledge, you
23       infer that he should have known that there was
24       no crew P&I cover?
```

William J. Scola
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-6    Filed 02/08/2006    Page 17 of 21

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

61

1  A.  Yes.
2  Q.  I'd like to show you another document, which
3      has previously been marked as Exhibit 9.  Do
4      you have that in front of you, sir?
5  A.  I have that right here.
6  Q.  Why don't you take a moment and read it.
7  A.  Okay.
8          (Pause.)
9  A.  Yeah.
10 Q.  Have you had a chance to read it?
11 A.  Yeah.
12 Q.  And would you agree that this is a letter dated
13     December 18, 2002 which pertains to Policy
14     No. 2, the prior policy?
15 A.  Yeah.  Yeah.
16 Q.  Yes?
17 A.  Yes.
18 Q.  Okay.  And Exhibit 9 is a letter from Ms. Houde
19     to Mr. Russo at Mary & Josephine Corp.
20     explaining changes to the policy?
21 A.  Yes.
22 Q.  And that letter pertains to the vessel going on
23     port risk?
24 A.  Yes.

62

1  Q.  And that letter also pertains to a change in
2      the size of the crew for which there is P&I
3      coverage under the policy while it's on port
4      risk?
5  A.  Yes.
6  Q.  And reading the first sentence of the letter,
7      starting after the words, "Dear Matt," it says,
8      "Enclosed you will find an endorsement to
9      Marine policy number DMM00003-00 (sic), which
10     amends the policy to Port Risk and deletes all
11     but one man from P&I effective December 9, 2002
12     to the expiration date of August 13, 2003."
13         Would you agree, Mr. Scola, that that
14     language makes it very clear that the boat is
15     going on port risk and that there's coverage
16     for only one man under crew P&I?
17         MR. LANGER:  Objection.  The document
18     speaks for itself.
19 A.  It makes it clear.
20 Q.  Very clear?
21         MR. LANGER:  Objection.
22 Q.  Clear is fine.  I won't force you to accept my
23     qualification of the word "clear."  Makes it
24     clear.  Wouldn't it have been possible at the

63

1      time the letter, Exhibit 8, was written to have
2      put in similar language, saying something to
3      the effect, that deletes all crew P&I
4      coverage --
5          MR. LANGER:  Objection.
6  Q.  -- to make it clear with respect to the changes
7      that occurred on Policy 3?
8          MR. LANGER:  Objection to the form of the
9      question.
10 A.  That -- that would have made it clear with
11     respect to the crew coverage.  But why would
12     you single out the crew coverage under port
13     risk as opposed to all those other things that
14     also change once a vessel goes under port risk?
15         I mean, the letter could go on and on.  The
16     reason that -- the reason that -- my belief,
17     the reason Exhibit 9 says that it has one
18     crewman is because it's an odd situation to
19     have the one crewman on a port risk policy
20     when, normally, there aren't any covered
21     crewmen.
22 Q.  So, in effect, so long as the insured is aware
23     if as- -- if one assumes your interpretation of
24     the scope of coverage under the port risk

64

1      policy is correct that there is no coverage
2      afforded crew for P&I if a vessel is on port
3      risk, if one assumes (A) that that is correct
4      and further assumes that that is known by the
5      insured, it's not necessary.  Is that what
6      you're saying?
7  A.  It's not necessary to -- say there are no
8      crew covered.
9  Q.  Okay.  Okay.  I'd like you to look at
10     Exhibit 3, please.
11 A.  Exhibit 3 is the endorsement?  Is that --
12 Q.  No.  Exhibit 3, the one that's got the
13     handwriting on it, it's a letter --
14 A.  Yeah.
15 Q.  -- correspondence dated December 8th, 2003 from
16     Craig McBurnie to Bob McVey.
17 A.  Yeah.
18 Q.  Do you recognize the handwriting --
19 A.  No.
20 Q.  -- "Per Bill"?
21 A.  I don't recognize the handwriting.  I probably
22     should, but I don't.
23 Q.  I don't even recognize my own half the time.
24     That's not your handwriting?

William J. Scola
September 13, 2005

Case 1:04-cv-10374-WGY   Document 27-6   Filed 02/08/2008   Page 18 of 21

North American Specialty Insurance Company
vs. Mary & Josephine Corp., et al.

65

```
 1  A.  No.  It is not.  I'm just -- I -- I don't
 2      recognize the handwriting.  I don't.
 3  Q.  That's fine.
 4  A.  I am trying to, but I don't.
 5  Q.  I haven't put the next question to you.
 6  A.  Yeah.
 7  Q.  "Per Bill, recs" -- recommends -- "getting
 8      legal viewpoint Bob Murphy."  Now, that's my
 9      interpretation.  You don't have to accept that
10      as a correct interpretation of that language.
11      But it brings up a question.  Did you ever see
12      a copy of Exhibit 3 with or without the
13      handwriting on it prior to today or -- hold the
14      end of that -- sometime around December of 2003
15      when, apparently, it was sent to Mr. McVey?
16  A.  Can I read it a little more thoroughly?
17      'Cause --
18  Q.  Oh, yes.
19  A.  Yeah.
20      MR. ABROMOVITZ:  Take a two-minute break.
21      I'll be right back.
22      (Brief recess taken.)
23      BY MR. PETTINGELL:
24  Q.  Mr. Scola, I believe I had asked whether you
```

66

```
 1      recall ever seeing a copy of what's been marked
 2      as Exhibit 3 at any time from December of 2003
 3      up until August of 200- -- December 2003 after
 4      it was sent.
 5      MR. LANGER:  Is that your question?
 6  Q.  Yes.
 7  A.  Yeah.  I -- I think I probably did see this.
 8  Q.  And do you recall any discussions after you saw
 9      this about the advisability of getting a legal
10      viewpoint from Bob Murphy?
11  A.  I don't.
12  Q.  Do you know who Bob Murphy is?
13  A.  I do.  Yeah.
14  Q.  Who's Bob Murphy?
15  A.  He's an attorney, one of probably several Bob
16      Murphys.  The one I know --
17      MR. LANGER:  In the greater Boston area.
18  A.  Well, the one I know is an attorney.  It's --
19  Q.  Holbrook & Murphy?
20  A.  Yes.
21  Q.  And that's a law firm that OMI occasionally
22      does business with on occasion?
23  A.  Yeah.
24  Q.  Okay.
```

67

```
 1  A.  Yeah.
 2  Q.  Are you aware, Mr. Scola, whether or not a
 3      legal viewpoint was obtained from Holbrook &
 4      Murphy?
 5  A.  I'm not.
 6  Q.  Are you aware of whether or not a legal opinion
 7      was obtained from any law firm as to the scope
 8      of coverage available under a port risk policy
 9      under the circumstances of this case?
10      MR. LANGER:  I'm going to -- as to whether
11      one was -- if he's aware if one was received,
12      I'm going to, certainly, instruct him not to
13      answer any further questions about what that
14      content was.
15      MR. PETTINGELL:  That's a fair instruction.
16      We may go around about that.  But, at the
17      moment, my question is whether he's aware of
18      whether or not a legal opinion was obtained.
19      And I'm entitled to that.
20  A.  I'm not aware if one was obtained.
21  Q.  Who would know at OMI?
22  A.  I don't know if -- I don't know if anyone at
23      OMI would know.
24  Q.  Whether or not one was --
```

68

```
 1  A.  One --
 2  Q.  -- obtained?
 3  A.  -- was obtained.  Yeah.
 4  Q.  If a determination was made by Sunderland to
 5      get a legal opinion on an issue, would they
 6      generally hire a law firm directly?  Or would
 7      they go through OMI and have OMI assist in
 8      hiring a law firm for them?
 9  A.  They're pretty strict about going directly.
10  Q.  Okay.  And you don't know whether one was
11      obtained?
12  A.  I don't.
13      MR. PETTINGELL:  Okay.  Well, we can't beat
14      that one to death anymore.  That concludes my
15      questions.
16      MR. LANGER:  I'm done.  I have no
17      questions.
18      MR. ABROMOVITZ:  Nothing further.
19      (Whereupon the deposition was concluded at
20      3:31 p.m.)
21                    *****
22
23
24
```

William J. Scola
September 13, 2005

Case 1:04-cv-10374-WGY    Document 27-6    North American Specialty Insurance Company
                                           vs. Mary & Josephine Corp., et al.

Filed 02/08/2006    Page 19 of 21

69

```
 1                    SIGNATURE PAGE
 2
 3
 4       I, WILLIAM J. SCOLA, do hereby certify that
 5   I have read the foregoing transcript of my
 6   testimony, and I further certify that said
 7   transcript is a true and accurate record of
 8   said testimony.
 9       Dated at _____, this ____
10   day of _____, 2005.
11
12
13
                      _____
                      WILLIAM J. SCOLA
14
15
16
17
18
19
20
21
22
23
24
```

71

```
 1                     ERRATA SHEET
 2    CHANGES TO THE DEPOSITION OF WILLIAM J. SCOLA
 3    INSTRUCTIONS TO WITNESS:  1) Please note any
      desired corrections to your testimony by page
 4    and line number.  2) Enter text as it appears
      in the transcript.  3) Enter text as it should
 5    appear.
 6    PAGE     LINE         CORRECTION
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
```

70

```
 1                  C E R T I F I C A T E
 2   COMMONWEALTH OF MASSACHUSETTS
     COUNTY OF NORFOLK, ss.
 3
 4       I, Jo Anne M. Shields, a Professional
 5   Shorthand Reporter and Notary Public in and for
 6   the Commonwealth of Massachusetts, do hereby
 7   certify that WILLIAM J. SCOLA, the witness
 8   whose deposition is hereinbefore set forth, was
 9   duly sworn by me and that such deposition is a
10   true and accurate record, to the best of my
11   knowledge, skills and ability, of the testimony
12   given by such witness.
13       I further certify that I am not
14   related to any of the parties in this matter by
15   blood or marriage and that I am in no way
16   interested in the outcome of this matter.
17       IN WITNESS WHEREOF, I have hereunto set
18   my hand and affixed my seal of office this 21st
19   day of September, 2005.
20
21                    _____
                      Notary Public
22
```





SCOLA

EXHIBIT NO. 8

9/13/05          J.M. SHIELDS

October 3, 2003

Mr. Matt Russo
Mary & Josephine Corp.
279 Western Avenue
Gloucester, MA 01930

RE:  F/V Mary & Josephine

Dear Matt:

Per our telephone conversation today, I notified Underwriters that the F/V Mary
& Josephine has not been fishing since May 1, 2003 and will not fish until
November, 2003. I am trying to get another Port Risk approved to your expired
policy for the period May 1, 2003 to August 12, 2003. The new effective date for
the next Port Risk credit is August 13, 2003. Once the vessel begins fishing
again, please fill in the date below and mail this letter back to me in the
enclosed envelope.

Date the F/V Mary & Josephine was tied up: __August 13, 2003__

Date the F/V Mary & Josephine began fishing: __1-21-03__
                                                  __per R city__

_____          _____
        Matt Russo                 Date

If you have any questions, please do not hesitate to call.

Sincerely,

Lynanne Houde

lh

enclosure



11-25-03

**Ocean Marine Insurance Agency, Inc.**

334 Knight Street  Unit 134  Warwick, Rhode Island  02886-1283



SCOLA
EXHIBIT NO. 9
9/13/05    J.M. SHIELDS

December 18, 2002


Mr. Matt Russo
Mary & Josephine Corp.
279 Western Avenue
Gloucester, MA 01930

Re: F/V Mary & Josephine

Dear Matt:

Enclosed you will find an Endorsement to Marine policy number DMM0000003-00 which amends the policy to Port Risk and deletes all but one man from P&I effective December 9, 2002 to the expiration date of August 13, 2003. Please keep this Endorsement with the policy covering the period August 13, 2002 to August 13, 2003. The original Endorsement has been sent to First Pioneer Farm Credit.

Also enclosed is an invoice showing a return premium of $6,925. Mid February, 2003 we will mail this credit to First Insurance Funding Corp. They will apply this credit to your account and amend the remaining installments accordingly.

REMINDER: Please give me a call when the vessel is ready to go fishing as I need to add the men back on.

If you have any questions, please do not hesitate to call.

Sincerely,

Lynanne Houde

lh

CC: First Pioneer Farm
Credit
P. O. Box 720
Middletown, MA 02346